**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 17-5259**

# United States Court of Appeals
# for the District of Columbia Circuit

RHEA LANA, INC. AND RHEA LANA'S FRANCHISE SYSTEMS, INC.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF LABOR
*Defendant-Appellee.*

_____

*On Appeal from the United States District Court for the District of Columbia
Case No.* 1:14:cv-00017 *(Hon. Christopher J. Cooper)*

## JOINT APPENDIX

| | |
|---|---|
| Julie A. Smith | Sydney A. Foster |
| Joshua N. Schopf | Mark B. Stern |
| John E. McGlothlin | U.S. DEPARTMENT OF JUSTICE |
| CAUSE OF ACTION INSTITUTE | CIVIL DIVISION, APPELLATE STAFF |
| 1875 Eye Street, NW, Suite 800 | 950 Pennsylvania Avenue, NW |
| Washington, DC  20006 | Washington, DC 20530-0001 |
| (202) 499-4232 | (202) 514-2000 |
| | |
| *Counsel for Appellants* | *Counsel for Appellee* |

February 16, 2018

## Joint Appendix Table of Contents

Page

Civil Docket Sheet (ECF No. 69) .......................................................... 001

Complaint (ECF No. 1) ....................................................................... 015

Answer (ECF No. 33) .......................................................................... 025

Order Partially Granting Leave to Supplement the Record

(ECF No. 45) ................................................................................ 033

Order Denying Leave to Supplement the Record

(ECF No. 48) ................................................................................ 037

Transcript of Hearing on Motion to Dismiss

(ECF No. 23) ................................................................................ 038

Transcript of Hearing on Motion for Summary Judgment

(ECF No. 65) ................................................................................ 042

Order Granting and Denying Summary Judgment

(ECF No. 66) ................................................................................ 081

Memorandum Opinion on Summary Judgment

(ECF No. 67) ................................................................................ 082

Notice of Appeal (ECF No. 68) ........................................................... 098

Declaration of Robert A. Darling (ECF No. 37-2) .............................. 099

Declaration of David Riner (ECF No. 54-1) ........................................ 103

Notice of Filing and Certified Index of Administrative Record

(ECF No. 37, 37-1) ....................................................................... 108

Notice of Filing and Certified Supplemental Index of Administrative Record

(ECF No. 49, 49-1) ....................................................................... 116

i

Materials from the Administrative Record (from ECF 62-1):

Establishment Information ........................................................... 120

Employee Interviews ................................................................. 122

Initial Conference Guide Notes .................................................. 175

DOL Wage and Hour Visit Letter .............................................. 180

June 12, 2013 Letter from C. Tad Bohannon to Tamara Haynes............... 186

May 28, 2013 Letter from C. Tad Bohannon to Robert Darling................ 190

April 17, 2013 Email from Dave Riner to DOL........................................ 192

March 25, 2013 Letter from Rhea Lana, Inc. to Tamara Haynes............... 193

Audit of Employees of Rhea Lana, Inc. .................................................. 196

March 19, 2013 Letter from Tamara Haynes to Rhea Lana Riner............. 201

PowerPoint on "Modern Childrens Consignment Events" ........................ 202

March 4, 2013 Email Between Robert Darling and Tamara Hynes
(forwarding email between Rhea Lana Riner and Darling). ...................... 215

February 28, 2013 Letter from C. Tad Bohannon to Robert Darling......... 217

Correspondence Between Rhea Lana and DOL WHD .............................. 221

Manager Time Sheets .......................................................................... 228

Volunteer Forms ................................................................................. 241

Conference Notes (WHD meeting with Rhea Lana, Inc.)......................... 251

May 20, 2013 Final Conference Memorandum ....................................... 257

January 19, 2012 Arkansas Consent Agreement...................................... 263

July 2011 Emails between Arkansas DOL and Rhea Lana's...................... 267

July 2011 Emails from Rhea Lana Riner to Consignors ........................... 271

Shift/Volunteer Management (July 2011)............................................... 274

July 2011 Email from Rhea Lana Riner Seeking Volunteers ................... 283

Rhea Lana's Early Worker Pass ................................................................. 285

"Bartering Agreement" Statement ............................................................. 286

September 3, 2011 Email from Rhea Lana to Consignors ......................... 287

DOL Case Diary Entries ............................................................................. 288

May 24, 2013 Letter from Robert Darling to Congressmen Tim Griffin .. 293

July 22, 2013 Memo from Robert Darling to Nadia De La Rosa .............. 295

June 20, 2013 WHISARD Compliance Action Report .............................. 297

June 18, 2013 Case Narrative ..................................................................... 299

August 26, 2013 Final Determination Letter ............................................. 311

February 15, 2013 Letter from Congressman Griffin to

Secretary Hilda Solis  ................................................................................. 312

July 18, 2013 Letter from Congressmen Griffin et al. to

Mary B. Maxwell  ....................................................................................... 314

August 6, 2013 Letter from Robert Darling to Whom It May Concern ..... 316

August 30, 2013 Letter from Laura Fortman to Congressmen Griffin ...... 317

APPEAL,CLOSED,TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:14−cv−00017−CRC
### *Internal Use Only*

RHEA LANA, INC., et al v. DEPARTMENT OF LABOR
Assigned to: Judge Christopher R. Cooper
Case in other court:  USCA, 15−05014
Cause: 05:551 Administrative Procedure Act

Date Filed: 01/06/2014
Date Terminated: 09/26/2017
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

**RHEA LANA, INC.**                    represented by   **Erica L. Marshall**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 803−6068
Fax: (202) 330−5842
Email: erica.marshall@causeofaction.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Nathaniel Schopf**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 499−4232
Fax: (202) 330−5842
Email: josh.schopf@causeofaction.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie A. Smith**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 499−4232
Fax: (202) 330−5842
Email: julie.smith@causeofaction.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Joseph Massari**

1

**– App. 001 –**

CAUSE OF ACTION INSTITUTE
1875 I Street, NW
Suite 800
Washington, DC 20006
(202) 499−4232
Fax: 202−330−5842
Email: patrick.massari@causeofaction.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aram A. Gavoor**
U.S. DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 868
Washington, DC 20044
(202) 616−4863
Fax: (202) 305−7000
Email: aram.gavoor@usdoj.gov
*TERMINATED: 05/05/2016*

**Daniel Zachary Epstein**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 499−4232
Fax: (202) 330−5842
Email: Daniel.Epstein@causeofaction.org
*TERMINATED: 02/03/2017*

**Lorinda B. Harris**
ELFVIN, KLINGSHIRN, ROYER &
TORCH, LLC
4700 Rockside Road
Suite 530
Independence, OH 44131
(202) 400−2723
Email: lorinda.harris@causeofaction.org
*TERMINATED: 02/03/2017*
*ATTORNEY TO BE NOTICED*

**Prashant Kumar Khetan**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 499−4232
Fax: (202) 350−4944
Email: prashant.khetan@causeofaction.org
*TERMINATED: 02/03/2017*

**Reed D. Rubinstein**

2

**– App. 002 –**

DINSMORE & SHOHL LLP
801 Pennsylvania Avenue, NW
Suite 610
Washington, DC 20004
(202) 372−9120
Fax: (202) 372−9141
Email: reed.rubinstein@dinsmore.com
*TERMINATED: 02/03/2017*

**Robyn N. Burrows**
WATT, TIEDER, HOFFAR &
FITZGERALD, LLP
1765 Greensboro Station Place
Suite 1000
McLean, VA 22102
(703) 749−1044
Fax: 703−893−8029
Email: rburrows@watttieder.com
*TERMINATED: 10/01/2014*
*PRO HAC VICE*

**Stephen S. Schwartz**
CAUSE OF ACTION INSTITUTE
1875 Eye Street, NW
Suite 800
Washington, DC 20006
(202) 499−2421
Email: sschwartz@schaerr−duncan.com
*TERMINATED: 02/03/2017*

**Plaintiff**

**RHEA LANA'S FRANCHISE SYSTEMS, INC.**            represented by   **Erica L. Marshall**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Nathaniel Schopf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie A. Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lorinda B. Harris**
(See above for address)
*TERMINATED: 02/03/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

3

**– App. 003 –**

**Patrick Joseph Massari**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aram A. Gavoor**
(See above for address)
*TERMINATED: 05/05/2016*

**Daniel Zachary Epstein**
(See above for address)
*TERMINATED: 02/03/2017*

**Prashant Kumar Khetan**
(See above for address)
*TERMINATED: 02/03/2017*

**Reed D. Rubinstein**
(See above for address)
*TERMINATED: 02/03/2017*

**Robyn N. Burrows**
(See above for address)
*TERMINATED: 10/01/2014*
*PRO HAC VICE*

**Stephen S. Schwartz**
(See above for address)
*TERMINATED: 02/03/2017*

V.

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF LABOR** | represented by | **Steven A. Myers**<br>UNITED STATES DEPARTMENT OF JUSTICE<br>Civil Division, Federal Progarms Branch<br>20 Masachusetts Avenue, NW<br>Washington, DC 20530<br>(202) 305−8648<br>Fax: (202) 616−8460<br>Email: steven.a.myers@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/06/2014 | 1 | | COMPLAINT against DEPARTMENT OF LABOR( Filing fee $ 400 receipt number 0090−3582985) filed by RHEA LANA, INC. and RHEA LANA'S |

4

**– App. 004 –**

| | | | |
|---|---|---|---|
| | | | FRANCHISE SYSTEMS, INC.. (Attachments: # 1 Exhibit # 1−5, # 2 Civil Cover Sheet, # 3 Summons Department of Labor, # 4 Summons US Attorney General, # 5 Summons US Attorney's Office Civil Process Clerk)(Epstein, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 2 | | Corporate Disclosure Statement by RHEA LANA, INC. and RHEA LANA'S FRANCHISE SYSTEMS, INC.. (Epstein, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 3 | | NOTICE of Appearance by Lorinda B. Harris on behalf of RHEA LANA, INC. and RHEA LANA'S FRANCHISE SYSTEMS, INC. (Harris, Lorinda) (Entered: 01/06/2014) |
| 01/06/2014 | | | Case Assigned to Judge Robert L. Wilkins. (md, ) (Entered: 01/06/2014) |
| 01/07/2014 | 4 | | ELECTRONIC SUMMONS (3) ISSUED as to DEPARTMENT OF LABOR, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons 2nd, # 2 Summons 3rd, # 3 Notice of Consent, # 4 Consent Form)(md, ) (Entered: 01/07/2014) |
| 01/08/2014 | 5 | | NOTICE of Appearance by Reed D. Rubinstein on behalf of RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Rubinstein, Reed) (Entered: 01/08/2014) |
| 01/14/2014 | 6 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEPARTMENT OF LABOR served on 1/10/2014 (Epstein, Daniel) Modified on 1/14/2014 (rdj). (Entered: 01/14/2014) |
| 01/14/2014 | 7 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 1/10/2014. (Epstein, Daniel) Modified on 1/14/2014 (rdj). (Entered: 01/14/2014) |
| 01/14/2014 | 8 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 1/13/2014. Answer due for ALL FEDERAL DEFENDANTS by 3/14/2014. (Epstein, Daniel) Modified on 1/14/2014 (rdj). (Entered: 01/14/2014) |
| 01/14/2014 | | | NOTICE OF ERROR re 8 Summons Returned Executed as to US Attorney; 6 & 7 emailed to Daniel.Epstein@causeofaction.org, cc'd 3 associated attorneys −− The PDF file you docketed contained errors: 1. Counsel is reminded to use the date DELIVERED, NOT the date MAILED in the future. NO ACTION REQUIRED (rdj) (Entered: 01/14/2014) |
| 01/24/2014 | | | Case reassigned to the Calendar Committee who will oversee it until it is reassigned to another judge. Judge Robert L. Wilkins has been elevated to the U.S. Court of Appeals for DC and is no longer assigned to the case. Any questions should be directed to Terri Barrett, formerly Judge Wilkins deputy clerk, at 202−354−3179 or terri_barrett@dcd.uscourts.gov. (ztnr, ) (Entered: 01/24/2014) |
| 03/11/2014 | 9 | | NOTICE of Appearance by Steven A. Myers on behalf of DEPARTMENT OF LABOR (Myers, Steven) (Entered: 03/11/2014) |
| 03/11/2014 | 10 | | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by DEPARTMENT OF LABOR (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 03/11/2014) |

**– App. 005 –**

5

Case 1:14-cv-00017-CRC   Document 69   Filed 11/15/17   Page 6 of 32

| | | | |
|---|---|---|---|
| 03/12/2014 | | | MINUTE ORDER granting 10 Unopposed MOTION for Extension of Time to File Answer re 1 Complaint; and its time to respond to the Complaint is hereby extended through and including April 29, 2014. Signed by Judge Ellen S. Huvelle on 3/12/2014. (tcb) (Entered: 03/12/2014) |
| 04/07/2014 | | | Case reassigned to Judge Christopher R. Cooper. Calendar Committee no longer assigned to the case. (ztnr, ) (Entered: 04/07/2014) |
| 04/29/2014 | 11 | | MOTION to Dismiss , MOTION to Dismiss for Lack of Jurisdiction by DEPARTMENT OF LABOR (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 04/29/2014) |
| 05/06/2014 | 12 | | Joint MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction *(seeking extension of deadlines of response and reply)* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Text of Proposed Order)(Epstein, Daniel) (Entered: 05/06/2014) |
| 05/07/2014 | | | MINUTE ORDER granting 12 Joint MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction; it is further ORDERED that Plaintiffs response to Defendants motion to dismiss shall be filed by June 3, 2014; and it is further ORDERED that Defendants reply shall be filed by June 23, 2014. Signed by Judge Christopher R. Cooper on 5/7/2014. (tcb) (Entered: 05/07/2014) |
| 06/03/2014 | 13 | | MOTION to Seal Case *[Motion for Leave to Partially Seal Exhibits 1 and 4 of Plaintiffs' Opposition to Defendant's Motion to Dismiss]* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Text of Proposed Order)(Epstein, Daniel) (Entered: 06/03/2014) |
| 06/03/2014 | 14 | | Memorandum in opposition to re 11 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Text of Proposed Order)(Epstein, Daniel) (Entered: 06/03/2014) |
| 06/09/2014 | | | MINUTE ORDER: The parties shall appear on Thursday, June 19, 2014 Courtroom 27A at 2:30 PM before Judge Christopher R. Cooper for a hearing on Defendant's 11 MOTION to Dismiss, MOTION to Dismiss for Lack of Jurisdiction. Signed by Judge Christopher R. Cooper on 6/9/2014. (tcb) (Entered: 06/09/2014) |
| 06/12/2014 | 15 | | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name−Aram Gavoor, :Firm− Cause of Action, :Address− 1919 Pennsylvania Ave NW Suite 650 Washington, DC 20006. Phone No. − 202−499−4232. Fax No. − 202−330−5842 by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Declaration of Aram Gavoor in Support of Plaintiffs' Unopposed Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Epstein, Daniel) (Entered: 06/12/2014) |
| 06/12/2014 | 16 | | Unopposed MOTION for Leave to Appear Pro Hac Vice :Attorney Name−Robyn Burrows, :Firm− Cause of Action, :Address− 1919 Pennsylvania Ave NW Suite 650 Washington, DC 20006. Phone No. − 202−499−4232. Fax No. − 202−330−5842 by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Declaration of Robyn Burrows in Support of |

6

**– App. 006 –**

| | | |
|---|---|---|
| | | Plaintiffs' Unopposed Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order)(Epstein, Daniel) (Entered: 06/12/2014) |
| 06/12/2014 | | MINUTE ORDER granting 15 Motion for Leave to Appear Pro Hac Vice. Signed by Judge Christopher R. Cooper on 6/12/14. (lccrc2, ) . (Entered: 06/12/2014) |
| 06/12/2014 | | MINUTE ORDER granting 16 Motion for Leave to Appear Pro Hac Vice. Signed by Judge Christopher R. Cooper on 6/12/2014. (lccrc2, ) . (Entered: 06/12/2014) |
| 06/16/2014 | | MINUTE ORDER: It is hereby ORDERED that the Motion hearing set for Thursday, June 19, 2014 at 2:30 PM has been RESCHEDULED to Tuesday, July 1, 2014 at 10:30 AM in Courtroom 27A before Judge Christopher R. Cooper. Signed by Judge Christopher R. Cooper on 6/16/2014. (tcb) (Entered: 06/16/2014) |
| 06/16/2014 | | MINUTE ORDER granting 13 Motion for Leave to File Under Partial Seal. Signed by Judge Christopher R. Cooper on 6/16/2014. (lccrc2, ) (Entered: 06/16/2014) |
| 06/23/2014 | 17 | REPLY to opposition to motion re 11 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction filed by DEPARTMENT OF LABOR. (Attachments: # 1 Exhibit A)(Myers, Steven) (Entered: 06/23/2014) |
| 06/27/2014 | 18 | NOTICE of Appearance by Prashant Kumar Khetan on behalf of All Plaintiffs (Khetan, Prashant) (Entered: 06/27/2014) |
| 06/27/2014 | 19 | NOTICE OF SUPPLEMENTAL AUTHORITY by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Exhibit 1)(Rubinstein, Reed) (Entered: 06/27/2014) |
| 06/30/2014 | 20 | MOTION for Leave to File *Response to Plaintiffs' Notice of Supplemental Authority* by DEPARTMENT OF LABOR (Attachments: # 1 Exhibit Proposed Response, # 2 Text of Proposed Order)(Myers, Steven) (Entered: 06/30/2014) |
| 06/30/2014 | | MINUTE ORDER granting 20 Motion for Leave to File Response to Plaintiffs' Notice of Supplemental Authority. Signed by Judge Christopher R. Cooper on 6/30/2014. (lccrc2, ) (Entered: 06/30/2014) |
| 06/30/2014 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by DEPARTMENT OF LABOR (td, ) (Entered: 07/01/2014) |
| 07/01/2014 | | Minute Entry for proceedings held before Judge Christopher R. Cooper: Motion Hearing held on 7/1/2014 re Defendant's 11 MOTION to Dismiss and MOTION to Dismiss for Lack of Jurisdiction; Argument heard and this matter is taken under advisement. (Court Reporter Barbara DeVico) (tcb) (Entered: 07/01/2014) |
| 07/11/2014 | 22 | NOTICE OF SUPPLEMENTAL AUTHORITY by DEPARTMENT OF LABOR (Attachments: # 1 Exhibit A)(Myers, Steven) (Entered: 07/11/2014) |
| 09/04/2014 | 23 | TRANSCRIPT OF PROCEEDINGS before Judge Christopher R. Cooper held on July 1, 2014; Page Numbers: 1−44. Date of Issuance:September 4, 2014. Court Reporter/Transcriber Barbara DeVico, Telephone number (202)354−3118, Court Reporter Email Address : |

| | | | |
|---|---|---|---|
| | | | Barbara_DeVico@dcd.uscourts.gov.<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<br><br>Redaction Request due 9/25/2014. Redacted Transcript Deadline set for 10/5/2014. Release of Transcript Restriction set for 12/3/2014.(DeVico, Barbara) (Entered: 09/04/2014) |
| 10/01/2014 | 24 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. Attorney Robyn N. Burrows terminated. (Burrows, Robyn) (Entered: 10/01/2014) |
| 11/21/2014 | 25 | | For the reasons set forth in the accompanying memorandum opinion, it is hereby ORDERED that Defendants Motion to Dismiss 11 is granted. It is further ORDERED that this case is dismissed. Signed by Judge Christopher R. Cooper on 11/21/2014. (lccrc2, ) (Entered: 11/21/2014) |
| 11/21/2014 | 26 | | MEMORANDUM AND OPINION re: Defendant's Motion 11 to Dismiss. Signed by Judge Christopher R. Cooper on 11/21/2014. (lccrc2, ) (Entered: 11/21/2014) |
| 01/20/2015 | 27 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 25 Order on Motion to Dismiss, Order on Motion to Dismiss/Lack of Jurisdiction,, by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. Filing fee $ 505, receipt number 0090−3967471. Fee Status: Fee Paid. Parties have been notified. (Rubinstein, Reed) (Entered: 01/20/2015) |
| 01/20/2015 | 28 | | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date 1/20/15 re 27 Notice of Appeal to DC Circuit Court,. (td, ) (Entered: 01/20/2015) |
| 01/21/2015 | | | USCA Case Number 15−5014 for 27 Notice of Appeal to DC Circuit Court, filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (rd) (Entered: 01/21/2015) |
| 05/05/2016 | 29 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. Attorney Aram A. Gavoor terminated. (Gavoor, Aram) (Entered: 05/05/2016) |
| 07/18/2016 | | | MINUTE ORDER: In light of the D.C. Circuit's Mandate, issued this day, it is hereby ORDERED that Defendant answer 1 Plaintiffs' Complaint by August 1, 2016. Signed by Judge Christopher R. Cooper on 7/18/2016. (lccrc2) (Entered: 07/18/2016) |

| | | | |
|---|---|---|---|
| 07/18/2016 | | | Set/Reset Deadlines: Defendant answer 1 Plaintiffs' Complaint by 8/1/2016. (kt) (Entered: 07/18/2016) |
| 07/18/2016 | 30 | | MANDATE of USCA (certified copy) as to 27 Notice of Appeal to DC Circuit Court, filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. USCA Case Number 15−5014. (Attachments: # 1 judgment filed June 3, 2016)(zrdj) (Entered: 07/18/2016) |
| 07/22/2016 | 31 | | NOTICE of Appearance by Stephen S. Schwartz on behalf of All Plaintiffs (Schwartz, Stephen) (Entered: 07/22/2016) |
| 07/22/2016 | 32 | | NOTICE of Appearance by Julie A. Smith on behalf of All Plaintiffs (Smith, Julie) (Entered: 07/22/2016) |
| 08/01/2016 | 33 | | ANSWER to Complaint by UNITED STATES DEPARTMENT OF LABOR.(Myers, Steven) (Entered: 08/01/2016) |
| 08/02/2016 | | | MINUTE ORDER: Before the Court in this case challenging administrative action are a complaint and an answer. It is hereby ORDERED that the parties promptly confer and file a joint proposed schedule for further proceedings by August 16, 2016. Signed by Judge Christopher R. Cooper on 8/2/2016. (lccrc2) (Entered: 08/02/2016) |
| 08/02/2016 | | | Set/Reset Deadlines: ORDERED that the parties promptly confer and file a joint proposed schedule for further proceedings due by 8/16/2016. Signed by Judge Christopher R. Cooper on 8/2/2016. (lsj) (Entered: 08/02/2016) |
| 08/12/2016 | 34 | | Unopposed MOTION for Extension of Time to File *Joint Proposed Schedule* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Text of Proposed Order Proposed Order)(Smith, Julie) (Entered: 08/12/2016) |
| 08/12/2016 | | | MINUTE ORDER granting 34 Plaintiffs' Motion to Extend Time to Confer. It is hereby ORDERED that the parties shall submit a joint proposed schedule by August, 26, 2016. Signed by Judge Christopher R. Cooper on 08/15/2016. (lccrc2) (Entered: 08/15/2016) |
| 08/15/2016 | | | Set/Reset Deadlines: ORDERED that the parties promptly confer and file a joint proposed schedule for further proceedings due by 8/16/2016. Signed by Judge Christopher R. Cooper on 8/2/2016. (lsj) (Entered: 08/15/2016) |
| 08/26/2016 | 35 | | PROPOSED BRIEFING SCHEDULE by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Text of Proposed Order)(Smith, Julie) (Entered: 08/26/2016) |
| 08/26/2016 | 36 | | ORDER granting 35 parties' Joint Proposed Schedule. Please refer to full order for details. Signed by Judge Christopher R. Cooper on 8/26/16. (lccrc2) (Entered: 08/26/2016) |
| 08/29/2016 | | | Set/Reset Deadlines: Administrative Record due by 9/26/2016. Supplemental Motions due by 10/21/2016. Summary Judgment motions due by 10/28/2016. Cross Motions due by 11/18/2016. Response to Cross Motions due by 12/9/2016. Reply to Cross Motions due by 12/23/2016. (lsj) (Entered: 08/29/2016) |
| 09/26/2016 | 37 | | |

9

**– App. 009 –**

| | | | |
|---|---|---|---|
| | | | NOTICE *of Filing of Certified List of Contents of Administrative Record and Declaration of Robert A. Darling* by UNITED STATES DEPARTMENT OF LABOR (Attachments: # 1 Certified List of Contents of Administrative Record, # 2 Declaration of Robert A. Darling)(Myers, Steven) (Entered: 09/26/2016) |
| 10/21/2016 | 38 | | MOTION for Leave to File *Supplement of the Record* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Exhibit ex. 1, # 2 Exhibit ex. 2, # 3 Exhibit ex. 3, # 4 Exhibit ex. 4, # 5 Exhibit ex. 5, # 6 Exhibit ex. 6, # 7 Exhibit ex. 7, # 8 Text of Proposed Order)(Smith, Julie) (Entered: 10/21/2016) |
| 11/07/2016 | 39 | | Memorandum in opposition to re 38 MOTION for Leave to File *Supplement of the Record and Motion for Leave to File Exhibit Ex Parte and Under Seal* filed by UNITED STATES DEPARTMENT OF LABOR. (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 11/07/2016) |
| 11/07/2016 | 40 | | MOTION for Leave to File Exhibit Ex Parte and Under Seal by UNITED STATES DEPARTMENT OF LABOR. (See Docket Entry 39 to view document). (znmw) (Entered: 11/08/2016) |
| 11/16/2016 | 41 | | NOTICE of Appearance by Patrick Joseph Massari on behalf of All Plaintiffs (Massari, Patrick) (Entered: 11/16/2016) |
| 11/16/2016 | 42 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Erica L. Marshall, :Firm− Cause of Action Institute, :Address− 1875 Eye Street N.W. Suite 800 Washington, DC 20006. Phone No. − (202) 499−4232. Fax No. − (202) 330−5842 Filing fee $ 100, receipt number 0090−4745808. Fee Status: Fee Paid. by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Smith, Julie) (Entered: 11/16/2016) |
| 11/17/2016 | | | MINUTE ORDER granting 42 Plaintiffs' Motion for Leave to Appear Pro Hac Vice. Signed by Judge Christopher R. Cooper on 11/17/2016. (lccrc2) (Entered: 11/17/2016) |
| 11/17/2016 | 43 | | REPLY to opposition to motion re 38 MOTION for Leave to File *Supplement of the Record* filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Smith, Julie) (Entered: 11/17/2016) |
| 11/21/2016 | 44 | | Unopposed MOTION for Leave to File *Surreply in Opposition to Plaintiffs' Motion to Supplement the Record (ECF No. 38)* by UNITED STATES DEPARTMENT OF LABOR (Attachments: # 1 Proposed Surreply, # 2 Text of Proposed Order)(Myers, Steven) (Entered: 11/21/2016) |
| 12/06/2016 | | | MINUTE ORDER granting 44 Defendant's Unopposed Motion for Leave to File a Surreply. Signed by Judge Christopher R. Cooper on 12/6/2016. (lccrc2) (Entered: 12/06/2016) |
| 12/06/2016 | 45 | | ORDER granting in part and denying in part 38 Plaintiff's Motion for Leave to Supplement the Record. It is further ORDERED that 40 Defendant's Motion for Leave to File Exhibit Ex Parte and Under Seal shall be GRANTED. The Department shall, by December 12, 2016, file under seal an unredacted version of its interview notes for the Courts in camera review. Please refer to Order for full details. Signed by Judge Christopher R. Cooper on 12/6/2016. (lccrc2) (Entered: 12/06/2016) |

| 12/06/2016 | | | Set/Reset Deadlines: In−Camera Submission due by 12/12/2016. (zlsj) (Entered: 12/06/2016) |
|---|---|---|---|
| 12/06/2016 | | | MINUTE ORDER: In light of 45 Order directing Defendant to file Exhibit Under Seal, it is hereby ORDERED that the summary−judgment briefing schedule be amended as follows: Defendant's motion for summary judgment shall be due 21 days after the Court rules on the adequacy of the redactions; Plaintiff's cross−motion for summary judgment and opposition to Defendant's motion shall be due 21 days thereafter; Defendant's reply in support of its motion and opposition shall be due within 21 days of Plaintiff's motion; and Plaintiff's reply shall be due within 14 days of Defendant's Opposition. Signed by Judge Christopher R. Cooper on 12/6/2016. (lccrc2) (Entered: 12/06/2016) |
| 12/06/2016 | 46 | | SURREPLY to re 38 MOTION for Leave to File *Supplement of the Record* filed by UNITED STATES DEPARTMENT OF LABOR. (znmw) (Entered: 12/07/2016) |
| 12/12/2016 | 47 | | SEALED DOCUMENT filed by UNITED STATES DEPARTMENT OF LABOR(This document is SEALED and only available to authorized persons.) (Attachments: # 1 Unredacted Record Excerpts)(Myers, Steven) (Entered: 12/12/2016) |
| 12/13/2016 | 48 | | ORDER denying 38 Plaintiff's Motion to Supplement the Record with redacted material. It is hereby ORDERED that the summary−judgment briefing schedule be established as follows: Defendant's motion for summary judgment shall be due by January 4, 2017; Plaintiff's cross−motion for summary judgment and opposition to Defendant's motion shall be due by January 25, 2017; Defendant's reply in support of its motion and opposition shall be due by February 15, 2017; and Plaintiff's reply shall be due by March 1, 2017. Signed by Judge Christopher R. Cooper on 12/13/2016. (lccrc2) (Entered: 12/13/2016) |
| 12/14/2016 | | | Set/Reset Deadlines: Dispositive Motions due by 1/4/2017. Response to Dispositive Motions due by 1/25/2017. Reply to Dispositive Motions due by 2/15/2017. Replies due by 3/1/2017. (zlsj) (Entered: 12/14/2016) |
| 12/19/2016 | 49 | | NOTICE *of Filing of Supplemental Index of Administrative Record* by UNITED STATES DEPARTMENT OF LABOR (Attachments: # 1 Supplemental Index)(Myers, Steven) (Entered: 12/19/2016) |
| 01/04/2017 | 50 | | MOTION for Summary Judgment by UNITED STATES DEPARTMENT OF LABOR (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 01/04/2017) |
| 01/13/2017 | 51 | | Unopposed MOTION to Modify *the Courts December 13, 2016 Scheduling Order to permit extensions of time for the parties to file oppositions and/or replies to dispositive motions* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Massari, Patrick) (Entered: 01/13/2017) |
| 01/17/2017 | | | MINUTE ORDER granting 51 Motion to Modify: Parties shall submit briefing according to the following modified schedule: Plaintiffs' cross−motion for summary judgment and opposition to Defendant's motion shall be due by February 8, 2017; Defendant's reply in support of its motion and opposition shall be due by March 15, 2017; Plaintiffs' reply to Defendant's opposition shall be due by March 29, 2017. Signed by Judge Christopher R. Cooper on 1/17/2017. (lccrc1) (Entered: 01/17/2017) |

**– App. 011 –**

| 02/03/2017 | 52 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. Attorney Prashant Kumar Khetan; Reed D. Rubinstein; Stephen S. Schwartz; Daniel Zachary Epstein and Lorinda B. Harris terminated. (Smith, Julie) (Entered: 02/03/2017) |
|---|---|---|---|
| 02/08/2017 | 53 | | Cross MOTION for Summary Judgment by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Attachments: # 1 Memorandum in Support of Plaintiffs' Cross−Motion for Summary Judgment, # 2 Declaration Declaration of David Riner, # 3 Text of Proposed Order)(Smith, Julie) (Entered: 02/08/2017) |
| 02/08/2017 | 54 | | MEMORANDUM IN SUPPORT re 53 Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Cross Motion filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Declaration of David Riner)(Smith, Julie) Modified text and linkage on 2/9/2017 (td). (Entered: 02/08/2017) |
| 02/08/2017 | 55 | | Memorandum in opposition to re 50 MOTION for Summary Judgment filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC..(See docket entry no. 53 to view document.) (td) (Entered: 02/09/2017) |
| 03/15/2017 | 56 | | REPLY to opposition to motion re 50 MOTION for Summary Judgment filed by UNITED STATES DEPARTMENT OF LABOR. (Myers, Steven) (Entered: 03/15/2017) |
| 03/15/2017 | 57 | | Memorandum in opposition to re 53 Cross MOTION for Summary Judgment filed by UNITED STATES DEPARTMENT OF LABOR. (Myers, Steven) (Entered: 03/15/2017) |
| 03/29/2017 | 58 | | REPLY to opposition to motion re 53 Cross MOTION for Summary Judgment filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Exhibit A)(Smith, Julie) (Entered: 03/29/2017) |
| 03/29/2017 | 59 | | MOTION to Strike 37 Notice (Other), *Declaration of Robert Darling* by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC. (Smith, Julie) (Entered: 03/29/2017) |
| 04/12/2017 | 60 | | Memorandum in opposition to re 59 MOTION to Strike 37 Notice (Other), *Declaration of Robert Darling* filed by UNITED STATES DEPARTMENT OF LABOR. (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 04/12/2017) |
| 04/12/2017 | 61 | | NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES DEPARTMENT OF LABOR (Attachments: # 1 Hugler v. Cathedral Buffet)(Myers, Steven) (Entered: 04/12/2017) |
| 04/12/2017 | 62 | | JOINT APPENDIX by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Attachments: # 1 Exhibit A− Joint Appendix)(Smith, Julie) (Entered: 04/12/2017) |
| 04/19/2017 | 63 | | REPLY to opposition to motion re 59 MOTION to Strike 37 Notice (Other), *Declaration of Robert Darling* filed by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. (Smith, Julie) (Entered: 04/19/2017) |
| 05/24/2017 | | | MINUTE ORDER: The parties are hereby ORDERED to appear for Oral Arguments re 50 Defendant's Motion for Summary Judgment, 53 Plaintiff's |

12

**– App. 012 –**

| | | | |
|---|---|---|---|
| | | | Cross−Motion for Summary Judgment, and 59 Plaintiff's Motion to Strike on 06/21/2017 at 11:00 AM in Courtroom 27A before Judge Christopher R. Cooper. Signed by Judge Christopher R. Cooper on 5/24/2017. (lccrc2) (Entered: 05/24/2017) |
| 05/24/2017 | | | Set/Reset Hearings: Motion Hearing set for 6/21/2017 at 11:00 AM in Courtroom 27A before Judge Christopher R. Cooper. (lsj) (Entered: 05/24/2017) |
| 05/25/2017 | 64 | | NOTICE of Appearance by Joshua Nathaniel Schopf on behalf of All Plaintiffs (Schopf, Joshua) (Main Document 64 replaced on 5/26/2017) (jf). (Entered: 05/25/2017) |
| 06/21/2017 | | | Minute Entry for Motions Hearing held before Judge Christopher R. Cooper on 6/21/2017. Cross Motion 53 for Summary Judgment and Motion 50 for Summary Judgment , argued. Motions taken under advisement; forthcoming Order. (Court Reporter Lisa Moreira) (lsj) (Entered: 06/21/2017) |
| 06/27/2017 | 65 | | TRANSCRIPT OF MOTION HEARING before Judge Christopher R. Cooper held on June 21, 2017; Page Numbers: 1−39. Date of Issuance:June 27, 2017. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, Telephone number 202−354−3187, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the cour t reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/18/2017. Redacted Transcript Deadline set for 7/28/2017. Release of Transcript Restriction set for 9/25/2017.(Moreira, Lisa) (Entered: 06/27/2017) |
| 09/26/2017 | 66 | 16 | ORDER granting 50 Defendant's Motion for Summary Judgment, denying 53 Plaintiff's Cross−Motion for Summary Judgment, and denying 59 Plaintiff's Motion to Strike. For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that Defendant's Motion for Summary Judgment is granted, Plaintiff's Cross−Motion for Summary Judgment is denied, and Plaintiff's Motion to Strike the Declaration or Robert Darling is denied. Signed by Judge Christopher R. Cooper on 9/26/2017. (lccrc2) (Entered: 09/26/2017) |
| 09/26/2017 | 67 | 17 | MEMORANDUM OPINION re 66 Order granting Defendant's Motion for Summary Judgment, denying Plaintiff's Cross−Motion for Summary Judgment, and denying Plaintiff's Motion to Strike. Signed by Judge Christopher R. Cooper on 9/26/2017. (lccrc2) (Entered: 09/26/2017) |

13

| 11/14/2017 | 68 | 15 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>66</u> Order on Motion for Summary Judgment,,,,,, Order on Motion to Strike,, by RHEA LANA'S FRANCHISE SYSTEMS, INC., RHEA LANA, INC.. Filing fee $ 505, receipt number 0090−5204248. Fee Status: Fee Paid. Parties have been notified. (Smith, Julie) (Entered: 11/14/2017) |
|---|---|---|---|

**– App. 014 –**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **RHEA LANA, INC.** | ) | |
| **1055 Sunflower Drive** | ) | |
| **Suite 104** | ) | |
| **Conway, AR 72034** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **RHEA LANA'S FRANCHISE SYSTEMS, INC.** | ) | |
| **1055 Sunflower Drive** | ) | **Case No. _____** |
| **Suite 104** | ) | |
| **Conway, AR 72034** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **U.S. DEPARTMENT OF LABOR** | ) | |
| **200 Constitution Avenue, NW** | ) | |
| **Washington, D.C. 20210** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is a civil action challenging the decision of the U.S. Department of Labor ("DOL" or "Defendant") to classify "consignors/volunteers" as employees under the Fair Labor Standards Act ("FLSA").

### Parties

1.      Plaintiff Rhea Lana, Inc. ("Rhea Lana's") is an Arkansas corporation with its principal place of business in Conway, Arkansas.

2.      Plaintiff Rhea Lana's Franchise Systems, Inc. ("Rhea Lana's Franchise Systems") is an Arkansas corporation with its principal place of business in Conway, Arkansas.  ("Rhea Lana's" and "Rhea Lana's Franchise Systems" may be jointly referred to as "Plaintiffs".)

Case 1:14-cv-00017-CRC   Document 1   Filed 01/06/14   Page 2 of 10

3.      Defendant DOL is an Executive Branch department of the United States, an "agency" within the meaning of 5 U.S.C. § 701(b), and is charged with administering the FLSA. DOL's principal office is located in Washington, D.C.

**Jurisdiction, Venue, and Relief**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 701-706, and 29 U.S.C. § 201 *et seq.* DOL's decision to classify consignors/volunteers as employees under the FLSA constitutes final agency action that is reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704.

5.      Venue properly lies with this Court under 28 U.S.C. § 1391(e) because DOL is an agency of the United States government with its principal office in this district.

6.      Venue also properly lies with this Court because this case involves a uniform, national DOL policy of classifying volunteers at for-profit enterprises as FLSA employees.[1]

7.      There is a dispute between the parties in this case with respect to Plaintiffs' FLSA compliance.

8.      This dispute is a justiciable "case or controversy" for which this Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, 5 U.S.C. § 702, and Fed. R. Civ. P. 57.

9.      Such relief will redress the harm done by DOL to Plaintiffs.

10.      This Court may grant Plaintiffs injunctive relief pursuant to 28 U.S.C. § 2202, 5 U.S.C. §§ 705-06, and Fed. R. Civ. P. 65.

11.      This Court may award Plaintiffs reasonable costs and attorneys' fees incurred in connection with this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

---

[1]      Appended as Exhibit 1 is a true and correct copy of a DOL webpage that reflects DOL's uniform policy toward volunteers under the FLSA. *See also* http://www.dol.gov/elaws/esa/flsa/docs/volunteers.asp.

**– App. 016 –**

**Facts**

Plaintiffs' Business

12.     Rhea Lana's is a family-owned business in Arkansas that organizes and hosts three semi-annual, short-term consignment sales for children's clothes, toys, and related items.

13.     Since 2004, Rhea Lana's has offered high-quality, name-brand, and boutique children's items for a low price.  Through consignment, individuals may sell used children's items at Rhea Lana's events.  While Rhea Lana's events are open to the public, young stay-at-home mothers, working mothers, and retired grandmothers make up the bulk of Rhea Lana's shoppers, consignors, and volunteers.

14.     In preparation for each event, Rhea Lana's leases space for the upcoming sale. The company's employees are accountable for logistical and administrative event details.

15.     Consignors provide all of the items for sale at Rhea Lana's events, which last approximately one week.

16.     Individuals wishing to sell clothes on consignment can register and price their items online in advance of the consignment sale.  Consignors receive an individual consignor code and report that enables them to track their individual sales progress in real-time online.

17.     Consignors are responsible for their items and must prepare them for sale, tag their items, bring their items to the event location, check-in and attach price labels to their items, and place their items on display racks.  If a consignor's items are not sold at the event, the consignor may either retrieve the items or donate them to a charity.

18.     Consistent with the consignment event industry, consignors may volunteer at Rhea Lana's events, but they are not required to do so.

19. Those consignors who choose to volunteer (consignors/volunteers) undertake general tasks such as greeting shoppers, picking up fallen price tags, reorganizing items that shoppers have handled, and assisting shoppers as they carry items to their vehicles.

20. Consignors/volunteers can volunteer for as many or as few hours as they desire and can choose their own schedules and control what activities (greeting, sorting, disassembling, etc.) they will perform.

21. If a consignor/volunteer is unable to attend, Rhea Lana's does not withhold any portion of that consignor's/volunteer's consignment proceeds.

22. Rhea Lana's allows consignors/volunteers to shop before the event opens to the general public.

23. Rhea Lana's does not interview potential consignors/volunteers.

24. Rhea Lana's does not compensate consignors/volunteers.

25. Consignors/volunteers have a vested interest in the success of Rhea Lana's events because the vast majority of them receive at least seventy percent (70%) of all proceeds from their sold items. They are therefore incentivized to volunteer to help ensure shoppers purchase their items. For instance, consignors/volunteers can favorably display their consigned items at events.

26. Consignors/volunteers also have a personal, non-monetary interest in volunteering, given that they have unique access to select products before other shoppers arrive.

27. Rhea Lana's Franchise Systems offers franchise opportunities to enterprises that operate in substantial conformity with Rhea Lana's business model. For example, each franchise is expected to operate semi-annual consignment events and consignors are allowed to volunteer during events.

<u>DOL's Investigation and Determination</u>

28.     In January 2013, DOL, through its Wage and Hour Division ("WHD"), initiated an investigation of Plaintiffs' employment practices for the time period January 28, 2011 to January 27, 2013.  Plaintiffs fully cooperated.

29.     On May 20, 2013, WHD met with Plaintiffs to discuss the results of its investigation.  WHD determined consignors/volunteers to be employees under the FLSA, and thus entitled to back wages in accordance with FLSA minimum wage and overtime provisions.

30.     WHD expected Plaintiffs' immediate compliance with WHD's decision.

31.     On or about August 6, 2013, Arkansas WHD District Director Robert Darling ("Darling") sent letters to Plaintiffs' current and/or former employees and consignors/volunteers, informing them that they "might not have been paid as required by the law for the period of 01/28/2011 to 01/27/20136 [sic]." [2]  The letters informed recipients of their "private right under the FLSA to bring an independent suit to recover any back wages due."[3]

32.     On August 26, 2013, Darling sent Plaintiffs a letter summarizing DOL's decision: "The investigation disclosed violations of FLSA section 6 resulting from the failure to pay employees at least the applicable minimum wage for all hours worked and/or FLSA section 7 from the failure to pay statutory overtime pay for hours worked in excess of 40 hours per week."[4]

33.     Darling's letter characterized consignors/volunteers as employees: "It is my understanding that you refuse to comply with the employee group known as

---

[2]     Appended as Exhibit 2 is a true and correct copy of an August 6, 2013 letter from DOL WHD to Plaintiffs' current and/or former employees and consignors/volunteers ("Ex. 2").

[3]     *See* Ex. 2.

[4]     Appended as Exhibit 3 is a true and correct copy of the August 26, 2013 letter from Robert Darling to Plaintiffs ("Ex. 3").

consignors/volunteers.  Letters have been sent to the consignors/volunteers informing them of their private right under the FLSA to bring an independent suit to recover any back wages due."[5]

34.    Darling's letter threatened civil money penalties if Plaintiffs refused to comply:

We would like to direct your attention to section 16(e) of the FLSA and Regulations, Part 578.  *As you will note, section 16(e) provides for the assessment of a civil money penalty for any repeated or willful violations of section 6 or 7, in an amount not to exceed $1,100 for each such violation.*  No penalty is being assessed as a result of this investigation.  If at any time in the future your firm is found to have violated the monetary provisions of the FLSA, it will be subject to such penalties.[6]  (Emphasis added.)

35.    WHD Principal Deputy Administrator Laura Fortman ("Fortman") explained DOL's rationale for classifying consignors/volunteers as employees in an August 30, 2013 letter to Congressman Tim Griffin of Arkansas.[7]  Fortman wrote:

The WHD has a long standing policy of limiting volunteer status to those individuals performing charitable activities by for-profit organizations. The WHD determined that consignor's at Rhea Lana's events who brought in items to be sold, dropped them off, and then left the premises were not employees.  However, other workers who considered themselves to be 'volunteers' and any consignors who also worked at the event (operating the cash register, providing security, and assisting in the sorting and sales of goods) were found to be employees. The WHD determined that the 'volunteers' and 'consignor volunteers' engaged in activities that are an integral part of the Rhea Lana's FLSA-covered, for-profit business.[8]

36.    Although Fortman wrote that DOL has a long-standing policy of limiting volunteer status to those individuals performing charitable activities by "for-profit" organizations, Plaintiffs believe this was a typographical error and that Fortman actually meant "non-profit" organizations.[9]

---

[5]    *See* Ex. 3.
[6]    *See* Ex. 3.
[7]    Appended as Exhibit 4 is a true and correct copy of the August 30, 2013 letter with enclosures from Fortman to Congressman Tim Griffin ("Ex. 4").
[8]    Ex. 4.
[9]    Appended as Exhibit 5 is a true and correct copy of five WHD opinion letters.

**Claim for Relief**

Arbitrary, Capricious, and Illegal DOL Action

37.    Plaintiffs repeat and incorporate by reference herein the allegations contained in paragraphs one (1) through thirty-six (36).

38.    DOL's actions described herein, including its wrongful determination that consignors/volunteers are employees under the FLSA, were arbitrary, capricious, and otherwise not in accordance with the law, and harmed Plaintiffs.  5 U.S.C. § 706(2)(A).

39.    DOL applied the incorrect legal standard when it determined that consignors/volunteers were FLSA employees.

40.    DOL wrongfully ignored the economic realities of this case and instead arbitrarily and capriciously applied a categorical ban against volunteerism on behalf of for-profit enterprises.

41.    The economic realities in this case do not create an employer-employee relationship.  Unlike the volunteers in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), the consignors/volunteers here are not in a position of dependence, nor do they receive wages in any form.

42.    Judicial review is appropriate because legal consequences flow from DOL's decision.

43.    DOL's determination in the Darling letter fixes the legal relationship between Plaintiffs and the consignors/volunteers and exposes Plaintiffs to civil money penalties under 29 U.S.C. § 216(e) and 29 C.F.R. § 578.3(a).

44.    DOL's determination in the Darling letter similarly exposes Plaintiffs to substantial back wages and liquidated damages under 29 U.S.C. § 216(b).

45.     Unless Plaintiffs make immediate, significant changes to their businesses, they will continue to accrue thousands of dollars in potential liability.  *See Sackett v. Envtl. Prot. Agency*, 132 S. Ct. 1367, 1372 (2012).  Because DOL expects immediate compliance, Plaintiffs must either incur the substantial costs of complying with DOL's determination or violate DOL's directive and risk adverse consequences, such as an enforcement proceeding for back wages, liquidated damages, and/or civil penalties.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967).

46.     Furthermore, DOL's actions have caused and continue to cause Plaintiffs significant hardship, particularly to their business reputation and goodwill.

47.     With respect to Rhea Lana's, a local news station that had historically provided gratuitous news coverage and advertising revoked its services due to DOL's investigation.

48.     With respect to Rhea Lana's Franchise Systems, certain prospective franchisees have either declined to purchase franchises or have indicated that their purchase is contingent upon a successful resolution of DOL's consignor/volunteer classification.  Additionally, DOL's investigation forced Rhea Lana's Franchise Systems to re-direct revenue to pay Plaintiffs' legal defense.

49.     Fortman's letter, among other things, demonstrates that DOL's determination in the Darling letter marks the consummation of its decision-making process.

50.     Fortman's letter, among other things, demonstrates that DOL's determination in the Darling letter is not subject to further consideration or possible modification or any other agency review.

51.     Plaintiffs have exhausted all administrative remedies.

**– App. 022 –**

52.     The harm done by DOL to Plaintiffs will be redressed by a favorable ruling in this case.

53.     Such favorable ruling would preserve Plaintiffs' businesses, restore Plaintiffs' business reputation, and preserve Plaintiffs' commercial good will.

## Relief Requested

WHEREFORE Plaintiffs request the following relief:

A.     A declaration that consignors/volunteers participating under Plaintiffs' business model are not FLSA employees.

B.     A temporary and preliminary injunction prohibiting DOL from initiating any investigations, audits, enforcements, or other agency proceedings against Plaintiffs based on the use of consignors/volunteers during the pendency of this litigation.

C.     A permanent injunction prohibiting DOL from initiating any investigations, audits, enforcements, or other agency proceedings against Plaintiffs based on DOL's policy prohibiting volunteerism at for-profit organizations, or any similar policy that ignores the "economic realities" test.

D.     If this Court determines that consignors/volunteers participating under Plaintiffs' business model are subject to the FLSA, a permanent injunction prohibiting DOL from recovering civil money penalties or liquidated damages.

E.     Such attorneys' fees and costs as Plaintiffs may be entitled to under the law, including the Equal Access to Justice Act, 28 U.S.C. § 2412.

F.     Such other relief as this Court deems just and proper.

Dated:  January 6, 2014                    Respectfully submitted,

/s/ Daniel Z. Epstein
Daniel Z. Epstein
D.C. Bar No. 1009132
Cause of Action, Inc.
1919 Pennsylvania Avenue, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 499-4232
daniel.epstein@causeofaction.org

/s/ Lorinda B. Harris
Lorinda B. Harris
D.C. Bar No. 993396
Cause of Action, Inc.
1919 Pennsylvania Avenue, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 499-4232
lorinda.harris@causeofaction.org

/s/ Reed D. Rubinstein
Reed D. Rubinstein
D.C. Bar No. 440153
Dinsmore & Shohl LLP
801 Pennsylvania Ave., NW, Suite 610
Washington, D.C. 20004
(202) 372-9120 (telephone)
(202) 372-9141 (fax)
reed.rubinstein@dinsmore.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RHEA LANA, INC. and RHEA LANA'S
FRANCHISE SYSTEMS, INC.,

Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR,

Defendant.

Case No. 1:14-cv-00017-CRC
Judge Christopher R. Cooper

## ANSWER

Defendant United States Department of Labor, by and through undersigned counsel, hereby answers Plaintiffs' Complaint as follows.

## FIRST DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted.

## SECOND DEFENSE

The Court lacks subject matter jurisdiction.

## THIRD DEFENSE

The Department answers the numbered and unnumbered paragraphs of the Complaint as follows.  With respect to every allegation concerning Plaintiff or Plaintiffs' practices, Defendant's knowledge is current as of August 26, 2013, the date of the agency determination challenged in this case.  Defendant lacks sufficient information to admit or deny any allegations about Plaintiffs or Plaintiffs' practice currently.

**– App. 025 –**

The unnumbered paragraph preceding the numbered paragraphs sets forth Plaintiffs' characterization of the case, which speaks for itself.

1.      Admit.

2.      Admit.

3.      Admit.

4.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

5.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, admit that venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

6.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, admit that DOL has a longstanding policy of limiting volunteer status for purposes of the FLSA to those individuals performing charitable activities for not-for-profit enterprises but deny that venue is proper for that reason.  The DOL web page referenced in footnote 1 speaks for itself, and Defendant respectfully refers the Court to that web page.

7.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, admit.

8.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

9.      This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

2

10.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

11.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

12.     Admit that Rhea Lana, Inc., is a family-owned business, that it is based in Arkansas, and that it organizes and operates semi-annual short-term consignment sales of children's clothes, toys, and related items.  Defendant lacks sufficient information to admit or deny any remaining allegations.

13.     Admit that Rhea Lana, Inc. organizes and operates semi-annual short-term consignment sales of children's clothes, toys, and related items and that such sales are open to the public.  Defendant lacks sufficient information to admit or deny any remaining allegations.

14.     Admit the first sentence.  Deny the second sentence to the extent it avers that only workers whom Plaintiffs treated as employees are accountable for the logistical and administrative details of the sales.

15.     Admit that Rhea Lana, Inc.'s, consignment sales last for approximately one week. Defendant lacks sufficient information to admit or deny any remaining allegations.

16.     Admit.

17.     Admit.

18.     Admit that Rhea Lana, Inc., permits consignors to work at consignment sales for no monetary compensation.  Defendant lacks sufficient information to admit or deny any remaining allegations.

3

19. Admit that individuals referred to by Plaintiffs as "consignor/volunteers" perform the tasks identified in this paragraph; deny to the extent this paragraph avers that these individuals perform only these tasks.

20. Admit that individuals referred to by Plaintiffs as "consignors/volunteers" can sign up to work shifts performing certain tasks. Defendant lacks sufficient information to admit or deny the remaining allegations of this paragraph.

21. Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

22. Admit.

23. Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

24. Admit that the individuals referred to by Plaintiffs as "consignor/volunteers" receive no monetary compensation; deny that they are not otherwise compensated.

25. Admit that the individuals referred to by Plaintiffs as "consignor/volunteers," if their items are sold at Rhea Lana, Inc.'s events, receive proceeds from their sales and therefore have an interest in the success of the events; deny that this interest is their sole or primary incentive for working at Rhea Lana, Inc.'s events, and deny any remaining allegations.

26. Admit that the individuals referred to by Plaintiffs as "consignor/volunteers" have an interest in working at Rhea Lana, Inc.'s events given that, in exchange, they are allowed to shop before other shoppers arrive; deny any remaining allegations.

27. Admit the first sentence. Defendant lacks sufficient information to admit or deny the allegations of the second sentence.

**– App. 028 –**

28.    Admit the first sentence.  With respect to the second sentence, Defendant admits that Plaintiffs cooperated with the WHD investigator but deny any remaining allegations.

29.    Admit.

30.    Admit except as to the word "immediate," which is vague and as to which Defendant accordingly lacks sufficient information to admit or deny.

31.    Admit that Mr. Darling sent the letter attached to Plaintiffs' Complaint as Exhibit 2 (and referenced in footnotes 2 and 3), which speaks for itself and to which Defendant respectfully refers the Court, and otherwise deny.

32.    Admit that Mr. Darling sent the letter attached to Plaintiffs' complaint as Exhibit 3 (and referenced in footnote 4), which speaks for itself and to which Defendant respectfully refers the Court, and otherwise deny.

33.    Admit that Mr. Darling sent the letter attached to Plaintiffs' complaint as Exhibit 3 (and referenced in footnote 5), which speaks for itself and to which Defendant respectfully refers the Court, and otherwise deny.

34.    Admit that Mr. Darling sent the letter attached to Plaintiffs' complaint as Exhibit 3 (and referenced in footnote 6), which speaks for itself and to which Defendant respectfully refers the Court, and otherwise deny.

35.    Admit that Ms. Fortman sent the letter attached to Plaintiffs' complaint as Exhibit 4 (and referenced in footnote 7), which speaks for itself and to which Defendant respectfully refers the Court, and otherwise deny.

36.    Admit that Ms. Fortman's letter contains a typographical error and that it should read "for not-for-profit organizations" instead of "by for-profit organizations."  The opinion letters attached to Plaintiffs' complaint as Exhibit 5 (and referenced in footnote 9) speak for

**– App. 029 –**

themselves, and Defendant respectfully refers the Court to those letters.  Defendant otherwise denies.

37.     Defendant hereby incorporates by reference its responses to paragraphs 1 through 36 of the Complaint as if fully set forth herein.

38.     This paragraph contains conclusions of law and not averments of fact to which a response is required.    To the extent that a response is required, deny.

39.     This paragraph contains conclusions of law and not averments of fact to which a response is required.   To the extent that a response is required, deny.

40.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

41.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

42.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

43.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

44.     This paragraph contains conclusions of law and not averments of fact to which a response is required.   To the extent that a response is required, deny.

45.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

46.     Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

47.     Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

48.     Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

49.     Admit.

50.     Admit.

51.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, admit that no administrative remedies are presently available to Plaintiffs to challenge the August 26, 2013 letter.

52.     This paragraph contains conclusions of law and not averments of fact to which a response is required.  To the extent that a response is required, deny.

53.     Defendant lacks sufficient information to admit or deny the allegations of this paragraph.

The balance of the Complaint constitutes Plaintiff's request for relief to which no response is required, but to the extent a response is required, Defendant denies that portion of the Complaint.

Defendant denies all allegations in Plaintiff's Complaint not specifically admitted herein, including in headings. In addition, Defendant denies that Plaintiff is entitled to the relief requested in the prayer for relief, or to any relief whatsoever.

WHEREFORE Defendant respectfully requests that the Court enter an order dismissing this action in its entirety and with prejudice and with costs, and award such other and further relief in favor of the Secretary as may be appropriate.

**– App. 031 –**

Dated:  August 1, 2016          Respectfully submitted,

                                BENJAMIN C. MIZER
                                Principal Deputy Assistant Attorney General

                                CHANNING D. PHILLIPS
                                United States Attorney

                                JUDRY L. SUBAR
                                Assistant Branch Director

                                */s/ Steven A. Myers*
                                STEVEN A. MYERS (N.Y. Bar No. 4823043)
                                Trial Attorney
                                United States Department of Justice
                                Civil Division, Federal Programs Branch
                                20 Massachusetts Avenue, Room 7334
                                Washington, DC 20001

                                Tel:   (202) 305-8648
                                Fax:  (202) 616-8460
                                E-mail: steven.a.myers@usdoj.gov

                                Attorneys for Defendant

**– App. 032 –**

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 37 of 330

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RHEA LANA, INC.** and **RHEA LANA'S FRANCHISE SYSTEMS, INC.**, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. DEPARTMENT OF LABOR**, <br><br> Defendant. | Case No. 1:14-cv-00017 (CRC) |

## ORDER

Plaintiff Rhea Lana, Inc. is a for-profit business that hosts periodic consignment sales of children's clothing and merchandise. In early 2013, Rhea Lana came under investigation by the Department of Labor ("DOL") for its practice of offering unpaid consignors and volunteers early access to shop the merchandise in exchange for staffing its sales. DOL ultimately determined that these consignors and volunteers qualified as employees under the Fair Labor Standards Act ("FLSA") and thus were entitled to back wages for the labor they had already provided. DOL further cautioned Rhea Lana that if it continued these employment practices, it would be subject to civil penalties. Rhea Lana then brought this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), to challenge DOL's determination as arbitrary and capricious.

Currently before the Court is Rhea Lana's partially unopposed motion to supplement the administrative record with the following materials: (1) an August 6, 2013 "right-to-sue" letter from DOL to certain Rhea Lana employees; (2) an August 30, 2013 letter from DOL to Rhea Lana's Congressman describing its findings; (3) any content that DOL redacted from its investigation notes pursuant to the "informer's privilege"; and (4) a declaration from Rhea Lana Vice President David Riner responding to DOL's current explication of the reasons for its decision. Pl.'s Mot. Suppl. Administrative R. 2–3. Supplementing an administrative record is typically limited to three specific

**– App. 033 –**

situations: "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review." City of Dania Beach v. F.A.A., 628 F.3d 581, 590 (D.C. Cir. 2010) (internal quotes and citation omitted). Rhea Lana asserts that both letters—sent within weeks of DOL's final determination letter—shed light on the basis for DOL's decision and provide relevant background information. Pl.'s Mot. Suppl. Administrative R. 3–4. DOL neither refutes Rhea Lana's contentions nor objects to placing the letters in the record. Def.'s Opp'n Pl.'s Mot. Suppl. Administrative R. n.1. ("Defendant has no objection to the Court's consideration of either of these two letters"). Therefore, the Court will grant Rhea Lana's motion with respect to the two letters sent by DOL in August 2013.

Rhea Lana also objects to DOL's invocation of the "informer's privilege" to redact notes of its investigative interviews with Rhea Lana employees, volunteers, and consignors. Pl.'s Mot. Suppl. Administrative R. 6–7. Agencies rely on the informer's privilege to protect the identity of individuals who observe and report violations of the law so as to safeguard them from retaliation, which, in turn, encourages the public to continue participating in law enforcement efforts. See Roviaro v. United States, 353 U.S. 53, 59 (1957). But the Supreme Court has warned that "[t]he scope of the privilege is limited by its underlying purpose," and that withholdings should be restricted to information that "tend[s] to reveal the identity of an informer" and is not critical to a party's litigation strategy. Id. Rhea Lana maintains that DOL's redactions obscure more than just the identity of the interviewees and, moreover, hamper the company's ability to prosecute its case. DOL rejoins that the scope of the redactions are justified and necessary to ensure future employee cooperation with FLSA investigations. Def.'s Opp'n Pl.'s Mot. Suppl. Administrative R. 3. Alternatively, DOL seeks leave to file the unredacted versions of its interview notes *ex parte* for the

2

USCA Case #17-5259      Document #1718347      Filed: 02/16/2018      Page 39 of 330

Court's *in camera* review. Id. at 9–10.  Given that Rhea Lana has produced at least some evidence of overbreadth in DOL's redactions, see Pl.'s Reply 6–7, and that "an *in camera* review of the employees' statements would fairly balance, 'the public's interest in efficient enforcement of the [FLSA], the informer's right to be protected against possible retaliation and the [plaintiff's] need to prepare for trial[,]' " Brock v. Frank V. Panzarino, Inc., 109 F.R.D. 157, 158 (E.D.N.Y. 1986) (quoting Hodgson v. Charles Martin Inspectors of Petroleum, Inc., 459 F.2d 303, 305 (5th Cir. 1972)), the Court will grant DOL's request to file the original documents *ex parte* and will conduct an *in camera* review to determine if the redactions warrant DOL's exercise of the informer's privilege.

Turning finally to the Riner declaration, Rhea Lana argues that it should be included in the record alongside the recent declaration of the former District Director of DOL's Wage and Hour Division—and its principal decision-maker—Robert A. Darling.  The Darling Declaration sets forth the reasons for DOL's finding of wage-and-hour violations, which were absent from the determination letter the agency sent Rhea Lana at the conclusion of its 2013 investigation.  As such, the declaration belongs in the administrative record because it "furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review." Olivares v. Transportation Sec. Admin., 819 F.3d 454, 463–64 (D.C. Cir. 2016) (internal quotes and citations omitted).  The Riner Declaration, by contrast, attacks the thoroughness of DOL's investigation and the agency's reliance on purportedly expired policies and contractual agreements. See Decl. of David Riner Ex. 7.  But Mr. Riner's attestations are best saved for summary judgment proceedings when the Court will consider whether DOL's decision and rationale were arbitrary and capricious. They do not belong in the administrative record because they neither supply missing information relied upon by DOL nor "delineate the path by which [DOL] reached its decision." Charleston

3

USCA Case #17-5259      Document #1718347      Filed: 02/16/2018      Page 40 of 330

<u>Area Med. Ctr. v. Burwell</u>, 2016 WL 6208365, at *8 (D.D.C. Oct. 24, 2016) (quoting <u>Occidental Petroleum Corp. v. S.E.C.</u>, 873 F.2d 325, 338 (D.C. Cir. 1989)) (internal quotation marks omitted).

Accordingly, it is hereby

**ORDERED** that [38] Plaintiff's Motion for Leave to Supplement the Record be **GRANTED** in part and **DENIED** in part. The Administrative Record will include the August 6, 2013 and the August 30, 2013 DOL letters, but it will not include the Riner Declaration offered by Rhea Lana. It is further

**ORDERED** that [40] Defendant's Motion for Leave to File Exhibits Ex Parte and Under Seal be **GRANTED**. The Department shall, by December 12, 2016, file under seal an unredacted version of its interview notes for the Court's *in camera* review.

**SO ORDERED.**

Christopher R. Cooper

CHRISTOPHER R. COOPER
United States District Judge

Date:   December 6, 2016

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RHEA LANA, INC.** and **RHEA LANA'S FRANCHISE SYSTEMS, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF LABOR,**<br><br>Defendant. | Case No. 1:14-cv-00017 (CRC) |

## ORDER

Per the Court's Order dated December 6, 2016, Defendant Department of Labor filed unredacted notes of its interviews with Rhea Lana employees for the Court's *in camera* review. After careful examination of the submitted content, the Court finds that the Department's redactions are justified under the informer's privilege because they protect the identity of individuals involved in the investigation and advance the public's interest in enforcing the FLSA without undercutting Rhea Lana's ability to litigate its case effectively. See Roviaro v. U.S., 353 U.S. 53, 59 (1959).

Accordingly, it is hereby

**ORDERED** that [38] Plaintiff's Motion for Leave to Supplement the Record with an unredacted version of the Department of Labor's interview notes be **DENIED.**

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date:    December 13, 2016

**– App. 037 –**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


RHEA LANA, INC.,                        :
                                        :
               Plaintiff,               :   CA 14-17
                                        :
v.                                      :
                                        :
UNITED STATES DEPARTMENT OF LABOR,:
                                        :
               Defendant.               :
-----------------------------------------------------------


TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE CHRISTOPHER COOPER

UNITED STATES DISTRICT JUDGE

Tuesday, July 1, 2014

APPEARANCES:

  For the Plaintiff:   PRASHANT KETAN, ESQUIRE,
                       ROBYN BURROWS, ESQUIRE,
                       REED RUBINSTEIN, ESQUIRE
                       CAUSE OF ACTION
                       1919 Pennsylvania Avenue NW
                       Washington, D.C. 20006
                       (202)499-4232



  For the Defendant:   STEVEN A. MYERS, ESQUIRE
                       U.S. DEPARTMENT OF JUSTICE
                       Civil Division
                       20 Massachusetts Avenue NW
                       Washington, DC 20530
                       (202)305-8648

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

14

THE COURT:  Thank you, Counsel.

MR. MYERS:  Your Honor, may I ask to be heard briefly on rebuttal following --

THE COURT:  Sure.

MR. MYERS:  Thank you.

THE COURT:  Ms. Burrows.  Why don't you start with *Sackett*.

MS. BURROWS:  I'd be happy to.  Good morning, Your Honor.

THE COURT:  Counsel's argument is that this order doesn't compel your client to do anything.  Is that right?

MS. BURROWS:  Right.  The Department of Labor is trying to claim that *Sackett* does not apply here because the DOL letter did not relieve themselves of its obligations.  But it did.  An employer-employee relationship in the context of consigning is new. Defendant's argument is assuming that the FLSA prohibits voluntary consignment defense, but the FLSA letter is an unprecedented application of the FLSA.

THE COURT:  Can you -- I know we're not here to talk about the merits, but explain to me how the consignment employer-employee relationship works.  How does it manage to work?

MS. BURROWS:  What does the consignor do?

15

THE COURT:  Exactly.

MS. BURROWS:  Well, a consignor would typically be a mom that has the children's clothes, toys and if they want to sell them and try to get the money.  So what they would do is take those clothing, toys, all those items, drop them off at Rhea Lana's events.  They would be hung up, price tagged; and at the end of the sale, Rhea Lana would remit typically 70 percent of the sales price to the consignor.

Consignors are also allowed to volunteer.  They don't have to.  It's typically up to them.  They chose what type of task they would want to do, such as picking up fallen price tags, hanging up clothes for the simple things.  And as sort of a thank you for being able to volunteer, Rhea Lana allows these people to come to the front of the line for the events.  This is a very popular, so a lot of moms try to get the best deals, the best products, so it's really important that they can get there early.

THE COURT:  Are there employees with similar tasks?

MS. BURROWS:  Rhea Lana has some employees.  I think approximately 20 or some employees.  And they do more administrative tasks.  They do high-level tasks. They are in charge of kind of the big picture things like

16

making sure the event is secured, because there's a different venue for each event.  These are kind of popular events that happen.  They would be involved in the financials and all the paperwork.

THE COURT:  The employees do not undertake the tasks that volunteers undertake.  The volunteers are required in order to stage an event; is that fair?

MS. BURROWS:  They do do a lot of tasks for setting up, but this is a completely voluntary thing. They are choosing how long they want to be there.  There are some times when someone will sign up to be a volunteer and so they get to -- they'll sign up to help after the fact, because that's one of the things that you can do. You can come and help at the end, packing everything up. So sometimes those people, they get to shop early before they actually volunteer, and they may never volunteer.

And plus the events, the event runs itself out after one week.  There are not events that go on the entire year, seven to ten days.

But, Your Honor, getting back to the question about *Sackett*, DOL is trying to make this a distinction between the letter and the order, but they are really the same thing.  DOL is trying to say that the compliance order had detailed very specific obligations.  But under *Bennett v. Spear*, the relevant question is not how

**– App. 041 –**

```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x
RHEA LANA, INC., et al.,
                                      CA No:  1:14-cv-00017-CRC
            Plaintiffs,
                                      Washington, D.C.
                                      Wednesday, June 21, 2017
vs.                                   11:03 a.m.

UNITED STATES DEPARTMENT OF LABOR,

            Defendant.
- - - - - - - - - - - - - - - - - - x


_____

                  TRANSCRIPT OF MOTION HEARING
        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                 UNITED STATES DISTRICT JUDGE
_____
APPEARANCES:
For the Plaintiff:          ERICA L. MARSHALL, ESQ.
                            JOSHUA NATHANIEL SCHOPF, ESQ.
                            JULIE A. SMITH, ESQ.
                            PATRICK JOSEPH MASSARI, ESQ.
                            CAUSE OF ACTION INSTITUTE
                            1875 Eye Street, NW, Suite 800
                            Washington, DC 20006
                            (202) 803-6068
                            erica.marshall@causeofaction.org

For the Defendant:          STEVEN A. MYERS, ESQ.
                            JUDRY SUBAR, ESQ.
                            UNITED STATES DEPARTMENT OF JUSTICE
                            Civil Division
                            20 Massachusetts Avenue, NW
                            Washington, DC 20530
                            (202) 305-8648
                            steven.a.myers@usdoj.gov

Court Reporter:             Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6718
                            333 Constitution Avenue, NW
                            Washington, DC  20001
                            202-354-3187
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Your Honor, we're on the record for Civil Case 14-17, *Rhea Lana, Incorporated, et al. vs. The United States Department of Labor*.

Counsel, if you could please approach the lectern and identify yourself for the record.

MS. MARSHALL:  Good morning, Your Honor; Erica Marshall on behalf of the plaintiff companies, Rhea Lana, Inc., and Rhea Lana Franchise Systems, Inc.  I'm here with the president of the plaintiff companies, Rhea Lana Riner, and Dave Riner, the vice president of the plaintiff companies, as well as my colleagues from Cause of Action Institute:  Julie Smith, Patrick Massari, and Josh Schopf.

THE COURT:  Okay.  Good morning, Ms. Marshall. Welcome to Washington, everyone.

MR. MYERS:  Good morning, Your Honor; Steven Myers from the Department of Justice on behalf of the Department of Labor, and I'm joined at the table by Dean Romhilt from the Department of Labor and by my colleague Jud Subar from the Department of Justice.

THE COURT:  Okay.  Mr. Myers, good morning.

MR. MYERS:  Good morning.

THE COURT:  I know we're here on cross-motions, but since the government filed first, why don't we hear from the government first.

MR. MYERS:  Thank you, Your Honor, and may it please the Court.

This case is a challenge to an August 2013 letter stating the Wage and Hour Division's view that certain workers of the plaintiffs' consignment events who plaintiffs call consignor/volunteers are employees under the Fair Labor Standards Act, and the parties agree that in determining whether or not that conclusion was right, the fundamental question is the economic reality of the relationship.

In this case, as Wage and Hour found, the consignor/volunteers are employees based on the economic realities.  Like any retail business, they need people to perform all of the tasks that it takes to keep a retail store open -- operating cash registers, picking up after customers, working security, et cetera -- but instead of paying people money to perform these tasks, Rhea Lana's offers them the opportunity to shop early, when the best merchandise is available.

THE COURT:  Okay.  They argue that that opportunity does not constitute compensation as envisioned by *Alamo* and the other cases that discuss that factor. Address that issue.

MR. MYERS:  That's correct, Your Honor.  They do make that argument in this Court, and I think it's critical to highlight that that is directly contrary to what the

administrative record shows.

On Page 172 of the administrative record, plaintiffs specifically told Wage and Hour that the consignor/volunteers' primary motivation for participating in the events is to get early access to the sales.

On Page 168 --

THE COURT:  That doesn't mean it's compensation, though, does it?

MR. MYERS:  If I can point, Your Honor, perhaps, to Page 168 of the administrative record, this is the chart showing the various early shopping opportunities that are available in exchange for different amounts of labor.  I have a copy, if Your Honor would like it.

THE COURT:  Yes.

MR. MYERS:  And if Your Honor looks at the right-most column, the column header there is "Remuneration," which I think is fair to say is really a synonym for "compensation."  This is what you receive for working at the events.  This is plaintiffs' own submission to Wage and Hour, and this chart is reproduced in the record by the Wage and Hour investigators at Pages 233 and 302.

Your Honor can also look to what the individual consignor/volunteers told Wage and Hour.  They made it abundantly clear that this is the reason why they showed up to work, that this is what they were trying to get.

On Pages 67 to 68, "The benefit of volunteering is that you can come in to shop at 8:00 versus coming in at 1:00, if you just consign."

On Page 72, "The only reason I volunteered was to shop early on Saturday to get better stuff to buy."

And so --

THE COURT:  Now, if the remuneration were a 15 percent discount, clearly that would be compensation.  But here it's, as I understand it -- everyone agrees it's the opportunity to shop early and to have access to merchandise that might not be around later in the day.  Is that right?

MR. MYERS:  Your Honor, not only might it not be available later in the day, but, you know, if multiple items were listed by different consignors at different prices, then presumably the less-expensive item would sell first, and so presumably the best deals are also available earlier in the day.

And I think we quoted in our brief the statement of plaintiffs' counsel at the last hearing, three years ago, when counsel said this is important because the best deals are available, you know, earlier in the day.

THE COURT:  Okay.

MR. MYERS:  And so there really is an economic benefit to doing this, and that is individuals are willing to work, you know, between five or 20 hours for this

opportunity.

In addition, Your Honor, we pointed to a document in the record which is at Page 278. This is the bartering agreement where, you know, consignor/volunteers are required to specifically acknowledge that they're voluntarily trading the time they work for early shopping opportunities.

Now, it's absolutely true, as plaintiffs have said, that this particular document was from a Rhea Lana franchisee and not the corporate parents, but the complaint specifically pleads at Paragraph 27 that the franchises operate in substantial conformity with the business model of the corporate parent, and so this is just another piece of evidence that shows, you know, again, as Wage and Hour found and as the consignor/volunteers said, that the incentive for working at these events is early shopping at the sales.

THE COURT: Okay. Is there any evidence in the -- or any suggestion in the record, other than the existence of that email in the record, that either Deputy Director Darling or the investigators considered that bargaining agreement, or, for that matter, some of the other emails that the plaintiff has highlighted in the case as being evidence of sort of post hoc justifications for the determination?

MR. MYERS: Your Honor, that particular document on Page 278 is certainly referenced in the Darling

declaration, which Your Honor has accepted into the record.

THE COURT:  I understand.

I'm not talking about the declaration.  I'm talking about the materials that were before Mr. Darling as reflected in the record at the time of the determination letter.

MR. MYERS:  Your Honor, other than the email itself, no, I'm not aware of another reference to that email.  But, again, the email itself is in the record, and that is the certified record of what was before the agency at the time that the decision was made.

So on the economic realities, Your Honor, the first factor that we've just been talking about is the fact that work is provided in exchange for compensation.  And the Supreme Court, you know, really clearly held in the *Alamo Foundation* case that when individuals expected to receive in-kind benefits and expected them in exchange for their services, that they're employees and not volunteers.

Moving to a second factor of the economic --

THE COURT:  You would acknowledge that the types of benefits at issue in *Alamo* were more directly beneficial, for lack of a better word, to the recipients.

MR. MYERS:  They were certainly different, Your Honor.  It was food and lodging.  We've also pointed to the *Hallissey* case, the *AOL* case, in which individuals received

**– App. 048 –**

discounts at the company store and, I think, free AOL Internet access.

THE COURT:  All of those things can be monetized, right?

MR. MYERS:  I suppose that's right, Your Honor. We would submit that early access to the sales when the most desirable deals are available also has a monetary value, and that's why individuals are interested in making this trade.

Let me talk about a second factor of the economic realities, which is the immediate advantage to Rhea Lana's. Rhea Lana's specifically tells its workers -- and this is on Page 264 of the record -- that volunteers are the life blood of our event, and we can't do it without you.

And there's really no dispute that the kind of work that the consignor/volunteers did was really menial tasks associated with operating a retail store.  We filed a notice of supplemental authority letting Your Honor know about the decision in *Hugler vs. Cathedral Buffet*, and in that case, you know, the Court based a finding of an employment relationship on the fact that the main purpose of using the volunteers was to save money -- that's at Paragraph 54 -- and also that the volunteers' work was clearly integral to the buffet's operations in that they did work that was necessary to the operation of a restaurant; things like cleaning, bussing tables, et cetera.  And this

**– App. 049 –**

case is simply the retail store analog of that restaurant case.

I'd also note, Your Honor --

THE COURT:  I'm sorry, where was that case from?

MR. MYERS:  That's *Hugler vs. Cathedral Buffet*. It's out of the Northern District of Ohio, and we filed a notice of supplemental authority at ECF 61.

The other point I would make, Your Honor, on that particular factor is that there's evidence in the record that when Rhea Lana's couldn't get enough workers through this trade, it would then offer $8 an hour.  And so, again, this is work that is critical to their business that they would otherwise be paying for if this trade didn't work out.

The third relevant factor of the economic realities is the relationship between the parties more broadly.  Again, we know that Rhea Lana's has a graduated scheme of compensation in exchange for work, which is really not consistent with charitable volunteering.  The record is clear that Rhea Lana's provides instruction on how the work is to be done.  Multiple consignor/volunteers made clear that you always check in with a manager and the managers tell you what to do.  The record amply supports that individuals sign up for shifts in advance and sign in and out on a time sheet, and finally, at Page 86, it's noted that workers wear a company T-shirt while they're on duty

**– App. 050 –**

for Rhea Lana's.  So, again, all of those factors are consistent with a working employment relationship.

Fourth, Your Honor can look to the goals of the statute.  Courts have noted again and again that the FLSA has a remedial and humanitarian purpose, and for that reason it needs to be interpreted broadly.  The Supreme Court has said that a broader definition of "employment" under the act would be basically impossible to frame.

Here, even if the particular employees are willing to forgo cash payment, the Supreme Court specifically held in the *Alamo* case that the purposes of the act required that it be applied even to those who would decline its protections, and one of the reasons --

THE COURT:  But the concern there, wasn't it, was the notion of unequal bargaining power and that employees could be coerced into saying that they really wanted to volunteer their labor, when, in fact, they should be being paid.

There's nothing like that here, is there?

MR. MYERS:  Your Honor, there's no evidence of coercion in this record, but with respect --

THE COURT:  But isn't that -- I get it that the FLSA is to be interpreted broadly, but isn't that the remedial concern that *Alamo* addressed?

MR. MYERS:  Yes, Your Honor.  In the context of

*Alamo*, that is certainly true.

But in terms of the purposes of the statute more broadly, you can look to the act's declaration of policy, and this is picked up by the Supreme Court in the *Citicorp Industries* case that we cited in our brief. An entirely separate purpose of the act is to eliminate the competitive advantage enjoyed by businesses that don't pay their workers a fair wage.

And so, you know, Rhea Lana's fundamentally sells inexpensive children's items, and in that market they compete not only with other consignment businesses, who, you know, they say follow their same model --

THE COURT:  Let's stop there.  Is there any evidence to the contrary that this is the prevalent business model in the periodic consignment market?

MR. MYERS:  There is no evidence to the contrary in the record, Your Honor.

THE COURT:  Okay.

MR. MYERS:  But, again, I would submit that businesses in that very narrow segment of the industry also compete with other sellers of used children's items, you know, thrift stores that don't follow a consignment model and also just other sellers of new-but-inexpensive children's items.  And, again, Congress was trying to avoid the competitive advantage enjoyed by businesses that don't

**– App. 052 –**

pay their workers in compliance with the FLSA.

Your Honor, a second and wholly independent basis for DOL's conclusion in this case is its long-standing policy that bars the use of volunteer labor at for-profit entities.  The Court of Appeals in this case noted that policy.  It said that DOL has for several decades read the FLSA that way, and we submit that that's an entirely reasonable reading of the statute.

The statute defines an employee as someone who is suffered or permitted to work, and the statute lays out very carefully various exemptions, you know, individuals who work for state governments or in the public sector, at food banks.  There's a Supreme-Court-based exception for trainees and interns based on the *Walling* case.  But plaintiffs' real problem in this case is that they don't have an exception that applies to them.  They would like one, and they're currently asking Congress for one, and they're telling Congress that they need one to protect their business, but they don't have an exemption yet.

The department's reading of the statute, that without an exception -- you know, unless there is an exception, for-profit businesses can't use volunteer labor is an entirely reasonable reading of the statute that's been, you know, noted by the regulated community over and over and over again, and it seems to be really broadly

understood.

THE COURT:  Apart from this circuit noting that that is your position, has there been any case assessing the validity of that position based on the statutory language and purpose, et cetera?

MR. MYERS:  Your Honor, the *Okoro* case that we pointed to, I think, summarizes our position quite well that this is generally DOL's policy.  There are exceptions.  You know, for example --

THE COURT:  Has anyone challenged that policy?

MR. MYERS:  Your Honor, I'm sure plaintiffs will mention the *Patel vs. Patel* case, which seemed to reject that policy, but we do think that that is the correct interpretation of the statute.  And, again, Your Honor, I would just point to plaintiffs' own testimony to Congress where they have said that new legislation is necessary to protect their business.

Let me talk about plaintiffs' counterarguments.  I think the central point that they make is that DOL applied the wrong test in the administrative process and is making different arguments in court today.

First of all, that argument relies entirely on cherry-picking particular documents from the record.  Your Honor has already held that it's the Darling declaration that states the reasons for DOL's conclusion, and as we've

explained, we don't think there's any basis for reconsidering that conclusion.

Even assuming for a moment, however, that Your Honor --

THE COURT:  But there -- I mean, I held what I held, right?  But isn't their argument that now that the administrative record is before the Court, the Court can determine whether there are inconsistencies between the Darling declaration and materials that are in the AR?

MR. MYERS:  So that is plaintiffs' argument, Your Honor, and candidly I was puzzled by it because when plaintiffs made their motion to supplement the record that put this question before Your Honor, they attached pages from the administrative record and so they could have put whatever pages from the administrative record that they wanted before Your Honor, and they seemed to have thought of new arguments later in the case that they wish they made, you know, back in September of 2016, but the administrative record was available to plaintiffs, and they demonstrated that they were capable of putting it, you know, before the Court.

With that said, Your Honor, you know, even if you were not to look to the Darling declaration and were to look only to the FLSA narrative and the final conference memorandum, those documents apply an economic reality test.

The D.C. Circuit has specifically held -- and this is *Spirides vs. Reinhardt* case -- that the independent contractor factors are simply a way of getting at the economic realities.  It's the test under the FLSA of employment is economic reality; and there are, perhaps, different sort of ways of approaching that question, but the fundamental question remains the same.

THE COURT:  Why did the investigators focus on the independent contractor versus employee distinction during the investigation?

MR. MYERS:  Your Honor, I'd have to speculate to answer that question.  I suspect it's because DOL is much more used to assessing the difference between employees and independent contractors than employees and volunteers simply because so much of the business --

THE COURT:  Slow down just a second.

MR. MYERS:  Thank you.  I suspect that they're more used to contrasting employees and independent contractors than employees and volunteers for the simple reason that the regulated community generally understands that you can't use volunteer labor at for-profit businesses, and so there's just a ton more case law that deals with independent contractors than deals with volunteers.

THE COURT:  So I read the FLSA narrative, and there's a notation that there are a certain number of

employees and something like a hundred independent contractors. Do you recall that?

MR. MYERS: I think generally, Your Honor.

THE COURT: And I guess the question is, what is the relevance of that to their investigation? I mean, was it the case that the company took the position that the volunteers were, in fact, independent contractors? Is --

MR. MYERS: Your Honor, to the best of my recollection, that is probably a reference to the pure consignors whom DOL agreed were not employees. I think that's probably what was being referred to.

THE COURT: So those are independent contractors, in your view?

MR. MYERS: Those are certainly not employees, in our view. DOL has never taken that position.

If you look to the findings that are made by the Wage and Hour investigators in the FLSA narrative and in the final conference memorandum, they're the exact same facts that are highlighted in the Darling declaration and that are highlighted in our briefs in this case. And so the final conference memo, you know, specifically notes that the motivation for participating is to get an early selection of high-quality items and save money on the family budget. That's at Page 233 of the record.

The final conference memo notes that Rhea Lana's

puts a schedule on the website with times to sign up and sets the schedule.  It notes at Page 232 that managers or ops managers direct the work of the consignors, and it notes at Page 233 that the work is routine in nature and includes things like --

THE COURT:  Okay.  Are those facts independent of the factors that the investigators considered in connection with the independent contractor test, or do those facts go to one of the prongs of the independent contractor test?

MR. MYERS:  Your Honor, the investigators organized their findings using the independent contractor test, and so they appear under those headings, but the point I'm making, or attempting to make, is that the independent contractor test is simply one sort of lens through which to view the economic realities.

THE COURT:  So it's not your argument that, you know, one or more prongs of the independent contractor test also satisfy the economic reality test under *Alamo*, but just that the facts that were used to apply the independent contractor test can also be applied in the other context?

MR. MYERS:  I think, Your Honor, both of those things are true.  So, for example, under the independent contractor test, the nature of the -- you know, the degree of control exercised by the employer is a relevant factor.

THE COURT:  So that would map to the relationship

of the parties' prong of the --

MR. MYERS:  I think that's fair, Your Honor.

But I think our sort of more fundamental point is that both of these tests are ways of getting at the economic realities.  You know, the Supreme Court has just said that in any context the test of employment under the act is economic reality, and that's true both in the independent contractor context and in the volunteer context.

Under the D.C. Circuit's decision in the *Mail Order Association vs. U.S. Postal Service* case, I think the law is pretty clear that if the agency relied in part on the wrong test and in part on the right test, Your Honor can sustain the agency decision so long as it relied in part on the right test.  And so I think to prevail on this point, plaintiffs would have to convince Your Honor that the agency didn't consider economic reality at all.  That was just not something it was thinking about.  And we submit that the record, you know, really makes plain that that is not the case.

I can touch briefly on a few of plaintiffs' counter-arguments in response to all of this.  They make the observation that the consignor/volunteers aren't employees because they're not dependent on Rhea Lana's.  Plaintiffs have conceded -- this is on Page 26 of their first brief -- that economic dependence isn't the only way to create an

expectation of compensation, and as we've argued, if it were, then independently wealthy people would never be employees, and employers of people who received no payment would also generally not be employees because, by refusing to pay their employees, these employers would preclude them from entering a state of dependence in the first place.

Plaintiffs also talk a lot about the Supreme Court's decision in the *Walling* case. This is *Walling vs. Portland Terminal Company*. This is the case that stands for the trainee exception to the FLSA, and the facts of that case just couldn't be more different from the facts of this case.

In that case, the trainees who were learning how to be, you know, operators of railroads or work on railroads had no expectation of compensation. They received valuable training from the railroad. They didn't displace any real employees, and they may have actually even impeded the railroad's work. That's all from the Supreme Court's decision in the *Walling* case.

Here all four of those factors point the opposite way. You know, as we've said, these individuals did have an expectation of compensation; they don't really get training; they're doing menial work; they do displace real employees because the company's alternative is to pay $8 an hour; and there's no suggestion that they impede the company's work.

Instead, they're the life blood of the company's work, to use their own words.

Plaintiffs also observe these individuals only work for a short period of time.  There's no authority for the proposition that short duration precludes an employment relationship.  Indeed, at plaintiffs' events they have these managers and ops managers who are also only working for a short period of time, but those individuals have to get paid under the FLSA.

Your Honor, just very briefly I can address the motion to strike.  We've talked about some of the sort of merits points behind it.  You know, we obviously think Your Honor got it exactly right based on the D.C. Circuit's decision in the *Olivares* case and other cases that we've pointed to.  But just as a procedural matter, for no other reason that motion should be denied because plaintiffs have never explained why they waited from December of 2016, when Your Honor ruled on this issue, all the way to the conclusion of briefing to then finally raise a belated motion to strike that should have been timely raised at the time that the declaration was filed.

THE COURT:  Okay.  Very well.

MR. MYERS:  Thank you, Your Honor.

THE COURT:  Ms. Marshall.

MS. MARSHALL:  Thank you, Your Honor.

**– App. 061 –**

We have 30 years of Supreme Court precedent that tells us that a person who works for their own purpose or pleasure without the expectation of compensation in the for-profit activities of another is not an employee under the Fair Labor Standards Act.

THE COURT:  Well, that begs the question as to what is compensation, right?  And we have volunteers saying that they did it, at least in part, to get early access to the merchandise, and the question which I asked your colleague is, you know, is that not compensation; and if not, why not?

MS. MARSHALL:  Yes, Your Honor.  I think that the Court hit on this particularly well when asking opposing counsel about this.  There is simply no authority for this proposition that the government is taking in this case that the subjective and intangible benefit of shopping early somehow constitutes compensation under the Fair Labor Standards Act.

THE COURT:  They say it's tangible, that it's access to better deals and it's access to merchandise that might not be around later.  Isn't that worth something?

MS. MARSHALL:  It certainly is access to more goods.  There's more choices and more selection at this early shopping opportunity.  However, there's nothing quantifiable, and that is the main distinction between the

opportunity here and anything like the *Alamo* case and the *AOL* case that the government has relied on.

THE COURT:  So I just purchased a ticket to fly on Southwest Airlines, and I paid an extra $15 for each leg in order to be able to board first and to have my choice of seats and access to the overhead compartments.  Isn't that worth something, and how is this any different?

MS. MARSHALL:  Your Honor, those items are certainly worth something.  Individuals are paying for those, as Your Honor has noted.

This is very different here in the context of the FLSA case law that we've been applying.  There's simply no authority for this proposition taken by the government that the opportunity to actually spend your own money can also be payment under the Fair Labor Standards Act such that it would create an employment relationship.  What you really have here are individuals who are paying $9.50 as Rhea Lana customers to both consign and then sign up to volunteer at these events and gain access to the earliest goods.

The DOL has offered no support for its position that an individual can somehow become a company's -- go from being a company's customer to being their employee suddenly because the employer received some sort of benefit.  I mean, this is interconnected with this argument that these individuals aren't receiving compensation.  If that is the

law, what the DOL is asking this Court to say is anyone can become an employee -- go from being a customer to an employee if the company's getting a benefit. If that's the case, any time I pump my own gas at a gas station, I'm going to become the employee of that gas station.

What the DOL is doing in its post hoc litigation positions is really saying -- what they're really saying here is there's all these other people who might want to work at Rhea Lana events for the minimum wage. They're not saying there's an employment relationship between -- they're trying to say there's an employment relationship between the customers of Rhea Lana's, but what they're really saying is there's this other group of people who we're trying to protect here who want to work.

But the goal of the Fair Labor Standards Act is to ensure that when there's been an employee relationship already consummated, that those individuals are working for a livable wage. It's not to suddenly mandate that employers go out and find employees to create those relationships with. So the government's position is arbitrary and capricious in that regard.

And if the Court takes a look at the economic realities test, as it must and as the Department of Labor was obligated to do back in 2013 but failed to do, it's very clear that the facts show these individual consignor/

volunteers, these moms and grandmothers who are signing up online to participate in these week-long pop-up children's consignment events, were not also entering into some sort of employment relationship with Rhea Lana at that time, and the record makes that clear, that Rhea Lana should succeed in this case for two reasons.

First and foremost, as Rhea Lana has briefed extensively, the DOL really applied the independent contractor test back in 2013, not the economic realities test as it was obligated to do.  For that reason alone, since it applied the wrong factors, its decision in 2013 was arbitrary and capricious and must be set aside.

THE COURT:  Okay.  Address the government's argument that under the -- let me start over.

Address the government's argument that under the prejudicial error doctrine, even if I agree with you that the wrong test was applied, but if the facts found also support employee status under the economic substance test, they still win.

MS. MARSHALL:  Your Honor, Rhea Lana was prejudiced by the application of the independent contractor test.  The factors of the independent contractor test were applied by the Department of Labor in a very strict way. They applied the seven factors set forth in the independent contractor test, even though a number of those factors have

no bearing or had no relation to the actual facts of this case. They did not apply the economic realities test as they now admit at Page 12 of their opening brief they should have done.

The key difference between the independent contractor test and the economic realities test and why plaintiffs were prejudiced by it is that the independent contractor test is an A or a B result. You're either an independent contractor or you're an employee under that test. There's no C for maybe you're a joint venture with Rhea Lana or maybe you're a volunteer. There is no third category. It's either A, independent contractor, or B, employee.

THE COURT: But the government's point is that if the facts that were used to make the employee determination based on the independent contractor test are sufficient to make an employee determination under the employee/volunteer test, why isn't the result the same under the --

MS. MARSHALL: Your Honor, under *SEC v. Chenery* the Department of Labor is not entitled to at this point go back and say -- and piece together parts of the administrative record and say, "Oh, we could have arrived at the right result anyway no matter what." The *SEC v. Chenery* case locks this Court into doing what the agency actually did in 2013, and that was apply this very stringent

independent contractor test, and the factors of that test do differ from what the agency was obligated to do in considering the totality of the circumstances under the economic realities.  The totality of the circumstances, Your Honor, indicate clearly that these individuals were not entering into an employment relationship with Rhea Lana.

At Page 14 of our reply brief, we actually bullet point out the key factors that demonstrate that there was no sort of employment relationship between the parties.  These events are week-long events that occur twice a year.  They function similarly to a garage sale.

THE COURT:  Before you get there, Counsel, let's talk about the right test/wrong test issue --

MS. MARSHALL:  Certainly.

THE COURT:  -- just for a minute.

Why isn't the letter that the Wage and Hour Division sent to Congressman Griffin a week after the determination letter which sets forth the *Alamo* test and the economic substance test, why isn't that evidence that Deputy Director Darling did, in fact, consider the economic substance test notwithstanding the investigator's reliance on the independent contractor test?  Do you follow me?

MS. MARSHALL:  I do, Your Honor.  I think I do anyway.

The May 24th letter from Mr. Darling to the

Congressman, it clearly sets forth the Fact Sheet 13.  It enclosed Fact Sheet 13.

THE COURT:  I'm sorry, I'm not talking about that.  The determination letter is August 26, 2013.

MS. MARSHALL:  I see, Your Honor.

THE COURT:  Okay.  One week later, August 30, 2013 -- and the determination letter obviously does not go into any detail as to the basis for the findings.

A week later, the Wage and Hour Division, through Ms. Fortman, responds to a letter from the Riners' Congressman which sets forth the *Alamo* economic substance test as the reason for the determination.  Why is that not evidence that Mr. Darling, in making the determination, considered that test as opposed to the independent contractor test?

MS. MARSHALL:  Your Honor, that letter post-dates the final determination letter that was sent out.

THE COURT:  By a week.

MS. MARSHALL:  By a week, yes.

THE COURT:  But what if she had said, "District Director Darling told me" or "District Director Darling considered the *Alamo* test"?

MS. MARSHALL:  Your Honor, again, that letter comes after the August 26th determination letter, and so in that regard it is similar to the Darling declaration that's

been submitted to this Court in that it was -- it's after the agency actually issued its final determination letter. The record makes it very clear that the agency actually made its final decision as of this final conference with Rhea Lana and Dave Riner on May 20, 2013.

Now, that -- and the contents, the reasons for its decisions that it relayed to my clients at that time are set forth in this aptly named final conference memorandum which the plaintiffs have been citing as the reason that really explains and explicates the agency decision in this case.

I mean, the record is replete with references to the independent contractor test, the same one that was applied in that final conference memorandum, and as we can discuss now or in the motion to strike, Your Honor, Mr. Darling adopted that reasoning.  He adopted that reasoning four days later when Mr. Darling, in his own writing, wrote to Congressman Griffin attaching Fact Sheet 13, the independent contractor test, and saying, "We've already made our determination that we find these consignor/ volunteers to be employees under FLSA."

THE COURT:  Okay.

MS. MARSHALL:  So the reality of the situation, as reflected by the administrative record, which this Court is bound to apply to the exclusion of the Darling declaration's contradictory attestations, is that the agency has rendered

its final decision as of May 20, 2013.

The final determination letter went out after that, of course, on August 26, 2013, but it doesn't change the fact that the agency had reached its conclusions as of this May 20th date and that -- those considered the wrong factors, and so under *Overton Park* and many Supreme Court cases, when the agency considers the wrong factors, this Court shall, under the Administrative Procedures Act, set it aside.

THE COURT:  Okay.  Address application of the economic substance test.

MS. MARSHALL:  Yes, Your Honor.

Under the -- as I was mentioning, Page 14 of our reply brief bullet points out a number of facts which the agency found and which clearly show that under the economic realities test, which the agency should have applied, these consignor/volunteers do not constitute employees.

These events are twice a year and operate as large-scale garage sales, Your Honor.  There's simply no dependence from the individuals who are working these events on Rhea Lana.  The DOL actually found that fact, that 99 percent of them have income from other sources.

Rhea Lana doesn't hire these consignor/volunteers, doesn't fire these consignor/volunteers.  Rhea Lana doesn't keep employment records on these individuals.  Rhea Lana

**– App. 070 –**

does not in any way judge the performance of these individuals. These individuals check in, they figure out within 60 seconds what needs to be done at the event to help out, and most importantly, these individuals have a stake in the outcome of the sale. As the DOL has admitted in its answer, to the extent that a Rhea Lana eight-day sales event is successful, those individual consignor/volunteers themselves benefit from that.

While the Department of Labor has essentially asked this Court to review the economic realities test, two particular factors of the economic realities test in a bubble -- that is this compensation issue, which we've already discussed, and the benefit that Rhea Lana is receiving from these consignor/volunteers -- that itself is not a proper application of the economic realities test. The D.C. Circuit has made it clear that this Court should look for the indicia of the traditional employment relationship, and here there just isn't one.

I mean, these consignor/volunteers have stated in the record that they have fun consigning. They're bringing their family members to these events with them. I'm not sure of anyone in this room who could send their husband to work or their wife to work for them and not have their employer say something about that. Here that's just par for the course at these events that are really run by moms for

moms; the idea being that these individuals come, and they consign their own goods and make some money that way, and then use that money to shop at these events and so that they get access to new goods for their families and for their growing children.  There's simply nothing in the record that shows any sort of indicia of a traditional employment relationship.

THE COURT:  Okay.  Address the competitive advantage issue.  Has the government identified the correct market, or is the market similar consignment sales shops?

MS. MARSHALL:  The Department of Labor here, Your Honor, has done everything they possibly can to convince this Court that Rhea Lana is competing with big box retailers or the brick-and-mortar retail industry.  That is simply not the case.

THE COURT:  Put that aside.  Are they competing with brick-and-mortar second-hand stores or thrift shops and the like --

MS. MARSHALL:  I don't --

THE COURT:  -- who do not have volunteer labor and who must pay minimum wages to their employees?

MS. MARSHALL:  I don't think they're competing with those stores, Your Honor, because those stores are open presumably five, six, or seven days a week year-round.

THE COURT:  Couldn't a consumer choose to go to

that store which is open year-round or wait for, you know, a couple of months until the next Rhea Lana sale takes place?

MS. MARSHALL:  I suppose, Your Honor, that if an individual wanted to wait six months until the next Rhea Lana consignment event, that individual could choose to do that, but I don't think that that places Rhea Lana in a market as competing on a daily basis with those companies.

The business model here is dramatically different, and as the record reflects, the other children's consignment event participants that have these twice-a-year pop-up garage-sale-like events, they're all using this similar business model.

THE COURT:  And it's just children's merchandise; is that right?

MS. MARSHALL:  I believe it's children's merchandise and goods, so I believe things such as strollers and toys and things of that nature.

Your Honor, there's just simply no -- nothing -- most importantly, I would draw the Court to the fact that there's nothing in the actual record showing that Rhea Lana was competing with any sort of big box retailers.  This Court under *Chenery* is locked in to look and see what is in the actual record.  While the Department of Labor, for its litigation papers, has certainly raised this as a reason why the Court should find a larger, more expansive market, if

**– App. 073 –**

you look at the actual facts of the administrative record, the facts make it clear that Rhea Lana's competitors are these other children's consignment events.

I'd also like to address, Your Honor, the Department of Labor's request that this Court give it *Skidmore* deference for its policy, its bright line ban on volunteering at a for-profit -- its bright line ban about volunteering at a for-profit company.

THE COURT:  It's not bright line.  There are exceptions, correct?

MS. MARSHALL:  Your Honor, the opinion letters take the position that barring an exception that the DOL itself has created, that it is a bright line ban on volunteerism at a for-profit company.  That is contrary to existing Supreme Court precedent from the *Alamo* case which clearly says that an individual can work in the for-profit activities of another as long as they're not being compensated and working for their own purpose or pleasure.

That is the case that we have here.  These individuals enjoy participating in these Rhea Lana events.  They're not being coerced in any manner to participate in those events.  They're signing up online at their own accord as Rhea Lana customers.

The Department of Labor is entitled to no *Skidmore* deference when its holding is contradicted by Supreme Court

**– App. 074 –**

precedent, and as the DOL brought up, they can't cite this Court a single case that has actually adopted that as the law and applied that policy, and indeed any court that has considered it -- even the *Okoro* court considering that has held that there's really no -- that the law does leave open this possibility that people volunteer at for-profit companies.

We think, when the Court really looks at the economic realities of this situation, it should find that the consignor/volunteers are not employees under the Fair Labor Standards Act, and for that second reason should set aside the agency action as arbitrary and capricious and not in accordance with law.

THE COURT:  Okay.  Thank you.

MS. MARSHALL:  Thank you, Your Honor.

THE COURT:  Mr. Myers, last bite.

MS. MARSHALL:  Your Honor, we do have the -- would you like me to address the motion to strike now?

THE COURT:  I don't need you to address it.  I have what I need.

MS. MARSHALL:  Okay.  Thank you.

MR. MYERS:  Your Honor, I was going to address the motion to strike, but I won't.  Let me just turn right to the economic realities.

Plaintiffs have invited Your Honor to look at Page

14 of their reply brief, and they have a list of facts. You'll notice that conspicuously missing from that page is any legal authority, and the reason for that is that there's no legal authority for the proposition that whether or not someone has fun at an event is dispositive of employment status. There's no legal authority --

THE COURT: I don't think they're arguing that any of these points are dispositive, and there doesn't have to be a case, right? This is a -- you know, when one considers what the economic reality is, it's a multifaceted inquiry, and whether it's supported by case law or not I'm not sure is the point, right?

MR. MYERS: Well, Your Honor --

THE COURT: You've cited factors like having to check in with a manager and the manager giving you instructions. I mean, that's not from a case, correct?

MR. MYERS: No, Your Honor, that goes directly to the degree of control, which we do think, you know, is widely recognized in the case law with respect to the economic realities.

THE COURT: The question is whether there's a traditional indicia of an employee/employer relationship, and, you know, are there performance reviews? Is there direction given? Is there reporting? You know, subject to being hired, you know, fired, promoted or demoted, all of

those things go to whether there is an employment relationship between the parties, correct?

MR. MYERS: That's fair, Your Honor. I think the Supreme Court has told us that one of the really first things to look at is the expectation of compensation, and that's why we've been, you know, quite so focused on that, but --

THE COURT: Both of you all have tried to, you know, give me a hierarchy of importance, right? And you point to the expectation of compensation and the benefit received by the employer; whereas they point to the dependency notion, and I've got to tell you, as I read these cases, you know, they all seem to go into the mix, and I'm not sure I can identify a hierarchy.

MR. MYERS: And I guess, Your Honor, my only response to that would be to say that the expectation of compensation comes, you know, with case support from *Alamo.* It being useful for the employer comes with case support from *Okoro* and from the *Cathedral Buffet* case. There really isn't, you know, case or other support for this notion of fun for the lack of expectation of payment being relevant. Indeed, that is directly foreclosed by the *Alamo* case.

Plaintiffs make the point that their consignor/volunteers have a stake in the sale. That's certainly true. We admitted as much in our answer. But we know that's not

**– App. 077 –**

enough to get them in the door to work, because if it were, they wouldn't have to offer this additional compensation. And as we explained in our brief, the reason they have to offer this additional compensation is that otherwise they'd be faced with a classic economic free-rider problem. Anybody would rationally stay home and hope that somebody else would work, and that's why they have to provide this compensation that is, you know, a targeted individual that comes with an early worker pass that you alone hold to get people in the store to work. And so, you know, that really is -- it's a form of compensation.

Again, plaintiffs have said as much in the administrative proceeding. They've said as much at the last oral argument in this court. It is the reason people volunteer or work. It's the remuneration, you know, per page 168 of the record.

Your Honor noted that this is ultimately just a lot of, you know, holistic facts being considered. We would submit that that underscores why the agency did apply the right test. Economic reality is about the holistic facts. One way of organizing those facts is through the independent contractor lens. Another way of doing it, you know, is without that rigid organizational structure. But, again, ultimately all of the points that we have said in this federal case are important are the same facts that were

relied upon during the investigation. And, again, all of that only matters if Your Honor strikes the Darling declaration, and we don't think you should.

THE COURT: Address Ms. Marshall's point regarding the earlier Darling letter to Congressman Griffin explaining that the Bureau had made a decision and that it can at least be inferred that that decision was based on the factors that were set forth in the FLSA narrative and in the, you know, final close-out meeting --

MR. MYERS: Your Honor, I think my response --

THE COURT: -- and that therefore the subsequent explanations in the second Griffin letter, let alone in the Darling declaration, are post hoc justifications.

MR. MYERS: Your Honor, my response to that particular letter is really the exact same response I would make to the FLSA narrative in the record, and that is to say, one, Your Honor has already ruled on this issue; two, there's not a meaningful distinction between the volunteer test and the independent contractor test -- they're both about economic realities -- and three, under the D.C. Circuit's *Mail Order Association* case, as long as the agency at least partially applied the economic realities, that's enough for you to uphold the agency determination.

THE COURT: Thank you.

MR. MYERS: Thank you very much, Your Honor.

THE COURT:  Okay.  Very well.

Okay.  We stand adjourned.  The Court will take the motions under advisement, and we will issue a written decision, okay?  Have a good day.

(Whereupon the hearing was

concluded at 11:51 a.m.)


**CERTIFICATE OF OFFICIAL COURT REPORTER**


I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 26th day of June, 2017.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

USCA Case #17-5259   Document #1718347   Filed: 02/16/2018   Page 85 of 330

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| RHEA LANA, INC. & RHEA LANA'S FRANCHISE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR <br><br> Defendant. |

Case No. 14-cv-00017 (CRC)

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [50] Defendant's Motion for Summary Judgment is GRANTED.  It is further

**ORDERED** that [53] Plaintiff's Cross-Motion for Summary Judgment is DENIED.  It is further

**ORDERED** that [59] Plaintiff's Motion to Strike is DENIED.

This is a final appealable order.

**SO ORDERED.**

*Christopher R. Cooper*

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    September 26, 2017

**– App. 081 –**

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 86 of 330

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RHEA LANA, INC. & RHEA LANA'S FRANCHISE SYSTEMS, INC.,** | |
| Plaintiffs, | |
| v. | Case No. 1:14-cv-00017 (CRC) |
| **U.S. DEPARTMENT OF LABOR,** | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, employees are entitled to earn a minimum wage for the hours they work. Plaintiff Rhea Lana, Inc. is a for-profit business that hosts semi-annual consignment sales of used children's clothing and merchandise, relying on the labor of its "consignor/volunteers" to help organize and run these events. In 2013, the Department of Labor investigated whether these volunteers, who were offered early access to shop the sales merchandise, qualified as employees under the FLSA. The Department ultimately determined that they were employees and thus entitled to back wages for their past labor. The agency cautioned Rhea Lana that if it continued these employment practices it could be subject to civil penalties in the future for violating the FLSA's requirements. In response, Rhea Lana filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), challenging the Department's determination as arbitrary and capricious. The parties have both moved for summary judgment. Finding that the Department applied the correct legal test and that the record adequately supports its employee determination, the Court will grant summary judgment in the Department's favor.

USCA Case #17-5259      Document #1718347           Filed: 02/16/2018      Page 87 of 330

## I.     Background

In 1997, Rhea Lana Rhiner hosted her first consignment sale out of her living room. Twenty years later, the company has achieved nationwide recognition as a leader in the consignment-sales industry.  Plaintiffs Rhea Lana, Inc., and Rhea Lana Franchise Systems, Inc. (collectively "Rhea Lana") are both incorporated in Arkansas, where the former continues to manage the original consignment sales while the latter franchises the consignment event model across the country.  Pl.'s Mem. Supp. Cross-Mot. Summ. J & Opp'n ("Pl.'s Opp'n") 6.

For each consignment sale, Rhea Lana is responsible for leasing space, providing racks and tables for displaying the merchandise, advertising, and performing administrative tasks related to the week-long sales. J.A. 122.  Families pay a flat fee of $9.50 to consign their used children's items at a particular sale and receive 70% of the profits from the sale of their items, with the remaining 30% going to Rhea Lana. J.A. 162.  The day-to-day operations of the sale are carried out by managers paid by Rhea Lana and by consignors who volunteer for five-hour shifts ("consignor/volunteers" or "volunteers") to help out with such tasks as pre-sale preparations, working the cash register, setting up display racks, re-stocking the merchandise, assisting customers during the sale, or sorting items and cleaning up after a sale has concluded. J.A. 126–27.  Most of the tasks that consignor/volunteers perform require little instruction from managers, with the exception of working the cash register. J.A. 127–28.

After set-up, the sale opens for "early shoppers," the consignor/volunteers who have signed up to prepare for or staff the sale. J.A. 126.  How far in advance of the general public a specific consignor/volunteer is permitted to shop depends on the amount of time he or she has committed to prepare for or staff the sale:  working one five-hour shift, for instance, permits the volunteer to access the sale before the general public whereas those working four five-hour shifts are allowed to access the sale before all other volunteers and the public. J.A. 164-65.  Once the early shopping

2

period ends, the sale opens to the general public. J.A. 126. On the last day of the sale, the consignors have the option of selling any remaining items for 50% of the listed price. J.A. 164. Once the sale concludes, the consignor/volunteers sort the leftover items and return them to the appropriate consignor. J.A. 155.

In late 2012, the Arkansas branch of the U.S. Department of Labor's Wage and Hour Division ("WHD") initiated an investigation of Rhea Lana's labor practices from January 28, 2011 to January 27, 2013. J.A. 218. In May 2013, the Department met with Rhea Lana to discuss its conclusion that the company's consignor/volunteers qualified as employees under the FLSA and were entitled to back wages. J.A. 4. In August 2013, WHD District Director Robert Darling sent a letter to Rhea Lana consignor/volunteers informing them that they have a "private right under the FLSA to bring an independent suit to recover any back wages due." J.A. 245. Later that month, District Director Darling sent a "Final Determination Letter" to Rhea Lana indicating that the Department's investigation had concluded and that Rhea Lana was in violation of the FLSA for "fail[ing] to pay [volunteers] at least the applicable minimum wage for all hours worked." J.A. 239. While the Department chose not to pursue any enforcement actions at that time, it warned Rhea Lana that it could be subject to civil penalties if it failed to comply with FLSA requirements going forward. Id.

Rhea Lana filed suit in January 2014 challenging the Department's determination as arbitrary and capricious under the APA. This Court originally dismissed the action on the ground that there was no final agency action to review because the Department's determination letter imposed no legal obligations on Rhea Lana other than to obey the law. See Rhea Lana v. U.S. Dep't of Labor, 74 F. Supp. 3d 240 (D.D.C. 2014). The D.C. Circuit, however, reversed, holding that the August 23, 2013 Final Determination Letter constituted final agency action subject to arbitrary and capricious review. Rhea Lana v. Dep't of Labor, 824 F.3d 1023, 1031–32 (D.C. Cir.

3

2016).  On remand, the Department and Rhea Lana filed cross-motions for summary judgment. The Court heard oral argument on June 21, 2017.

**II.  Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it is capable of affecting the outcome of litigation.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id.  Courts have recognized that summary judgment is the proper stage for determining whether, as a matter of law, an agency action is supported by the administrative record and is consistent with the APA.  Richards v. INS, 554 F.2d 1173, 1777 (D.C. Cir. 1977).

The APA provides that the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The scope of arbitrary and capricious review is narrow and the Court is not to "substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  An agency decision is arbitrary and capricious where (1) the agency has "relied on factors which Congress has not intended it to consider," (2) the agency has "entirely failed to consider an important aspect of the problem," (3) the agency has "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) the agency decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id.  In contrast, if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation including a 'rational connection between the facts found and the choice made,'" then the Court must uphold the agency's

4

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 89 of 330

**– App. 085 –**

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 90 of 330

action. Id. (citation omitted).

In reviewing an agency's action, the Court is limited to considering the administrative record, Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003), and the party challenging an agency's action bears the burden of proof, City of Olmstead Falls v. FAA, 292 F.3d 261, 271 (D.C. Cir. 2002).

## III.   Analysis

The Department justifies its determination that Rhea Lana volunteers qualified as employees on two independent grounds:  first, the results of its factual investigation and second, its longstanding interpretation of the FLSA.  See Def.'s MSJ 2–3.  With respect to the first justification, the Department points to the following factors that support its employee determination:  Rhea Lana volunteers expected early access shopping benefits in exchange for their work; Rhea Lana received an immediate advantage from the volunteers' work; the nature of the work was consistent with an employer-employee relationship; and Congress intended for FLSA's protections to be interpreted broadly in favor of workers' rights.  See id. at 11–19.  Alternatively, the Department relies on its decades-old agency guidance—in the form of opinion letters—laying out its interpretation of the FLSA as prohibiting private, for-profit companies from using unpaid volunteers.  At a minimum, it argues, these letters are "entitled to respect" under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

Rhea Lana disagrees.  It argues that the Department's August 2013 determination letter must be set aside as arbitrary and capricious because (1) the Department applied the wrong legal test when making its determination, (2) the Department's fact-finding investigation was cursory and one sided and its analysis did not properly consider all of the relevant facts, and (3) the Department's

5

USCA Case #17-5259   Document #1718347   Filed: 02/16/2018   Page 91 of 330

interpretation of the FLSA as banning for-profit volunteering is "legally indefensible." See Pl.'s Opp'n 2–3.

### A. Legal Standard for Determining Employees Under the FLSA

The FLSA defines "employee" as "any individual employed by an employer[,]" and "employ" as "to suffer or permit to work."  29 U.S.C. § 203(e)(1),(g).  Under the FLSA, "[t]he definition of 'employ' is broad."  Rutherford Food Corp. v. McComb, 331 U.S. 722, 728 (1947). Thus, "common law employee categories . . . are not of controlling significance," and the FLSA definition is "comprehensive enough to require its application to many persons, which prior to [the FLSA] were not deemed to fall within an employer-employee category."  Walling v. Portland Terminal Co., 330 U.S. 148, 150 (1947).

Yet the definition of "employee" is not unlimited.  As relevant here, it does not encompass volunteers who work "'without promise or expectation of compensation, but solely for [their] personal purpose or pleasure.'"  Tony & Susan Alamo Found. v. Sec'y of Labor ("Alamo"), 471 U.S. 290, 295 (1985) (citation omitted).  Such volunteers are distinguished from those who expect to receive "in-kind benefits" in exchange for their services—the latter are employees and entitled to statutorily-mandated wages, regardless of whether they view themselves as volunteers.  Id. at 301.

The test to determine whether a putative employee is an employee under the FLSA is one of "'the economic reality' rather than 'technical concepts. . . .'"  Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961).  This test is applied even where the putative employee herself argues she is a volunteer.  See Alamo, 471 U.S. at 301 ("The test of employment under the Act is one of 'economic reality.'" (citation omitted)).  Courts have used a variety of factors in applying the test. The D.C. Circuit, for instance, has looked to whether the employer (1) "had the power to hire and fire the employees," (2) "supervised and controlled employee work schedules or conditions of employment," (3) "determined the rate and method of payments," and (4) "maintained employment

6

**– App. 087 –**

records." Morrison v. Int'l Programs Consortium, Inc., 253 F.3d 5, 11 (D.C. Cir. 2001). Other courts have also considered: (1) "the degree of control exercised by the employer over the workers," (2) "the workers' opportunity for profit or loss and their investment in the business," (3) "the degree of skill and independent initiative required to perform the work," (4) "the permanence or duration of the working relationship," and (5) "the extent to which the work is an integral part of the employer's business." Id. (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–59 (2d Cir. 1988)); see also J.A. 252–53 (Department Fact Sheet #13) (listing similar factors). In the specific context presented here—whether a putative employee is a volunteer or employee—some courts have focused on still other factors, such as the expectation of compensation, an employer's immediate advantage from its putative employees' work, the relationship between the parties, and the overarching goals of the FLSA. See Okoro v. Pyramid 4 Aegis, 2012 WL 1410025, at *6, 9 (E.D. Wis. April 23, 2012).

Regardless of which specific factors a court looks to, "[n]o one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence." Morrison, 253 F.3d at 11; see also Rutherford Food Corp., 331 U.S. at 730 ("[T]he determination of the [employee] relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). Ultimately, "the 'economic reality' test is designed to measure 'the extent to which typical employer prerogatives, such as the authority to hire and fire, control work schedules and conditions, determine the rate of payment, and maintain employee records, are exercised'" by the putative employer over the putative employee. Henthorn v. Dep't of Navy, 29 F.3d 682, 686 (D.C. Cir. 1994).

Here, the Department applied a totality of the circumstances test and looked to several of the factors that courts have considered relevant in making employee determinations under the FLSA.

7

See J.A. 161–63, 230–34; Darling Decl. ¶¶ 5–8.[1]  For instance, the Department discussed the

consignor/volunteers' expectation of receiving a benefit in exchange for working. See J.A. 234;

Darling Decl. ¶¶ 5-6, 8.  It looked at the extent to which the services the consignor/volunteers

rendered were an integral part of Rhea Lana's business. See J.A. 161, 231; Darling Decl. ¶ 6.  It

considered the nature and degree of control Rhea Lana exerted over the consignor/volunteers. See

J.A. 162, 232.  And it assessed the consignor/volunteers' opportunities for profit and loss. See J.A.

162–63, 232–33.  All of these are factors courts have turned to when performing the economic

realities test under the FLSA. See, e.g., Morrison, 253 F.3d at 11.  In this analysis, the Department

hewed to the Supreme Court's instruction in Alamo that those who "expect[] to receive in-kind

benefits . . . in exchange for their services" are employees, not volunteers, 471 U.S. at 301. See J.A.

234 ("The incentive for consignors to work additional hours at an event is early purchasing access

to the items being sold in the sale."); Darling Decl. ¶ 5 ("We determined that the workers were

employees because Rhea Lana offered and incentivized them to work in exchange for the

opportunity to shop early at the sales.").

---

[1] Rhea Lana again moves to strike District Director Darling's declaration as a post-hoc
rationalization of the agency's analysis that contradicts the administrative record. See Pl.'s Mot. to
Strike the Decl. of Robert Darling 4–8.  The Court will deny Rhea Lana's motion, having already
held that the declaration belongs in the administrative record because it "furnishes an explanation of
the administrative action that is necessary to facilitate effective judicial review." Dec. 6, 2016
Order, ECF No. 45 (quoting Olivares v. Transportation Sec. Admin., 819 F.3d 454, 463–64 (D.C.
Cir. 2016)); see also Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (allowing
agencies to submit a declaration when the rationale is not otherwise discernible); Clifford v. Pena,
77 F.3d 1414, 1418 (D.C. Cir. 1996) ("[T]here is nothing improper in receiving declarations that
'merely illuminate[] reasons obscured but implicit in the administrative record.'" (citation
omitted)).  Darling submitted his declaration during the course of litigation because, at the time of
the 2013 determination letter, the Department apparently did not consider it a final agency action
subject to APA review, and therefore did not include the basis for its decision in the letter itself.  In
its most recent motion to strike, Rhea Lana has not offered any new information to convince the
Court otherwise.

8

USCA Case #17-5259      Document #1718347            Filed: 02/16/2018      Page 93 of 330

Rhea Lana nevertheless contends that the Department applied the incorrect legal test. It argues that the Department applied the factors from the employee/independent contractor test rather than the employee/volunteer test, relying on the occasional reference in the record to the independent contractor factors in support of its position. See Pl.'s Opp'n 21–22. There are several flaws in this contention.

For one, the Department *did* apply the correct legal test. The legal question here is whether the consignor/volunteers are employees under the FLSA and, as explained above, the Supreme Court has stated that the proper test to use in that inquiry is a multi-factor, totality of the circumstances test focused on the economic reality. See, e.g., Morrison, 253 F.3d at 11; see also Alamo, 471 U.S. at 301 (applying economic reality test to allegations that putative employees were volunteers). That is precisely the test the Department used: it looked to a variety of factors that courts have determined are relevant to this inquiry and applied them to the totality of the circumstance as a whole. See J.A. 231-34, 247; Darling Decl. ¶¶ 6–8.

Admittedly, the Department at times made reference to the fact that these factors have been "considered significant to determine independent contractor or employee [status] for purposes of the FLSA." J.A. 161. And understandably, several of the factors typically relied on by courts that hail from the traditional employee/independent contractor test may not fit the specific context presented here, where the allegation is that the putative employees are volunteers (not independent contractors) rather than employees. But that the Department may have looked to some specific *factors* that are better suited to the independent contractor-versus-employee scenario does not mean it applied the wrong legal test. The proper legal test, after all, is a *multi-factor* test, and that some factors that the agency considered are more relevant in other contexts does not make them irrelevant in this context. Both parties agree that the "economic reality" test considers a multitude of factors,

9

and it was therefore not arbitrary and capricious for the Department to consider such a multitude of factors.

In any event, the Department *also* looked to the factors that are considered particularly critical to the volunteer-versus-employee inquiry, such as the consignor/volunteers' expectation of in-kind benefits—i.e., early access shopping—and the "immediate advantage" Rhea Lana derived from the consignor/volunteers' work. See Okoro, 2012 WL 1410025, at *9. And the Department was investigating both consignor/volunteers and the consignors themselves (who were alleged to be independent contractors), see Hr'g Tr. 15–16, so its references to the "independent contractor" factors were understandable given this dual analysis, see J.A. 161–63 (mixed discussion of consignors and consignor/volunteers). Finally, the Department understood—as evidenced in its internal guidance and in letters sent to Rhea Lana—that it was analyzing the volunteer/employee question and that this context is somewhat different from the employee/independent contractor question. See J.A. 246–248 (Fortman Letter) (discussing the economic reality test as applied to volunteers); J.A. 251–52 (Fact Sheet #13) ("A situation involving a person volunteering his or her services for another may *also* result in an employment relationship. . . . [I]ndividuals may volunteer or donate their services to religious, public service, and non-profit organizations, *without contemplation of pay*, and not be considered employees of such organization." (emphasis added)).

Moreover, Rhea Lana focuses too narrowly on the Department's occasional reference to the independent-contractor factors. When an agency's decision is properly before the Court, it "review[s] the entire administrative record." Epsilon Elect., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control, 857 F.3d 913, 924 (D.C. Cir. 2017). "An agency action need not stand or fall" on any single "document in the record; if the record as a whole satisfied the APA's requirements, remand 'would be pointless.'" Id. at 925. Here, the record as a whole shows that the Department considered the relevant "volunteer" factors—the consignor/volunteers' expectation of

10

receiving a benefit in exchange for their service, Rhea Lana's benefit from the service, and the role of the service in Rhea Lana's enterprise—and concluded that those factors indicated that the putative employees were not volunteers. See Darling Decl. ¶ 10 (explaining that "the materials gathered during the course of the investigation and contained in the administrative record showed that the workers were incentivized to trade their labor in exchange for offered compensation, worked alongside and were supervised by Rhea Lana's employees, and were integral for Rhea Lana's for-profit sales events to take place, all of which indicated that they were employees under the FLSA"). Looking to the record as a whole—as the Court must—the Department applied the proper legal test.

### B. The Department's Application of the FLSA Employee Test

Rhea Lana further contends that even applying the proper test, the facts do not support the Department's ultimate determination. The Department's ultimate conclusion that the consignor/volunteers were employees, not volunteers, is not arbitrary and capricious. The Department's factual analysis of the relevant factors was supported by adequate evidence from the record and its conclusion that these factors indicated an employee relationship was reasonable.

First, and most importantly, as the Department explained and adequately documented, Rhea Lana's volunteers, like those in Alamo, expected to receive "in-kind benefits" for their work. See Darling Decl. ¶¶ 5, 8; J.A. 234 (noting that the incentive for consignors to work 5-hour volunteer shifts is "early purchasing access to the items being sold in the sale"). The record is replete with corroborating statements from volunteers that they worked in order to obtain early access to shop the merchandise, not simply for personal pleasure or out of the goodness of their hearts. See J.A. 12 ("[I]ts to your advantage to volunteer and consign if you want to shop."); J.A. 15 ("Volunteers need to have 5 hours per sale to shop the sale."); J.A. 21 ("When I volunteer[ed], I signed up online and got to shop earlier."); J.A. 25 ("The benefit of volunteering and consigning is that you can

11

come in at 8am versus coming in at 1pm. . ."); J.A. 37 ("If you're a volunteer, you are not paid anything you get to shop early to get the best deals."); J.A. 44 ("Volunteers are assigned to different managers. You do this in exchange for early shopping."). And Rhea Lana did not dispute that this was the consignor/volunteers' primary motivation. See J.A. 130 (Rhea Lana response to Department question: "Their primary motivation for participating in Rhea Lana's is to get an early selection o[f] high quality items and save hundreds of dollars for their family's budget.").

Furthermore, the number and type of 5-hour shifts that volunteers committed to work determined how early they could shop—indicating that volunteers placed some relative value on these early shopping benefits. See J.A. 22 ("It is a requirement to work a sorting shift on the last day . . . to get the Super Mom. . . [The Super Moms] can shop at 8am at the sales. . . . You have to work 2 shifts and 2 different types of marketing [shifts]."); J.A. 29–30 ("I signed up online for certain shifts . . . and *in exchange for that* I shopped early. . . . The more shifts I worked, the earlier I got to shop." (emphasis added)); J.A. 125–26 (Email from Rhea Lana cofounder Dave Riner including a chart detailing the hierarchy between 5-hour shifts and "remuneration" in the form of early shopping benefits). Volunteers in Tulsa, Oklahoma were even required to sign a "bartering agreement" before signing up for shifts acknowledging that their labor was worth the federally mandated minimum wage, but that the "opportunity to shop early [was] worth more to [them] than the value of [their] labor." J.A. 208.[2]

---

[2] Rhea Lana objects to the Department's consideration of the bartering agreement because it was used by one of its franchisees, and not the main headquarters. This argument blinks reality. Rhea Lana admits to having used similar types of agreements during the period of time it was being investigated for. See Riner Decl. ¶ 8 ("The Tulsa Agreement and similar documents *were used by Rhea Lana and Rhea Lana franchisees* at some consignment events prior to the January 19, 2012 Consent Agreement." (emphasis added)). And the fact that it stopped using such agreements prior to the conclusion of the Department's investigation does not negate their relevance.

12

Second, as the Department explained and adequately documented, Rhea Lana received an "immediate advantage" from their volunteers' labor and that labor was integral to Rhea Lana's business. Volunteers, as Rhea Lana co-founder Dave Riner explained, performed tasks before, during, and after the sale including "hang[ing] up clothes; organiz[ing] items as they get disturbed during sale; open[ing] doors for shoppers; pick[ing] up fallen price tags from the floor; straighten[ing] merchandise; carry[ing] things to cars for shoppers." J.A. 127. They also worked the cash registers, helped customers, and sorted and returned leftover items after the sale. J.A. 127–28, 155. These tasks are the bread and butter of a retail enterprise, and not having to pay for them indisputably reduced Rhea Lana's overhead. See Okoro, 2012 WL 1410025, at *10 ("[T]he nature of the work that [Plaintiff] performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex, was undeniably of substantial assistance to [employer]."); Hugler v. Cathedral Buffet, 15-cv-1577, 2017 WL 1287422, at *11 ¶¶ 60–61 (N.D. Ohio March 29, 2017) ("It is hard to fathom that a restaurant could operate without such work being completed . . . [The restaurant] admitted that if the volunteers did not perform this work, paid employees would need to do it."). Rhea Lana's dependence on volunteers to run their events is further borne out by the record. Rhea Lana Riner, for instance, sent an email offering to pay an hourly wage for people to work the sales when insufficient volunteers signed up to staff the necessary shifts. See J.A. 209. In another email, the company solicited volunteers and encouraged consignors to volunteer and to apply for the position of "Super Mom"—a consignor/volunteer who works three shifts in exchange for shopping a day early—by telling them that they were the "lifeblood of our events and we can't do it without you." J.A. 206.

Third, as the Department explained and documented, Rhea Lana exercised a degree of control over the consignor/volunteers typically associated with an employer, including: (1) posting the shift schedule for volunteers to sign up for beforehand; (2) tracking when volunteers worked by

13

requiring them to check in upon arriving for a shift and to check out when they left; (3) providing t-shirts bearing the company logo for consignor/volunteers to wear during their shifts staffing the event; (4) employing managers that directed consignor/volunteers on their tasks and instructed them on how to run the cash register; and (5) specifying that consignor/volunteers received a half-hour break per shift to eat lunch. See J.A. 162, 232; Darling Decl. ¶ 8. These contentions were also adequately documented in the record. See, e.g., J.A. 21, 23, 29, 31, 37, 44, 95.

And finally, the Department explained that its final determination best comports with the underlying "remedial and humanitarian" purpose of the FLSA, which is generally interpreted in favor of workers' rights. Tenn. Coal, Iron & R.R. Co. v. Muscodoa Local No. 123, 321 U.S. 590, 597 (1944); see also Okoro, 2012 WL 1410025, at *10.

In sum, substantial evidence supports the Department's conclusion that Rhea Lana's consignor/volunteers performed tasks integral to Rhea Lana's commercial success and expected to receive a personal benefit for those tasks and that Rhea Lana exercised some control over the consignor/volunteers analogous to an employer. The economic realities of this situation, including the nature of consignor/volunteers' work, contrasts with the services "typically associated with volunteer work," like "help[ing] to minister to the comfort of the sick, elderly, indigent, infirm, or handicapped" and working with "disadvantaged youth." Alamo, 471 U.S. at 303 n.25. Given these factual findings—and its application of the correct legal test—the Department's conclusion that the consignor/volunteers here are not volunteers but rather employees was not arbitrary and capricious.

Rhea Lana's arguments to the contrary are not persuasive. It argues that early access to shopping the merchandise has no "independent value" and thus cannot be considered compensation. But the definition of compensation is not quite as technical as Rhea Lana makes it out to be: the Supreme Court explained in Alamo that a volunteer is someone who works "*solely* for his personal purpose or pleasure." 471 U.S. at 295 (emphasis added). While many of Rhea Lana

14

USCA Case #17-5259     Document #1718347     Filed: 02/16/2018     Page 99 of 330

consignor/volunteers undoubtable supported the company's overall mission, as a group they indisputably lacked purely altruistic motives: they understood that by working 5-hour shifts they were "not paid anything[,]" but got "to shop early to get the best deals." J.A. 37. Nor do the facts that Rhea Lana argues negate the Department's findings—that the company did not hire and fire its volunteers, control their schedules, or provide extensive training or supervision, Pl.'s Cross-MSJ 27–29—render the ultimate decision arbitrary and capricious. While there is some support for these factual assertions in the record, substantial evidence supports the Department's other factual conclusions and, under a totality of the circumstances test, the factors that Rhea Lana highlights do not outweigh the other factors that the Department reasonably concluded support employee status.[3] In addition, Rhea Lana contends that the consignor/volunteers cannot be employees because they all have other primary sources of income. Id. at 25. But under that theory, independently wealthy individuals or those who worked multiple jobs (and thereby had other primary sources of income too) could not be employees, an outcome inconsistent with the broad and remedial purposes of the FLSA. Rhea Lana's final argument—that its actions are consistent with consignment industry standards—is largely beside the point since industry standards are not one of the economic reality factors that courts have traditionally turned to in their analysis.[4]

---

[3] Relatedly, Rhea Lana argues that volunteers were personally motivated to help because the overall success of the sale (which depended on volunteers) was directly tied to their success as consignors. The record supports the opposite conclusion. Consigned items were all mixed together so the individual actions of volunteers was in no way related to how well their individually consigned merchandise sold. J.A. 41; see also Def.'s MSJ 14–15 (discussing the free-rider problem that would result if general success of the sale was the only motivation to volunteer).

[4] The Department further argues that its position is consistent with "its longstanding policy of limiting volunteer status to those individuals performing charitable activities for not-for-profit organizations." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1999 WL 1788160, at *1 (Sept. 30, 1999). It contends in addition that these opinion letters are, at the very least, entitled to Skidmore deference. See Christensen v. Harris Cty., 529 U.S. 576, 587 (2000). While it is likely that the Department's decades-old interpretation and consistent application of its policy weigh in favor of its persuasiveness, the Court need not resolve the question of deference because it

15

**– App. 096 –**

## IV.   Conclusion

Nothing in the Court's decision should be read to detract from the Riners' success in building their business or to suggest that their labor practices are designed to exploit consignors who volunteer to assist with sales.  For the reasons discussed, however, the Department of Labor was not unreasonable in determining that consignor/volunteers should be paid as employees.  The Court will therefore grant the Department's Motion for Summary Judgment and deny Rhea Lana's Cross-Motion for Summary Judgment.  A separate Order accompanies this Memorandum Opinion.

Christopher R. Cooper

CHRISTOPHER R. COOPER
United States District Judge

Date:    September 26, 2017

_____

concludes the Department's conclusion is not arbitrary and capricious without resorting to the policy letters.

16

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 101 of 330

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Rhea Lana, Inc., et al.
_____
                    Plaintiff

            vs.                         Civil Action No. 14-cv-00017
                                                        _____

U.S. Department of Labor
_____
                    Defendant

## NOTICE OF APPEAL

Notice is hereby given this   14th        day of   November              , 20 17      , that

 Plaintiffs, Rhea Lana, Inc. and Rhea Lana's Franchise Systems, Inc.

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the      26th            day of  September          , 20 17

in favor of    Defendant, U.S. Department of Labor

against said    Plaintiffs, Rhea Lana, Inc. and Rhea Lana's Franchise Systems, Inc.


                                    _____
                                           /s/ Julie A. Smith
                                         Attorney or Pro Se Litigant

                                    Cause of Action Institute
                                    1875 Eye Street, N.W., Ste. 800
                                    Washington, D.C. 20006
                                    202-499-4232
                                         Address and Phone Number

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)

**CLERK**  Please mail copies of the above Notice of Appeal to the following at the addresses indicated:

Steven A. Myers
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW Room 7334
Washington, DC 20001

## – App. 098 –

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RHEA LANA, INC. and RHEA LANA'S FRANCHISE SYSTEMS, INC.,<br><br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR,<br><br><br>Defendant. | Case No. 1:14-cv-00017-CRC<br>Judge Christopher R. Cooper |

## DECLARATION OF ROBERT A. DARLING

I, Robert A. Darling, provide the following declaration to summarize the contents of the administrative record and further describe how the record contemporaneously supported the challenged agency determination in this case. The following declaration is based upon my personal familiarity with the administrative record in this case.

1. From 2010 to 2015, I was the District Director at the Little Rock, Arkansas office of the Department of Labor's Wage and Hour Division (WHD). As the District Director, I was in charge of the office and was responsible for all investigative actions in the State of Arkansas.

2. WHD administers and enforces the Fair Labor Standards Act (FLSA).

3. In 2013, WHD's Little Rock office investigated whether Rhea Lana, Inc. and Rhea Lana's Franchise Systems, Inc. (Rhea Lana) were in compliance with the FLSA. I oversaw the investigation, reviewed the materials gathered by the investigator, and communicated with Rhea Lana and its attorneys about the investigation.

**– App. 099 –**

4.     As is relevant to this case, the investigation found a violation involving a group of workers whom Rhea Lana treated as volunteers and to whom Rhea Lana did not pay any wages. At least some of these workers consigned goods for sale at the sales operated by Rhea Lana. We affirmed that consigning goods for sale at Rhea Lana's sales did not make the workers employees of Rhea Lana under the FLSA. However, this group of workers also worked shifts at Rhea Lana's sales alongside Rhea Lana's employees. We concluded that these workers were employees of Rhea Lana during the time that they worked shifts at the sales.[1]

5.     We determined that the workers were employees because Rhea Lana offered and incentivized them to work in exchange for the opportunity to shop early at the sales. The opportunity to shop early was valuable because the workers were able to shop at the sales before the general public and therefore buy items that may not have been available when the sales were open to the general public. The workers did not work shifts at the sales for a charitable purpose.

6.     The materials in the administrative record supported this conclusion. Particularly relevant materials upon which we relied in concluding that the workers were employees included:

    a.     Rhea Lana's solicitations to the workers to sign up for shifts in exchange for the opportunity to shop early (A.R. 263, 275);

    b.     The "official Bartering Agreement" which Rhea Lana required the workers to accept (A.R. 278);

---

[1] The investigation also found a second violation involving a group of workers whom Rhea Lana treated as employees but to whom Rhea Lana did not pay all of the wages due them under the FLSA. Rhea Lana agreed to pay these employees about $6,400 in back wages and to change the pay practices that resulted in the violation.

2

**– App. 100 –**

    c.    Rhea Lana's offer to pay people $8 per hour to work shifts at the sales when it could not induce enough individuals to work in exchange for the opportunity to shop early (A.R. 279); and

    d.    Rhea Lana's admission that the workers treated as volunteers were the "lifeblood" of their sales events (A.R. 264).

7.    Rhea Lana's "official Bartering Agreement" (A.R. 278) with the workers stated: "By 'volunteering' time with Rhea Lana's you are actually 'bartering' your labor. This means you are trading your work hours for the valuable opportunity to shop early." In the Agreement, the worker acknowledged that "I am voluntarily trading the time I work for Rhea Lana's for the opportunity to shop for children's items and accessories earlier than the general public. This work time is determined from my signing up on the volunteer schedule . . . and by my signing in and out at the event location." The worker further acknowledged that "my labor is worth the federally mandated minimum wage ($7.25/hr) multiplied times the number of hours I work" and "the opportunity to shop early is worth more to me than the value of my labor as calculated above. So, I am bartering my labor for this valuable opportunity."

8.    We also relied on the workers' interview statements gathered during the course of the investigation and maintained in the case file (A.R. 53-104). The workers in their statements indicated that they were motivated to work at the sales by the opportunity to shop early (before the general public) at the sales (including A.R. 54, 67, 72, 86). The statements indicated that the workers were supervised by Rhea Lana's employees (including A.R. 63, 82, 86, 89, 92, 97, 101) and that the tasks that they performed were for the benefit of Rhea Lana's general sales operations (including A.R. 71, 81, 82, 84, 86, 91). The shift sign-up lists (A.R. 215-224, 266-274) also indicated that the tasks performed by the workers were for the benefit of Rhea Lana's

**– App. 101 –**

general sales operations.  Examples of shifts included checking in consignors, handling returns, sorting and preparing unsold items for pick-up by consignors, and clean up.  The description of the work showed that the tasks performed by the workers supported Rhea Lana's sales generally; much of the work would not have helped to sell any items that the workers had consigned at the sales (to the extent that they had consigned items to sell) (including A.R. 83, 102).

9.     In addition, Rhea Lana was a for-profit company.  WHD's longstanding position is that, with very limited exceptions, for-profit companies cannot treat workers as volunteers instead of employees under the FLSA.  That position was further support for our conclusion that the workers at issue were employees.

10.    In sum, the materials gathered during the course of the investigation and contained in the administrative record showed that the workers were incentivized to trade their labor in exchange for offered compensation, worked alongside and were supervised by Rhea Lana's employees, and were integral for Rhea Lana's for-profit sales events to take place, all of which indicated that they were employees under the FLSA.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the forgoing is true and correct.  Executed on this 26th day of September, 2016.

Robert A. Darling

<div align="center">4</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RHEA LANA, INC. and<br>RHEA LANA'S FRANCHISE SYSTEMS, INC.,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF LABOR,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1:14-CV-00017 (CRC) |

### DECLARATION OF DAVID RINER

I, David Riner, pursuant to 28 U.S.C. § 1746, do hereby declare and state:

1. I submit this declaration in supplementation of the administrative record in the above-captioned matter. My statements are based on personal knowledge.

2. I am Vice President of Plaintiffs Rhea Lana, Inc. and Rhea Lana's Franchise Systems, Inc. (collectively, "Rhea Lana"). I have served in that role since 2004, including during the 2013 Audit (the "Audit") conducted by Defendant Department of Labor ("DOL").

3. During the Audit, I interacted directly with DOL officials and investigators, including District Director Robert A. Darling. I was present at multiple in-person and telephone meetings between DOL and Rhea Lana during the Audit, including the May 20, 2013 meeting where DOL announced its conclusion that consignors who assist with consignment events are Rhea Lana employees (the "May 20 meeting"). I have reviewed all correspondence between Rhea Lana and DOL related to the Audit. I have also reviewed Mr. Darling's September 26, 2016 Declaration ("Darling Declaration").

4. As part of the Audit, DOL asked Rhea Lana to provide several categories of documents. DOL did not request that Rhea Lana produce other categories of documents. For

**– App. 103 –**

example, DOL did not ask Rhea Lana to produce agreements between Rhea Lana and its consignors, including consignors who performed work at consignment sale events. DOL also did not ask Rhea Lana to produce any consignment event announcements or documents related to the terms for consignors or other individuals agreeing to work at those events.

5.    DOL did not ask Rhea Lana to estimate the value of the early shopping opportunities that some consignors obtained by working at Rhea Lana events. DOL did not request documents related to early shopping behavior. DOL provided no indication of whether it had performed a valuation of early shopping opportunities or, if it did perform such a valuation, what its findings might have been. If DOL had intended to perform such a valuation, the information DOL asked for and which Rhea Lana provided would not have made it possible for them to do so.

6.    As part of the Administrative Record, DOL has produced a document styled as a "bartering agreement," which appears to have been printed from the website of the Rhea Lana franchisee in Tulsa, Oklahoma in August 2011, nearly two years before the DOL Audit. *See* AR 278 (the "Tulsa Agreement"). It was not related to consignment events that Rhea Lana itself organizes, and did not come from any event in the State of Arkansas. DOL never requested that Rhea Lana provide the Tulsa Agreement or similar documents during the Audit. I do not know how DOL obtained it.

7.    The Darling Declaration cites the Tulsa Agreement as a basis for DOL's resolution of the Audit. *See* Darling Decl. ¶¶ 6-7. However, I do not recall that DOL mentioned or asked questions about the Tulsa Agreement at any time during the Audit, including at the May 20 meeting. To my recollection, DOL never mentioned the Tulsa Agreement as relevant to its conclusions. I also do not recall that DOL ever indicated orally or in writing that it considered

Rhea Lana to have bartered with individuals who work at consignment events, or otherwise discussed "bartering" at any time.

8.      If DOL had asked about the Tulsa Agreement during the Audit, I would have informed DOL that the Tulsa Agreement was not in effect at Rhea Lana events in Arkansas at the time of the Audit.  The Tulsa Agreement and similar documents were used by Rhea Lana and Rhea Lana franchisees at some consignment events prior to the January 19, 2012 Consent Agreement between Rhea Lana and the State of Arkansas (the "Consent Agreement").  However, they have not been used in Arkansas after the Consent Agreement.  I believe the Tulsa Agreement and similar documents were removed from use at Rhea Lana events, as well as Rhea Lana franchisee events, no later than January 2012.  I would have informed DOL that no Rhea Lana volunteer had been required to sign such an agreement for more than a year before the Audit began.

9.      If DOL had asked about the Tulsa Agreement, I would have further informed DOL that the Consent Agreement worked an important change in Rhea Lana's relationship with the individuals who work at Rhea Lana events.  Prior to the Consent Agreement, members of the public were free to volunteer at Rhea Lana events, and individuals who volunteered were given the opportunity to shop early.  Since the date of the Consent Agreement, however, Rhea Lana has restricted the unpaid staff at Rhea Lana events in Arkansas to consignors (as defined by the Consent Agreement), and certain family members of consignors.  Consignors who work to ensure the success of events they participate in receive early shopping opportunities as a token of appreciation.

10.     If DOL had indicated that it attached importance to the Tulsa Agreement, I would have further explained that Rhea Lana considers consignors who work at events to be co-venturers with Rhea Lana rather than parties to a bartering arrangement.  After the Consent Agreement, all

"volunteers" at Rhea Lana events in Arkansas thus fall into the category of co-venturers.  The Tulsa Agreement — and other documents in the Administrative Record related to Rhea Lana's business practices before the date of the Consent Agreement — no longer accurately described the relationship between Rhea Lana and the workers at its Arkansas events at the time of the Audit.  Because DOL did not inquire about the Tulsa Agreement, I had no opportunity to explain these facts to DOL during the Audit.

11.     The Darling Declaration cites various other Rhea Lana documents as bases for DOL's conclusions.  *See* Darling Decl. ¶¶ 6-7.  DOL did not request those documents from Rhea Lana either, and I do not know how DOL obtained them.  DOL did not mention those documents to me during the Audit or identify them as supporting its decision at the time.  Like the Tulsa Agreement, all of those documents appear to pre-date the Consent Agreement.

12.     In my recollection, DOL investigation was directed at understanding the nature of the work that consignors perform at Rhea Lana events and how the consignors are organized and managed.  Mr. Darling also indicated in a March 21, 2013 telephone conversation that he attached importance to the fact that, while all consignors prepare items for sale by doing work at home, the event location where consignors chose to work together was arranged by Rhea Lana.

13.     DOL appeared only incidentally interested in the nature of the Rhea Lana business model or the existence of any agreements between Rhea Lana and the consignors who assist at events.  DOL did not appear to investigate those issues in any depth, either in its requests for documents or its questions to Rhea Lana.  In my recollection, DOL did not mention such issues at the May 20 meeting.

14.     For example, I do not recall that DOL asked any questions related to the Consent Agreement or its effect on Rhea Lana's business model during the Audit.  To my recollection,

**– App. 106 –**

DOL did not indicate that it considered whether Rhea Lana's pre- and post-Consent Agreement business models differed in any legally significant way.

15.    I attempted to draw DOL's attention to the Consent Agreement and Rhea Lana's business model on various occasions, starting with a February 25, 2013 telephone conversation with Randy O'Neal, DOL's regional administrator. When I raised issues related to Rhea Lana's business model with Mr. Darling, including at a February 28, 2013 meeting, he avoided discussing the issue by saying "let's keep this simple," which I interpreted as showing a lack of interest and curiosity about how the Rhea Lana business really works.

16.    At the May 20 meeting, DOL representatives Tamara Haynes and Lesbia Rodriguez explained DOL's decision. I asked them to explain the legal test that DOL relied upon and the facts that DOL considered most important in additional detail, but Ms. Haynes and Ms. Rodriguez refused to do so. When I pressed them for additional information, they were only willing to discuss whether Rhea Lana would comply with DOL's ruling.

17.    I am aware that Rhea Lana supplied DOL with the names of ten consignors to interview for purposes of the Audit, of whom DOL interviewed eight. I know the names of at least three of the "managers" DOL interviewed, and Rhea Lana time sheets show the names of the other managers whom DOL could have spoken to. When DOL interviewed Rhea Lana employees on the Rhea Lana premises, it did not conceal from Rhea Lana management which employees were interviewed.

I declare under penalty of perjury that the foregoing is true and correct.

David Riner

Executed this 20th day of October 2016.

5

**– App. 107 –**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RHEA LANA, INC. and RHEA LANA'S FRANCHISE SYSTEMS, INC., <br><br><br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR, <br><br><br> Defendant. | Case No. 1:14-cv-00017-CRC <br> Judge Christopher R. Cooper |

## NOTICE OF FILING

Pursuant to Local Civil Rule 7(n)(1) and this Court's order of August 26, 2016, *see* ECF No. 36, Defendant hereby files a certified list of the contents of the administrative record in this case. A copy of the administrative record itself will be served on counsel for Plaintiffs.

Defendant is also filing a declaration from Robert A. Darling, which serves to summarize the contents of the administrative record and further describe how the record supports the agency determination challenged in this case. *See generally Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 464 (D.C. Cir. 2016).

**– App. 108 –**

Dated:  September 26, 2016        Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JUDRY L. SUBAR
Assistant Branch Director

*/s/ Steven A. Myers*
STEVEN A. MYERS (N.Y. Bar No. 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, Room 7334
Washington, DC 20001

Tel:   (202) 305-8648
Fax:  (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

Attorneys for Defendant

**– App. 109 –**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RHEA LANA, INC. and RHEA LANA'S
FRANCHISE SYSTEMS, INC.,

                Plaintiffs,

        v.

U.S. DEPARTMENT OF LABOR,

                Defendant.

Case No. 1:14-cv-00017-CRC
Judge Christopher R. Cooper

## CERTIFICATION

I, Robert A. Darling, District Director at the Little Rock, Arkansas, office of the Department of Labor's Wage and Hour Division from 2010 to 2015, certify that the following index constitutes a true and accurate transcript of the administrative record pertaining to the August 26, 2013, agency letter challenged in this case.

_____
Robert A. Darling

1

# Index of Administrative Record

**Title**                                                                                                                                 **Page(s)**

Rhea Lana Attorney's Business Card ..................................................................................................... 1

Wage and Hour Case Diary Entries (printed Jun. 18, 2013) ............................................. 2-6

Information Form ............................................................................................................... 7-8

Wage and Hour Wage Transcription and Computation Sheet ......................................... 9-11

Rhea Lana Payroll Journal, Pay Period Nov. 26 – Dec. 25, 2012 ...................................... 12

Wage Transcription and Computation Worksheet (May 22, 2013) ................................ 13-51

List of Employees Interviewed (Exhibit B to Narrative) ..................................................... 52

Employee Interview Statements (Exhibits B-1 to B-16 to Narrative) ............................ 53-104

Rhea Lana's Articles of Incorporation (Oct. 19, 2004) ................................................ 105-113

Rhea Lana Information (WHISARD Exhibit C) ................................................................... 114

Wage and Hour Notes from Initial Conference with Rhea Lana (Jan. 28, 2013) .............. 115-119

IRS Letter to Rhea Lana assigning an Employer Identification Number .......................... 120

Wage and Hour Scheduled Visit Letter to Rhea Lana (Jan. 9, 2013) ................................ 121

Haynes Email to Darling and Response from Rodriguez (Jan. 7, 2013) .......................... 122-126

Letter from Rhea Lana's Attorney to Haynes (Jun. 12, 2013) ...................................... 127-128

2

**– App. 111 –**

Letter from Rhea Lana's Attorney to Haynes (Jun. 5, 2013)................................129-130

Email from Rhea Lana's Attorney to Haynes (Jun. 4, 2013)................................131-132

Letter from Rhea Lana's Attorney to Haynes (May 28, 2013)..............................133-134

Email from Dave Riner to Darling and Haynes........................................................135

Rhea Lana Letter to Haynes Responding to Records Request (Mar. 25, 2013)..............136-138

List of Rhea Lana Employees during Audit Period..............................................139-140

List of Rhea Lana Consignors who Received Money Compensation
during Audit Period....................................................................................141-142

List of Potential "Volunteers" at Rhea Lana Events, Fall 2011 ..............................143

Email from Dave Riner to Darling and Haynes (Mar. 22, 2013) ................................144

Wage and Hour Letter to Rhea Lana Requesting Records (Mar. 19, 2013)......................145

UPS Delivery Confirmation (Mar. 20, 2013) .....................................................146-147

PowerPoint Presentation on "Modern Childrens Consignment Events,
Business Model and Labor Issues"...................................................................148-160

Email from Darling to Haynes forwarding Consignor Contact Info received
from Rhea Lana (Mar. 4, 2013) .......................................................................161-162

Letter from Rhea Lana's Attorney to Darling (Feb. 28, 2013).................................163-166

Correspondence between Darling and Rhea Lana re: Follow-up Questions.....................167-173

Application for Employment of a Minor ...........................................................174-176

**– App. 112 –**

Emails between Dave Riner and Arkansas DOL re: Employment of Minor......................177-178

Handwritten List of Rhea Lana's Employees Under 18 Years Old....................................179

Email from Rhea Lana to Haynes with Employee List (Feb. 4, 2013)................................180

Rhea Lana List of Employees and Contract Labor in 2012..............................................181-186

Rhea Lana Manager Time Sheets ...................................................................................187-199

Rhea Lana Check Stubs from November/December 2011 ................................................200-214

Volunteer Form, Shift/Volunteer Management, Listing of Shifts Worked by
Volunteers at July 2012 Event ......................................................................................215-224

Notes from Conference with Rhea Lana and its Attorneys (Feb. 28, 2013).......................225-228

Wage and Hour Questions to Ask Rhea Lana Interviewees.............................................229-230

Rhea Lana Final Conference Outline.............................................................................231-236

Arkansas DOL Form Indicating Resolution of Its Investigation (Jan. 20, 2012)..............237

Arkansas DOL Memo Transmitting Copy of Rhea Lana Consent
Agreement (Jan. 20, 2012)............................................................................................238

Consent Agreement between Rhea Lana and Arkansas DOL (Jan. 19, 2012) ..................239-242

Emails between Arkansas DOL and Rhea Lana's Attorney (Aug. 19, 2011) ....................243

Arkansas DOL Records Request to Rhea Lana (Aug. 4, 2011)........................................244-248

Emails between Arkansas DOL and Rhea Lana (July 2011)............................................249-262

**– App. 113 –**

Internal Arkansas DOL email with Rhea Lana Flyer ("Conway Marketing Day and RL 101 Class is Tomorrow!!") Sent to Wife of Arkansas DOL Employee.................263-265

Shift/Volunteer Management, Listing of Shifts Worked by Volunteers at July 2011 Event.................................................................................................266-274

Email to Arkansas DOL Employee from his Wife with Rhea Lana Flyer ("Join Us For Rhea Lana's of Conway, August 28 – Sept 3!!") ..............................275-276

Rhea Lana Early Worker Pass ................................................................................277

Rhea Lana "Bartering Agreement" for Volunteers.................................................278

September 3, 2011 Rhea Lana Email Flyer ("Additional Help Needed & Consignor Pick Up Tomorrow!") ........................................................................279

Arkanasasbusiness.com printout regarding Arkansas' Fast-growing Companies, listing Rhea Lana ................................................................................................280

Inc.com profile of Rhea Lana (printed Aug. 25, 2011) .........................................281-282

Wage and Hour Case Diary Entries (printed Jun. 21, 2013) .................................283-287

WHISARD Case Registration/Investigator Assignment (printed Jun. 21, 2013)..............288-289

Darling Letter to Congressman Griffin re: Rhea Lana Investigation (May 24, 2013) .......290-291

Rhea Lana Attorney's Letter to Wage and Hour (Aug. 6, 2013)...........................292-293

Rhea Lana Attorney's Letter to Wage and Hour (Jul. 24, 2013)...........................294-295

Memorandum from Regional Administrator to Darling (Jul. 22, 2013)..........................296

Memorandum from Darling to Nadia de la Rosa (Jun. 27, 2013) ..................................297

Wage and Hour Form 136 re: Case File (Jun. 21, 2013)..............................................298

**– App. 114 –**

WHISARD Compliance Action Report (Jun. 20, 2013)......................................................299-300

Investigator's Narrative ..................................................................................................301-312

Rhea Lana Attorney's Letter Regarding Proof of Back Wage Payments
(Jul. 23, 2013) ................................................................................................................313-314

Payroll Journals, Receipts for Payment, and Copies of Cashed Checks Showing
Proof of Rhea Lana's Payment of Back Wages
(submitted with Jul. 23, 2013 letter) ..............................................................................315-368

WH-56s, Summary of Unpaid Wages (June 2013) ..........................................................369-378

August 26, 2013 Letter from Darling to Rhea Lana .............................................................379

**– App. 115 –**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RHEA LANA, INC. and RHEA LANA'S
FRANCHISE SYSTEMS, INC.,

              Plaintiffs,

    v.

U.S. DEPARTMENT OF LABOR,

              Defendant.

Case No. 1:14-cv-00017-CRC
Judge Christopher R. Cooper

## NOTICE OF FILING

Pursuant to the Court's order of December 6, 2016, *see* ECF No. 45, and consistent with

the parties' agreement, *see* ECF No. 43 at 7 n.3, Defendant hereby files a certified list of certain

documents with which it is supplementing the administrative record.  A copy of the supplemental

record pages themselves will be served upon counsel for Plaintiffs.

**– App. 116 –**

Dated:  December 19, 2016          Respectfully submitted,

                                   BENJAMIN C. MIZER
                                   Principal Deputy Assistant Attorney General

                                   CHANNING D. PHILLIPS
                                   United States Attorney

                                   JUDRY L. SUBAR
                                   Assistant Branch Director

                                   */s/ Steven A. Myers*
                                   STEVEN A. MYERS (N.Y. Bar No. 4823043)
                                   Trial Attorney
                                   United States Department of Justice
                                   Civil Division, Federal Programs Branch
                                   20 Massachusetts Avenue, Room 7334
                                   Washington, DC 20001

                                   Tel:   (202) 305-8648
                                   Fax:  (202) 616-8460
                                   E-mail: steven.a.myers@usdoj.gov

                                   Attorneys for Defendant

**– App. 117 –**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RHEA LANA, INC. and RHEA LANA'S
FRANCHISE SYSTEMS, INC.,

　　　　　　　　　Plaintiffs,

　　　v.

U.S. DEPARTMENT OF LABOR,

　　　　　　　　　Defendant.

Case No. 1:14-cv-00017-CRC
Judge Christopher R. Cooper

## CERTIFICATION

On September 26, 2016, I, Robert A. Darling, District Director at the Little Rock, Arkansas, office of the Department of Labor's Wage and Hour Division from 2010 to 2015, certified an index of the administrative record pertaining to the August 26, 2013, agency letter challenged in this case. I understand that since that certification, the Court has directed the administrative record to be supplemented with certain additional documents, and that Defendant has agreed to supplement the record with certain other additional documents at Plaintiffs' request. The following index represents a true and accurate list of the documents with which Defendant is supplementing the record.

Robert A. Darling

1

**– App. 118 –**

# Supplemental Index of Administrative Record

**Title**                                                                                                    **Page(s)**

Letter from Congressman Tim Griffin to Secretary Hilda Solis (Feb. 15, 2013)...............380

Letter from Derrick J. Witherspoon to Congressman Tim Griffin (June 5, 2013),
and Referral Memorandum ........................................................................................381-382

Letter from Senators and Congressmen to Mary Beth Maxwell (July 18, 2013)...............383-384

Letter from Robert A. Darling to Whom It May Concern (Aug. 6, 2013) ........................385

Letter from Laura A. Fortman to Congressman Tim Griffin (Aug. 30, 2013) ..................386-395

A.R. 304 (with certain redactions modified) ..................................................................396

A.R. 312 (with certain redactions modified) ..................................................................397

2

Informers' Privilege

**U.S. Department of Labor**
Wage And Hour Division

# Informers' Privilege

## Establishment Information

| | | |
|---|---|---|
| Name: | *Rhea Lana's* | |
| Address: | *1055 Sunflower Drive, Suite 104* | |

Primary Phone:  *501-499-0009*    ext.
Other Phone:    ext.
Fax:    ext.
Email:

*Conway, AR 72034*

County:  *Faulkner*

NAIC    *448130*

Contact Name:  *Rhiner, Rhea Lana*    Gov. Contract, Furnishes goods:    *N*

Contact Title:    *Owner*    Gov. Contract, Furnishes services:    *N*

Estimated # of locations:    Gov. Contract, Performs construction:    *N*

Headquarters location:    Gov. Contract, Other contract type:    *N*

Branch Name/Location 1:    Gov. Contract, Unknown contract    *N*

Branch Name/location 2:    Est. expiration date  of gov.

ER business status:    *In Business*    Estimated EEs affected:

Estimated $ADV:    *Unknown*    Special Coverage:

Nature of Business:    *Resale*    Franchise:    *N*

Interstate Commerce:    *ER Engaged in IC (Various*    Union Shop:    *N*

Number Of Employees:    ER Exempt?    *N*

U. S. Department of Labor
Wage Hour Division
Regional Office
SEP 0 6 2013

| | | | | |
|---|---|---|---|---|
| *FLSA* | *Failure to pay Minimum Wage* | *03/01/2010* | *11/29/2012* | |

Informers' Privilege

Most critical act:  *FLSA*

# Informers' Privilege

*ER is a For Profit corporation according to the Arkansas Secretary of State.  News releases and ER's website state ER has been in business since 1997 and to date has 5 locations in Arkansas and franchise locations in 19 other states.*

*Rhea Lana's, Inc. is an upscale children's consignment event business. They hold semi annual sales events in Conway, Little Rock, Hot Springs, Russellville, Searcy, Jonesboro, El Dorado, and Northwest Arkansas.*

*ER's website states the following:  Volunteering one 5 hour shift will earn you a Worker's pass, if you volunteer two 5 hour shifts you will earn an Early Worker's Pass to shop even earlier in the day.  They also have the Super Mom, for 3 shifts they will earn an even earlier shopping privilege.*

*The passes are of no value other than allow the volunteers to buy the good stuff before the public is allowed in.*

*ER's EEs supervise the volunteers who are required to set up, sort, hang and fold clothing or arrange other items such as furniture, toys etc. and whatever else is necessary for the sales events.*

*Inspection of franchise websites indicate this volunteer practice is used at all franchise sponsored events.*



Informers' Privilege

Date: 12/03/2012 1:51:59 PM                      Informers' Privilege                      Page 2

DOL 0008

**EMPLOYEE INTERVIEWS -- "B" Exhibit**

| | | | |
|---|---|---|---|
| Informers' Privilege | Manager/Consignor | B - 1 | Written |
| Informers' Privilege | Manager | B - 2 | Written |
| Informers' Privilege | ▮▮▮▮▮▮ | B - 3 | Written |
| Informers' Privilege | Volunteer/Consignor | B - 4 | Telephone |
| Informers' Privilege | ▮▮▮▮▮▮ | B - 6 | Written |
| Informers' Privilege | Consignor/Volunteer | B - 5 | Telephone |
| Informers' Privilege | Volunteer/Consignor | B - 7 | Telephone |
| Informers' Privilege | Consignor | B - 8 | Telephone |
| Informers' Privilege | Manager | B - 9 | Written |
| Informers' Privilege | Consignor/Volunteer | B - 10 | Telephone |
| Informers' Privilege | Consignor/Volunteer | B - 11 | Telephone |
| Informers' Privilege | Manager | B - 12 | Written |
| Informers' Privilege | Manager | B - 13 | Written |
| Informers' Privilege | Consignor/Volunteer | B - 14 | Telephone |
| Informers' Privilege | Consignor | B - 15 | Telephone |
| Informers' Privilege | ▮▮▮▮▮▮ | B - 16 | Written |

**– App. 122 –**

Personal Interview Statement    **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. ██████ **Informers' Privilege**, of ██████ **Informers' Privilege**

(Name of employee)    (Number, street, apt. no.)

**Informers' Privilege**

██████ **Informers' Privilege**

AR    ██████ **Informers' Privilege**
State    Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) _Rhea Lana_

**Informers' Privilege**    (Establishment)

or the approximate period from _2007_ to _Present_
(Location of establishment)    (if still employed state "present")

as _____ Manager/Consigner
(Occupation or description of duties)

Statement: I began working as a manager in 2009. As a manager I work the register, pull tags, and merchandise. I do not supervise anyone. I lead volunteers but its not really supervising. The volunteers report to us and we provide direction to them. I am paid $8.00 per hour. I just work weekends Friday, Saturday, Sunday Friday **Informers' Privilege** Sat I work **Informers' Privilege** and Sunday **Informers' Privilege** **Informers' Privilege** i am paid when the event is over, on Wednesday. To my knowledge there is no one under

(If additional space is needed continue on reverse)    Form WH-31 (Rev. May 2010)
DOL 0053
B-1a

**– App. 123 –**

the age of 18 as a volunteer, consigner, or Manager.

I am also a consigner. I prepare and enter all my items on-line. Some of the volunteers or Manager check through the items for stains, broke zippers things like that. I price my own items and make up the descriptions for the items. When the sale is over you pick up your consignment check. You get 70% of sale price and you have to pay $9.50 consignment fee that is taken out of your check. If you're a consigner you have the option to also volunteer to shop early.

If you're just a consigner there are 3 levels of people who can shop before you. So its to your advantage to volunteer and consign if you want to shop.

As a consigner you do not have to step foot into the sale.

You can be a VIP consigner, and a manager will come pick up your stuff and price it and enter it in the computer and bring it to the event, but you only get 50% commission instead of 70%. Then Lang gets 30% and that manager gets 20%.

I have never worked over 40 hours in a week. I believe the most I worked was 70 hours over

Informers' Privilege

DOL 0054

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division

**WHD★**
U.S. Wage and Hour Division

This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.

Miss

Mrs.

I, Ms. ███ **Informers' Privilege** ███ , of

(Name of employee)

███ **Informers' Privilege** ███

**Informers' Privilege**

███ (Telephone number)

4/12/2013
(Date)

Establishment
(Place of interview)

███ Informers' Privilege ███ █ ███ ███
(Number, street, apt. no.)

AR ███ **Informers' Privilege** ███

State    Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) _Thea Lana_

(Establishment)

_____        for the approximate period from _2007_ to _Present_
(Location of establishment)                                           (if still employed state "present")

as _____
(Occupation or description of duties)

Statement: _2 weeks. I am paid on a 1099 So there are no deductions form my pay as a manager._
_I am paid a $25.00 gas bonus for each event -_
~~_I have been strictly a volunteer in_~~ ███ Informers' Privilege ███ ~~_I_~~

_The above is true and accurate to the best of my knowledge_

███ **Informers' Privilege** ███

_Interview taken by WHI [signature]_

**(If additional space is needed continue on reverse)**    Form WH-31 (Rev. May 2010)
DOL005
B-16

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

4-12-13
(Date)

Mr.
Miss
Mrs.
Ms.

Informers' Privilege

(Name of employee)

Informers' Privilege

(City or town)

(Telephone number)

____ of ____

Informers' Privilege

(Number, street, apt. no.)

AR
State

Informers' Privilege

Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

est
(Place of interview)

____ years of age, (was/have been employed by) ____ Rhea Lana
(Establishment)

Informers' Privilege

(Location of establishment)

for the approximate period from 3 yr. to present
(if still employed state "present")

as ____ Manager
(Occupation or description of duties)

Statement: I have been consigning for 12 years & have been a paid worker for 3 years. As a manager, I am checking in clothing toys, and other items, making sure no holes items clean et. Then we will set the store up, organize items. The Mom's pulling up items for sale, determine their own prices for their items, tag their items. The mom's go online register their items to sell, pick up their labels at the store before the sell. We will take 1 day to clean, & set up the store. We will take 3 days to check in items for consignment. We then have pre-sale day

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0056

– App. 126 –

where workers-managers and volunteers can purchase items before sale opens to the public. [Informers' Privilege] The next day sale opens to the next group who can purchase is the consignors, the moms to be are then allowed in to purchase items after that. Finally that evening consignor's guest can shop.

Finally we are open to the public. On day 6 we go to ½ price for volunteers, managers and consignors. On day 7 the public ½ price sale.

The store is open from 9am to 7pm. I do keep track of my own hours worked. Rhea Lana emails hours available and managers will say when they will work. Rhea Lana wants managers to work about 25 hours per sale.

Volunteers need to have 5 hours per sale to shop the sale.

After the sale, volunteers and managers will sort the left over items to return to consignor or donate to charity.

In an average week, I will work 30 hours. I do keep my time sheet. I do have a lunch break of 30 minutes. I work 3 sales, every fall & every spring. So I am working 3 months total for the year. A manager needs to work 2 sales per season or 4 per year.

DOL 0057

**– App. 127 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.

I, Ms. ██Informers' Privilege██ , of ████████ ██████████ (Number, street, apt. no.)
(Name of employee)

_____ 4-12-13
(Date)

est
(Place of interview)

██Informers' Privilege██     AN     ██Informers' Privilege██
(City or town)               State               Zip Code

██Informers' Privilege██
(Telephone number)     (Driver's licence number - Do not request if number is same as Social Security Number)

_____ years of age, (was/have been employed by)   Rhea Lane
(Establishment)

██Informers' Privilege██   for the approximate period from 3 yr to present
(Location of establishment)                                (if still employed state "present")

as   menage
(Occupation or description of duties)

Statement: I am paid $9.00 per hour. I have not worked over 40 hours in a week. I do not have any deductions from my pay for shortages or damages. I do receive gas mileage for driving from ██Informers' Privilege██ to here. There is a manager meeting once a season during the first sale you are working. That time is paid time.

I have not seen anyone here under the age of 18 working.

Volunteers will be more on pre sale and sort days, but now towards the end the sale there are few volunteers here. Normally

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0058
B-2b

there maybe 10-12 volunteers here.

I have read the above and it is correct

**Informers' Privilege**

Taken & witnessed by WHL *illegible* cMB 4/12/13

DOL 0059

Personal Interview Statement        **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms.

1/28/13
(Date)

Establishment
(Place of interview)

**Informers' Privilege**

, of

(Name of employee)                    (Number, street, apt. no.)

**Informers' Privilege**

An
State

**Informers' Privilege**

(City or town)                                        Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

(Telephone number)

years of age, (was/have been employed by)

Rhee Lara
(Establishment)

**Informers' Privilege**

for the approximate period from 8+ 2009 to Present
(if still employed state "present")

(ment)

as

**Informers' Privilege**

(Occupation or description of duties)

Statem

# Informers' Privilege

**Informers' Privilege**

I have never worked over 40 hours in a week. I have always been paid for all hours that I work. The only deductions from my pay are taxes. I have

(If additional space is needed continue on reverse)          Form WH-31 (Rev. May 2010)
DOL 0000

B-3

Never been instructed to perform any work and was not paid. Informers' Privilege no one is employed under the age of 18. There might be some of the many guys who work at an event who may be under the age of 18.

To my knowledge the above is true and accurate.

Informers' Privilege

Interview taken by WHI Dan Hayes

DOL 0061

– App. 131 –

Personal Interview Statement                    **U.S. Department of Labor**
                                                Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Mr.
Miss
Mrs.

*Phone Interview*
(Place of interview)

I, Ms. ██Informers' Privilege██ of ██ ██Informers' Privilege██

(Name of employee)

██Informers' Privilege██

AR

██Informers' Privilege██

(City or town)        State                    Zip Code

██(Telephone number)██    (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by)  Rhea Lana's
                                                (Establishment)  Volunteered Feb. 2013

██Informers' Privilege██  for the approximate period from Spring 2010  Present

(Location of establishment)                     (if still employed state "present")

as  Volunteer | Consignor
(Occupation or description of duties)

Statement: I consigned July 2012 when I was a consignor I get all my clothes cleaned and laundryed. I put the information into the computer. I place tags on all my items. I put a number on them. This number is the number that Rhea Lana gives me out of the database. I believe the limit is about 300 items. The minimum is 15 items. They can be clothes, toys, shoes, tights, anything your kids could possibly need. The consignor prices their own items. I had a friend, ██Informers' Privilege██ who

(If additional space is needed continue on reverse)        Form WH-31 (Rec. May 2010)

① B4a

– App. 132 –

Showed me how to consign. There is also a video on Rhea Lana site that shows you how to bring your clothes, how to tag your shoes, and how to make your items visably appealing. Rhea Lana provides the tables and racks to bring clothes. The consignee provides the hangers and clothes pins. Rhea Lana also provides the laundry baskets and all racks. I am not actually selling my clothes. I just drop them off and go. I get 70% of what is sold of my items. I drop my clothes off on a Tuesday and I pick them up on a Sunday. I then recieve my consignment check. I have to pay $9.50 fee and I a I make an average of $150 on each sale.

I also consigned in April 2012. I participate because I also buy my clothes there at Walmart prices and I also can sell my kids items in the event.

When I volunteer, I signed up online and got to shop earlier. I passed out door hangers, and magnets. I worked 2 5 hour shifts January 2013. There is a sign-in and sign-out to verify you were there, basically as if you were getting paid. There are some managers, <span style="background:black;color:red">Informers' Privilege</span> who tell you what to do. The managers are the ones who actually get paid. Rhea Lana is usually

DOL 0063

Personal Interview Statement   **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.

3/8/2013
(Date)

*Phone Interview*
(Place of interview)

I, Ms. ██Informers' Privilege██ , of ██Informers' Privilege██
(Name of employee)          (Number, street, apt. no.)

██Informers' Privilege██          AR          ██Informers' Privilege██
(City or town)          State          Zip Code

██Informers' Privilege██ ███████
(Telephone number)          (Driver's licence number - Do not request if number is same as Social Security Number)

18 years of age, (was/have been employed by) __Rhea Lana's__
(Establishment)

██Informers' Privilege██          for the approximate period from Spring/2010 to Present _Volunteered Feb. 2012_
(Location of establishment)          (if still employed state "present")

as __Volunteer / Consignor__
(Occupation or description of duties)

Statement: There as well. I organize the clothes. It is requirement to work a sorting shift on the last day. You sort the clothes by consignor number. Its a requirement to get the Super Mom. The Super Mom, they get in 8am and pass out flyers at the different schools. They can shop at 8am at the sales. You have to work 2 shifts and 2 different types of marketing. A marketing shift is about 6 hours. You're passing out flyers and door hanger. I volunteered in July 2012, April 2012, July 2011, January 2011. I don't think there was anyone under ②

(If additional space is needed continue on reverse)     Form WHDOL0064 (May 2010)

B-46

**– App. 134 –**

Case 1:14-cv-00017-CRC    Document 62-1    Filed 04/12/17    Page 23 of 254

The age of 18 doing assignments. They give you about a 20-30 minute lunch break on your shifts. You can take a break whenever you want. They tell you about half way through your shift to take a lunch. Usually the managers tell you this.

Interview taken by WHI Tom Hay

DOL 0065

Personal Interview Statement | **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms.

3/8/2013
(Date)

Phone Interview
(Place of interview)

█████ Informers' Privilege , of ███ █ █ ████████████
(Name of employee)                    (Number, street, apt. no.)

Informers' Privilege                AR          Informers' Privilege
(City or town)          State                        Zip Code

**Informers' Privilege**
(Telephone number)      (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana's
(Establishment)

**Informers' Privilege**
(Location of establishment)    for the approximate period from 2010 to Feb 2013 Present
                                                        (if still employed state "present")

as Consignor / Volunteer
(Occupation or description of duties)

Statement: I gather all my items that my children have outgrown. I put my items into Rhea Lana's website. I get 70% of my items sold. I price my items. I also make a decision wether to put them half price on the half price day. Rhea Lana provides the labels to put on the merchandise. The consignor is responsible for the safety pins, hangers, ziplock bags to put the shoes in. Rhea Lana provides tables, chairs, racks. It is open to the public. Rhea Lana does provide trainings/tutorials for first time consignors.

(If additional space is needed continue on reverse)     Form WH-61 (Rev. May 2010)

DOL0060

B-5a

This is all on the Rhea Lana website. I am not at the event selling my merchandise. There are drop off days a couple days before the events starts. It depends on the number of volunteers out there if you have to place your items on the racks. If you refer a new cosigner (3) I think she increases your percentage to 80%. But this has not happened with me. There is a $9.50 consigner fee that covers the marketing aspect of it and the rent of the facility for the week, I believe there were about 900 families consigning in a sale. The day after the sale ends, you pick up your unsold items and your check. Consignors get to shop the day before the event opens to the public. I consign to get rid of everything my daughter has outgrown, and make money to buy more clothes. I have no clue if there is anyone under the age of 18 doing assignments.

I have volunteered at events. mainly I passed out marketing materials at daycare centers. I did this in Feb 2013. This took about 1 hour. If you sign up to market or volunteer you get a pass to get in earlier in the day to shop. The benefit of volunteering and consigning is that you can come in at 8am versus coming in at 1pm if you

DOL 0067

Personal Interview Statement        **U.S. Department of Labor**
                                    Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Mr.
Miss
Mrs.
I, Ms.  ██ Informers' Privilege ██ , of   ██ ██ ██        ██
(Name of employee)                          (Number, street, apt. no.)

_Phone Interview_
(Place of interview)

██ Informers' Privilege ██

AR                              ██ Informers' Privilege ██
(City or town)        State                              Zip Code

██ Informers' Privilege ██
(Telephone number)          (Driver's licence number - Do not request if number is same as Social Security Number)

18 years of age, (was/have been employed by)  _Rhea Lana's_
                                              (Establishment)

██ Informers' Privilege ██            for the approximate period from _2010_ to  _Feb. 2013 Present_
(         ent)                                                                  (if still employed state "present")

as  _Consignor / Volunteer_
    (Occupation or description of duties)

Statement: _just consign when you volunteer in Marketing you have to sign out the materials and then call Rhea Lana when you finish to let her know you are done. I do know if you volunteer at an event you have to sign in and out. As a consignor Rhea Lana guarantees your items. If they cant find your item they pay you for the item._
_As a consignor I average about $500 at an event._

_Interview taken by WHI (Pam Hay)_

②

(If additional space is needed continue on reverse)        Form WH-DOL (8068 May 2010)

B-Jb

– App. 138 –

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. **Informers' Privilege** , of **Informers' Privilege**

(Date) 1/28/13

(Place of interview) Establishment

(Name of employee)          (Number, street, apt. no.)

**Informers' Privilege**                                    **Informers' Priv I...**

(City or town)          State          Zip Code

**Informers' Privilege**

(Telephone number)          (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana

(Establishment)

**Informers' Privilege**

...ment)          for the approximate period from Dec 2009 to Present

(if still employed

as

**Informers' Privilege**

**Informers' Privilege**

(If additional space is needed continue on reverse)          Form WH-31 (Rev. May 2010)

DOL0060

Informers' Privilege

My salary has never been deducted for missed work, partial days worked, or if I come to work late. There is no sick leave policy

Informers' Privilege

Informers' Privilege

Informers' Privilege

Taxes are the only deductions from my pay. To my knowledge no one is employed under the age of 18. The past four people who made and set-up I believe are in college. Informers' Privilege

Informers' Privilege

To my knowledge the above is true and accurate.

Informers' Privilege

Interview taken by WHI (signature)

DOL 0070

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Phone Interview
(Place of interview)

Mr.
Miss
Mrs.

I, Ms. ▓Informers' Privilege▓ , of ▓▓▓ ▓Informer Privilege▓ ▓▓
(Name of employee)                    (Number, street, apt. no.)

▓Informers' Privilege▓                 AR          ▓Informers' Privilege▓
(City or town)          State                       Zip Code

▓Informers' Privilege▓
(Telephone number)          (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana's
(Establishment)

▓Informers' Privilege▓          for the approximate period from 2006 to Present
(Location of establishment)                                      (if still employed state "present")

as ____ Volunteer / Cosignor
(Occupation or description of duties)

Statement: I volunteered for Rhea Lana's July and August of 2012. I signed up on-line for certain shifts. I picked which shift worked best for me and in exchange for that I shopped early. I pulled tap off of the clothing, I counted the items, I sorted the clothing for the cosignors so they could come pick up the clothing. I also checked in clothing. There was always a past volunteer who would assist you or a manager, I think that's what they called them. I can't

(If additional space is needed continue on reverse)          Form WH-DOL (Rev. May 2010)

B-7a

– App. 141 –

think off hand of a particular person. I was not interviewed for the assignments. I was a consignor also at the same events. As a consignor I would get my clothes all clean and hung up and Rhea Lana tags on them and then go on-line and put my register my items on-line with Rhea Lana. I would print my tags at home to put on my items. I priced my own items. At the end of sale, there would be a pick up day to pick up your items or donate them. You also would pick up your consignment check. There were hundreds of people who were consignors. I can't think of anyone off hand. The only reason I volunteered was to shop early on Saturday to get better stuff to buy. I do 2 events in the summer, I work 2 events as a volunteer and 1 event I would consign in. Rhea Lana provides tables, chairs, and racks. You do have to provide your own hangers and are responsible for tagging your own clothes. I have volunteered and consigned since 2006. In 2011 I participated in 3 events, 2 in the summer and 1 in the fall. I only volunteered in 2011. As a volunteer, the more shifts I worked (5 hr shifts) the earlier I got to shop. As a consignor I recieved 70% of the items I sold.

DOL 0072

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Phone Interview
(Place of interview)

Mr.
Miss
Mrs.
I, Ms. ████ Informers' Privilege ████ , of ████ Informers' Privilege ████

AR
State

████ Informers' Privilege ████
Zip Code

████ Informers' Privilege ████
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) __Rhea Lana's__
(Establishment)

████ Informers' Privilege ████
(Location of establishment)

for the approximate period from __2006__ to __Present__
(if still employed state "present")

as __Volunteer/Consigner__
(Occupation or description of duties)

Statement: I usually worked 3 shifts an event as a volunteer. As a consigner, you do not have to be present at the event. When I was physically there at an event, I was a volunteer. Another volunteer assignment was to bring in lunch for the other volunteers. There was a sign-up sheet to volunteer to bring in lunch or snacks. During the shift whenever you wanted to take a break to eat you could. I would take about a 30 minute lunch. There was no one under the age of 18 consigning with me. I am not aware of anyone under 18 doing assignments.

Interview take by WHI [Don Hay]  ②

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)

R-76

**– App. 143 –**

Personal Interview Statement          **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Mr.
Miss

**Informers' Privilege**, of **Informers' Privilege**

(Name of employee)                    (Number, street, apt. no.)

**Informers' Privilege**

(City or town)          AR                    **Informers' Privilege**
                        State                    Zip Code

**Informers' Privilege**

(Telephone number)        (Driver's licence number - Do not request if number is same as Social Security Number)

18⁺ years of age, (was/have been employed by)   Rhea Lara's
                                                   (Establishment)

**Informers' Privilege**            for the approximate period from   2000   to   Feb 2013 Present

(if still employed state "present")

as                    Consignor
                      (Occupation or description of duties)

Statement: I gather up what I don't want anymore and want to sell. The Rhea Lara website gives you a consignor number. You put your items into the database online. You prep all your items and place tap on all your items. You have the option of printing labels online or having them label them when you drop off your item. The consignor picks the price of item. Rhea Lara suggests pricing. You also have the option for your items to go half-price or to donate your items. You get a check on the day you pick up your items. You recieve

(If additional space is needed continue on reverse)        Form WHDOL (Rev. May 2010)

B-8a

**– App. 144 –**

70% of your items sold. You can also get up to 80% if you refer other consigners. You get 40% if they prep all your items for you. You can log into the website and see what items have sold. I am not at the event selling my merchandise. There are about 900 consignors. You drop off your items on Tuesday, wed, or Thursday and the sale starts on Saturday. The sale lasts a week. I consign to get rid of a bunch of my stuff. I think its fun. Its turned into a hobby for me. There is no maximum or minimum for the number of items to put into the event. There is training provided on Rhea Lana website on how to prepare your merchandise. When you drop of your items you sign a piece of paper saying you will pick up your items. Also Rhea Lana guarantees your items, if something is lost Rhea Lana will pay you for that item. I also shop the events. I have seen people bring their kids to shop, but I don't think there were any kids doing any work or anything, and the ones I saw were teenagers. There are two events held per year. As a consigner you also get to shop early the day before it opens to the public. Rhea Lana provides racks, tables, and location, and employees

DOL 0075

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
_____
(Date)

Mr.
Miss

**Informers' Privilege**
, of _____
(Name of employee)     **Informers' Privilege**

Phone Interview
_____
(Place of interview)

**Informers' Privilege**     **Informers' Privilege**
(Number, street, apt. no.)

**Informers' Privilege**
(City or town)

AR
State     **Informers' Privilege**
Zip Code

**Informers' Privilege**
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana's
_____
(Establishment)

**Informers' Privilege**
_____ (ent)

for the approximate period from 2010 to Feb 2013 Present
(if still employed state "present")

as Consignor
_____
(Occupation or description of duties)

Statement: to sell gun items.

**Informers' Privilege**

Witnessed by Tamara Hagur 3/14/13

(If additional space is needed continue on reverse)

Form WH-DOL (Rev. May 2010)

B-8b

– App. 146 –

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division


U.S. Wage and Hour Division

This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. ████ Informers' Privilege ████ , of
(Name of employee)

4/11/13
(Date)

Establishment
(Place of interview)

Informers' Privilege
(Number, street, apt. no.)

Informers' Privilege

Informers' Privilege

AR
State

Informers' Privilege

Zip Code

(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana
(Establishment)

Informers' Privilege

(Location of establishment)

approximate period from March 20/20 Present
(if still employed state "present")

as Manager
(Occupation or description of duties)

Statement: I make sure everything is sized correctly. I put things back on the racks. I act as a cashier, take customer payments. I sort out items at the end of the sale. I also hand out checks at the end of the sale to the consignors. I do not supervise any employees. I am paid $8.00 per hour. My hours vary. I work whatever day I want to work. I tell Ms. Rhea the hours that I can work. For this specific event I worked last Wednesday (4/3) I worked ████ hours (4/6) I worked ████ hours, (4/7) ████ hours, (4/10) ████ hours

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0077

**– App. 147 –**

(4/11) I will work ███ hours and (4/17) I will work ███ hours. I take a 30 minute lunch, but this time is not deducted from my work time. I keep track of my hours by signing in and out on timesheets. The only deductions from my pay is for taxes.

I also consign once a season. When I consign I get all the clothes ready, I price my items, put them on the computer on the Rhea Lana site, I then bring my items to the sale before it starts. When I drop off my items other managers go through the items to make sure they can sell. There is a managers' meeting before the sale starts. I am paid my hourly rate for attending the managers meeting. The consignor get 70% of items sold and Rhea Lana receives 30%.

As a manager I also receive compensation for gas at a flat rate of $25.00 for the event. I have not worked over 40 hours in a week working an event as a manager. As a consignor you can just drop off your items and pick them up at the end of the sale. You are not physically working the event.

If you're a volunteer, the more you work the earlier you get to shop.

DOL 0078

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. ▉Informers' Privilege▉ , of ▉Informers' Privilege▉
(Name of employee)          (Number, street, apt. no.)

▉Informers' Privilege▉

▉Informers' Privilege▉

An          ▉Informers' Privilege▉

State          Zip Code

▉(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

18 years of age, (was/have been employed by) _Rhee Lana_
(Establishment)

▉Informers' Privilege▉          for the approximate period from _2012_ to _Present_

(Location of establishment)          (if still employed state "present")

as _Manager_
(Occupation or description of duties)

Statement: If you're a consigner and volunteer, you shop even more earlier. If you're a volunteer, you are not paid anything you get to shop early to get the best deals. You do have to sign-in and out on a timesheet when you volunteer.

Within the last two years, I have been a Manager/consigner. There is a $9.50 for every 100 items a consigner puts in the sale. To my knowledge there is no one under the age of 18 working as a

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0079
B-9b

**– App. 149 –**

congressmen, volunteer, or manager.
You sign-in online to volunteer or
they can call.
There are also top Operator Managers.
I report to the Ops Manager I do
not know how they are paid, but
they supervise the Managers.
I am unsure how many managers They
are.
I work Little Rock, North Little Rock, and
Conway events.

X Informers' Privilege

Interview taken by witt [signature]

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.     **Informers' Privilege**
I, Ms.

**Informers' Privilege**                    , of     **Informers' Privilege**

_3/13/2013_
(Date)

_Phone Interview_
(Place of interview)

**Informers' Privilege**

_AR_
State

Zip Code

(City or town)

**Informers' Privilege**

(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

_18+_ years of age, (was/have been employed by)    _Rhea Lana's_
(Establishment)

**Informers' Privilege**

for the approximate period from _2009_ to _Oct/nov. 2012_
(if still employed state "present")

as _Consignor/Volunteer_
(Occupation or description of duties)

Statement: _I get all my items together and put everything in size order and enter everything on the Rhea Lana site, I place my tap on my items. To get my items Guzrnteed, I ~~print~~ Rhea Lana off my labels and place on tap. The volunteers still check the items when I drop off the items. The volunteers also help put everything out on the floors. I drop off my items two day before the sale starts. There is a shipping order. There is a Pre-sale day a day before the sale; volunteers, consigners, and managers._

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)

_B-10~_

**– App. 151 –**

The consigner sets the price of the items. Rhea Lara does have guidelines to the minimum price set on items. There is not a maximum price. Rhea Lara does recommend that the price not be more than 70% of the original price. Rhea Lara does have training tutorials for first time consigners. You have to complete the training before you can consign and put your items into the Rhea Lara database. The items that I consign, I receive 70% of the item day. On pick-up day I receive a check for my items sold. The sale normally end on a Saturday at 2pm. The volunteers then sort the items for the consigners to pick up. I do have the option to donate any unsold items. There is a consigner fee of $9.00 for each consigner number. Each consigner can batch 100 items. The majority of the workers are volunteers. If you volunteer you sign-up. They need allot of people to check-in and sort. You sign-up for shifts. You make sure items are on racks, pull tag for checkout. The more volunteer hours, the earlier you shop. The shifts range from 2-12 hours. Generally when I volunteer, I work for 12 hours, I make it an all day event. You sign-in and out on a log book. You always check-in with a manager. They give you the assignment on what to be done. The managers

DOL 0082

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. ███████ **Informers' Privilege** ███████ , of

(Name of employee)

███████ (City or town) ███████

███████ (Telephone number) ███████

3/13/2013
(Date)

Phone Interview
(Place of interview)

**Informers' Privilege**
(Number, street, apt. no.)

AR
State    **Informers' Privilege**    Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by)   Rhea Lana's
(Establishment)

**Informers' Privilege**

for the approximate period from 2009 to Oct/Nov. 2012
(if still employed state "present")

as   Consignor / Volunteer
(Occupation or description of duties)

Statement: actually work for the company. They provide a company T-shirt and name tag. My items as a consigner are amongst thousands of items. I am not there selling my items. There is no way for a consigner to just sell their items because all the items are mixed in together. As a consigner Rhea Lana provides all the racks, tables, chairs. Consigners have to provide their own hangers and ziplock bags for shoes and small items, also safety pins. Rhea Lana will sell you hangers, batteries, and safety pins. I consign

(If additional space is needed continue on reverse)    Form WH-31 (Rev. May 2010)

B-10b

**– App. 153 –**

because its an easy way to get rid of items
that my daughter has out grown. I can
also shop and purchase items that are
not at full price. It is so economical
to shop at consignment events
The volunteers look for stains, and tears
in clothing.
As a consignor I make anywhere from
$50 - $300 at an event. On the
website it tells all the events. They are
held all over the state and also in
other states.
The majority of the people who volunteer are
your moms and grandmothers. I don't
think there are anyone under the age of
18.
There are seasonal guidelines to what ~~goes~~ items
can be sold at events. For instance in the
fall you can't put swim suits and allot of
short sleeve shirts. They don't accept things
like used underwear. The guidelines are
on the company website.

<span style="background-color:black;color:red">Informers' Privilege</span>

Witnessed by WHI _____ 3/15/13

DOL 0084

**– App. 154 –**

Personal Interview Statement          **U.S. Department of Labor**
                                      Wage and Hour Division

This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/11/2013
(Date)

Mr.
Miss
Mrs.
I, Ms.    Informers' Privilege          Phone Interview
                            , of          Informers' Privilege
Informers' Privilege                     (Place of interview)
          (employee)                     (Number, street, apt. no.)

                            AR          Informers' Privilege
Informers' Privilege        State                    Zip Code

          (Telephone number)     (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by)  Rhea Lana
                                               (Establishment)
Informers' Privilege

          for the approximate period from Spring Fall 2010 to Feb. 2013 present
(Location of establishment)                              (if still employed state "present")

as  Consigner / Volunteer
          (Occupation or description of duties)

Statement:  As a consigner I gather all my items together and then enter the information on Rhea Lana site. The site will then print out Barcodes and you place the codes on the item. I drop off my items the tuesday or wednesday before the sale opens to the public. I am not physically at the event selling my items. I sign a consigner it~~em~~ ~~tha~~ agreement that basically tells you that Rhea Lana will not guarantee your item if its not bar coded at the event. Rhea Lana will guarantee your item if

(If additional space is needed continue on reverse)          Form WH-31 (Rev. May 2010)

— App. 155 —

they are properly tagged and in order.
You can volunteer to bring in food,
do car magnets, pass out brochures and work
shifts at the event. when you volunteer
at an event, you set-up the racks and
hold clothes, sort items, check-out
customers. Volunteers are assigned to
different managers. You do this in exchange
for early shopping. I volunteered at
Conway event held February 2013. Before this
I worked fall sales for Little Rock in
July or August 2012. If you work 3 or
more shifts you get at the event at 8am,
The events open to the public on Sunday at
noon. Pre-sale is open to Volunteers on
Saturday at 8am. I volunteer because I like to
get there early. The consignors get in at
Saturday at 1pm. You get the best deals
if you volunteer versus just being a consignor.
The shifts are usually 5 hours. We have to
sign-in and sign-out on a log sheet. Its
basically like Clocking-in and clocking-out.
there is <span style="color:red">[Informers' Privilege]</span> and another manager that
works. The managers direct you on what you
need to do. Volunteers are required to wear
a Volunteer shirt. Rhea Lana provides this.
As a Consignor, we make 70% - 80% of
your items sold. If you refer I think
5 consignors you make 80%. You pay a
$9.54 consignor fee. You pick up

DOL 0086

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/11/2013
(Date)

Phone Interview

Mr.
Miss
Mrs.
I, Ms. ███ **Informers' Privilege** ███ , of **Informers' Privilege**
(Name of employee)                              (Number, street, apt. no.)

**Informers' Privilege**                        AR        ███████
(City or town)                      State                    Zip Code

(Telephone number)              (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana
(Establishment)

**Informers' Privilege**      for the approximate period from Fall 2010 to Feb 2013 Present
(Location of establishment)                                           (if still employed state "present")

as Consignor/Volunteer
(Occupation or description of duties)

Statement: Your Consignor check at the end of the sale. On this day you also pick up your items that did not sell. You also have the option to donate your items. If you have missing items, Rhea Lana will compensate you for any missing items. Managers will assist you in locating your missing items. Rhea Lana provides you with bar codes and racks. Some people also bring in tables and as volunteers. As a Consignor I provide the clothes, hangers, and tags. We also have to bag our shoes and

(If additional space is needed continue on reverse)     Form WH-31 (Rev. May 2010)
DOL 006
13-11-b

**– App. 157 –**

safety items. If you bring your items untagged you can buy tang tap them Rhea Lana. As a volunteer you also get fed provided by other volunteers. I dont think there are any volunteers or consignors under the age of 18.

Interview take by WHI Crathly

DOL 0088

Personal Interview Statement       **U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. ████████ , of ████████
(Name of employee)          (Number, street, apt. no.)

AR.
(City or town)    State           Zip Code

4/10/13
(Date)

Establishment
(Place of interview)

(Telephone number)       (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana
(Establishment)

for the approximate period from Jan 2013 to Present
(Location of establishment)                          (if still employed state "present")

as Manager
(Occupation or description of duties)

Statement: I do consigner check-in. This is when people bring in their clothes and we check them holes and stuff. We make sure they bring in what they said they would bring in. We insure their items. This is done on Wed on Thursday before the event starts. Pre-Sale is held on Saturday. I also do store set-up, store organization, checking out customers, pulling tags. I supervise the volunteers. The volunteers report to the managers. At the Greater Little Rock sale in January there were

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0089

– App. 159 –

allot of volunteers, but this Event we have not had very many. I am paid $8.00 per hour, but we do not start getting paid until we have worked over 12.5 hours and if you start shopping early which could be Friday or.put you have to give up another 12.5 hours. I Sign in and Sign out on a time sheet. I send the hours that I can work to Rhea Lara and she makes the schedule. This Event I worked **Informers' Privilege**

# Informers' Privilege

**Informers' Privilege** I will and have worked over 40 hours in a week and I am still paid $8.00 for these hours. There is not a set lunch time, but we can take breaks when we want. There is not a lunch deduction from my time, I did not shop pre-sale at this event, so that additional 12.5 hours will not be deducted from my pay. There is no perk for having to work that first 12.5 hours, which is about $100. I get paid on Wednesday after the sale ends. They mail you your check. I report to the Ops Manager. The Ops Manager make more money and

DOL 0090

**– App. 160 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms. █████ **Informers' Privilege** █████ , of **Informers' Privilege**

(Name of employee)                                    (Number, street, apt. no.)

**Informers' Privilege**

(City or town)

An
State

**Informers' Privilege**

Zip Code

**Informers' Privilege**

(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

_____ years of age, (was/have been employed by) Rhea Lana

(Establishment)

**Informers' Privilege**

(Location of establishment)

for the approximate period from Jan 2013 to Present

(if still employed state "present")

as _____ Manager

(Occupation or description of duties)

Statement: they were alot. There is at least one Op Manager here each day. I volunteered Marketing first in 2009. I also volunteered in January 2011 **Informers' Privilege** when I Volunteered, I did customer check-in, worked returns, marketing, sorting. Volunteers do everything, when you volunteer, you sign in and out of a log book. You sign up for your shifts online, when I volunteered I worked about 15 hours for the entire event; no 20 hours. I was a promo mom. As a promo-mom gets to shop Friday night

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)

DOL 0091

B-126

**– App. 161 –**

after the mangers ship. As a volunteer, I was not paid anything I just get to shop early. As a Volunteer you report to a Manger and they tell you what to do.

When I was a consigner I got my items ready at home, price my items, and put my labels on the items. As a consigner you are not at the event selling your items. They are just out on the racks. You get 70% of the items you sale. You can donate your items at the end of the sale. You do not get a tax right off, Rhea Lana does. As a consigner you also pay $9.95 per 100 items in the sale.

When you're a manager you have to be a consigner. If you choose not to shop early and not give up 12.5 hours you shop with the regular consigner.

If you're a regular volunteer, your shopping times vary depending on how many hours you work. As a volunteer you can also sign family up to volunteer such as your husband can volunteer to walk security. The volunteer hours go toward the family as a whole. To my knowledge no one is volunteering under the age of 18. As a consigner/volunteer they shop early. The only perk to being a consigner/volunteer

DOL 0092

**– App. 162 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.
Miss
Mrs.
I, Ms.

4/12/13
(Date)

Establishment
(Place of interview)

**Informers' Privilege** , of **Informers' Privilege**
(Name of employee)                  (Number, street, apt. no.)

**Informers' Privilege**          AR          **Informers' Privilege**
(City or town)                State                      Zip Code

**Informers' Privilege**
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

_____ years of age, (was/have been employed by)     Rhee Lara
(Establishment)

**Informers' Privilege**     for the approximate period from Jan 2013 to Present
(Location of establishment)                                      (if still employed state "present")

as     Manager
(Occupation or description of duties)

Statement: is to ship early. If you consign you don't have to work at the event, you just drop your stuff off and then come pick it up. The volunteers and Managers organize it, sort it, put it out, and give the consignors their checks at the end of the sale

As a manager I'm unsure if there were deductions such as taxes from my pay.

**Informers' Privilege**

_____ taken by [illegible] [signature]

(If additional space is needed continue on reverse)          Form WH-31 (Rev. May 2010)
                                                              DOL 0093

B-12C

– App. 163 –

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

Mr.

Miss

Mrs. ~~Informers' Privilege~~

Ⓧ Ms. [REDACTED - Informers' Privilege] of [REDACTED - Informers' Privilege]

4-12-13
(Date)

esp
(Place of interview)

[REDACTED - Informers' Privilege]
(Number, street, apt. no.)

(City or town)

AR
State

[REDACTED - Informers' Privilege]
Zip Code

[REDACTED - Informers' Privilege]
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

_____ years of age, (was/have been employed by) Rhea Lana
(Establishment)

(Location of establishment)

for the approximate period from 6 yrs to present (if still employed state "present")

as manager
(Occupation or description of duties)

Statement: I started as a consignor for 1 year. Then I became a manager. As a manager, I run the register, pull tags, organize sales floor, work the door, make the signs for sorting and dealing with merchandise.

My schedule depends on when I am available. This past week, I worked [REDACTED - Informers' Privilege] last Thursday - Saturday [REDACTED - Informers' Privilege], Sunday, 4/7/13 [REDACTED - Informers' Privilege], Monday [REDACTED] [REDACTED - Informers' Privilege], Tues + Wed. Thursday [REDACTED - Informers' Privilege] and today 4/12/13 from [REDACTED - Informers' Privilege] - and will probably stay till [REDACTED]

I do keep a time sheet of the hours that I work. I am paid $8.50 per hour. I would normally

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0094

– App. 164 –

work 50 hours per sale, which is 2 weeks. This is the first year I've worked 3 sales in the spring. I will normally work 1 in the spring and 1 sale in the fall.

I have not had any deductions from my pay for shortages or damages. I do receive travel reimbursement if you live certain miles [?] miles away.

**Informers' Privilege**

**Informers' Privilege** the above and it is correct
4/12/13

[illegible signature] by WHP [illegible] 4/12/13

DOL 0095

**– App. 165 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/13/13
_____
(Date)

Phone Interview
_____
(Place of interview)

Mr.

Miss

Mrs.

I, Ms. **Informers' Privilege**  , of **Informers' Privilege**
(Name of employee)               (Number, street, apt. no.)

**Informers' Privilege**         AR,                    **Informers' Privilege**
(City or town)          State              Zip Code

**Informers' Privilege**

(Telephone number)            (Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) *Rhea Lana*
                                                (Establishment)

**Informers' Privilege**                                          Feb. 2013
                          for the approximate period from 2 years to    Present
(ment)                                                              (if still employed
                                                                   state "present")

as  *Consignor / Volunteer*
     (Occupation or description of duties)

Statement: I go through all my clothes and clean, iron, and hang them. I tag them with barcodes. I enter the items on the Rhea Lana website. I price my items. The system prints out the barcodes and put them on the items and drop them off at the sale. Rhea Lana sets up different drop off drop about 3 or 4 drop. The volunteers go through the items to make sure your items match your descriptions. I am not at the events selling my items. I put my items on the rack when I drop them off and they stay there

(If additional space is needed continue on reverse)    Form WHD-91 (Rev. May 2010)

DOL 0096

D+4a

until the end of the week. If my items
sell, I get 70% of the sale, Rhea Lana
gets 30%. If the items don't sell,
you pick them up at the end of the
week on Sunday. The volunteers sort
through the items at the end of sale for
the consigners to pick up. There is a
one time consignee fee of about $9.00.
I also volunteered at the last event. If
you volunteer you get to shop early, a day
before the event starts. It basically a
Thank you for volunteering. You go
through the Rhea Lana website and pick
what shifts you want to work. My
husband and I split shifts. He helped
set-up and I helped stock and sorting
of the items for the consigners. You
have to sign-in and sign-out to keep
track of when you were there. I have volunteered
before, there is someone there who shows
you exactly what to do, what they need you
to do.

As a consigner Rhea Lana provides tables, racks,
I am required to make sure all my clothes
have hangers, tags, and bags for my items.
I've not seen anyone under 18. Everyone
that I've seen is an adult.
Rhea Lana also provides food and drink
during the shifts. As a volunteer you do get
a lunch break. I usually work at the

DOL 0097

**– App. 167 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/13/13
(Date)

Phone Interview
(Place of interview)

Mr.
Miss
Mrs.
I, Ms.     Informers' Privilege , of    Informers' Privilege
Informers' Privilege                    (Number, street, apt. no.)

Informers' Privilege           AR ,       Informers' Privilege
                            State                        Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

18ʳ years of age, (was/have been employed by) Rhea Lana
                                            (Establishment)

Informers' Privilege                                    Feb. 2013
                                                        Present
for the approximate period from 2 yrs to
                                                        (if still employed
                                                        state "present")

as Consigner / Volunteer
(Occupation or description of duties)

Statement: end of the event sorting and there are about 100 workers at a time at an event.

Online there is tones of information on how to make your clothes sell, how to price recommendations such as 30% of what you paid for them, and how to hang your clothes. This is good information for new consigners. I consign so I can get money back for the clothes I purchased. This allows me to get more clothes. You can't make that type of money in a regular yard sale.

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0098

B-14b

**– App. 168 –**

Rhea laura is strict about the items
you put in the sale. So you can get
high quality items.
I volunteer about 15 hours at each event.
I volunteer for Greater Little Rock.

Interview take by wHI ꞏDan Hay

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

3/8/2013
(Date)

Phone Interview
(Place of interview)

Mr.
Miss
Mrs.
I, Ms. **Informers' Privilege** , of **Informers' Privilege**
(Name of employee)                     (Number, street, apt. no.)

**Informers' Privilege**

AR                          **Informers' Privilege**
(City or town)          State                                    Zip Code

**Informers' Privilege**
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) Rhea Lana's
(Establishment)

**Informers' Privilege**

for the approximate period from 2006 to Present
(Location of establishment)                                      (if still employed state "present")

as Consignor
(Occupation or description of duties)

Statement: I basically put my clothing, toys, books, and maternity clothes on hangers and print off barcodes and attach to items. I print these barcodes off my account on the Rhea Lana website. I automatically generates barcodes for the items. I participate in one event a year. It was a good way to get rid of my kids stuff. I [g]ot involved I just picked it up online. The process has been the same over the years. I ~~work events~~ consign in events in Little Rock, Arkansas. I am unsure of the number of consigners participating in

(If additional space is needed continue on reverse)          Form WH-[...]1(Rev May 2010)

**– App. 170 –**

events. There are allot. Rhea Lana will prints your bar codes for you. Rhea Lana provides the locations for the events and racks. The consigner provided own hangers, and safety pins. I priced my own items. There is an on-line training or tutorial that is provided by Rhea Lana. It shows you how to hang your clothes and what type of items will sell, and tips on how to price items. You do not physically have to be at an event to sell your items. During the events, I did volunteer. When I volunteered, I signed up to do things such as straighten clothes, check people out, clean-up, and assist customers, check for stains, and sort clothing to return to consigners. One of the mangers directed my work. I would check-in with them ▉Informers' Privilege▉ and Rhea Lana were all mangers. I volunteered for 5 hours at an event. When I volunteered, I was able to shop the sale early, we didn't get any money or any thing like that. we usually took about a 15 minute break for snacks and during the sort shift a 30 minute break to eat. As a consigner I recieved a check at the end of the sale. I recieved 70% for my sale of my items. If they didn't sell, they were returned to me or I had the option to donate them. when I volunteered at

DOL 0101

**– App. 171 –**

## Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

_3/8/2013_
(Date)

Mr.
Miss
Mrs.

_Phone Interview_
(Place of interview)

I, Ms. **Informers' Privilege** ███████, of **Informers' Privilege** ███████
(Name of employee)          (Number, street, apt. no.)

_AR_
State

**Informers' Privilege** ███████
Zip Code

**Informers' Privilege** ███████
(City or town)

**Informers' Privilege** ███████
(Telephone number)

(Driver's licence number - Do not request if number is same as Social Security Number)

_18ᵗ_ years of age, (was/have been employed by) _Rhea Lana's_
(Establishment)

**Informers' Privilege** ███████
(Location of establishment)

for the approximate period from _2006_ to _Present_
(if still employed state "present")

as _____
(Occupation or description of duties)

Statement: _Events I would sign-in when I got there and sign-in when I left. You could also sign-in online for the shift you wanted to volunteer at. When you are a consigner, you are not at an event selling your items, They are all mixed in with everybody else's items. I am not aware of anyone under 18 doing assignments._

_Interview taken by WHI _____ Martha___

(If additional space is needed continue on reverse)

_B15b(2)_

Form WH-31 DOL (Rev. May 2010)

**– App. 172 –**

Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division



This report is authorized by Section 11 of Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

1/28/13
(Date)

Mr.

Miss

**Informers' Privilege**

, of

**Informers' Privilege**

AR
State                    Zip Code

(Driver's licence number - Do not request if number is same as Social Security Number)

18+ years of age, (was/have been employed by) _Rhea Lana Franchse_
(Establishment)

**Informers' Privilege**

ment)

for the approximate period from Dec. 2012 to _present_
(if still employed state "present")

as _____ **Informers' Privilege**

Statement: _____ **Informers' Privilege**

# Informers' Privilege

(If additional space is needed continue on reverse)

Form WH-31 (Rev. May 2010)
DOL 0103

3-16

**– App. 173 –**

Case 1:14-cv-00017-CRC   Document 62-1   Filed 04/12/17   Page 62 of 254

# Informers' Privilege

Informers' Privilege

My salary has never been deducted for missed work or partial days worked. The only deductions from my pay are for taxes. I am paid once a month, on the 30th or 31st of the month (last day of the month).

Informers' Privilege

Informers' Privilege

Informers' Privilege

To my knowledge no one is employed under the age of 18.

To my knowledge the above is true and accurate.

Informers' Privilege

Interview taken by written statement

DOL 0104

**– App. 174 –**

Initial Conference Guide

Conference Date: 1/28/13 _____ Location Establishment _____

Met with: Christy Hudson _, Account Executive
                    (name)                                      (title)

1. Legal Identity of Firm (name): Rhea Lana, Inc.

   (t/a* or dba*) _____ Rhea Lana's _____

   (address) _____ 1055 Sunflower Drive Suite 104 (Corporate
   _____ Conway, AR. 72034          office)

2. Principals of Firm:(names) Rhea Lana Riner title President 50%

   Dave Riner _____ title Vice President 50%

   _____ title _____

   _____ title _____

3. Date/State Incorporated: Arkansas  October 19, 2004

4. Federal ID# (EIN#): **PII** ████ ██ ████ _____

                                                        Legal name Rhea Lana's
5. Other Branches:    Yes / No  (circle one)   Franchise (locations) Franchise Systems

   Location/Address: _____ Approx. 62 in 21
                           _____ Different State

   Location/Address: _____

   Location/Address: _____

DOL 0115 C-2a

**– App. 175 –**

Note: "t/a" means "trading as" and "dba" means "doing business as."  These
      designate the name, if other than the legal identity, under which the general
      public would know the business.

6.  Business Information:

    a. What does firm do?  Mea Lana's Inc, Children's
       Consignment events - 6 events per year
       in Conway and Little Rock.
       7 days (event length)

    b. What items are shipped or received in Interstate Commerce and by whom:
       Purchase products from Consetuct (children's Trap)
       functioning Internet Site.

    c. Employees – any interstate travel?
       NO

    d. Government Contracts:
       N

DOL 0116

– App. 176 –

_reported by Firm_ ___Initial Conference___

7. ADV for last three years: 2011 $1,862,431 ___Fiscal year: From___ 2010 $1,667,074

to _____

to _____

to _____

8. Employee Information:

   a. Average number of employees:   enterprise: Rhea Lara Inc. 15

                             establishment: _____

   b. Salaried employees:      Names/Positions/Salary

| Name: | Position: | Salary: | Work Schedule (or approx. hrs. per week) |
|---|---|---|---|
| Rhea Lana Riner, Owner | | | |
| | | | |
| | | | |
| | | | |

   c. Hourly employees:   Lowest paid hourly employee:

| Name | Job Category | Hourly Rate | Paid Overtime |
|---|---|---|---|
| Mover/ Set-up | | $14.00 | $8.00 per hour |
| | | | |
| | | | |

CBA?   Yes/No ⟶ (circled No)

If yes, who is the union rep?_____

Which employees are covered by CBA?   NO 16(b) actions reported.

Most paid on 1099: 80 to 106

DOL 0117

**– App. 177 –**

Event Hours: 2 wks (Mon. - Sunday)
Scheduled Hours Vary. Schedule Online

9. Workweek Information:                    OFFICE Hours: 8am - 4pm
                                                           Monday - Friday
   a. Workweek:              Day Begins Mon. Day Ends Sunday

   b. Workday:  Normal Work Schedule: Rhea Lena

   Franchise Systems: 8am - 3pm
                                    9am - 4pm monday - Friday
   c. Meal Periods: _____

10. Are overtime hours worked? ___No___

    If "yes", how are OT hours paid?

11. Pay Information:

    a. Commissioned Employees: ___NO_____

    _____

    b. Tipped Employees: ____NO_____

    _____

    c. Piece Rate Employees: ___NO_____

    _____

    d. Bonuses: Discretion of owner.

    _____

    ∴ Deductions: None.

    _____

    Firm entered into consent agreement
    with ADL 1/19/2012 in regards to
    unpaid volunteers and co-signers.

DOL 0118

Initial Conference

12. Record keeping:

a. Who does payroll: _Paychecks (~~Nicole~~ Czeter)_ *Nichole*

b. How are records kept: _Electronic_

c. Who maintains records: _Nichole Czeter_

d. Date of last completed payroll: _26th of the month_

e. Pay Period (weekly, biweekly, etc.): - Salaried paid monthly
— Hourly from Rhea Lana Inc paid ~~monthly~~ biweekly.
Franchise Systems paid monthly.

13. Child Labor:

# minors currently on payroll in profile pay period: _____

a. Youngest Employee: _Rhea Lana Inc._ ~~⬤⬤⬤⬤⬤⬤~~

b. Jobs: _- No Driving._ Possibly movers/set under 18.

c. Hours: _____

d. CL Work Permits: _____

14. Garnishment:

a. Any garnished employees: _None_

PII

Rhea Lana Franchise Systems

_____

20 Employee's

Allison Crum, Graphic Communication Director - Salary
Kailey Wood, Creative Design - Salary

lowest paid hourly $14.00 - Clerical work.

C-2C

DOL 0119

**U.S. Department of Labor**

Wage and Hour Division
10810 Executive Center Drive
Suite 220

Little Rock, AR  72211
501-223-9114
501-223-8734

January 09, 2013

Rhea Lana Rhiner
Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, AR  72034

Scheduled Visit to Begin:
Date: January 17, 2013
Time: 9:00 am

SUBJECT:     Visit by Wage and Hour Investigator

The Wage and Hour Division is responsible for the administration and enforcement of a number of Federal labor standards laws. These laws are briefly described in the enclosure entitled "Visits to Employers" (Wage & Hour Fact Sheet No. 044.)

.

This is to advise you that I will visit your establishment on the date and at the time shown above to determine compliance with one or more of these laws. In this regard, please have available for examination employee time and payroll records for the past two years.

Every effort will be made to conduct this assignment expeditiously and with a minimum of inconvenience to you and your employees.  If you or your designated representative will not be available on the date and at the time indicated above, please let me know promptly so that other arrangements can be made.

Tamara  Haynes
Wage and Hour Investigator

Enclosures:
Handy Reference Guide (FLSA)
Visit to Employers ( Fact Sheet No. 044)

DOL 0121

**– App. 180 –**

**Haynes, Tamara - WHD**

| | |
|---|---|
| **From:** | Haynes, Tamara - WHD |
| **Sent:** | Monday, January 07, 2013 2:50 PM |
| **To:** | Darling, Robert A - WHD |
| **Cc:** | Rodriguez, Lesbia A - WHD; Haynes, Tamara - WHD |
| **Subject:** | MODO COMMUNICATION - CASE ASSOCIATED: Rhea Lana's |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

DATE SENT: January 07, 2013


INQUIRING OFFICE: Little Rock AR District Office


CASE ID (BRANCH ESTABLISHMENT): 1677670
CASE TRADE NAME: Rhea Lana's
CASE LEGAL NAME:


MODO OFFICE: Little Rock AR District Office MODO ID: 50096 MODO TRADE NAME: Rhea Lana's


ADDRESS OF BRANCH ESTABLISHMENT
1055 Sunflower Drive, Suite 104
Conway, AR  72034


TELEPHONE NUMBERS(S) OF BRANCH ESTABLISHMENT Primary Phone Number: 501-499-0009


NAME AND ADDRESS OF HOME OFFICE
Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, AR  72034


CASE INFO
REGISTRATION ACT: FLSA
CASE STATUS: Under Investigation
Informers' Privilege
DATE OF REGISTRATION: 12/03/2012
ORIGINATING DO: Little Rock AR District Office INVESTIGATING DO: Little Rock AR District
Office AMOUNT BW COMPUTED:  $0.00
AMOUNT BW AGREED:     $0.00
AMOUNT CMP ASSESSED: $0.00


Informers' Privilege


MODO INFO
10810 Executive Center Drive
Suite 220

1

DOL-0122

D-2a

**– App. 181 –**

Little Rock, AR  72211


MODO TELEPHONE NUMBER(S)
Primary Phone Number: 501-217-9264
Secondary Phone Number: 501-217-9782
Primary Public Phone Number: 501-223-9114 FAX Number: 501-223-8734


LEAD MANAGER/OFFICE
Rodriguez, Lesbia
Little Rock AR District Office
Lead mgr Telephone Number: 501-217-9264


LEAD INVESTIGATOR/OFFICE
Haynes, Tamara
Little Rock AR District Office
Telephone Number: 501-217-9264


BRANCH DO LOCATION
10810 Executive Center Drive
Suite 220
Little Rock, AR  72211


BRANCH DO TELEPHONE NUMBER(S)
Primary Phone Number: 501-217-9264
Secondary Phone Number: 501-217-9782
Primary Public Phone Number: 501-223-9114 FAX Number: 501-223-8734


CASE SUMMARY NOTES


MODO MANAGERS
MAIN MANAGER: Darling, Robert
BACKUP MANAGER: Rodriguez, Lesbia


MODO INSTRUCTIONS/GUIDANCE INFORMATION
Handle Locally Unless Systemic Problem

Follow FOH instructions. Notify MODO if systemic violations are found prior to FC.  If no
systemic violations found, handle locally.



Your office has been associated with the above case as the MODO office for this employer.
You
may view this case in your MODO Notification list in case Management.  If this association is
a
mistake, you may remove it from your MODO Notification list by using the Remove button.

(Replaces WH-137)

DOL 0123

## Haynes, Tamara - WHD

| | |
|---|---|
| **From:** | Rodriguez, Lesbia A - WHD |
| **Sent:** | Monday, January 07, 2013 2:47 PM |
| **To:** | Haynes, Tamara - WHD |
| **Cc:** | Darling, Robert A - WHD; Murry, Dedrick W - WHD |
| **Subject:** | RE: Request MODO Control Record : Rhea Lana's |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tamara, the MODO control ID is 50096. Please associate immediately.  Let me know immediately if any of the following applies:

1) findings are face of the records
2) findings are systemic
3) ER will not cooperate


Thank you,

LESBIA A. RODRIGUEZ
Assistant District Director
Little Rock, AR
501-223-9114

****WARNING****
The attached information may be confidential. It is intended only for the addressee(s) identified above. If you are not the addressee(s), or an employee or agent of the addressee(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy and/or permanently delete the information and notify the sender of the error.


-----Original Message-----
From: Haynes, Tamara - WHD
Sent: Monday, January 07, 2013 1:59 PM
To: Darling, Robert A - WHD; Rodriguez, Lesbia A - WHD; Schott, Christine M - WHD; Dalton Jr, Charles H - WHD; Murry, Dedrick W - WHD; Rodriguez, Rolando - WHD
Cc: Haynes, Tamara - WHD
Subject: Request MODO Control Record : Rhea Lana's

Coverage:  Enterprise coverage is applicable for entire investigative period based on Manta ADV is above $500,000.  Firm has 5 additional locations within the State of Arkansas and currently franchises in 19 other states.

Issue:  Firm had a previous investigation by the Arkansas Department of Labor and found to be in violation of State MW and OT violations.  Firrm entered into an agreement with State on 1/19/12 to change business practices  that violated state MW and OT laws in regards to volunteers who were found to be employees of the firm, but collected no backwages.

Informers' Privilege ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮     Estimated 20 to 40 volunteers.  Volunteers work either a 5 hour shift or two 5 hour shifts.

1

DOL 0124

**– App. 183 –**

Business practices/model is used at all locations or sponsored events.

Please provide MODO instructions.
ALLEGED ER HQ ADDRESS
Legal Name: Rhea Lana's Inc.
TRADE NAME: Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, Arkansas 72034

CASE ID: 1677670
CASE STATUS: Under Investigation


ADDRESS OF BRANCH ESTABLISHMENT
1055 Sunflower Drive, Suite 104
Conway, AR  72034


TELEPHONE NUMBERS(S) OF BRANCH ESTABLISHMENT Primary Phone Number: 501-499-0009


CASE INFO
REGISTRATION ACT: FLSA
CASE STATUS: Under Investigation
Informers' Privilege
DATE OF REGISTRATION: 12/03/2012
ORIGINATING DO: Little Rock AR District Office INVESTIGATING DO: Little Rock AR District
Office AMOUNT BW COMPUTED:  $0.00
AMOUNT BW AGREED:    $0.00
AMOUNT CMP ASSESSED: $0.00


Informers' Privilege


LEAD MANAGER/OFFICE
Rodriguez, Lesbia
Little Rock AR District Office
Lead mgr Telephone Number: 501-217-9264


LEAD INVESTIGATOR/OFFICE
Haynes, Tamara
Little Rock AR District Office
Telephone Number: 501-217-9264


BRANCH DO LOCATION
10810 Executive Center Drive
Suite 220
Little Rock, AR  72211


BRANCH DO TELEPHONE NUMBER(S)
Primary Phone Number: 501-217-9264
Secondary Phone Number: 501-217-9782
Primary Public Phone Number: 501-223-9114 FAX Number: 501-223-8734

DOL 0125

CASE SUMMARY NOTES




------------------------ Circumstances ------------------------

DOL 0126

EDWARD L. WRIGHT
(1903-1977)
ROBERT S. LINDSEY
(1918-1991)
ALSTON JENNINGS
(1917-2004)
GORDON S. RATHER, JR.
JOHN R. TISDALE
JOHN WILLIAM SPIVEY III
LEE J. MULDROW
N.M. NORTON
CHARLES T. COLEMAN
EDWIN L. LOWTHER, JR.
GREGORY T. JONES
WALTER McSPADDEN
JOHN D. DAVIS
JUDY SIMMONS HENRY
KIMBERLY WOOD TUCKER
TROY A. PRICE
KATHRYN A. PRYOR
J. MARK DAVIS
JERRY J. SALLINGS
WILLIAM STUART JACKSON
MICHAEL D. BARNES
STEPHEN R. LANCASTER
KYLE R. WILSON
C. TAD BOHANNON
J. CHARLES DOUGHERTY
M. SEAN HATCH
JUSTIN T. ALLEN
MICHELLE M. KAEMMERLING
SCOTT ANDREW IRBY
PATRICK D. WILSON
DAVID P. GLOVER
REGINA A. YOUNG
PAUL D. MORRIS
GARY D. MARTS, JR.

# WRIGHT, LINDSEY & JENNINGS LLP

### ATTORNEYS AT LAW

**200 WEST CAPITOL AVENUE, SUITE 2300
LITTLE ROCK, ARKANSAS 72201-3699
(501) 371-0808 • FAX (501) 376-9442**

NORTHWEST ARKANSAS

3333 PINNACLE HILLS PARKWAY, SUITE 510
ROGERS, ARKANSAS 72758-8960
(479) 986-0888 • FAX (479) 986-8932

www.wlj.com

Writer's Direct Dial No. 501-212-1362
ctbohannon@wlj.com
Reply to Little Rock Office

June 12, 2013

ERIC BERGER
P. DELANNA PADILLA
CALEY B. VO
JOHNATHAN D. HORTON
JANE A. KIM
ADRIENNE L. BAKER
JEFFREY L. SINGLETON
KATHRYN M. IRBY
DAVID L. JONES
W. CARSON TUCKER
KRISTEN S. MOYERS
ERIN S. BROGDON
RICHARD BLAKELY GLASGOW
DIANA BORGOGNONI SNYDER
PATRICK M. YOUNG
BIANCA M. RUCKER
ANTWAN D. PHILLIPS
BAXTER D. DRENNON
MICHAEL A. THOMPSON
SETH R. JEWELL
HAYDEN W. SHURGAR
COURTNEY C. McLARTY
JAIMIE G. MOSS
NEEMAH A. ESMAEILPOUR
R. AARON BROOKS
REBECCA B. STAHL

OF COUNSEL
RONALD A. MAY
JOHN G. LILE
ROGER A. GLASGOW
ALSTON JENNINGS, JR.
FRED M. PERKINS III
BRUCE R. LINDSEY
JAMES R. VAN DOVER
CHARLES S. BOHANNON

*Via Email: Haynes.Tamara@dol.gov*

Tamara Haynes
Wage Hour Investigator
U.S. Department of Labor
Wage and Hour Division
10810 Executive Center Drive
Danville Building 2, Suite 220
Little Rock, AR 72211

RE:  Rhea Lana's, Inc.

Dear Ms. Haynes:

This letter is to follow up my letter of June 5, 2013, and our conversations yesterday afternoon. As you know, our client, Rhea Lana's, Inc. ("Rhea Lana's"), has agreed to pay its "managers" back pay and overtime as calculated by you. The checks are now ready to be delivered. When Rhea Lana's agreed to pay the back wages to the managers, we asked you to prepare the WH-58s and deliver them to Rhea Lana's. You have now required that I confirm, in writing, that in the future Rhea Lana's will to pay its managers as employees in accordance with the laws of the United States, including no less than minimum wage for each hour worked and overtime pay when applicable, before the Department of Labor will provide the individual WH-58s for each prior manager. I have been authorized by Rhea Lana's to confirm to you that Rhea Lana's employs no managers at this time, but in the event Rhea Lana's hires managers in the future, Rhea Lana's will pay them no less than

1173216-v1

DOL 0127

– **App. 186** –

WRIGHT, LINDSEY & JENNINGS LLP

June 12, 2013
Page 2

minimum wage per hour and overtime pay when applicable in accordance with the laws of the United States of America.

I hope this is the last requirement before you will prepare and deliver the individual WH-58s to Rhea Lana's so we can move forward.

I thank you in advance for your prompt attention to this matter.

<div style="text-align: right;">

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

C. Tad Bohannon

</div>

CTB

cc:  Rhea Lana Riner (rhealana@rhealana.com)

1173116-v1                                          DOL 0128

**– App. 187 –**

EDWARD L. WRIGHT
(1903-1977)
ROBERT S. LINDSEY
(1913-1991)
ALSTON JENNINGS
(1917-2004)
GORDON S. RATHER, JR.
JOHN R. TISDALE
JOHN WILLIAM SPIVEY III
LEE J. MULDROW
N.M. NORTON
CHARLES T. COLEMAN
EDWIN L. LOWTHER, JR.
GREGORY T. JONES
WALTER McSPADDEN
JOHN D. DAVIS
JUDY SIMMONS HENRY
KIMBERLY WOOD TUCKER
TROY A. PRICE
KATHRYN A. PRYOR
J. MARK DAVIS
JERRY J. SALLINGS
WILLIAM STUART JACKSON
MICHAEL D. BARNES
STEPHEN R. LANCASTER
KYLE R. WILSON
C. TAD BOHANNON
J. CHARLES DOUGHERTY
M. SEAN HATCH
JUSTIN T. ALLEN
MICHELLE M. KAEMMERLING
SCOTT ANDREW IRBY
PATRICK D. WILSON
DAVID P. GLOVER
REGINA A. YOUNG
PAUL D. MORRIS
GARY D. MARTS, JR.

ERIC BERGER
P. DELANNA PADILLA
CALEY B. VO
JOHNATHAN D. HORTON
JANE A. KIM
ADRIENNE L. BAKER
JEFFREY L. SINGLETON
KATHRYN M. IRBY
DAVID L. JONES
W. CARSON TUCKER
KRISTEN S. MOYERS
ERIN S. BROGDON
RICHARD BLAKELY GLASGOW
DIANA BORGOGNONI SNYDER
PATRICK M. YOUNG
BIANCA M. RUCKER
ANTWAN D. PHILLIPS
BAXTER D. DRENNON
MICHAEL A. THOMPSON
SETH R. JEWELL
HAYDEN W. SHURGAR
COURTNEY C. McLARTY
JAIMIE G. MOSS
NEEMAH A. ESMAEILPOUR
R. AARON BROOKS
REBECCA H. STAHL

OF COUNSEL
RONALD A. MAY
JOHN G. LILE
ROGER A. GLASGOW
ALSTON JENNINGS, JR.
FRED M. PERKINS III
BRUCE R. LINDSEY
JAMES R. VAN DOVER
CHARLES S. BOHANNON

# WRIGHT, LINDSEY & JENNINGS LLP

### ATTORNEYS AT LAW

**200 WEST CAPITOL AVENUE, SUITE 2300
LITTLE ROCK, ARKANSAS 72201-3699
(501) 371-0808 • FAX (501) 376-9442**

NORTHWEST ARKANSAS

3333 PINNACLE HILLS PARKWAY, SUITE 510
ROGERS, ARKANSAS 72758-8960
(479) 986-0888 • FAX (479) 986-8932

www.wlj.com

Writer's Direct Dial No. 501-212-1362
ctbohannon@wlj.com
Reply to Little Rock Office

June 5, 2013

*Via Email: Haynes.Tamara@dol.gov*

Tamara Haynes
Wage Hour Investigator
U.S. Department of Labor
Wage and Hour Division
10810 Executive Center Drive
Danville Building 2, Suite 220
Little Rock, AR 72211

RE:   Rhea Lana's, Inc.

Dear Ms. Haynes:

Our client, Rhea Lana's, Inc. ("Rhea Lana's"), has reviewed the Back Wage Summary and computations you initially supplied on May 30, 2013, and amended at our request on June 4, 2016. Rhea Lana's firmly believes that the U.S. Department of Labor (the "DOL") has erroneously determined that "managers" and "consigning volunteers" of Rhea Lana's are "employees" as defined under Section 203 of the Fair Labor Standards Act (the "FLSA"). 29 U.S.C. § 203(g). As we have consistently stated throughout the DOL's audit process, we do not believe that individuals who assist with Rhea Lana's consignment sales events are "employees" under the FLSA given that, among other reasons, they are performing services for their own economic benefit. Under the specific facts and circumstances applicable to Rhea Lana's—and the consignment industry nationwide—Rhea Lana's firmly believes that it is in full compliance with the FLSA.

1173216-v1

DOL 0129
D-88

WRIGHT, LINDSEY & JENNINGS LLP

June 5, 2013
Page 2

Nevertheless, in order to conclude this audit and obtain "final" agency action, Rhea Lana's is prepared to pay, under protest, the amounts indicated in the Back Wage Summary to the listed managers. It is our understanding that payment of these amounts will conclude the audit of the period from January 28, 2011 through January 27, 2013. I have enclosed the signed WH-56. Rhea Lana's anticipates delivering the payment checks to each of the individuals no later than June 19, 2013, but she hopes to complete the task sooner. As you know, Rhea Lana's does not have an on-going employment relationship with most of the individuals so she cannot just walk down the hall and deliver the check to them. Each check will have to be mailed and they are checking to make sure they have current information for each person.

Please prepare the individual WH-58s and deliver them to Rhea Lana's. It is our understanding that once Rhea Lana's delivers to you proof of delivering payment to the listed "managers" then the DOL will send Rhea Lana's a closing letter evidencing final agency action with respect to this audit period.

Thank you for your attention to this matter.

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

C. Tad Bohannon

CTB

cc: Rhea Lana Riner (rhealana@rhealana.com)

1173116-v1

DOL 0130
D-8b

EDWARD L. WRIGHT
(1903-1977)
ROBERT S. LINDSEY
(1913-1991)
ALSTON JENNINGS
(1917-2004)
GORDON S. RATHER, JR.
JOHN R. TISDALE
JOHN WILLIAM SPIVEY III
LEE J. MULDROW
N.M. NORTON
CHARLES T. COLEMAN
EDWIN L. LOWTHER, JR.
GREGORY T. JONES
WALTER McSPADDEN
JOHN D. DAVIS
JUDY SIMMONS HENRY
KIMBERLY WOOD TUCKER
TROY A. PRICE
KATHRYN A. PRYOR
J. MARK DAVIS
JERRY J. SALLINGS
WILLIAM STUART JACKSON
MICHAEL D. BARNES
STEPHEN R. LANCASTER
KYLE R. WILSON
C. TAD BOHANNON
J. CHARLES DOUGHERTY
M. SEAN HATCH
JUSTIN T. ALLEN
MICHELLE M. KAEMMERLING
SCOTT ANDREW IRBY
PATRICK D. WILSON
DAVID F. GLOVER
REGINA A. YOUNG
PAUL D. MORRIS
GARY D. MARTS, JR.

# WRIGHT, LINDSEY & JENNINGS LLP

### ATTORNEYS AT LAW

## 200 WEST CAPITOL AVENUE, SUITE 2300
## LITTLE ROCK, ARKANSAS 72201-3699
## (501) 371-0808 • FAX (501) 376-9442

### NORTHWEST ARKANSAS

3333 PINNACLE HILLS PARKWAY, SUITE 510
ROGERS, ARKANSAS 72758-8960
(479) 986-0888 • FAX (479) 986-8932

www.wlj.com

Writer's Direct Dial No. 501-212-1362
ctbohannon@wlj.com
Reply to Little Rock Office

ERIC BERGER
P. DELANNA PADILLA
CALEY B. VO
JOHNATHAN D. HORTON
JANE A. KIM
ADRIENNE L. BAKER
JEFFREY L. SINGLETON
KATHRYN M. IRBY
DAVID L. JONES
W. CARSON TUCKER
KRISTEN S. MOYERS
ERIN S. BROGDON
RICHARD BLAKELY GLASGOW
DIANA BORGOGNONI SNYDER
PATRICK M. YOUNG
BIANCA M. RUCKER
ANTWAN D. PHILLIPS
BAXTER D. DRENNON
MICHAEL A. THOMPSON
SETH R. JEWELL
HAYDEN W. SHURGAR
COURTNEY C. McLARTY
JAIMIE G. MOSS
NEEMAH A. ESMAEILPOUR
R. AARON BROOKS
REBECCA H. STAHL

OF COUNSEL
RONALD A. MAY
JOHN G. LILE
ROGER A. GLASGOW
ALSTON JENNINGS, JR.
FRED M. PERKINS III
BRUCE R. LINDSEY
JAMES R. VAN DOVER
CHARLES S. BOHANNON

May 28, 2013

*Via Email:  Darling.Robert@dol.gov*

Bob Darling
District Director
U.S. Department of Labor
Wage and Hour Division
10810 Executive Center Drive
Danville Building 2, Suite 220
Little Rock, AR 72211

RE:    Rhea Lana's, Inc.

Dear Director Darling:

Our client, Rhea Lana's, Inc. ("Rhea Lana's"), met with Ms. Haynes and Ms. Rodriguez on May 20, 2013, to discuss the U.S. Department of Labor's (the "DOL") audit of the individuals who assist with Rhea Lana's consignment sales events. It is my understanding that the DOL has concluded its audit and considers the individuals in question to be "employees" as defined under Section 203 of the Fair Labor Standards Act (the "FLSA"). 29 U.S.C. § 203(g). It is also my understanding that Ms. Haynes and Ms. Rodriguez expect to meet with Rhea Lana's again on May 28, 2013, to further discuss the results of the DOL's audit and related issues.

I have conferred with Rhea Lana's and am writing to advise you that we believe the May 28th meeting is unnecessary. As we have consistently stated throughout the DOL's audit process, we do not believe that the individuals who assist with Rhea Lana's consignment sales events are "employees" under the FLSA given that,

1172095-v1

DOL 0133

WRIGHT, LINDSEY & JENNINGS LLP

May 28, 2013
Page 2

among other reasons, they are under no obligation whatsoever to appear at the event (and are not penalized for failing to do so) and are performing services for their own economic benefit. Under the specific facts and circumstances applicable to Rhea Lana's—and the consignment industry nationwide—Rhea Lana's firmly believes that it is in full compliance with the FLSA.

Nevertheless, assuming that we correctly understand the DOL's position with respect to the status of Rhea Lana's "managers" and in order to fully resolve that issue (without conceding that the DOL is correct), Rhea Lana's is willing for purposes of this audit to pay an accurate calculation of any uncompensated time or overtime with respect to the managers for the periods since January 2012. Therefore, if Ms. Haynes, Ms. Rodriguez, or you will provide us with a calculation of the amounts you believe are due to the managers, together with the spreadsheets showing how you arrived at those amounts, we will either submit payment or work with you in good faith to arrive at a mutually agreeable sum. Additionally, as discussed in our meeting on May 20, until we can obtain some additional administrative guidance or rulings on this issue, Rhea Lana's is willing to consider ceasing to allow managers from "volunteering" hours in exchange for the benefit of being able to shop early at Rhea Lana's sales, and to ensure that managers are instead paid their hourly wage for each hour worked.

Thank you for your attention to this matter. If you believe that a meeting is still necessary or appropriate, or if you have any questions, please feel free to give me a call. Given that Rhea Lana's sales occur periodically throughout the year and no sales are currently occurring, we believe this is an appropriate way to move forward at this time.

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

C. Tad Bohannon

CTB/rab

cc: Tamara Haynes (via email: Haynes.Tamara@dol.gov)

1172095-v1

DOL 0134

**– App. 191 –**

## Haynes, Tamara - WHD

| | |
|---|---|
| **From:** | Dave Riner [PII                    ] |
| **Sent:** | Wednesday, April 17, 2013 11:24 AM |
| **To:** | Darling, Robert A - WHD; Haynes, Tamara - WHD |
| **Cc:** | 'Mattingly, Stacey (Boozman)'; 'McGehee, Jason'; Peter.Comstock@mail.house.gov; 'C. Tad Bohannon'; abrooks@wlj.com; Denise.Oxley@arkansas.gov |
| **Subject:** | National Consignment Industry Featured This Morning |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Bob and Tamara,

This link is Matt Lauer on the Today Show this morning, April 17, 2013, singing the praises of Just Between Friends, our competitor which is more than twice our size. This is another honest attempt to educate on the national consignment industry.

http://lifeinc.today.com/_news/2013/04/17/17782136-consignment-shops-go-big-at-just-between-friends?lite

Rhea Lana's has spent close to $25,000 the past two years defending ourselves and the consignment industry by willingly educating the State of Arkansas and the Dept. of Labor. This effort has been done in the context of many labor investigations and audits. No complainant exists. These efforts were initiated by governments at their own behest. No complainant has existed in the 30 years of the consignment industry.

At the same time, Just Between Friends continues to gain national prestige and spend its money on funding its growth. Rhea Lana's offers better returns and better service than our national competitors. However, for the past two years our available funds have been spent - not on marketing – but on surviving investigations.

Bob, when will you and Tamara complete your investigation of Rhea Lana's, and what is your proposed equal treatment of the consignment industry nationwide?

Thanks for this important information, since it will help us know how to navigate 2013.

Dave and Rhea Lana Riner

1

DOL 0135
D-11

**– App. 192 –**

March 25, 2013

Attn: Ms. Tamara Haynes
Employment Standards Administration
Wage and Hour Division
10810 Executive Center Drive
Little Rock, Arkansas 72211

Re:  Records Request - Period Investigated: January 28, 2011 until January 27, 2013

Dear Ms. Haynes:

Provided to you are documents pursuant to your request of March 19, 2013.  All information provided is confidential and not subject to disclosure under the Federal Freedom of Information Act.

1.  *List of employees: names, addresses, phone numbers, period of employment, rate of pay, position held, period of employment; payroll records.*

Included is a worksheet listing those we consider to be employees for some or all of their activities related to Rhea Lana's.  Also included is a list of consignors who were treated as employees for a period of time during the development and implementation of the Consent Agreement with the State of Arkansas.  These consignors were then re-classified according to the Consent Agreement.

And we include our check stubs from 2011 and our PayChex payroll records from 2012.  These documents show rate of pay and hours for each payment period.

2.  *List of salaried employees with a notation stating if exempt or non-exempt*

Rhea Lana Riner – President of Rhea Lana's Franchise Systems, Inc. – Exempt
Alison Craun – Director of Communications and Design - Exempt
Barbi Akridge – Event Manager – Exempt
Kailey Woods (Start Date: December 3, 2012) – Creative Design - Exempt

3.  *List of consignors, workers, volunteers: names, addresses, phone numbers.*

While the Fair Labor Standards Act (FLSA) regulations specifically call for examination of "employee" records, we understand that the Dept. of Labor is in the process gaining an overall understanding of the Children's Consignment Event industry.  To facilitate the process we provide the following.

A.  Included are the names, addresses and known phone numbers of all <u>working</u> Consignors who received financial remuneration in addition to their opportunity to shop early at our events.

1

DOL 0136

D-12a

B. Included is a listing of the almost 7,000 consignor codes used during the audit period, together with the names of the consignors who utilized these codes to input items for sale. Over 16,000 total codes currently exist for our three flagship events. Some families use multiple codes, or share codes with each other. Codes are not carried between the three events in our model. This document is clearly a listing of our <u>co-venturers,</u> rather than our employees, so no contact information is provided. We provide this listing to help facilitate the process and show the scale of our efforts to serve young mothers in Central Arkansas.

4. *Depending on the method used to track hours during events; log books, time cards or time sheets for employees, consignors, workers, and volunteers used during the investigative period.*

Our timesheets and check stubs for 2011 (before we began utilizing Paychex) are included. Also, all our payroll records generated by Paychex for 2012 are included for both RLI and RLFS. Further, we include the online signup sheets for eleven of the twelve events held during the audit period. These <u>sign-up</u> sheets have never been considered "employee records" either before or after our State audit, and our model does not hold those consignors who sign up strictly responsible for showing up. Therefore, the <u>sign-in</u> sheets are also not considered employee records, and they are discarded after the event. They are not available. The sign-up sheets provided show the names of our consignors and their intent to help stage the event. Rhea Lana's switched to a new server on June 26, 2011, and all the old digital records of the volunteer sign-ups were discarded (Spring of 2011.) However, we were able to locate hard copies of sign-up sheets for two out of three of our Spring 2011 events (West Little Rock and Conway) and have provided those to you.

Further, we ran a computer cross check of our consignor names and codes with the names and emails on the volunteer list for the Fall 2011 to determine if we could identify any "Volunteers" – that is, individuals who do not appear to be Consignors but who signed up and who may have worked at the event. We attached a list of eleven POTENTIAL "VOLUNTEERS" FOR ALL THREE FLAGSHP EVENTS FOR FALL 2011. These individuals could yet be consignors, or possibly did not show up, or may not even exist.

Our conclusion is that "Volunteers" were minimal to nonexistent in the Fall of 2011. We wish to note that we have never had a misunderstanding where someone signed up and yet thought they were joining our company as an employee or to otherwise be paid. In fact, we have never heard of this happening ever before in the consignment event industry. We do not have the ability to cross check the Spring of 2011 since we switched servers on June 26, 2011 long before this investigation was envisioned.

<u>We continue to maintain that the relationship between a children's consignment event operator and its consignors is an industry matter.</u> This relationship has been established for decades, and the economic reality of the relationship is commercial and demonstrably independent. It is the collaboration of market-seeking co-venturers who cooperate freely for the good of all with a built-in business risk.

2

DOL 0137
D-126

We have enjoyed being an industry leader and love serving young families.  We hope we have been able to shed light on our industry.  While this has been a very time-consuming effort for our small company, we believe that our selection for this investigation will ultimately work for the good of young families.  We hope the Department of Labor will join with us in maintaining the health of this vital activity which only acts to help America's working and middle class folks in a way that is precious to them – providing economically for their children.

Please contact us if you have any questions at 501-733-3710.


Very Truly Yours,


Rhea Lana and Dave Riner

Rhea Lana, Inc.
Rhea Lana's Franchise Systems, Inc.

3

DOL 0138

**– App. 195 –**

Workers who are employees of Rhea Lana, Inc. and/or Rhea Lana Franchise Systems, Inc. for the audit period.

| First | Last | Address | Phone | RLI 2011 1099 | RLI 2011 W2 | RLI 2012 W2 | RLI 2012 1099 | RLFS 2012 W2 |
|---|---|---|---|---|---|---|---|---|
| Peter | Acuna | | | | | Crew | | |
| Barbi | Akridge | | PII | Event Manager | | | | |
| Kinsey | Baker | | PII | Franchise Marketing | Franchise Marketing | | | Franchise Marketing |
| Matt | Berry | | | | Crew | Crew | | |
| Amy | Bolduc | | | | | Crew | | |
| Nate | Booth | | | | | Crew | | |
| Traci | Caldwell | | PII | WC/Franchise Support | WC/Franchise Support | Working Consignor | Working Consignor | Franchise Support |
| Taylor | Carnahan | | | | | Crew | | |
| Nichole | Carter | | PII | Accounting/Clerical | Working Consignor | WC/ Acct Clerical | Working Consignor | Accounting/Clerical |
| Alex | Chambliss | | | | | Crew | | |
| Cailen | Cohran | | PII | | | | | Design & Printing |
| Dylan | Corbett | | | | | Crew | | |
| Alison | Craun | | PII | Dir. Comm & Des | Dir. Comm & Des | | | Dir. Comm & Des |
| Chris | Cullum | | | | | Crew | | |
| Devin | DiGuilio | | | | | Crew | | |
| Micah | Dixon | | | | Crew | Crew | | |
| Cameron | England | | | | Crew | | | |
| Holly | Escueta | | | | Crew | | | |
| Blake | Farris | | | | | Crew | | |
| Ethan | Folkert | | | | | Crew | | |
| Adam | Ford | | | | | Crew | | |
| Rachel | Ford | | | | | Crew | | |
| Cullen | Frazier | | | | | Crew | | |
| Aaron | Garcia | | | | | Crew | | |
| Charles | Gardner | | | | | Crew | | |
| Marina | Harmon | | | | | Crew | | |
| Cody | Harrod | | | | | Crew | | |
| Moilliee | Henagar | | | | | Crew | | |
| Justin | Holland | | | | | Crew | | |
| Christy | Hudson | | PII | WC/Franchise Support | WC/Franchise Support | Working Consignor | Working Consignor | Franchise Support |
| Casey | Imboden | | | | | Crew | | |
| Jacob | Jasper | | | | | Crew | | |
| Carly | Jones | | | | Crew | | | |
| Charisa | kakalala | | | | Crew | | | |
| Zachary | Knight | | | | | Crew | | |
| Jordan | LaGree | | | | | Crew | | |
| Andrew | Landry | | | | | Crew | | |
| John | Lewis | | | | | Crew | | |
| Joshua | Lichoff | | PII | | | Crew | | |
| John | Lopez | | | | | Crew | | |
| Sam | Lyman | | | | | Crew | | |
| Andrea | Martin | | PII | WC/Franchise Support | WC/Franchise Support | Working Consignor | Working Consignor | Franchise Support |
| Brandon | Martinez | | | | | Crew | | |
| Derek | McCain | | | | Crew | | | |
| Sarah | McGarl | | PII | Franchise Support | Franchise Support | | | Franchise Support |
| Tasha | McGee | | | | Crew | | | |

– App. 196 –

Workers who are employees of Rhea Lana, Inc. and/or Rhea Lana Franchise Systems, Inc. for the audit period.

| First | Last | Address | Phone | RLI 2011 1099 | RLI 2011 W2 | RLI 2012 W2 | RLI 2012 1099 | RLFS 2012 W2 |
|---|---|---|---|---|---|---|---|---|
| Jonathan | McKnight | PII | | | Crew | | | |
| Lauren | Miller | | PII | | Working Consignor | Working Consignor | Working Consignor | Franchise Support |
| Sharyn | Moore | | | | Crew | | | |
| Aaron | Ono | | | | | Crew | | |
| Steven | Overturf | | | | | Crew | | |
| Kurland | Parks | | | | | Crew | | |
| Chelsea | Pearcy | | PII | Working Consignor | | Working Consignor | Working Consignor | Franchise Support |
| Jared | Pflasterer | | | | Crew | | | |
| Stacy | Pinkett | | | | Crew | | | |
| Robert | Powell | | | | | Crew | | |
| Timothy | Preuett | | | | | Crew | | |
| Michael | Rabb | | PII | | Crew | Crew | | |
| Jorjean | Retzloff | | | | Crew | | | |
| Blake | Riddle | | | | Crew | | | |
| Kelley | Rideout | | PII | Franchise Support | Franchise Support | Working Consignor | Working Consignor | Franchise Support |
| Leah | Riner | | PII | | | Crew | Working Consignor | Admin Support |
| Rhea Lana | Riner | | PII | | | | | RLFS President |
| Antonio | Rivera | | PII | | | Crew | | |
| JT | Roberts | | PII | Super Crew | Crew | Crew | | |
| Gavin | Roberts | | | | | Crew | | |
| Chase | Roberts | | | | | Crew | | |
| Richard | Rogers | | PII | | Franchise Support | | | Admin Support |
| Jennifer | Rogers | | PII | | | | | Franchise Support |
| Casey | Ruple | | | | | Crew | | |
| William | Shankle | | | | | Crew | | |
| Travis | Shelnutt | | PII | | | Crew | | |
| Maverick | Smith | | | | Crew | Crew | | |
| Kristie | Smith | | PII | Working Consignor | | | | Franchise Support |
| Zachary | Smith | | | | | Crew | | |
| jake | steele | | | | Crew | Crew | | |
| Lacynthia | Thompson | | | | Crew | | | |
| Daniel | Thursby | | | | Crew | | | |
| Chance | Townsell | | | | | Crew | | |
| Brandon | Treece | | | | | Crew | | |
| Jeff | Triplett | | | | | Crew | | |
| Brittanee | Vaught | | | | Crew | | | |
| Charlie | Wagner | | | | Crew | Crew | | |
| Zach | Walezonia | | | | | Crew | | |
| Lori | Witting | | PII | WC/Franchise Support | WC/Franchise Support | Working Consignor | Working Consignor | Franchise Support |
| Kailey | Wood | | PII | | | | | Creative Design |

**Consignors who received monetary compensation from Rhea Lana, Inc. and/or Rhea Lana Franchise Systems, Inc. for the audit period.**

| First | Last | Address | Phone | RLI 2011 1099 | RLI 2011 W2 | RLI 2012 W2 | RLI 2012 1099 | RLFS 2012 W2 |
|---|---|---|---|---|---|---|---|---|
| Marianne | Barnett | | | | | Working Consignor | | |
| Kristi | Beggs | | | Working Consignor | | Working Consignor | | |
| Amanda | Birdsong | | | | | Working Consignor | | |
| Krista | Brewington | | | | | Working Consignor | | |
| Laura | Brewington | | | | | Working Consignor | | |
| Debbie | Brinkley | | | | | | Working Consignor | |
| Kim | Burbank | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Dawn | Burnett. | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Jasmin | Burton | | | | | Working Consignor | | |
| Christal | Cicero | | | | | Working Consignor | | |
| Jennifer | Cook | | | | Working Consignor | | | |
| Damitra | Crow | | | | Working Consignor | Working Consignor | | |
| Jennifer | Curtis | | | | Working Consignor | | | |
| Holly | DeBoard | | | Working Consignor | Working Consignor | | Working Consignor | |
| Andrea | Dollar | | | | Working Consignor | Working Consignor | Working Consignor | |
| Julie | Dyer | | | | | Working Consignor | | |
| Nikki | Easley | | | Working Consignor | | | | |
| Amy | Ellis | | | | | Working Consignor | Working Consignor | |
| Tina | Falkner | | | | | Working Consignor | | |
| Melissa | Gates | | | | Working Consignor | Working Consignor | | |
| Allisun | Golden | | | | Working Consignor | | | |
| Laura | Gottsponer | | | | Working Consignor | Working Consignor | Working Consignor | |
| Amanda | Haggins | | | | Working Consignor | | | |
| Kristie | Hamilton | | | | Working Consignor | | | |
| Lindsey | Hammers | | | | | | Working Consignor | |
| Laura | Harrell | | | | | Working Consignor | Working Consignor | |
| Erica | harrod | | | | Working Consignor | | Working Consignor | |
| vanessa | Hendrix | | | | Working Consignor | Working Consignor | Working Consignor | |
| Katie | Hill | | | | Working Consignor | Working Consignor | Working Consignor | |
| Shannon | Howe | | | Working Consignor | | | | |
| Judi | James | | | | Working Consignor | | | |
| Jacob | Johnson | | | | Working Consignor | Working Consignor | Working Consignor | |
| Kim | Jones | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Brandy | Lane | | | Working Consignor | Working Consignor | Working Consignor | | |
| Cheri | Martin | | | | Working Consignor | Working Consignor | | |
| Katie | Martin | | | | Working Consignor | | | |
| Bethany | McElyea | | | | | Working Consignor | | |
| Joseph | McElyea | | | | | Working Consignor | | |
| Michelle | McGinnis | | | | Working Consignor | Working Consignor | | |
| Michelle | Mentzer | | | | | Working Consignor | | |
| Victoria | Milam | | | | | | Working Consignor | |
| Chandra | Mitchell | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Trina | Mitchell | | | | Working Consignor | Working Consignor | | |
| April | Moix | | | | | Working Consignor | Working Consignor | |
| Beth | Moore | | | | | Working Consignor | | |
| Angelique | Neeley | | | | Working Consignor | | | |

– App. 198 –

Consignors who received monetary compensation from Rhea Lana, Inc. and/or Rhea Lana Franchise Systems, Inc. for the audit period.

| First | Last | Address | Phone | RLI 2011 1099 | RLI 2011 W2 | RLI 2012 W2 | RLI 2012 1099 | RLFS 2012 W2 |
|---|---|---|---|---|---|---|---|---|
| Daniel | Neeley | | | | Working Consignor | | | |
| Veronica | Norris | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Laura | Panfil | | | | Working Consignor | | | |
| Micheael | Panfil | | | | Working Consignor | | | |
| Sheryl Dana | Pate | | | | Working Consignor | Working Consignor | | |
| Dexter | Pearcy | | | | Working Consignor | Working Consignor | Working Consignor | |
| Naomi | Perez-Taylor | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Beth | Phillips | | | | Working Consignor | Working Consignor | Working Consignor | |
| Jodi | Phillips | | | | | Working Consignor | | |
| rebekah | pratt | | | | Working Consignor | Working Consignor | | |
| Natalie | Rawls | | | | | Working Consignor | | |
| Megan | Rudd | | | | Working Consignor | | | |
| Melinda | Saxton | | | | Working Consignor | Working Consignor | | |
| Alicia | Sims | | | | | Working Consignor | | |
| Leslie | Smittle | | | Working Consignor | | | | |
| Kathy | Sproles | | | Working Consignor | Working Consignor | Working Consignor | Working Consignor | |
| Lauren | Walker | | | | Working Consignor | Working Consignor | Working Consignor | |
| Amanda | Wardojo | | | | | Working Consignor | | |
| Angela | Wilgus | | | | Working Consignor | Working Consignor | | |
| Jamie | Witting | | | | | Working Consignor | | |

— App. 199 —

DOL 0142
App. 199

**POTENTIAL "VOLUNTEERS" FOR ALL THREE FLAGSHP EVENTS FOR FALL 2011**

| Event | ID | Sign Up Time | Shift Date | Shift Time | Shift Description | Worker Name | Woker Phone | Worker Email |
|---|---|---|---|---|---|---|---|---|
| Greater Little Rock | PII | 7/30/2011 15:24 | 7/30/2011 16:00 | 4:00PM to 9:00PM | Store Organization | anila krovvidi | | |
| West Little Rock | | 9/16/2011 16:21 | 9/20/2011 16:00 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | Anita La Monica | | |
| Conway | | 8/5/2011 15:55 | 8/22/2011 17:00 | 5:00PM to 10:00PM | Move In | Erendy Gonzalez | | |
| Conway | | 8/5/2011 14:31 | 8/24/2011 18:00 | 6:00PM to 11:00PM | Consignor Check In/Store Organization | Evelin ramos | | |
| Conway | | 8/18/2011 8:53 | 8/24/2011 8:30 | 8:30AM to 1:30PM | Consignor Check In | Fawn Geels | | |
| Conway | | 8/25/2011 11:59 | 9/2/2011 9:30 | 9:30AM to 2:30PM | Returns/Store Organization | julius golden | | |
| West Little Rock | | 9/19/2011 15:26 | 9/22/2011 16:00 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | lysha | | |
| Conway | | 8/3/2011 15:31 | 8/28/2011 11:30 | 11:30AM to 4:30PM | Big Tickets/Returns | Melissa Eller | | |
| Greater Little Rock | | 7/20/2011 0:58 | 7/26/2011 12:00 | 12:00PM to 5:00PM | Store Set-up, Consignor Check-in | Kwami Abdul-Bey | | |
| West Little Rock | | 9/10/2011 9:20 | 9/21/2011 8:30 | 8:30AM to 1:30PM | Consignor Check/Store Organization | terri hubbard | | |
| West Little Rock | | 9/16/2011 16:23 | 9/20/2011 16:00 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | Timothy La Monica | | |



Each of these might be:

1. A real person who is not a Consignor - a true "Volunteer."
2. A person local to the event who signed up but never showed up.
3. A Consignor who has not been properly identified, including a family member of a registered Consignor.
4. A webot-generated sign up. That is, not a real person.
5. A person who just signed up to see what would happen if they filled out the form. They could be from anywhere around the globe with no intentions of volunteering.

— App. 200 —

Case 1:14-cv-00017-CRC   Document 62-1   Filed 04/12/17   Page 103 of 254

| **U.S. Department of L  or** | Employment Standards Ac    istration<br>Wage and Hour Division<br>Danville Building, Suite 220<br>10810 Executive Center Drive<br>Little Rock, Arkansas  72211 | |
|---|---|---|
| | PH:   (501) 221-4615<br>FAX:  (501) 221-4615 | |

March 19, 2013

Attn: Rhea Lana Rhiner
Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, Arkansas 72034

Re:  Records Request - Period Investigated: January 28, 2011 until January 27, 2013

Dear Ms. Rhiner:

As previously discussed, an investigation to determine compliance of the Fair Labor Standards
Act (FLSA) of your firm, Rhea Lana Inc. and Rhea Lana Franchise Systems is being conducted.
The investigation is conducted under authority contained in FLSA Section 11. We request that
your firm provide the records of your firm regarding any employees, consignors, workers, and
volunteers during the above mentioned investigative period.  This should include;

1.  List of employees: names, addresses, phone numbers, period of employment, rate of pay,
    position held, period of employment; payroll records.
2.  List of salaried employees with a notation stating if exempt or non-exempt
3.  List of consignors, workers, volunteers: names, addresses, phone numbers.
4.  Depending on the method used to track hours during events; log books, time cards or
    time sheets for employees, consignors, workers, and volunteers used during the
    investigative period.

This request is made pursuant to the authority granted by FLSA Section 11 and by
implementing regulations.  The recordkeeping regulations (29 C.F.R., at Part 516) require
that any such records made or retained by your firm in the ordinary course of its business
be preserved for a period of two years (see Section 516.6(b) of the regulations) and be
made available to this Department for its inspection and/or copying (see Section 516.7(b)
of the regulations), on request by the Department.

Please submit these records to our office shown in the letterhead of this letter by **3/25/13**.

Your cooperation in this matter is appreciated.

Sincerely,

Tamara Haynes
Wage and Hour Investigator

DOL 0145

USCA Case #17-5259      Document #1704241      Filed: 02/16/2018      Page 206 of 330

# Modern Childrens Consignment Events

## Business Model and Labor Issues



# Business Model

- Started with multi-mom garage sales and grew from there.

- Consignors pay a fee up front to consign, enter items into computer program, price items, bring items to sale, tag, and display.    ⟵How

- Moms, dads, and grandparents <u>participate</u> to make sure sale is successful and to receive early shopping rights (best pick of the items)

- Semi-annual sales occurring for close to 20 years; zero labor complaints (I have been unable to locate a single article, a single reported decision, or a single memo on the issue.)

DOL 0149
App. 203

# Business Model – TotSwap

## (Maryland's Leading Children's Consignment Sales)

### We Love Our Volunteers!

Without our great volunteers, we would be unable to coordinate such a successful, exciting event! Thank you for taking the time to consider helping us with our sale.

ANYONE can volunteer. You do not have to consign in order to become involved with TotSwap. Volunteers are asked to work at least one shift, which is 4 hours, and to assist in areas such as: set up of racks/shelving, check-in items, organization of sales flock, handle payments, check out customers, and other responsibilities as needed. **Don't forget that husbands can sign up to help, too**! We have several volunteer opportunities for men, and we are in need of filling those volunteer slots. Duties may include set up of racks, security, and other responsibilities as needed.

### Our Volunteers Love the Perks!

Not only do our volunteers get the opportunity to meet new people, but one of the greatest perks of volunteering is being able to **shop the sale first**! As a "thank you," volunteers are able to shop during the presale event on Thursday and gain valuable access to the sales floor before the general public. The more hours you volunteer, the earlier you can shop TotSwap's amazing bargains! So gather some friends, volunteer together and shop together!

To sign up, please <u>REGISTER</u> and schedule your preferred shift online. Please contact Denise at denise@totswap.net for more information.



www.totswap.net

DOL 0150

App. 204

# Business Model – Weepeat
## (New York)

WeePeat could not function without the wonderful group of volunteer workers we have at each sale. These workers assist consignors during check-in, set up and take down racks, place consigned items in the appropriate places, and help during the sale. In return for their assistance, volunteers receive special incentives. **Thank you** again to all volunteers, past, present, and future!

### Requirements for Volunteers

You no longer need to be a registered consignor for the current sale to volunteer. See registration link below to register as a volunteer only and to access your volunteer homepage.

Sign in and out for each shift that you work.

Be on time and stay for your entire shift.

Wear your WeePeat shirt (if you have one) or a name tag and apron during your shift.

The sale can be extremely busy at times, therefore we ask you not to bring children with you to work. If there are special situations, please contact me.

If an unavoidable circumstance arises that will prevent you from working the shift for which you registered, **let me know as soon as possible** so that provisions can be made for someone to cover your shift and your shift time can be rescheduled.

If you sign up for a shift then don't show up without letting me know, then you will be blocked from volunteering for the next sale.

### Incentives

People who volunteer for eight or more hours during the sale will be eligible to shop at the worker pre-sale on Monday evening from 6:30 until 8:30 PM (**children are not allowed at the pre-sale**).

If you volunteer for and work the **eight hours on Saturday 3-23-13 from 1PM – 9PM** or a total of **eight hours on Thursday 3-21-13 and/or Friday 3-22-13** you will receive a larger percentage of your sales **(80%).**

www.weechildrensconsignment.com



DOL 0151
App. 205

# Scope of Business

## Arkansas

- Rhea Lana's
- Duck Duck Goose
- Twice as Nice
- June Bugs Reruns
- Growing Kids
- Sweet Repeat Hensley
- Twinkle Twinkle
- Cottontail Consignment
- Lilly Pads
- Our Kids Closets
- Patty's Upsale Garage Sale
- Peek-A-Boo
- Polka Dots and Lollipops
- White Elephant Exchange

## Nationally

- 2,500 consignment sale events each season (one national website dedicated to promoting these events estimates an average of 200 consignors per event – that is 500,000 consignors).

DOL 0152
App. 206

# Employee

▸ **Fair Labor Standards Act**
  ◦ "Employee" means any individual employed by an employer; §203(e)(1)
  ◦ "Employ" includes to suffer or permit to work; §203(g)

▸ We recognize that employment relationship under the FLSA is broader than the traditional common law concept. (Field Operations Handbook, §10b01)

▸ **We understand these definitions, we just don't think they apply in this instance.**

DOL 0153
App. 207

# Employee

▸ Your own Field Operations Handbook (10/20/93) provides,

In order for the FLSA to apply there must be an employee–employer relationship. This requires an "employer" and "employee" <u>and the act or condition of employment</u>. §10b00



DOL 0154
App. 208

# Employee – Test

▸ Traditional test deals more with employee v. independent contractor rather than employee v. co-venturers.



DOL 0155
App. 209

# Employee – Test

▸ Employment relationship under §10b09 is more applicable:

  ◦ (b) an essential element is not only that the employer receives certain benefits from the services of the alleged employees but that '<u>the work necessarily or primarily benefits the company</u>.'"



DOL 0156
App. 210

# Employee – Test

▸ "However, the Supreme Court has said that there is 'no definition that solves all problems as to the limitations of the employer–employee relationship' under the FLSA.  A determination of the relationship cannot be based on 'isolated factors' or upon a single characteristic '<u>but rather upon the circumstances of the whole activity</u>.'"
§10b05(a)



DOL 0157
App. 211

# Employee – Test

▸ Supreme Court has also stated that <u>the definitions contained in the FLSA were "not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another</u>." *Walling v. Portland Terminal Co.,* 330 U.S. 148, 152 (1947).



DOL 0158

# Employee – Test

▸ Although the Act's definition of "employ" and "employee" <u>could be construed</u> broadly to encompass "each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit," there is "<u>no indication from [the FLSA] that Congress intended to outlaw such relationships as these</u>." *Walling*, 330 U.S. at 152.

DOL 0159
App. 213

# NOT AN EMPLOYEE

▸ Supreme Court tells us that we should not check our common sense at the doors to the FLSA.

▸ Must examine the "circumstances of the whole activity" – know it when we see it

▸ In this instance (industry), the individuals are not working primarily for the benefit of the company hosting the sale, THEY ARE WORKING FOR THEIR OWN BENEFIT!

  ◦ Opportunity to sell their children's clothing for dollars rather than quarters or dimes.

  ◦ Also easier than holding own garage sale.

  ◦ Shop Early – Get the best merchandise for their children

  ◦ Fun



DOL 0160
App. 214

**Haynes, Tamara - WHD**

| | |
|---|---|
| **From:** | Darling, Robert A - WHD |
| **Sent:** | Monday, March 04, 2013 1:29 PM |
| **To:** | Haynes, Tamara - WHD |
| **Cc:** | Rodriguez, Lesbia A - WHD |
| **Subject:** | FW: Privileged and Confidential - Consignor Contact Information |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Robert A. Darling
District Director, Arkansas
(501) 221-4607

****W A R N I N G****

The attached information may be confidential. It is intended only for the addressee(s) identified above. If you are not the addressee(s), or an employee or agent of the addressee(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy and/or permanently delete the information and notify the sender of the error.

---

**From:** rhealana@rhealana.com [mailto:rhealana@rhealana.com]
**Sent:** Monday, March 04, 2013 1:16 PM
**To:** Darling, Robert A - WHD
**Cc:** ctbohannon@wlj.com; ABrooks@wlj.com
**Subject:** Privileged and Confidential - Consignor Contact Information

Dear Bob,

My thanks to you and Les for giving us your time last Thursday. Below are the Names, Emails and Phone Numbers for ten of our consignors. Consistent with the discussions at our meeting, today we sent these women an email notifying them that Tamara Haynes may be contacting them this week. At least one is a single mother, a few are stay-at-home moms, two work in the medical industry, one is a physician (radiologist) and two are teachers.

One of the encouraging things which came from our meeting, Bob, was to hear from you that the questions Tamara will be asking these Rhea Lana customers include many about their motivations for participating in the consignment events. I am hopeful that Tamara's questions about their initiatives and judgments related to preparing, pricing, tagging and displaying their items, together with their hopes for selling and buying items, will give insight into the independent status of the hard working women. They wish to provide high quality items for their children at a price they can afford in today's challenging economy. This model simply facilitates all the same independent work activities they would perform at their own garage sales.

Please contact me if you have any questions.

Rhea Lana Riner
President,
Rhea Lana, Inc.

NOTE: The correspondence is "Privileged and Confidential."

1

DOL-0161

These ten ladies below received an email from me today entitled, "A Note from Rhea Lana."  The email content is shown here.

Dear Charlotte,

I wanted to let you know that Tamara Haynes with the Wage and Hour Division of the Dept. of Labor is learning more about the children's consignment event industry and how Rhea Lana's hosts our events.  You were one of a few people we recommended that she contact.

Tamara may give you a call in the next few days, and I hope you will answer her questions.  Also, even though we might cross paths before then, I wanted to ask you not to get in touch with me about this subject until after you talk with her.

Thank You,

Rhea Lana Riner


NAME                         EMAIL                    PHONE
Charlotte Watson
Tina Patton
Emily Krablin
Jessica McElreath
Natalie Stanton
Sallie Socia
Trisha Cullum
Tracy Stuckey
Annette Chambers
Sarah Taylor



2

DOL 0162

EDWARD L. WRIGHT
(1903-1977)
ROBERT S. LINDSEY
(1913-1991)
ALSTON JENNINGS
(1917-2004)
GORDON S. RATHER, JR.
JOHN R. TISDALE
JOHN WILLIAM SPIVEY III
LEE J. MULDROW
N. M. NORTON
CHARLES T. COLEMAN
EDWIN L. LOWTHER, JR.
GREGORY T. JONES
WALTER McSPADDEN
JOHN D. DAVIS
JUDY SIMMONS HENRY
KIMBERLY WOOD TUCKER
TROY A. PRICE
KATHRYN A. PRYOR
J. MARK DAVIS
JERRY J. SALLINGS
WILLIAM STUART JACKSON
MICHAEL D. BARNES
STEPHEN R. LANCASTER
KYLE R. WILSON
C. TAD BOHANNON
J. CHARLES DOUGHERTY
M. SEAN HATCH
JUSTIN T. ALLEN
MICHELLE M. KAEMMERLING
SCOTT ANDREW IRBY
PATRICK D. WILSON
DAVID P. GLOVER
REGINA A. YOUNG
PAUL D. MORRIS

# WRIGHT, LINDSEY & JENNINGS LLP
ATTORNEYS AT LAW

200 WEST CAPITOL AVENUE, SUITE 2300
LITTLE ROCK, ARKANSAS 72201-3699
(501) 371-0808 • FAX (501) 376-9442

NORTHWEST ARKANSAS

3333 PINNACLE HILLS PARKWAY, SUITE 510
ROGERS, ARKANSAS 72758-8960
(479) 986-0888 • FAX (479) 986-8932

www.wlj.com

Writer's Direct Dial No. 501-212-1362
ctbohannon@wlj.com
Reply to Little Rock Office

February 28, 2013

GARY D. MARTS, JR.
ERIC BERGER
P. DELANNA PADILLA
CALEY B. VO
JOHNATHAN D. HORTON
JANE A. KIM
ADRIENNE L. JUNG
KATHRYN M. IRBY
DAVID L. JONES
W. CARSON TUCKER
KRISTEN S. MOYERS
ERIN S. BROGDON
RICHARD BLAKELY GLASGOW
DIANA BORGOGNONI SNYDER
PATRICK M. YOUNG
BIANCA M. RUCKER
ANTWAN D. PHILLIPS
BAXTER D. DRENNON
MICHAEL A. THOMPSON
SETH R. JEWELL
HAYDEN W. SHURGAR
COURTNEY C. McLARTY
JAIMIE G. MOSS
NEEMAH A. ESMAEILPOUR
R. AARON BROOKS

OF COUNSEL
RONALD A. MAY
JOHN G. LILE
ROGER A. GLASGOW
ALSTON JENNINGS, JR.
FRED M. PERKINS III
BRUCE R. LINDSEY
JAMES R. VAN DOVER
CHARLES S. BOHANNON

Mr. Robert Darling
Arkansas District Director
U.S. Department of Labor
Wage and Hour Division
10810 Executive Center Drive
Danville Building 2, Suite 220
Little Rock, AR 72211

RE:   Rhea Lana's, Inc.

_____

Dear Mr. Darling:

We are providing you with this letter in connection with our February 28, 2013 meeting with you regarding the U.S. Department of Labor's (the "DOL") audit of our client, Rhea Lana's, Inc. (the "Company"), an Arkansas corporation. The Company operates semi-annual short term consignment sales of children's clothing and related items. In connection with its audit, we understand that the DOL has requested the names and contact information of the Company's "Workers," as hereinafter defined. We are concerned that the DOL is incorrectly categorizing the Company's Workers as "employees" of the Company for purposes of the Fair Labor Standards Act (the "FLSA" or the "Act"). As explained more fully below, we do not believe that the Workers qualify as employees. We also believe that providing the requested information to the DOL and the DOL contacting each of the Workers will result in significant market confusion and serious economic harm to the Company.

1158313-v1                                                                      DOL 0163

**– App. 217 –**

WRIGHT, LINDSEY & JENNINGS LLP

February 28, 2013
Page 2

<u>Business Model</u>

The Company is in the business of organizing and hosting periodic children's consignment sales. Similar to many consignment sales across the country, the Company provides space for the sale, arranges advertising, enables families to sell children's clothes, toys and accessories at the event, and handles all other logistical and administrative details. Consignors, not the Company, provide the items for sale.

Each consignor receives seventy percent (70%) of the proceeds from his or her sold items.  For consignors, these events are more efficient than organizing and holding a garage sale, and if the event is successful, the consignors have access to more customers, higher prices, and ultimately more revenue than could be provided by an individual garage sale. Shoppers also benefit from finding thousands of items in one location, increasing the likelihood that they find high-quality, low-cost items, while saving them the time and resources required to attend several different garage sales.

Consistent with industry practice, the Company hires and maintains employees to assist with promotion, set-up, daily operation and coordination of the sales. In addition to the Company's employees (who are paid by the Company), Workers also assist with the set-up, operation and take-down of each sale.

"Workers" are divided into two categories, depending on when individuals served as a Worker. Prior to the Consent Agreement with the State of Arkansas, Workers consisted of both consignors and non-consigning individuals (both of whom have a personal stake in the success of the event) who provide assistance to make sure the event is successful. After the effective date of the Consent Agreement with the State of Arkansas, Workers were limited to those individuals permitted under the Consent Agreement. Individual Workers work an average of four hours each setting up clothes racks, acting as greeters, organizing sale items, assisting shoppers, taking out the trash, and performing similar tasks.  Workers are allowed to be the first shoppers at the event, thereby providing them with the best selection of sale items.  They are, however, not employees (see below) and they do not expect any payment from the Company in return for their services; rather, they engage in activity so that the event (their event) will be successful.  Workers provide their services for their own advantage.

1158313-v1

DOL-0164

WRIGHT, LINDSEY & JENNINGS LLP

February 28, 2013
Page 3

<u>Analysis</u>

The FLSA defines "employee" to mean "any individual employed by an employer," 29 U.S.C. § 203(e), and "employ" to include "to suffer or permit to work." 29 U.S.C. § 203(g).  Less than a decade after the FLSA was enacted, however, the Supreme Court acknowledged the impracticality of these broad definitions, noting that the Act contains "no definition that solves problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corporation v. Comb*, 331 U.S. 722, 728 (1947).  The Court has similarly stated that the definitions contained in the FLSA were "not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947).  Although the Act's definition of "employ" and "employee" could be construed broadly to encompass "each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit," there is "no indication from [the FLSA] that Congress intended to outlaw such relationships as these." *Walling*, 330 U.S. at 152.  In order to identify the parameters of the FLSA and determine whether an employment relationship exists, the Court does not look at "isolated factors but rather upon the circumstances of the whole activity," including the underlying "economic realities." *Walling*, 330 U.S. at 727, 730.

As contemplated in *Walling*, the Company's consignment event Workers are persons "without any express or implied compensation agreement" who offer their services in order to "work for their own advantage."  The Workers are under no obligation or compulsion to show up to the event, and there is no penalty if they fail to attend, refuse to help, or ignore requests from the event organizers. In fact, the perk of being an "early shopper" is not even contingent upon assisting with the event; many Workers agree to work during or after the event and are allowed to shop early just like all other Workers.  If such Workers shop early and then fail to show up to help, they are not sent a bill or asked to return their purchased items.  The Workers that perform services at these events do so purely because doing so is to their own economic benefit, either in order to maximize their own proceeds (in the case of consignors) or to ensure that they have access to a high volume of different items (in the case of other Workers).  The Company does not have any control over the Workers, has no right to coerce them into work, and does not withhold or deduct a consignor's proceeds if they do not work an event.

As a practical matter, classifying children's consignment event Workers as employees would adversely impact the national consignment industry.  Over two

1158313-v1

DOL_0165

**– App. 219 –**

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 224 of 330

WRIGHT, LINDSEY & JENNINGS LLP

February 28, 2013
Page 4

thousand children's consignment entities around the country host events with business models and operating structures substantially similar to those of the Company.[1] Individuals who assist with the consignment sales enjoy participating in the events, do not expect (and are not led to believe they will receive) compensation for their services, and are not dependent upon the children's consignment sales for their livelihood. In light of these "circumstances of the whole activity," then, we do not believe that Workers can be reasonably classified as employees under the FLSA.

If you have any questions or would like to discuss, please do not hesitate to call me. Otherwise, the Company looks forward to your confirmation that these children's consignment event Workers are not employees within the meaning of the Fair Labor Standards Act and for the withdrawal of the request for a list of Workers with contact information.

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

C. Tad Bohannon

CTB/rab

---

[1] For example, an article on "Up Up and Away Kids Consignment in Orange County, California" states that "[i]f you work the sale as an unpaid volunteer, you get access to an exclusive presale and also a higher rate of return on anything you sell." (*http://ocdeals.ocregister.com/tag/up-up-and-away-kids-consignment/*). An article from Verona says that "[v]olunteers . . . get to come in to shop first for all the bargains." (*http://verona.channel3000.com/news/news/childrens-consignment-sale-returns-verona/47860*). The website for "My Child's Closet" says that "[i]n exchange for working a volunteer shift, you will receive early shopping privileges. (*http://mychildscloset.com/volunteer/*).

1158313-v1

DOL_0166  D-172d

Hi Dave,

I have a few follow up questions.  If my understanding of any items is incorrect, please let me know.

- During the sale is there someone directing consignors or other individuals to do "projects" that may arise?
- I understand that the consignors provide their own price tags.  The only other equipment used by the consignors is the individual's personal car used to transport the clothes from their house to the sale.  Once at the sale, virtually all equipment/facilities used are provided by Rhea Lana.   This includes the building in which the sale occurs, the racks that clothing items are displayed on.  What other equipment is used?

- In some instances, the consignors/volunteers bring family members to help them.  What are the job responsibilities of those family members?
- Who accepts liability for damages or pays liability insurance?
-  What is the biggest way that consignors have flexibility in their work schedules?

- What is the approximate percentage of turnover by consignors/volunteers from one sale to the next?
- Does Rhea Lana provide instructions on how work is to be done, train workers, set hours of work, determine sequence of work to be performed?
- Who is responsible for quality control?
- Does Rhea Lana provide specific restrictions and guidance about what individual responsibilities are/were for consignors/volunteers?
- How do consignors/volunteers generally, if at all, have a contribution to sales of the other consignors?
- I understand that the sales are twice a year.  How long are the sales?  (A day, a week, two weeks?)
- Is the minimum price of an item still $3 even if the consignor brings in more than 12 items?
- These individuals are expected to work at least one shift, which is 4 hours to assist in areas such as setting up the rack/shelving, check-in items, organization of sales flock, handle payments check out customers. True?


Robert A. Darling
District Director, Arkansas
(501) 221-4607

****WARNING****

The attached information may be confidential. It is intended only for the addressee(s) identified above. If you are not the addressee(s), or an employee or agent of the addressee(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy and/or permanently delete the information and notify the sender of the error.

---

**From:** Dave Riner [mailto PII                         ]
**Sent:** Friday, February 22, 2013 10:27 AM
**To:** 'Dave Riner'; Darling, Robert A - WHD
**Cc:** 'C. Tad Bohannon'; rhealana@rhealana.com; Peter.Comstock@mail.house.gov; jason.mcgehee@mail.house.gov; Stacey_Mattingly@boozman.senate.gov

DOL 0167

Dear Bob,

We are writing in response to the "follow-up" questions you submitted after our meeting on February 28, 2013. Rather than going directly into answering those questions, we think it would be helpful to provide you with a further explanation of how the consignor system works in Rhea Lana's sales. It is also important to realize that these "categories" have changed over time. When the sales first started, and they were much smaller, there was less differentiation between the "levels." As the sales have grown, the levels have evolved.

There are currently multiple "levels" of consignors. Hopefully the table below will fully explain those levels to you.

| Title | Work | Remuneration |
|---|---|---|
| Consignor | Enter items for sale in computer program, decide if items will go to "half-price" on last day is still unsold, package or otherwise prepare items for sale, tag sale items, bring sale items to sale location, check-in and price items, put items on display racks at sale location, pick-up or donate items at end of sale | 70% of the their selected sale price |
| Worker | Same as Consignors plus work 1 five hour shift | Same benefits as Consignor plus the right to shop before the sale opens to the general public |
| Early Worker | Same as Consignors plus work 2 five hour shifts | Same benefits as Consignor plus the right to shop before the Workers |
| Super Mom | Same as Consignors plus work 3 five hour shifts | Same benefits as Consignor plus the right to shop before the Early Workers |
| Primo Mom | Same as Consignors plus work 4 five hour shifts | Same benefits as Consignor plus the right to shop before the Super Moms |

DOJ 00186

– App. 222 –

| Title | Work | Remuneration |
|---|---|---|
| Manager* | (30 to 40 of these) Same as Consignors, operate cash registers and helping consignors identify recall items, plus they are asked to work at two of the three events held each season, a minimum of 25 hours each sale. Most accomplish this request. | Same benefits as Consignors plus the right to shop before the Primo Moms and paid $8 to $9 per hour for those hours in addition to hours required to obtain the desired shopping time. If they want to shop before Primo Moms they have to work a minimum of 12.5 hours and they are paid for every hour over 12.5. |
| Ops Manager* | (5 of these) Same as Managers and they are asked to work all three events per season and they work lots of hours. | Same benefits as Consignors plus the right to shop before the Managers and paid $14 to $15 per hour. |

\*    In the Fall of 2011, prior to entry of the Consent Agreement with the State of Arkansas, these individuals were paid as employees.  After entry of the Consent Agreement (and during and before the Spring of 2011), these individuals have been paid as independent contractors; given that they are consignors they are not employees by definition under the Consent Agreement

After Consignors register for a sale, they are given the opportunity to sign up and work the "event." They can sign up for different segments, such as – Setup, Check-in, The Event, Post Event Sorting, and Pickup. Within a segment, the individuals can sign up for different days and different times.

The work performed by Workers, Early Workers, Super Moms and Primo Moms is rather menial – hang up clothes; organize items as they get disturbed during sale; open doors for shoppers; pick up fallen price tags from floor; straighten merchandise; carry things to cars for shoppers.  As a result, once they have worked a shift or two they take very little supervision, if any. It takes most workers about 60 seconds to catch on and figure out what needs to be done.

Managers and Ops Managers do the same activities and assist first time Workers, Early Workers, Super Moms, and Primo Moms find their way.  They also check out shoppers (operate cash registers) and assist consignors with the identification of recalled items.

Now we will attempt to answer your specific questions.

- During the sale is there someone directing consignors or other individuals to do "projects" that may arise?

  As stated above, most Consignors need very little direction. They see something that needs to be done and they do it. They also seem to find things they like doing. Some like operating the cash register and jump right into it. Others enjoy mingling with



DOL 01607

**– App. 223 –**

customers, sorting clothes, helping customers locate the right areas, etc. The new ones usually need a little guidance at first but then they generally figure it out or work with the other Workers, Early Workers, Super Moms, Primo Moms, Managers and Ops Managers to find what needs to be done. They direct each other. Managers and Ops Managers (who are also consignors) have enough experience to see what needs to be done and, if needed, they help others find something to do.

● Does Rhea Lana provide instructions on how work is to be done, train workers, set hours of work, determine sequence of work to be performed?

Generally, there are no written instructions, because the work is menial. It can be explained in two minutes in most cases. Rhea Lana sets the schedule of shifts and posts this to the web page. Consignors make their own decisions on when and how they wish to participate. Consignors who are familiar with a shift and its activities can direct new consignors. If necessary, a Manager or Ops Manager can assist. Past workers help new workers learn the cash registers, etc. Very little training is necessary since all tasks are simple. There are instruction sheets for operation of the cash registers and how to handle the check-out of large items that cannot be "carried" to the cash register (i.e, placement of "sold signs" on big items while shoppers continue to look).

● Who is responsible for quality control?

Consignors are encouraged on the website to select their highest quality items to offer for sale. So, they themselves are the "first line of defense" for quality control. When they bring their items to the event, the items are inspected by other consignors who are working the Check In. Items with stains or rips or recalled are taken back home by the consignor who brought those items.

● I understand that the consignors provide their own price tags. The only other equipment used by the consignors is the individual's personal car used to transport the clothes from their house to the sale. Once at the sale, virtually all equipment/facilities used are provided by Rhea Lana. This includes the building in which the sale occurs, the racks that clothing items are displayed on. What other equipment is used?

Consignors also provide their own hangers or "packaging."

The other equipment provided by Rhea Lana's is computers for printing labels, the "point of sale" system, including credit card readers, for tracking sales.

● I am under the impression that the only class of workers is consignors. Are there other classes of workers currently?

See above.

In addition, Rhea Lana hires "move-in guys" who are part time employees for each sale.



**– App. 224 –**

Rhea Lana's also has a few office employees who work year round. The office employees are classified as employees.

● In some instances, do the consignors/volunteers bring family members to help them. If yes, what are the responsibilities of those family members?

Yes. Based on the Consent Agreement we don't currently distinguish family members (i.e. who is the consignor - mom or dad or grandmom?) We refer you to the Consent Agreement for how family members are handled.

● If yes, in a given sale, approximately how many of the workers are family members of consignors?

Maybe 10-15% are family teams who help each other to sell and buy their children's clothing. They decide who will work and when. Maybe a dad will do one shift and mom will do a different shift. Or they will trade places at the last minute depending on the needs of their own family.

● Who accepts liability for damages or pays liability insurance?

Rhea Lana, Inc. buys liability insurance for Rhea Lana, Inc. Consignors are not named as additional insureds. Whether an individual consignor obtains liability insurance is up to the individual consignor. Consignors are responsible for the safety of the products that they offer for sale. The Consignor Agreement states that risk for destroyed items in a catastrophe is borne by the Consignors.

● What is the biggest way that consignors have flexibility in their work schedules?

The biggest way they have flexibility is to not show up at all. This happens all the time. Sometimes they call to notify that their child is sick, or they have to go into work at their real job. Sometimes they will not call. Consignors are not "assigned" a time to work; they schedule their own time. As stated above, Rhea Lana puts a schedule on the website with individual times to sign up and the consignors pick when they want to assist and what job they want to do.

● What is the approximate percentage of turnover by consignors/volunteers from one sale to the next?

About 50% change from season to season. Some will skip a season. Some will skip the Little Rock event and then decide to do the Conway event in the same season. They are deciding to participate based on what fits their schedules, their need for children's items, and the timing of the events on the calendar.

● Does Rhea Lana provide specific restrictions and guidance about what individual responsibilities are/were for consignors/volunteers?

Rhea Lana gives guidance on how to consistently display tags and general pricing guidelines. But, they make their own decisions on pricing. This helps shoppers know

DOL 0171

where to find prices. Rhea Lana also suggest that they put shoes in zip lock bags, make sure multiple items are securely attached to each other, put small pieces for toys in zip locks, etc.; common sense stuff.

Anyone can be a consignor at Rhea Lana's and anyone who meets the criteria set forth in the Consent Agreement can work.

- How do consignors/volunteers generally, if at all, have a contribution to sales of the other consignors?

They put the sale on.  The consignors are co-venturers in the consignment events together, and they definitely impact the sales of each other in many ways.  The way they work together for the benefit of all is the core concept of the event.

They buy the items from their fellow consignors.  As consignors they get to shop earlier than the public to buy their fellow consignors' items.  Their primary motivation for participating in Rhea Lana's is to get an early selection o high quality items and save hundreds of dollars for their family's budget.  At a Rhea Lana's event, they are in the store, checking their sales result LIVE during the night.  This tells them how much money they have to spend on purchasing other consignor's items.  Some consignors will attempt to sell and buy an equal amount – with a huge positive impact on their family budget.

They choose their best items and build a good reputation together.  When combined with the other consignor's best items the event gains a reputation for high quality which increases shopping traffic. They are aware that shoppers have many choices in town – including competing consignment events.  So, they bring their best.  They count on others also bringing their best.

They inspect each other's items at check in.  They make sure that shoppers won't see junk on the rack and report it on Facebook. People won't come back to a bad sale that has crummy merchandise. Instead, they hold each other accountable for excellent items, so Facebook blows up with good comments and attracts more shoppers.

All consignors do marketing, like dropping off flyers at daycares. They display car magnets with sale dates. Where allowed they put yard signs in their yards. They deliver cookies to teacher's lounges with brochures about the event. They share announcements on Facebook. They write blogs about their shopping experiences to attract more moms. They post to company and church bulletin boards. The better they market, the more they (and other consignors) will sell.

They talk about it. Moms are heavy communicators, and they talk about the event, which will cause the event to be shopped more heavily.

- I understand that the sales are twice a year.  How long are the sales? (A day, a week, two weeks?)



Eight days.  When first starting, the sales were shorter, but as they have grown, so has the number of days. The events will remain eight days in the future.

- Is the minimum price of an item still $3 even if the consignor brings in more than 12 items?

The minimum for us is 15 items. Yes $3 is the minimum price per item.

- All workers/consignors are expected to work at least one shift, which is 4 hours to assist in areas such as setting up the rack/shelving, check-in items, organization of sales flock, handle payments check out customers. True?

All consignors must price, tag, bring, check in, display their items.  Not all consignors work a shift, but those who choose to shop even earlier than others do so by working shifts. Any consignor can choose to work zero, one or more shifts. And they can change their minds after they sign up. For working a shift (helping other consignors and the sale itself) they get a "worker pass" which gives them even earlier access as discussed at the beginning of this response.

DOL 0173

**– App. 227 –**

### Manager Time Sheet

**Please fill out all information so we can update our records for tax purposes**

Checks will be cut and mailed the Tuesday **after** the sale

Name: Angela Wilous

Address: PII City PII Zip PII

SSN PII (You may give this to us when you turn your timesheet in)

| Date | Job Description | Time in | Time out | Total Hrs |
|------|----------------|---------|----------|-----------|
| 7-27 | ck out table | 12:30 | 11:30 | 11 |
| 7-28 | floor set-up | 7:00 | 1:45 | 6.75 |
| 8-7 | ck distribution | 1:15 | 6:00 | 4.75 |
| 8-6 | sort | 9:30 | 10:00 | .5 |

Total Hours ___ 23

Did you attend a mgr meeting? no

~~(12.5)~~ Pd

Did you shop early? yes

Totals Hours ___ 10.5

ROP ___ $8

Total ___ $84.00

How many miles do you travel to get to the store? 30ish

25,00 travel

Total ckeck amount ___ $84.00 106.00

DOL 0187

**– App. 228 –**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

Please fill out all information so we can update our records for tax purposes.

Name: _Julie Bergfeld_    Phone: **PII**

Address: _____    City: _____

SSN: _____    (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| 7/27 | Check-in | 2:00 | 4:30 | 2½ |
| 7/28 | " " | 8:00 | 9:30 | 13½ |
| 7/30 | Presale | 12:00 | 11:00 | 11 |
| 8/2 | Computer | 3:30 | 8:45 | ~~5~~ 5¼ |
| 8/4 | ½ price Sale | 9:30 | 3:00 | 5½ |
|  |  | 4:30 | 10:00 | 5½ |

Did you attend a meeting?  NO

Did you shop early?  yes

Total Hours _____ 43 ¼

_____ <12.5>

Total Hours _____ 30.75

ROP _____ 89

Total _____ 276.75

How many miles to you travel to get to the store? _____    _____

Total Check Amount _____ 276.75

DOL 0188    D-216

**– App. 229 –**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

*Please fill out all information so we can update our records for tax purposes.*

Name: Andrea Dollar                    Phone: **PII**

Address: **PII**                      City: **PII**

SSN: **PII** (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| Mon - 7/25 | Set-up | 5:00 | 10:00 | 5 |
| Wed 7/27 | Check In | 11am | 10pm | 11 |
| Th 7/28 | Check in | 5:00 | 11:00 | 6 |
| Sun 8/7 | Pick-Up | 1:00 | 6:00 | 5 |

Did you attend a meeting? no
Did you shop early? yes

Total Hours ___27___

___⟨12.5⟩___

Total Hours ___14.5___

ROP ___8 8___

Total _____

How many miles to you travel to get to the store? ___15___

Total Check Amount ___$116.00___

DOL 0189

D-21C

**– App. 230 –**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*
*Please fill out all information so we can update our records for tax purposes.*

Name: Nikki Easley PII

Address: ████████████ ████████    City: PII

SSN: _____ (you can give this to me when you turn your time sheet in if you would like)

| Date | | Job Description | Time In | Time Out | Total Hours |
|------|------|-----------------|---------|----------|-------------|
| Wed | 7/27 | Check In | 9:30 A | 5:00 P | 7.5 |
| Thurs | 7/28 | Check In | 9:30 A | 5:00 P | 7.5 |
| | 7/29 | | | | |
| Sat | 7/30 | Big Ticket/Returns | 11:00 A | 9:00 P | 10 |
| Sun | 7/31 | " " | 11:00 A | 4:00 P | 5 |
| Sat | 8/6 | Sort | 5:00 P | 11:00 | 6 |
| | 8/7 | Front Door | 1:00 P | 5:30 | 4.5 |

*Car Magnet*

Did you attend a meeting? yes
Did you shop early? yes

*CarMagnet?*

Total Hours _____ 40.5
                   -12.5
Total Hours _____ 28.0
ROP _____ $7.5
Total _____

How many miles to you travel to get to the store? 14 miles _____

Total Check Amount _____ $210 ⁰⁰

DOL 0100

# Manager Time Sheet

### Checks will be cut and mailed the Tuesday after the sale.
### Please fill out all information so we can update our records for tax purposes.

Name: Vanessa Hendrix          Phone: **PII**

Address: **PII**          City: **PII**

SSN: _____ (you can give this to me when you turn your time sheet in if you would like)

+111

| Date | Job Description | Time In | Time Out | Total Hours |
|------|----------------|---------|----------|-------------|
| 7/26 | store setup/check in | 9:00 a | 3:00 p | 6 |
| 7/28 | cons. check in | 8:30 a | 3:00 p | 6½ |
| 8/2 | register/computer | 9:30 a | 3:30 p | 6 |
| 8/3 | register/soft prep | 9:30 a | 4:00 p | 6½ |
| 8/4 | register/computer | 5:00 p | 10:45 | 5 3/4 |
| 8/6 | sort | 12:00 p | 10:30 | 10½ |
| 8/7 | check out | 1:15 p | 6:00 | 4 3/4 |

24
15
4
33

1
27
/30

25
10.5
10.5/0
46

Math not my strong suit

3/4 7 3/4
4/4 2 2

Did you attend a meeting? yes
Did you shop early? yes

Total Hours  37.75  46

42.57

Total Hours  33.5
ROP  $8
Total  $268

How many miles to you travel to get to the store? 5

Total Check Amount  $268

DOL 0191

D-21e

**– App. 232 –**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

Please fill out all information so we can update our records for tax purposes.

Name: Jennifer Henry    Phone: **PII**

Address: _____ City: _____ **PII**

SSN: _____ (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| 7/28 | check in | 8:30 | 9:00 | 12 1/2 |
| 7/30 | presale | 8:40 | 9:10 | 12 1/2 |

Did you attend a meeting? NO
Did you shop early? yes

Total Hours _____ 25 _____

< 12.5 >

Total Hours _____ 12.5 _____
ROP _____ $8.50 _____
Total _____

How many miles to you travel to get to the store? _____

Total Check Amount _____ $106.25 _____

DOL 0192    D-21f

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

*Please fill out all information so we can update our records for tax purposes.*

Name: Katie Hill                    Phone: **PII**

Address: **PII**

SSN: _____ (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|------|------|------|------|
| 7/26 | Meeting | 5:10 pm | 7:30 | 2 |
| 7/27 | checkin | 6:00 pm | 12:00 am | 6 |
| 7/30 | PreSale | 3:50 pm | 11:00 pm | 7 |
| 8/1 | public | 9:15 am | 2:00 pm | 4:45 |
| 8/4 | halfprice | 5:20 pm | 11:00 pm | 5:40 |
| 8/6 | Sort | 2:00 pm | 8 pm | 6 |

Total Hours _____ 31.5

Did you attend a meeting? yes                    (12.5)

Did you shop early? yes

Total Hours _____ 19.0

ROP _____ 18

Total _____

How many miles to you travel to get to the store? _____ 2

Total Check Amount _____ $152 ⁰²

DOL 0193

— App. 234 —

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

*Please fill out all information so we can update our records for tax purposes.*

Name: Kim Jones                     Phone: PII

Address: PII                        City: PII

SSN: PII   (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|----------------|---------|----------|-------------|
| 7/26 | Checkin/meeting | 4:30 | 8 | 3.5 |
| 7/27 | " | 5 | 11:30 | 6.5 |
| 7/28 | " | 6 | 10 | 4 |
| 7/30 | Presale | 10 | 10:30 | 12.5 |
| 7/31 | Public | 12 | 8:30 | 8.5 |
| 8/1 | public | 4:45 | 8 | 3.25 |
| 8/3 | public | 4 | 8 | 4 |
| 8/4 | 1/2 presale | 7:15 | 10:30 | 3.75 |
| 8/6 | public/sort | 10:15 | 10:15 | 12 |
| 8/7 | pickup | 1:45 | 3 | 1.25 |

Total Hours ___59.25___

Did you attend a meeting? yes
Did you shop early? yes

&lt;12.5&gt;   Pd

Total Hours ___48.75___ @
ROP ___#8___
Total ___390.00___

How many miles to you travel to get to the store? ___35___

#50 Bonus

Total Check Amount ___440.00___

DOL 0194   D-216

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

*Please fill out all information so we can update our records for tax purposes.*

Name: Michelle Mentzer    Phone: PII

Address: PII    City: PII

SSN: PII    you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| 7/26 | Mgr. Mtg | 5:00 | 7:00 | 2 |
| 7/30 | 1st day Public | 11:00 | 5:00 | 6 |
| 8/4 | Half price presale | 5:00 | 11:15 | 6.25 |
| 8/6 | SORT | 2:00 | 10:15 | 8.25 |
| 8/7 | Pickup | 2:00 | 5:00 | 3 |

Did you attend a meeting? yes

Did you shop early? yes

yes

Total Hours ___25.50___

___(12.5)___

Total Hours ___13.0___

ROP ___$8___

Total ___

How many miles to you travel to get to the store? ___14___

Total Check Amount ___$104⁰⁰___

DOL 019  D-21

**− App. 236 −**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*
*Please fill out all information so we can update our records for tax purposes.*

Name: Beth Moore     Phone: PII

Address: PII     City: PII

SSN: _____ (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| 7/30/11 | Register / Tags | 12:10 | 7:10 | 7 |
|  | Mngr. Mtg. | 5 | 7 | 2 |
| 7/31 | Register / Tags | 12:00 | 7 | 7 |
| 8/1/11 | Reg/Tags | 2:30 | 5:30 | 3 |
| 8/6/11 | Sort | 1:15 | 7:15 | 6 |
| 8/7/11 | Pick-Up | 1:00 | 6:00 | 5 |

Did you attend a meeting? Yes
Did you shop early? Yes

Total Hours ___30___

___<12.5>___

Total Hours ___17.5___
ROP ___$8___
Total _____

How many miles to you travel to get to the store? _____   _____

Total Check Amount ___$140___

DOL 0196

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*
*Please fill out all information so we can update our records for tax purposes.*

Name: Carrie Ramsey            Phone: PII

Address: PII            City: PII

SSN: PII        (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|----------------|---------|----------|-------------|
| 07/30 | check out | 9:00 | 8:15 | 11 hrs |
| 08/04 | Check out/pull tags | 6:00 | 10:45 | 4 hrs 45 min |
| 08/06 | sort | 12:00 | 10:15 | 10 hrs 15 min |
| 08/07 | pickup | 1:45 | 6:30 | 4 hrs 45 min |

Total Hours __30.75__

Did you attend a meeting? NO
Did you shop early? yes            <12.5>

Total Hours __18.25__
ROP __$10__            (RV)
Total _____

How many miles to you travel to get to the store? _____

Total Check Amount __$182.50__

DOL 0197    D-214

**– App. 238 –**

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

Please fill out all information so we can update our records for tax purposes.

Name:  Kathy Sproles                            Phone:  PII

Address:  PII                                   City:  PII

SSN: _____  (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|---|---|---|---|---|
| 7/30 | register | 12:00 pm | 10:30 pm | 10.5 |
| 7/31 | register | 3:00 pm | 9:00 pm | 6.0 |
| 8/1 | public sale | 9:00 am | 7:00 pm | 10.00 |
| 8/2 | public sale | 9:00 am | 3:00 pm | 6.00 |
| 8/4 | ½ price pre-sale | 6:30 pm | 10:00 pm | 3.50 |
| 8/5 | sort | 6:00 pm | 10:30 pm | 4.50 |

Did you attend a meeting?  Y
Did you shop early?  Y

Total Hours _____  40.5

_____  ⟨12.5⟩

Total Hours _____  28 h
ROP _____  $2.5
Total _____

How many miles to you travel to get to the store? ____ 15 ____

Total Check Amount _____  $ 238

DOL 0198   D-2/L

# Manager Time Sheet

*Checks will be cut and mailed the Tuesday after the sale.*

*Please fill out all information so we can update our records for tax purposes.*

Name: LaurenWalker          Phone: **PII**

Address: **PII**          City: **PII**

SSN: **PII** (you can give this to me when you turn your time sheet in if you would like)

| Date | Job Description | Time In | Time Out | Total Hours |
|------|-----------------|---------|----------|-------------|
| 6·25·11 | marketing | 7:30 ~~~~ | 10:00 | 2.5 |
| 6·28·11 | | 3:30 | 4:00 | .5 |
| 7·7·11 | | 2:00 | 2:30 | .5 |
| 7·10·11 | | 6:00 | 8:00 | 2 |
| 7·11·11 | | 6:00 | 7:30 | 1.5 |
| 7·13·11 | | 2:15 | 3:00 | .75 |
| 7·30·11 | presale checkout | 7:45 | 6:15 | 10.5 |
| 8·1·11 | Checkout/clean | 4:30 | 9:00 | 4.5 |
| 8·4·11 | checkout | 5:00 | 10:45 | 5.75 |
| 8·6·11 | sort | 2:00 | 10:30 | 8.5 |

Did you attend a meeting? no
Did you shop early? yes

Total Hours _____ 37 _____

_____ ⟨12.5⟩ _____

Total Hours _____ ~~~~ 24.5 _____
ROP _____ $8.5 _____
Total _____ $208.25 _____

How many miles to you travel to get to the store? _____

Total Check Amount _____ $208.25 _____

DOL 0199

– App. 240 –

FALL 2012 — GREATER LITTLE ROCK

## Volunteer Form

### Shift/Volunteer Management

Enter a New Shift. *Required

| Shift Date | | | Shift Time | | | | |
|---|---|---|---|---|---|---|---|
| Month | Day | Year | Start | Finish | *Shift Description | Volunteers | |
| [▼] | [▼] | 2013 [▼] | [▼] | [▼] | | 0 [▼] | Add This Shift |

### Listing of Shifts

If your Shifts don't show up, click your "Refresh" Button. When people sign up, they will show up below! Use these Delete and Clear buttons to delete shifts and clear volunteers.

Delete ALL Shifts

| | | Shift Info | | | Volunteer Info | | |
|---|---|---|---|---|---|---|---|
| | | Date | Time | Description | Name | Phone | Email |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | Great Shift for Dad | Gina/Bill Campbell | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | Store Set Up | Joanne Brewer | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | Great Shift for Dad | Debbie Brinkley | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | Store Set Up | Rachel Bollinger | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | Store Set Up | Charlotte Watson | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | STore Set Up | Tressa Ashberry | | |
| DELETE | CLEAR | Monday, July 16, 2012 | 5:00PM to 10:00PM | STore Set Up | Paula Morse | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Natalie Stanton | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Bekah Knobeloch | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Melodie Copher | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Molly Crowe | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Jessica McElreath | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 9:00AM to 2:00PM | Store Set Up | Tina Patton | | |
| DELETE | CLEAR | Tuesday, July 17, | 12:00PM to | Store Set Up/ Early Consignor Check In | Lea Gray | | |

PII

DOL 0215



**– App. 241 –**

| | | | | | |
|---|---|---|---|---|---|
| | | 2012 | 5:00PM | | |
| DELETE | CLEAR | Tuesday, July 17, 2012 | 12:00PM to 5:00PM | Store Set Up/ Early Consignor Check In | Sarah Barham Stuart |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In/Store Organization | Sarah Barham Stuart |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Amanda Leamons |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Amy White |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Kayla Richardson |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Ramya Muddaragada |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Tracy Stuckey |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Sallie Socia |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 8:30AM to 1:30PM | Consignor Check In | Kathryn Stewart |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 11:00AM to 4:00PM | Consignor Check In | Molly Crowe |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 11:00AM to 4:00PM | Consignor Check In | Sarah Taylor |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 11:00AM to 4:00PM | Consignor Check In | Charlotte Watson |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 11:00AM to 4:00PM | Consignor Check In | Melanie Hammock |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 11:00AM to 4:00PM | Consignor Check In | Sarah Taylor |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 12:00PM to 5:00PM | Consignor Check In | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 12:00PM to 5:00PM | Consignor Check In | Chelsea newberry |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | Bridgette Stricklin |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | DEBBIE BRINKLEY |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Jessica Flowers |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Logan Brixie |

PII



DOL 0216

– App. 242 –

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Wednesday, July 18, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Martha Lercher |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 6:00PM to 11:00PM | Consignor Check In/Store Organization | Trisha Cullum |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 6:00PM to 11:00PM | Consignor Check In/Store Organization | Lacey Lovelis |
| DELETE | CLEAR | Wednesday, July 18, 2012 | 6:00PM to 11:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30AM to 1:30PM | Consignor Check In/Store Organization | Molly Crowe |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30AM to 1:30PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30AM to 1:30PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | Heather Cole |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | Bekah Knobeloch |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | Sarah Taylor |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | Emily Krablin |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | Krystal Rowles |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 10:00AM to 3:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 11:00AM to 4:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 11:00AM to 4:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 12:00PM to 5:00PM | Consignor Check In/Store Organization | Melanie Hammock |
| DELETE | CLEAR | Thursday, July 19, 2012 | 12:00PM to 5:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 12:00PM to 5:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 12:00PM to 5:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 2:00PM to 7:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 2:00PM to 7:00PM | Consignor Check In/Store Organization | Diane Broaddrick |
| DELETE | CLEAR | Thursday, July 19, 2012 | 2:00PM to 7:00PM | Consignor Check In/Store Organization | Debbie Veach |
| DELETE | CLEAR | Thursday, July 19, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | Tressa Ashberry |
| DELETE | CLEAR | Thursday, July 19, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | DEBBIE BRINKLEY |



DOL-0217 C

PII

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Thursday, July 19, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | Bridgette Stricklin |
| DELETE | CLEAR | Thursday, July 19, 2012 | 4:00PM to 9:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Sharlee Antee |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Jill DeLon |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Katie Coleman |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Cindy Rogers |
| DELETE | CLEAR | Thursday, July 19, 2012 | 5:00PM to 10:00PM | Consignor Check In/Store Organization | Martha Lercher |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Alison Passmore |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Amanda Jackson |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Reva Durham |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Angie Carlton |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Lacey Lovelis |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Jessica Ferguson |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Tasha Fuller |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Kambrie Abels |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Heather Benton |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Sabrina Langehaug |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Tosha Biggs |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | DeAnn Gilpatrick |
| DELETE | CLEAR | Thursday, July 19, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT (Work 3.5 hrs, get credit for 5 hours!) | Diane Broaddrick |
| DELETE | CLEAR | Saturday, July 21, 2012 | 11:30AM to 4:30PM | Big Tickets | Lisa Walker |
| DELETE | CLEAR | Saturday, July 21, 2012 | 11:30AM to 4:30PM | Big Tickets | Priscilla Bockelman |
| DELETE | CLEAR | Saturday, July 21, | 11:30AM to | Big Tickets | pam lee |

| | | | | | |
|---|---|---|---|---|---|
| | | 2012 | 4:30PM | | |
| DELETE | CLEAR | Saturday, July 21, 2012 | 11:30AM to 4:30PM | Big Tickets | Angie Carlton |
| DELETE | CLEAR | Saturday, July 21, 2012 | 11:30AM to 4:30PM | Big Tickets | Mavis Williamson |
| DELETE | CLEAR | Saturday, July 21, 2012 | 12:00PM to 5:00PM | Returns | Tracy Stuckey |
| DELETE | CLEAR | Saturday, July 21, 2012 | 12:00PM to 5:00PM | Returns | Sallie Socia |
| DELETE | CLEAR | Saturday, July 21, 2012 | 12:00PM to 5:00PM | Returns | Shannon Jackson |
| DELETE | CLEAR | Saturday, July 21, 2012 | 1:00PM to 6:00PM | Big Tickets/Returns | Lindsey Hammers |
| DELETE | CLEAR | Saturday, July 21, 2012 | 1:00PM to 6:00PM | Big Tickets/Returns | Kaleigh Walser |
| DELETE | CLEAR | Saturday, July 21, 2012 | 2:00PM to 7:00PM | Big Tickets/Returns | Jennifer Elliott |
| DELETE | CLEAR | Saturday, July 21, 2012 | 2:00PM to 7:00PM | Big Tickets/Returns | Tracy Stuckey |
| DELETE | CLEAR | Saturday, July 21, 2012 | 2:00PM to 7:00PM | Big Tickets/Returns | Sallie Socia |
| DELETE | CLEAR | Saturday, July 21, 2012 | 2:00PM to 7:00PM | Big Tickets/Returns | |
| DELETE | CLEAR | Saturday, July 21, 2012 | 3:30PM to 8:30PM | Store Organization | |
| DELETE | CLEAR | Saturday, July 21, 2012 | 3:30PM to 8:30PM | Store Organization | |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization | Priscilla Bockelman |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization | Mavis Williamson |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization | Debbie Brinkley |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization/Returns | Donna Whittingham |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization/Returns | |
| DELETE | CLEAR | Saturday, July 21, 2012 | 5:00PM to 10:00PM | Store Organization/Returns | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | karen Cerney |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | Mavis Williamson |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | Lisa Walker |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | Jessica Murphy |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | emily arthur |
| DELETE | CLEAR | Sunday, July 22, | 11:30AM to | Big Tickets/Returns | Kaleigh Walser |

PII



PII

| | | | | | |
|---|---|---|---|---|---|
| | | 2012 | 4:30PM | | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 11:30AM to 4:30PM | Big Tickets/Returns | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Returns/Help With Restock | brittany smith |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Returns/Help With Restock | Heather Carter |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Returns/Help With Restock | Bridgette Stricklin |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Returns/Help With Restock | Shannon Perry |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Sunday, July 22, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Monday, July 23, 2012 | 9:30AM to 2:30PM | Store Organization | Nina Whitley |
| DELETE | CLEAR | Monday, July 23, 2012 | 9:30AM to 2:30PM | Store Organization | JAMIE GEORGE |
| DELETE | CLEAR | Monday, July 23, 2012 | 10:30AM to 3:30PM | Store Organization | Ashley Ussery |
| DELETE | CLEAR | Monday, July 23, 2012 | 10:30AM to 3:30PM | Store Organization | Emily krablin |
| DELETE | CLEAR | Monday, July 23, 2012 | 3:00PM to 8:00PM | Store Organization | samantha yates |
| DELETE | CLEAR | Monday, July 23, 2012 | 3:00PM to 8:00PM | Store Organization | Tamela Cain |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 9:30AM to 2:30PM | Store Organization | Nina Whitley |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 9:30AM to 2:30PM | Store Organization | Annette Chambers |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 10:30AM to 3:30PM | Store Organization | Michelle Meier |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 10:30AM to 3:30PM | Store Organization | Ashley Ussery |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 11:00AM to 4:00PM | Store Organization | Heather Cole |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 11:00AM to 4:00PM | Store Organization | Krystal Rowles |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 11:00AM to 2:30PM | Store Organization | |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Tuesday, July 24, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Wednesday, July 25, 2012 | 9:30AM to 2:30PM | Store Organization | Kathleen Ward |

DOL 0228

D-22f

**– App. 246 –**

USCA Case #17-5259    Document #1718347    Filed: 02/16/2018    Page 251 of 330

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Wednesday, July 25, 2012 | 9:30AM to 2:30PM | Store Organization | Leslie Young |
| DELETE | CLEAR | Wednesday, July 25, 2012 | 10:30AM to 3:30PM | Store Organization | Natalie Stanton |
| DELETE | CLEAR | Wednesday, July 25, 2012 | 10:30AM to 3:30PM | Store Organization | Michelle Meier |
| DELETE | CLEAR | Wednesday, July 25, 2012 | 3:00PM to 8:00PM | Store Organization | Kristen Jackson |
| DELETE | CLEAR | Wednesday, July 25, 2012 | 3:00PM to 8:00PM | Store Organization | |
| DELETE | CLEAR | Thursday, July 26, 2012 | 9:30AM to 2:30PM | Store Organization | Beth Jackson |
| DELETE | CLEAR | Thursday, July 26, 2012 | 9:30AM to 2:30PM | Store Organization | Kathleen Ward |
| DELETE | CLEAR | Thursday, July 26, 2012 | 9:30AM to 2:30PM | Store Organization | Michelle Meier |
| DELETE | CLEAR | Thursday, July 26, 2012 | 6:00PM to 11:00PM | Half Price Pre-Sale Returns | Michelle Noel |
| DELETE | CLEAR | Thursday, July 26, 2012 | 6:00PM to 11:00PM | Half Price Pre-Sale Returns | DeAnn Gilpatrick |
| DELETE | CLEAR | Thursday, July 26, 2012 | 6:00PM to 11:00PM | Half Price Pre-Sale Returns | |
| DELETE | CLEAR | Friday, July 27, 2012 | 9:30AM to 2:30PM | Store Organization/Half Price Sale | Amanda Leamons |
| DELETE | CLEAR | Friday, July 27, 2012 | 9:30AM to 2:30PM | Store Organization/Half Price Sale | Leslie Young |
| DELETE | CLEAR | Friday, July 27, 2012 | 9:30AM to 2:30PM | Store Organization/Half Price Sale | April Puchynets |
| DELETE | CLEAR | Friday, July 27, 2012 | 2:30PM to 7:30PM | Half Price Sale/Returns | Paula Morse |
| DELETE | CLEAR | Friday, July 27, 2012 | 2:30PM to 7:30PM | Half Price Sale/Returns | Priscilla Bockelman |
| DELETE | CLEAR | Friday, July 27, 2012 | 2:30PM to 7:30PM | Half Price Sale/Returns | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30AM to 1:30PM | Returns | Nicole Mogish |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30AM to 1:30PM | Returns | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 10:00AM to 3:00PM | Returns | Heather Owens |
| DELETE | CLEAR | Saturday, July 28, 2012 | 10:00AM to 3:00PM | Returns | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 10:00AM to 3:00PM | Returns | Christie Hull |
| DELETE | CLEAR | Saturday, July 28, 2012 | 12:00PM to 5:00PM | Returns/Sort Prep | allison ward |
| DELETE | CLEAR | Saturday, July 28, 2012 | 12:00PM to 5:00PM | Returns/Sort Prep | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 12:00PM to 5:00PM | Returns/Sort Prep | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 12:00PM to 5:00PM | Returns/Sort Prep | Emily krablin |

DOL 0221



**– App. 247 –**



| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Michelle Meier |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT – Free Pizza! | Jamie |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT – Free Pizza! | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT – Free Pizza! | Justin Vermillion |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Tammy Oleson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Kelsey Oleson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Beth Jackson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Rachel Bollinger |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Trisha Cullum |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Karen Cerney |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Meghan Mitchell |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Lisa (Meghan Mitchell) |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Charlotte Watson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | pam lee |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Annette Chambers |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Kathleen Ward |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Lillian Hoffman |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Celeste Knight |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Amanda Leamons |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Debbie Veach |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Bridgette Stricklin |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Tosha Biggs |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Natalie Stanton |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Priscilla Bockelman |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Jessica McElreath |

DOL-0222

D-22h

**– App. 248 –**

PII

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Lindsay Hammers |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Kelsey Oleson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Justin Vermillion |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Kaleigh Walser |
| DELETE | CLEAR | Saturday, July 28, 2012 | 3:00PM to 8:00PM | SORT - Free Pizza! | Lee Hammers |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT – FREE PIZZA! | Adam Neal |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | brittany smith |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Sharla Antee |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Heather Carter |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Amy White |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Angie Carlton |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Martha Lercher |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Sarah Taylor |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Michelle Noel |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | JAMIE GEORGE |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - Free Pizza! | Marcus & Dana Trickey |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - FREE PIZZA! | Kathryn Stewart |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - FREE PIZZA! | Nicole Perez |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - FREE PIZZA! | Janet Runsick |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - FREE PIZZA! | Jennifer Kelley |
| DELETE | CLEAR | Saturday, July 28, 2012 | 5:00PM to 10:00PM | SORT - FREE PIZZA! | Katie Sanders |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Sarah Clements Smith |
| DELETE | CLEAR | Saturday, July 28, | 8:00PM to | NIGHT OWL SHIFT - Work 3.5 hrs, get | Brad Fuller |

DOL 0223



**– App. 249 –**

| | | | | | |
|---|---|---|---|---|---|
| | | 2012 | 11:30PM | credit for 5 hrs | |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Tasha Fuller |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Mavis Williamson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Melodie Copher |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Heather Cole |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | DeAnn Gilpatrick |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Shannon Perry |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Tosha Biggs |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:00PM to 11:30PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs | Melanie Hammock |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs! | Charlotte Watson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs! | Holly Schimmel |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs! | Paula Morse |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs! | Bailey Thompson |
| DELETE | CLEAR | Saturday, July 28, 2012 | 8:30PM to 11:59PM | NIGHT OWL SHIFT - Work 3.5 hrs, get credit for 5 hrs! | |
| DELETE | CLEAR | Sunday, July 29, 2012 | 10:00AM to 3:00PM | Packing/Consignor Pick UP | Kathryn Stewart |
| DELETE | CLEAR | Sunday, July 29, 2012 | 10:00AM to 3:00PM | Packing/Consignor Pick UP | JAMIE GEORGE |
| DELETE | CLEAR | Sunday, July 29, 2012 | 10:00AM to 3:00PM | Packing/Consignor Pick UP | |
| DELETE | CLEAR | Sunday, July 29, 2012 | 2:30PM to 7:30PM | Consignor Pick Up | Mavis Williamson |
| DELETE | CLEAR | Sunday, July 29, 2012 | 2:30PM to 7:30PM | Consignor Pick Up | |
| DELETE | CLEAR | Sunday, July 29, 2012 | 2:30PM to 7:30PM | Consignor Pick Up | Shannon Perry |

PII

DOL 0224



Consignor Notes  2/28/13 with Kemper

Consignors                                    Aaron Brooks
                                              Atkny
Individual                                    Dave Diner
  Provides                                       owner
    racks                                     Consigners
    date
    location

Flat Fee - to put item
  on sale

Part of making sale successful
  Check on product

Set up

Check in

Operation of sale

Sorting after the sale.

Running the sale.
    picking up

After the sale - gathers leftover
  Help sort

DOL 0225

F-1a

**– App. 251 –**

when clothes: — tag - barcode
scann barcode
price goes into the computer
- like any other

Pickup clothes left       70% of
and check            the proceeds.

They have an economic interest

→ Individual Hosting sale

Sales happen 2x per you

DOL 0226
F-16

Volunteers — purchase people
who are not ready
to be consignors

State:                          Currently
                                No volunteers
1) WALes consignus —
2) Early buyers
3) Pd workers

— Register as a consignor and
then volunteer —

Outside of ARKANSAS
ne Franchises

No charge on duty for
consignors

Model 2 — Sales pr yr pr
location
        2x pr year multiple
        location

DOL 0227
E-1c

**– App. 253 –**

HRK stale — Did not
asses penalti. lev
BWs for volunter
in ord to ~~###~~

20 to 50 Corsages / Per sale.
—1000— Corsages /
Consignors
Minimum of items : 15 required
for $3 each
min of ~$36. —

Myant people Come at least
$100. —

— 30 min to 1 hrs 1/2,
depends how organized they
are

List of SOs by MONDAY

DOL 0228

**– App. 254 –**

RHEA LANA'S INC   QUESTIONS:

ASSIGNMENTS:

- What do you do? When did you do it? Give examples.  How often?  Why did you do it?  What do you get in return? What did you get in return?  Who showed you how to do it? Who told you when to do it?  Where you're interviewed for the assignment, if so, by whom?
- Have your assignments changed?  Who changed them? Why?
- Have you had merchandised on consignment? If so, how often?
- Explain the consignment process that you followed: who, what, where, when, how often

HOURS

When did you do the assignments? How often? Where? When did you start? When did you end? When did you take lunch time? How long was lunch time?

PAY

How were you compensated for your labor? How often?

CROSS REFERENCE

Who else did the same thing you did? Who else told you what and when to do the assignments? How often he/she did it? To whom else did he/she did it?

CHILD LABOR

Any minors doing assignments? What minors? Who are they? How often? What do they do? Dates? Location, equipment, ages, parents, school

Note:

ER asserts no more "volunteers" work there, only consigners.

DOL 0229

✻ Do not use the word, work.
Use "Assignment"

Ask:

1) Who is doing the job of the volunteer currently.
2) Ask about passes

DOL 0230
E-2b

<u>Final Conference Rhea Lana</u>  5/24/11

**Coverage:** All employees are covered on an enterprise basis under Section 3(s)(1)(a) of the FLSA for the entire investigative period.  The firms ADV in 2011; $1,862,431.000, 2010: $1,667,074.00.  CFR Part 776

**Exemptions:**

541.101 asserted (Business Owner) The firm is owned by Rhea Lana Riner (50%) and Dave Riner (50%).

541.302 Creative Professionals asserted for Allison Crom- Graphic Commnications Director, primary duties are creative design, graphic arts.  Paid a salary of at least $455 per week.

541.302 Creative Professional asserted for Kailey Wood.

The Arkansas Department of Labor did an investigation and came into a settlement with the signing of a consent agreement by Rhea Lana on January 19, 2012.

**Status of Compliance**

**<u>Employment relationship Factors in which the US Supreme Court has considered significant to determine independent contractor or employee for puposes of the FLSA.</u>**

**1) The extent to which the services rendered are an integral part of the principal's business.**

- The services performed are the primary type of work the principal performs for her customers/clients.
- The services are clearly a distinct job that is part of the principal's overall process of production.
- The alleged subcontractor does not supervise any of the principal's employees.  In some instances individuals bring in family members to assist them in their responsibilities but those seem to be largely related to the responsibilities of the consignor/volunteer.

**2) The permanency of the relationship.**

- The individuals involved do not have a fixed employment period.  The sales that occur happen twice or more a year so any labor performed occurs in blocks of time related to the timing of the sales.
- The persons in question work for relatively short periods of time at irregular intervals in between personal activities.  Thus far there is no indication of them working for others.
- As projects are completed employees are given other project such as operating the cash register, greeting/assisting customers, sorting clothes.
- The persons in question do not work exclusively or almost exclusively for one company over a longer period of time.  They work 6 times per year at the most.  They can choose to sit out on a sale if they so choose without any negative repercussions.

**3) The amount of the alleged contractor's investment in facilities and equipment.**

- The amount of Investment by the consignors is very small.  There is a fee paid to the Rhea Lana.  The consigners provide their own price tags but this is a minimal cost.  The only equipment used is the individual's personal car used to transport the clothes from their house to the sale.  Once at the sale, virtually all equipment/facilities used are provided by Rhea Lana.  This includes the building in which the sale occurs, the racks that clothing items are displayed on.  Consignors provide their own hangers


DOL 0231

**– App. 257 –**

or packaging.   Regardless there are not a large amount of capital expenditures, such as risk capital and capital investments, not negligible items, or labor.  As stated above, in some instances, the consignors/volunteers bring family members to help them.  Rhea Lana does not distinguish family members (i.e. who is the consignor- mom, dad, or grandma.

- None of the consignors/volunteers has a company name or holds themselves out as an independent business person.  However, none of them think of themselves as employees either.
- IC provides materials and supplies
- The consignors/volunteers are not charged rent for premises comparable to market value for generally equivalent premises as in the example of a dealer.  However, they do pay a nominal fee of $9.50 and 30% of the sales.
- Rhea Lana, Inc buys liability insurance for Rhea Lana, Inc.  Consignors are not named as additional insured's.  Consignors are responsible for the safety of the products that they offer for sale.

**4) The nature and degree of control by the principal.**

- Consignors are not assigned a time to work; they schedule their own time as a "volunteer." Rhea Lana puts a schedule on the website with individual times to sign up and the consignors pick when they want to assist and what job they want to do.
- Because the individuals in question think of themselves as neither employee nor independent contractor, they do not think of themselves as having their own employees to hire and fire.  However, they do feel free to bring helpers with them.
- As stated above, it is accurate to say that the individuals in question have the ability to terminate a relationship without incurring any liability.  This is evidenced by the percentage of turnover by workers from one sale to the next being about 50%.
- Rhea Lana sets the schedule on when and how the consignors want to participate.  Managers or Ops Managers direct the work of the consignors.  There are instruction sheets for the operation of the cash registers and how to handle the check-out of large items.  Rhea Lana also provides training videos for new consignors on the firm's website.  This training includes; how to hang clothing properly, suggestions on pricing, and product guidelines on what items can be sold.
- None of the consignors/volunteers are required to provide oral or written reports on the progress of work.
- The consignors/volunteers are not restricted from working for anyone else.
- Employees generally cannot perform work on their own schedule but are assigned to a part of a project that may require orderly and sequential coordination of various crafts and workers.
- Rhea Lana gives guidance on how to consistently display tags and general pricing guidelines. Consignors make the final decision on pricing on items.  Rhea Lana also suggest that consignors put shoes in zip lock bags, make sure multiple items are securely attached to each other, and all other small items be placed in zip locks.

**5) The alleged contractor's opportunities for profit and loss.**

- The individuals in question do not bid on the job (labor and material). The reason the consignors/volunteers purchase the items sold is not so they can resell them, the items are for their consumption and that of their families.  They later sell them but only as an afterthought.
- None of the individuals are considered employees or independent contractors by Rhea Lana.  The individual consignors/volunteers can be a part of the sale or not, but there is no competition with other consignors/volunteers.  There is no bid process.


DOL 0232

- Consignors/volunteers do not "turn down a job" per se.  They are informed of a sale and if they want to sign up for it they do.  If they don't want to be a part of it they don't sign up. If they don't want to be a part of one sale, they can be a part of the next sale without sanctions against them.
- Consignors/volunteers do not make any investments for insurance or bonding for business purposes.
- Consignors can earn more money based on how they choose to market their items.  They choose which items are sold and are not sold. They choose the price of their items.  They choose how they will be displayed in the sale.  They choose if the items in question will be sold by themselves or as part of a group, sold as a group. The amount of profit made by the individual consignor will be clearly correlated with the mastery of these areas.
- Consignors buy items from their fellow consignors.  As consignors, they get to shop earlier than the public to buy their fellow consignor's items.  Their motivation for participating in Rhea Lana's is to get an early selection on high quality items and save for their family's budget.  All consignors do marketing for the event, such as dropping off flyers at daycares, displaying car magnets with sale dates, and sharing announcements on social media sites.
- The vast majority (well over 99%), of income for consignors/volunteers, comes from other sources of income and not from selling goods at Rhea Lana or shops like Rhea Lana.
- None of the consignors/volunteers is paid a fixed hourly rate.

**6) The amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor.**

- As stated above, the earnings of the consignors depend completely upon their judgment or initiative.
- Consignors have direct control over the essential determinants of profits in a business and direct share in the success of the business.
- There are aspects of the work done by consignors/volunteers that is routine in nature.  Examples included picking up clutter/garbage in work areas, running the cash register, watching for shot lifters and general straightening.  Non-routine work which requires industry and efficiency related to the marketing of their products is listed above.

**7) The degree of independent business organization and operation.**

- Neither the consignors or volunteers develop a business relationships with any other contractors.
- None of the consignors/volunteers considers themselves employees or independent contractors. The don't advertise independently.  They do not use the yellow pages and don't have business cards. None has a separate business site.

The firm has different classifications of workers;

| Title | Work | Remuneration | Violation |
|-------|------|--------------|-----------|
|       |      |              |           |

 DOL 0238

– App. 259 –

| Title | Work | Remuneration | Violation |
|---|---|---|---|
| Consignor | Enter items for sale in computer program, decide if items will go to "half-price" on last day is still unsold, package or otherwise prepare items for sale, tag sale items, bring sale items to sale location, check-in and price items, put items on display racks at sale location, pick-up or donate items at end of sale | 70% of the their selected sale price | Independent Contractors- Not considered volunteers |
| | | | |
| Worker | Same as Consignors plus work 1 five hour shift | Same benefits as Consignor plus the right to shop before the sale opens to the general public | MW And OT Viols due to nonpayment of hours worked.<br><br>Also RK viols due to failure to maintain hours worked. |
| | | | |
| Early Worker | Same as Consignors plus work 2 five hour shifts | Same benefits as Consignor plus the right to shop before the Workers | MW And OT Viols due to nonpayment of hours worked.<br><br>Also RK viols due to failure to maintain hours worked. |
| | | | |


DOL 0234

**– App. 260 –**

| Title | Work | Remuneration | Violation |
|---|---|---|---|
| Super Mom | Same as Consignors plus work 3 five hour shifts | Same benefits as Consignor plus the right to shop before the Early Workers | MW And OT Viols due to nonpayment of hours worked.<br><br>Also RK viols due to failure to maintain hours worked. |
| | | | |
| Primo Mom | Same as Consignors plus work 4 five hour shifts | Same benefits as Consignor plus the right to shop before the Super Moms | MW And OT Viols due to nonpayment of hours worked.<br><br>Also RK viols due to failure to maintain hours worked. |
| | | | |
| Manager* | (30 to 40 of these) Same as Consignors operate cash registers and helping consignors identify recall items, plus they are asked to work at two of the three events held each season, a minimum of 25 hours each sale. Most accomplish this request. | Same benefits as Consignors plus the right to shop before the Primo Moms and paid $8 to $9 per hour for those hours in addition to hours required to obtain the desired shopping time. If they want to shop before Primo Moms they have to work a minimum of 12.5 hours and they are paid for every hour over 12.5. | OT viols due to ST for OT, also possible MW Viol due to deduction of 12.5 hours for shopping early.<br><br>Does not meet salary requirement for exemption. |
| | | | |

DOL 0235

**– App. 261 –**

| Title | Work | Remuneration | Violation |
|---|---|---|---|
| Ops Manager* | (5 of these) Same as Managers and they are asked to work all three events per season and they work lots of hours. | Same benefits as Consignors plus the right to shop before the Managers and paid $14 to $15 per hour. | OT viols due to ST for OT, also possible MW Viol due to deduction of 12.5 hours for shopping early.<br><br>Does not meet salary requirement for exemption. |

*\* Above table provided by employer*

**785.6  Definition of "employ" and partial definition of "hours worked".**

By statutory definition the term "employ" includes (section 3(g)) "**to suffer or permit to work**."

**§ 785.5  General requirements of sections 6 and 7 of the Fair Labor Standards Act.**

Section 6 requires the payment of a minimum wage by an employer to his employees who are subject to the Act. Section 7 prohibits their employment for more than a specified number of hours per week without proper overtime compensation.

Everyone is considered to be an employee except for, workers who strictly Consign.  We are putting you on notice you are not in compliance with the FLSA.

Before we discuss BWs, the firm must agree to comply.

There is a possibility of CMPs, 16b right of action by employees, liquidated damages.



DOL 0236

**– App. 262 –**

CONSENT AGREEMENT

This Consent Agreement is entered into as of the 19 day of January, 2012, by and between Rhea Lana's, Inc., an Arkansas corporation (the "Company"), and the Arkansas Department of Labor (the "ADL").

WHEREAS, the ADL instituted an investigation into the Company's use of unpaid labor in violation of the Minimum Wage Act of the State of Arkansas;

WHEREAS, the Company operates using a business model whereby much of the work done to run a semi-annual children's clothing consignment event is done by individuals who, without pay, set up clothes racks; "check in" the clothes brought by consignors; act as greeters; act as security (to keep their goods from walking out the door), and many other duties to assure that each sale is successful;

WHEREAS, the Company utilizes two types of unpaid workers. The first type is consignors. The second type or class is referred to herein as "volunteers;"

WHEREAS, the parties agree that the consignors are not employees of Rhea Lana's Inc. or its franchisees within the meaning of the Arkansas Minimum Wage Act, but disagree as to whether those worker referred to herein as volunteers are employees;

WHEREAS, the Company believes that the volunteers are not employees but wishes to resolve this dispute without further legal action for its own benefit and for the benefit of all franchisees of the Company within the State of Arkansas; and

WHEREAS, the Company desires to assure that all children's clothing consignment sales using the same or similar business model in the State of Arkansas will be operated under the same regulatory scheme;

NOW THEREFORE, the parties, for and in consideration of the promises, covenants, representations and warranties contained herein, intending to be legally bound, agree as follows:

1.    The parties agree that "consignors" (as defined in paragraph 2 below) are not employees within the meaning of the Arkansas Minimum Wage Act.

2.    "Consignors" are individuals who provide or plan to provide items for sale at a Rhea Lana event and receive a percentage of the sales price for their items and work. Consignors, for the purposes of this Consent Agreement, include the individuals listed as the consignor in the records of the Company as well as a member of the consignor's immediate family. The term consignors also includes children of consignors under 18 years of age who work under the direct supervision of and assist a parent or guardian who is a consignor in his

DOL 0230

**– App. 263 –**

or her duties at a Rhea Lana event, but such children may not work independent of or a part from the parent or guardian or under the direct supervision of any other person.

3.     The ADL agrees that the Company, and all children's consignment sales operating under the umbrella of the Rhea Lana franchise in the State of Arkansas, may use and permit individuals who are or will be "consignors" to work before, during and after a Rhea Lana franchise sale without compensation under the Arkansas Minimum Wage Act.

4.     The parties agree that Rhea Lana events currently utilize unpaid volunteer workers who provide labor in return for the opportunity to shop a Rhea Lana event early.  The Company agrees that all children's consignments sales operating under the umbrella of the Rhea Lana franchise in the State of Arkansas will cease and desist from using such volunteer workers and will utilize only consignors or workers paid in accordance with the Minimum Wage Act of the State of Arkansas.

5.     The ADL agrees that so long as the Company, and any operators of a children's consignments sale under the Rhea Lana franchise in the State of Arkansas complies with the provisions of this Consent Agreement, the ADL shall not pursue any claims on behalf of volunteers for violations of the Minimum Wage Act of the State of Arkansas which arose before the date of this Consent Agreement.

6.     The ADL agrees that so long as the Company, and any operators of children's consignment sales under the Rhea Lana franchise in the State of Arkansas, complies with the provisions of the Consent Agreement, the ADL shall not pursue any claims on behalf of consignors for violations of the Minimum Wage Act of the State of Arkansas which arise after the date of this Consent Agreement.

7.     The ADL agrees that any individual Rhea Lana franchisee shall not be liable for any violations of this Consent Agreement by any other Rhea Lana franchisee.

8.     The ADL acknowledges that there are other children's clothing consignment sales operating in the State of Arkansas that are not affiliated with the Company or the Rhea Lana franchise (the "Other Sales"). The ADL shall require the Other Sales to comply with this Consent Agreement and the Minimum Wage Act of the State of Arkansas. The ADL shall prosecute any known violations of this Consent Agreement or the Minimum Wage Act of the State of Arkansas by the operators of Other Sales.

9.     In the event the ADL enters into any settlement or consent agreement with the operator of any Other Sale with terms that differ from the terms of this Consent Agreement, the ADL shall notify the Company of such settlement and the Company shall have the option of complying with the terms of this Consent Agreement or the terms applicable to the Other Sale.

2

DOL-0240

10.    This Consent Agreement applies to and is reach in full and final settlement of all claims by the ADL on behalf of volunteer unpaid workers or consignors under the Minimum Wage Act of the State of Arkansas arising before the date of this Consent Agreement.

11.    The ADL **RELEASES, ACQUITS** and **FOREVER DISCHARGES** the Company and all other companies operating under a Rhea Lana franchise from any and all past, present or future claims, demands, debts, sums of money, accounts, damages, obligations, actions, causes of action, demands for payment, proceedings, rights, costs, expenses, compensation, suits at law or in equity, and/or all liability whatsoever of any kind or nature whatsoever, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, and by whomever caused, solely, jointly or otherwise, including without limitation for damages, costs and expenses, in any manner or in any capacity claimed or possessed by the ADL directly or indirectly, arising out of, based upon, resulting from, relating to or regarding violations of the Minimum Wage Act of the State of Arkansas by utilizing "volunteer workers" before, during or after children's clothing consignment sales under a Rhea Lana franchise.

12.    In the event of clarification of the law in the future that is favorable to the business model utilized by the Company and the use of unpaid workers or volunteers, the Company may elect to operate under such law rather than this Consent Agreement.

13.    This Consent Agreement shall be construed and interpreted in accordance with the laws of the State of Arkansas.

14.    This Consent Agreement is intended to be as broad and as comprehensive as possible. This Consent Agreement shall be interpreted in such a manner as to be valid and enforceable and effectuate the intent of the parties.

15.    The ADL acknowledges and agrees that the matters set forth in this Consent Agreement constitute the settlement and compromise of disputed claims based upon unsettled principals of law, and that this Consent Agreement is not an admission or evidence of liability by the Company regarding any claims under the Fair Labor Standards Act and the Minimum Wage Act of the State of Arkansas.

16.    This Consent Agreement may be executed in counterparts which taken together shall constitute the fully executed Consent Agreement.

17.    The individual executing this Consent Agreement on behalf of the ADL represents and warrants that he/she is empowered to so act.

[Remainder of page left blank intentionally.]

[Signature page follows]

3

DOL 0241

**IN WITNESS WHEREOF,** the parties have executed this Consent Agreement as of the set forth above.

THE ARKANSAS DEPARTMENT OF LABOR

By: Denise P. Oxley (84-117)
General Counsel
Arkansas Department of Labor
10421 West Markham Street
Little Rock, AR  72205
PII

RHEA LANA'S, INC.

By: Rhea Lana Riner, President
Rhea Lana's Inc.
P.O. Box 10222
Conway, AR  72034
PII

4

DOL 0242

**Nathan D. Butler (ADL)**

| | |
|---|---|
| **From:** | Lindsay Moore (ADL) |
| **Sent:** | Tuesday, July 19, 2011 7:52 AM |
| **To:** | Nathan D. Butler (ADL) |
| **Subject:** | FW: Rhea Lana's, Duck Duck Goose, and Arkansas Labor |

Lindsay Moore
Labor Standards Administrator
PII

This e-mail is provided for informational purposes only and is not to be relied on as legal advice or as the legal opinion of the agency in future or pending matters.

-----Original Message-----
From: Dave Riner [mailto:PII
Sent: Monday, July 18, 2011 9:51 PM
To: Lindsay Moore (ADL)
Cc: Gilbert.Baker@senate.ar.gov; 'Rhea Lana Riner'
Subject: RE: Rhea Lana's, Duck Duck Goose, and Arkansas Labor

Dear Lindsay,

Thanks for your more thorough explanation of the history and your position. I will plan to meet you at your office at noon tomorrow. At that time I'll be ready to get your advice for adhering to your interpretation of the current law.

Also at that time please give me your thoughts on an appropriate definitional phrase which would be inserted as 11-4-203(R) and would then exempt our industry from these regulations, as so many others are exempted.
You may have other suggested regulation changes as well.

The reason our industry has 50,000 Arkansas families involved is because hard working people desperately need an efficient way to buy and sell their quality used children's clothing. It is a unique activity akin to the barn raisings and quilting bees of earlier times. Our volunteers are very happy with the current arrangement and are already compensated much, much more than minimum wage from the savings to their tight budgets. These facts and the current tough economic situation are why we will focus on getting the law changed.

Thank you,

Dave Riner

-----Original Message-----
From: Lindsay Moore (ADL) [mailto PII                                    ]
Sent: Monday, July 18, 2011 3:37 PM
To: PII
Subject: Rhea Lana's, Duck Duck Goose, and Arkansas Labor

Mr. Riner;

I am responding on behalf of the Department. The reason the labor standards contacted you regarding the issue of volunteers was a result of a Rhea Lana's email flyer sent to one of our employees wives regarding the volunteering for work at Rhea Lana's consignment sales. Based on that information and our subsequent review, we have determined that Rhea Lana's is subject to the Arkansas wage & hour law in general and the minimum wage and overtime laws specifically. It is the Department's sincerest hopes that we can work with you in making the corrections necessary to bring Rhea Lana's into compliance with the wage and

1

DOL 0249

hour laws of the state and avoid a formal investigation that could potentially subject your business to repayment of back wages and possible monetary penalties.

The labor standards section is responsible for enforcing the wage and hour laws for the state. We are authorized to investigate any wage and hour matter that comes before us through complaints, information brought to our attention of a possible improper labor practice or Department initiated audits. As you stated in your email this has been an ongoing practice by you and possibly other like businesses. We will be happy to review and investigate those as well. If you submit those business's names to us and any contact information we will begin an immediate review to determine their compliance status. Just because a practice has been ongoing and the Department has not previously investigated the matter does not mean that it is an acceptable practice nor does it exempt the practice by law.

Regarding your concerns over possible labor issues regarding pick your own vegetable or fruit vendors, there are different rules and regulations that apply to agriculture growers which may apply to them specifically. To give you a proper response would require additional information to determine their applicability to the labor laws.

Please feel free to have Senator Baker contact me directly at PII           and I will assist him in any way possible to provide the information he needs. I also urge you to contact competent labor counsel to discuss the issue with them or have them present at any Department meeting.

I will be able to meet with you all day Tuesday or Wednesday morning anytime between 8:00 AM and 1:00 PM. I am unavailable the remainder of this week. I can also meet with you next week as well.

Please feel free to contact me if I can assist you further at PII         .
I look forward to meeting with you to discuss this matter.

Lindsay M Moore
Labor Standards Administrator
Arkansas Department of Labor
Little Rock, Arkansas 72202
PII
PII

This e-mail is provided for informational purposes only and is not to be relied on as legal advice or as the legal opinion of the agency in future or pending matters.

---

From: Nathan D. Butler (ADL)
Sent: Monday, July 18, 2011 1:10 PM
To: Lindsay Moore (ADL)
Cc: Denise Oxley (ADL)
Subject: FW: Rhea Lana's, Duck Duck Goose, and Arkansas Labor

Nathan D. Butler
Arkansas Department of Labor
Labor Standards Division
PII
www.arkansas.gov/labor<http://www.arkansas.gov/labor>

This e-mail is provided for informational purposes only and is not to be relied on as legal advice or as the legal opinion of the agency in future or pending matters.

---

From: Dave Riner [mailto:PII                ]
Sent: Monday, July 18, 2011 1:04 PM
To: Nathan D. Butler (ADL)
Cc: Gilbert.Baker@senate.ar.gov; 'Rhea Lana Riner'; 'Richard Rogers'

2

DOL 0250

)                                    )

Subject: Rhea Lana's, Duck Duck Goose, and Arkansas Labor

Mr. Butler,

I know there are over eighty "pick your own" fruit and vegetable farms operating in Arkansas.  There are also another twenty "cut your own" Christmas tree farms in our state.  Unless everyone who uses these services are employees of these farms, then I am sure that our volunteers do not qualify as employees.

Probably a better example is the "Stuck on a Truck" event held by Centennial Bank during Toad Suck Daze in Conway.  The participants volunteer to be part of the banks' promotional event during Toad Suck Daze for the opportunity to receive something worth value at the end.  The bank benefits from their labor.  They get a chance for value by participating that others who do not labor do not receive.

Our volunteers sign up at times convenient for them.  They give themselves the opportunity to shop early and create value for themselves and their families in doing so.  As opposed to Stuck on A Truck, they are more likely to create this value, and their labor is not nearly as strenuous.  But, in both cases the value they receive is unknown at the time of participation.
In our case, it would depend on how many children they have and how much they find to purchase for their children.

I can meet later this week.  However, I am copying Gilbert Baker on this email with the hope that he may join us.  He has interacted with the State on our behalf in the past when more clarity was needed.

Mr. Butler, we have been in operation for 15 years and also have at least one major competitor.  Could you tell me why you have become interested in us lately?  Is our competitor, Duck Duck Goose, also under the same scrutiny?  If you are not at liberty to answer, would a FOIA request be the most appropriate way for me to learn?

Thanks for your help,

Dave Riner
PII

From: Nathan D. Butler (ADL) [mailto:PII                          ]
Sent: Monday, July 18, 2011 9:51 AM
To: 'Dave Riner'
Subject: RE: Links to Arkansas wage and hour laws and regulations

Mr. Riner,

Statute 11-4-203 define the terms "employ", "employee", and "employer."
From the information I have so far, it appears that the volunteers meet the definition of "employee" and are employed by an employer.  If this is the case then minimum wage and overtime laws need to be complied with as well as Arkansas child labor laws if workers are below the age of 18.

When would  you want to meet?

Nathan D. Butler
Arkansas Department of Labor
Labor Standards Division
PII
www.arkansas.gov/labor<http://www.arkansas.gov/labor>

This e-mail is provided for informational purposes only and is not to be relied on as legal advice or as the legal opinion of the agency in future or pending matters.

3

DOL 0251

From: Dave Riner [mailto PII                    ]
Sent: Saturday, July 16, 2011 1:38 AM
To: Nathan D. Butler (ADL)
Cc: 'Rhea Lana'; 'Richard Rogers'
Subject: RE: Links to Arkansas wage and hour laws and regulations Dear Mr. Butler,

Since neither of the two attachments you provided include any reference to volunteers,
please be more specific as to your reasoning for a review of our events.  In your phone
call to my wife, you indicated a suspicion that we are in violation of the referenced
laws.  Please explain your basis for your suspicion.

Your more thorough explanation will allow us to make a meeting with you much more
effective.

Very Truly Yours,

Dave Riner
Vice President


From: Nathan D. Butler (ADL) [mailto PII                    ]
Sent: Friday, July 15, 2011 11:44 AM
To: 'rhealana@rhealana.com'
Cc: Lindsay Moore (ADL)
Subject: Links to Arkansas wage and hour laws and regulations

Rhea Lana Riner,

Pursuant to our conversation on July 15th, 2011 I indicated to you that I would like to
set up a meeting with you to discuss Arkansas minimum wage and overtime laws with respect
to using volunteers.  You indicated that you would like a couple other people to be in
attendance in such a meeting so no date is yet set.  Below is links to Arkansas minimum
wage and overtime laws and regulations for your reference.

http://www.state.ar.us/labor/pdf/statutes_wage_hour.pdf
http://www.state.ar.us/labor/pdf/permanent_regs_minwage2007.pdf


Sincerely,

Nathan D. Butler
Arkansas Department of Labor
Labor Standards Division
PII
www.arkansas.gov/labor<http://www.arkansas.gov/labor>

This e-mail is provided for informational purposes only and is not to be relied on as
legal advice or as the legal opinion of the agency in future or pending matters.

4

DOE-0252

## Informers' Privilege

**From:** Informers' Privilege
**Sent:** Sunday, July 24, 2011 7:00 PM
**To:** Informers' Privilege
**Subject:** FW: Conway Marketing Day and RL 101 Class is Tomorrow!!

**From:** Informers' Privilege
**Sent:** Saturday, July 23, 2011 10:03 AM
**To:** Informers' Privilege
**Subject:** Fw: Conway Marketing Day and RL 101 Class is Tomorrow!!

----- Forwarded Message -----
**From:** "rhealana@rhealana.com" <rhealana@rhealana.com>
**To:** Informers' Privilege
**Sent:** Friday, July 22, 2011 8:41 PM
**Subject:** Conway Marketing Day and RL 101 Class is Tomorrow!!



# Conway!

### Conway Fall 2011 Children's Consignment Event
### Conway Expo Center
### Private Pre-Sale, Saturday, August 27.
### Public Sale Days, Sunday, August 28 - Saturday, Sept 3.

Our database is now open and consignors may register and begin entering their items. We are accepting Back To School and Fall/Winter children's and maternity clothing, indoor and outdoor toys, ride on toys, puzzles, books, baby equipment and nursery items. We are also accepting like new furniture items for the home such as leather sofas, kitchen table and chairs, coffee tables and bunk beds.

MARKETING DAY
If you would like to help spread the word about our event in exchange for an early shopping pass, please join us for RL Marketing Day. **It is tomorrow, Saturday, July 23, 9-11am** at the RL Corporate Office, located behind Sonic on Prince St. Materials will be distributed Saturday on a first come, first served basis.

7/25/2011

DOL 0263

**– App. 271 –**

)                                    )

We are offering the following options:

Car Magnet - Option 1
Car Magnet plus 3 Volunteer Hours on Clean Up Saturday or Sunday = Worker Pass

Car Magnet - Option 2
Car Magnet plus 5 Hours on Clean Up Saturday or Sunday = Early Worker Pass

Door Hanger Option 1
100 Door Hangers = Worker Pass

Door Hanger Option 2
200 Door Hangers = Early Worker Pass

Door Hanger Option 3
100 Door Hangers plus 3 Volunteer Hours on Clean Up Saturday or Sunday = Early
Worker Pass

Posters, Brochures and Sale Flyers to targeted locations

Besides marketing help, other volunteer opportunities include bringing meals for our
workers, volunteering Dad to help us set up racks, donating the use of tables and chairs
and more. Volunteers are the lifeblood of our events and we can't do it without you!

## RHEA LANA 101
We are also offering an RL 101 Class this Saturday from 10:30-11:00AM. This is a small
group setting where we help moms learn the ins and outs of RL Consigning. Bring a few
items you plan to consign - we'll have our laptops and supplies to help you get started.
Or maybe you are a longtime RL Consignor and want to bring your best friend so that
she can learn how to do it with you!

## VOLUNTEERS
When you volunteer with us, you'll receive an early shopping pass and a free RL T-Shirt!
Just sign up for your favorite shift here. Volunteering is a fun way to make new friends
or spend fun time with your mom or best friend.

## SUPER MOMS
A Super Mom volunteers for 3 shifts at our event, plus helps us with one marketing
effort. Super Moms may shop even earlier than our Early Workers. You must be a
Consignor to apply for this position.

See you tomorrow for Conway Marketing Day - and don't forget our Greater Little Rock
event. The last day to enter items into the database is this Tuesday, July 26. Consignor
Drop Off is Wednesday and Thursday, July 27 and July 28.

Rhea Lana Riner

7/25/2011                                                              DOL 0264

501-499-0009

Email us at: rhealana@rhealana.com
Visit us at: conway.rhealana.com

Click Here to Unsubscribe the email address: Informers' Privilege

7/25/2011

DOL 0265

# Greater Little Ro

Back to Dashboard

## Shift/Volunteer Management

### Enter a New Shift

| Shift Date | | | Shift Time | | Shift Description MUST INCLUDE | Volunteers Needed | |
|---|---|---|---|---|---|---|---|
| Month | Day | Year | Start | Finish | | | |
| 🔲 | 🔲 | 2010 🔲 | 🔲 | 🔲 | | 0 🔲 | Add This Shift |

### Listing of Shifts

If your Shifts don't show up, click your "Refresh" Button. When people sign up, they will show up below!

Delete ALL Shifts

| Use these buttons to delete shifts and clear volunteers. | | Shift Date | Shift Time | Shift Description | Volunteer Name | Volunteer Phone | Volunteer Email |
|---|---|---|---|---|---|---|---|
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Great shift for Dad! | Matt King | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Great shift for Dad! | Nick Sartain | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Great shift for Dad! | Pete Johnson | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Move-In | | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Move-In | | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Move-in | | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Bring 5, 6ft or 8ft Tables | | | |
| DELETE | CLEAR | Monday, July 25, 2011 | 5:00PM to 10:00PM | Bring 5, 6ft or 8ft Tables | | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 9:00AM to 2:00PM | Store Set-up | Heidi Jumper | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 9:00AM to 2:00PM | Store Set-up | Lori Wiedower | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 9:00AM to 2:00PM | Store Set-up | Kim Ham | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 9:00AM to 2:00PM | Store Set-up | Betty Boyette | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 12:00PM to 5:00PM | Store Set-up, Consignor Check-In | Christy Anderson | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 12:00PM to 5:00PM | Store Set-up, Consignor Check-In | Jessica McElreath | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 12:00PM to 5:00PM | Store Set-up, Consignor Check-In | Brenda Conn | | |
| DELETE | CLEAR | Tuesday, July 26, 2011 | 12:00PM to 5:00PM | Store Set-up, Consignor Check-In | Kwami Abdul-Bey | | |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check In | Nicole Perez | | |



**– App. 274 –**

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check In | KATHERINE MCELYEA |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Tracy Stuckey |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Laura Glover |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Tamara Ketter |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Sassy SOcia |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Katie Lann |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 8:30AM to 1:30PM | Consignor Check-In | |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | Yulia Batalina |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | Sassy Socia |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | Allison Ward |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | Sherrie Ivy |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 11:00AM to 4:00PM | Consignor Check-In | Andrea Dollar |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 12:00PM to 5:00PM | Consignor Check-In | Sassy Socia |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 12:00PM to 5:00PM | Consignor Check-In | Tracy Stuckey |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 12:00PM to 5:00PM | Consignor Check-In | Kristen Jones |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 12:00PM to 5:00PM | Consignor Check-In | |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Julie Mott |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Kristan Vaughn |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Tracy Stuckey |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Sassy Socia |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Traci Boyd |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 4:00PM to 9:00PM | Consignor Check-In | Andrea Dollar |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Debbie Veach |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Schell Gower |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Kelsey Hays |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Hayley Frye |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Angie Carlton |
| DELETE | CLEAR | Wednesday, July 27, 2011 | 6:00PM to 11:00PM | Consignor Check-In | Charity Wood |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-In | KATHERINE MCELYEA |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Katherine Bynum |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Jessica Morrow |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-In | Sassy SOcia |
| | | Thursday, July 28, 2011 | 8:30AM to | Consignor Check- | |

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | 28, 2011 | 1:30PM | in | Tracy Stuckey |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 8:30AM to 1:30PM | Consignor Check-in | Lisa Turpin and mom (2) |
| DELETE | CLEAR | Thursday, July 28, 2011 | 10:00AM to 3:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 10:00AM to 3:00PM | Consignor Check-in | Heather Hignite |
| DELETE | CLEAR | Thursday, July 28, 2011 | 10:00AM to 3:00PM | Consignor Check-in | Laura harrell |
| DELETE | CLEAR | Thursday, July 28, 2011 | 10:00AM to 3:00PM | Consignor Check-in | Kristan Vaughn |
| DELETE | CLEAR | Thursday, July 28, 2011 | 12:00PM to 5:00PM | Consignor Check-in | Tracy Stuckey |
| DELETE | CLEAR | Thursday, July 28, 2011 | 12:00PM to 5:00PM | Consignor Check-in | Sassy SOcia |
| DELETE | CLEAR | Thursday, July 28, 2011 | 12:00PM to 5:00PM | Consignor Check-in | Sara Ervin |
| DELETE | CLEAR | Thursday, July 28, 2011 | 12:00PM to 5:00PM | Consignor Check-in | Jessica Cheney |
| DELETE | CLEAR | Thursday, July 28, 2011 | 2:00PM to 7:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 2:00PM to 7:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 2:00PM to 7:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 2:00PM to 7:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | Courtney Burris |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | Nicki Spivey |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | Amy Newsom |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | Emily Krablin |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 4:00PM to 9:00PM | Consignor Check-in | |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Andrea Dollar |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Schell Gower |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Bridgette Stricklin |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Chelsea Goodman |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Erin Gray |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | Michelle Bailey Keahey |
| DELETE | CLEAR | Thursday, July 28, 2011 | 6:00PM to 11:00PM | Consignor Check-In/Store Organization | |
| DELETE | CLEAR | Saturday, July 30, 2011 | 11:30AM to 4:30PM | Big Tickets | Tamara Ketter |
| DELETE | CLEAR | Saturday, July 30, 2011 | 11:30AM to 4:30PM | Big Tickets | Maria Garcia |
| DELETE | CLEAR | Saturday, July 30, 2011 | 11:30AM to 4:30PM | Big Tickets | jamie barnum |
| DELETE | CLEAR | Saturday, July | 11:30AM | Big Tickets | Angel Burnett |

| | | | | | |
|---|---|---|---|---|---|
| | | 30, 2011 | to 4:30PM | | |
| DELETE | CLEAR | Saturday, July 30, 2011 | 12:00PM to 5:00PM | Returns | Shelly Dahl |
| DELETE | CLEAR | Saturday, July 30, 2011 | 12:00PM to 5:00PM | Returns | Tammy Oleson |
| DELETE | CLEAR | Saturday, July 30, 2011 | 12:00PM to 5:00PM | Returns | Kelsey Oleson |
| DELETE | CLEAR | Saturday, July 30, 2011 | 12:00PM to 5:00PM | Returns | Kristine Phillips |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Returns | Kristine Phillips |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Big Tickets | Jamie barnum |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Big Tickets | Carolyn Weber |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Big Tickets | Jennifer Parker |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Big Tickets | |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Returns | Angie Carlton |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Returns | Deanne King |
| DELETE | CLEAR | Saturday, July 30, 2011 | 2:00PM to 7:00PM | Returns | |
| DELETE | CLEAR | Saturday, July 30, 2011 | 4:00PM to 9:00PM | Store Organization | Carrie Johnson |
| DELETE | CLEAR | Saturday, July 30, 2011 | 4:00PM to 9:00PM | Store Organization | Katie Hill |
| DELETE | CLEAR | Saturday, July 30, 2011 | 4:00PM to 9:00PM | Store Organization | Jill DeLon |
| DELETE | CLEAR | Saturday, July 30, 2011 | 4:00PM to 9:00PM | Store Organization | Shelly Hall |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Lillian Hoffman |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Mavis Williamson |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Jamie barnum |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Kristine Phillips |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Tamara Allen |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Celeste Knight |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Shelly Hall |
| DELETE | CLEAR | Sunday, July 31, 2011 | 11:30AM to 4:30PM | Returns | Carrie Johnson |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | Tamara Ketter |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | Emily Taylor |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | Chelsea Goodman |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | LaSandra Hill |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | Carolyn Weber |
| DELETE | CLEAR | Sunday, July 31, 2011 | 3:00PM to 8:00PM | Returns | Jennifer Parker |
| DELETE | CLEAR | Monday, August 01, 2011 | 9:30AM to 2:30PM | Returns | Heather Hignite |
| DELETE | CLEAR | Monday, August 01, 2011 | 9:30AM to 2:30PM | Returns | tamara ketter |
| DELETE | CLEAR | Monday, August 01, | 9:30AM to | Returns/Help | Chrissy King |

| | | 2011 | 2:30PM | with Restock | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Monday, August 01, 2011 | 9:30AM to 2:30PM | Returns/Help with Restock | Katie Lann |
| DELETE | CLEAR | Monday, August 01, 2011 | 2:30PM to 7:30PM | Returns | Laura Glover |
| DELETE | CLEAR | Monday, August 01, 2011 | 2:30PM to 7:30PM | Returns | Allison Leonard |
| DELETE | CLEAR | Monday, August 01, 2011 | 2:30PM to 7:30PM | Returns/Help with Restock | |
| DELETE | CLEAR | Monday, August 01, 2011 | 2:30PM to 7:30PM | Returns/Help with Restock | |
| DELETE | CLEAR | Tuesday, August 02, 2011 | 9:30AM to 2:30PM | Returns | Allison Leonard |
| DELETE | CLEAR | Tuesday, August 02, 2011 | 9:30AM to 2:30PM | Returns | Katherine Bynum |
| DELETE | CLEAR | Tuesday, August 02, 2011 | 2:30PM to 7:30PM | Returns | |
| DELETE | CLEAR | Tuesday, August 02, 2011 | 2:30PM to 7:30PM | Returns | |
| DELETE | CLEAR | Wednesday, August 03, 2011 | 9:30AM to 2:30PM | Returns | tamara ketter |
| DELETE | CLEAR | Wednesday, August 03, 2011 | 9:30AM to 2:30PM | Returns | Meghan Mitchell |
| DELETE | CLEAR | Wednesday, August 03, 2011 | 2:30PM to 7:30PM | Returns | Emily Musick |
| DELETE | CLEAR | Wednesday, August 03, 2011 | 2:30PM to 7:30PM | Returns | Charlotte Watson |
| DELETE | CLEAR | Thursday, August 04, 2011 | 9:30AM to 2:30PM | Returns | Laura harrell |
| DELETE | CLEAR | Thursday, August 04, 2011 | 9:30AM to 2:30PM | Returns | |
| DELETE | CLEAR | Thursday, August 04, 2011 | 5:00PM to 10:00PM | Returns | Carolyn Weber |
| DELETE | CLEAR | Thursday, August 04, 2011 | 5:00PM to 10:00PM | Returns | Erin Gray |
| DELETE | CLEAR | Thursday, August 04, 2011 | 5:00PM to 10:00PM | Returns | jennifer parker |
| DELETE | CLEAR | Friday, August 05, 2011 | 9:30AM to 2:30PM | Returns | Karen Cerney |
| DELETE | CLEAR | Friday, August 05, 2011 | 9:30AM to 2:30PM | Returns | Laura harrell |
| DELETE | CLEAR | Friday, August 05, 2011 | 9:30AM to 2:30PM | Returns | |
| DELETE | CLEAR | Friday, August 05, 2011 | 9:30AM to 2:30PM | Returns | Marla Garcia |
| DELETE | CLEAR | Friday, August 05, 2011 | 2:30PM to 7:30PM | Returns | |
| DELETE | CLEAR | Friday, August 05, 2011 | 2:30PM to 7:30PM | Returns | Karen Cerney |
| DELETE | CLEAR | Friday, August 05, 2011 | 2:30PM to 7:30PM | Returns | Amy White |
| | | Friday, August | 2:30PM to | | |

PII

Volunteer Shift Management                                                    Page 6 of 9

| | | | | | | |
|---|---|---|---|---|---|---|
| DELETE | CLEAR | 05, 2011 | 7:30PM | Returns | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 8:30AM to 1:30PM | Returns | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 8:30AM to 1:30PM | Returns | debbie veach | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 8:30AM to 1:30PM | Returns | Kate Wetsell | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 8:30AM to 1:30PM | Returns | jaime ables | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | jamie barnum | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | Laura harrell | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | Kristine Phillips | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | Angel Burnett | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | Mary Fleming | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Meghan Mitchell | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Emily Krablin | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Charlotte Watson | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Bridgette Stricklin | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Sherrie Ivy | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Cara chapman | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Lindsey Brannon | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Teresa French (Nicole Haynes) | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Mavis Williamson | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (must be Super Mom) | Schell Gower | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | Amy White | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | | |

**PII**

http://www.rhealana.com/cardinal/volform.asp?init=81rllrye5r                    7/25/2011   DOL 0271   E-4a1

| | | | | | |
|---|---|---|---|---|---|
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 12:00PM to 5:00PM | Pre-Sort (Must Be Super Mom) | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Katherine Bynum |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Arti Koppar |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA! | Emily Musick |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Katie Hill |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Allison Leonard |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Mayra Narvaez |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | tamara ketter |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Heather Hignite |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Terra Sowell |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Traci Boyd |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Shelly Dahl |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Laura Whitehead |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Erin Gray |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Tamara allen |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Laura Glover |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA | Michelle Bailey Keahey |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA! | Charity Wood |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA! | stephanie mason |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA! | Lisa turpin |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA! | Dana & Marcus |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA!! | |
| | | Saturday, | 3:00PM to | SORT! FREE | |

PII

http://www.rhealana.com/cardinal/volform.asp?init=81rllrye5r

7/25/2011

E 4(a)

| | | | | | | |
|---|---|---|---|---|---|---|
| DELETE | CLEAR | August 06, 2011 | 8:00PM | PIZZA!! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA!! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA!! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 3:00PM to 8:00PM | SORT! FREE PIZZA!! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 5:00PM to 10:00PM | Sort! Free Pizza! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 5:00PM to 10:00PM | Sort! Free Pizza! | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 5:00PM to 10:00PM | Sort! Free Pizza! | Shayla Albey | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 5:00PM to 10:00PM | Sort! Free Pizza! | Chelsea Goodman | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 5:00PM to 10:00PM | Sort! Free Pizza! | Emily Taylor | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 6:00PM to 11:00PM | SORT! FREE PIZZA1 | Lanie Milligan | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 6:00PM to 11:00PM | SORT! FREE PIZZA1 | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 6:00PM to 11:00PM | SORT! FREE PIZZA1 | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 6:00PM to 11:00PM | SORT! FREE PIZZA1 | | |
| DELETE | CLEAR | Saturday, August 06, 2011 | 6:00PM to 11:00PM | SORT! FREE PIZZA1 | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 10:00AM to 3:00PM | Sorting and packing | Ashley Beck | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 10:00AM to 3:00PM | Sorting and packing | Amanda Leamons | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 10:00AM to 3:00PM | Sorting and packing | Jessica Worthington | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 10:00AM to 3:00PM | Sorting and packing | Misty Casey | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 10:00AM to 3:00PM | Sorting and packing | Melissa Silveira | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Jamie barnum | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Sarah Childers | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Amy Newsom | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Traci Boyd | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Hayley Frye | |

| | | 2011 | | | | |
|---|---|---|---|---|---|---|
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | Mavis Williamson | PII |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 3:00PM to 8:00PM | Consignor Pick-up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 4:00PM to 9:00PM | Consignor Pick up & clean up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 4:00PM to 9:00PM | Consignor Pick up & clean up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 4:00PM to 9:00PM | Consignor Pick up & clean up | | |
| DELETE | CLEAR | Sunday, August 07, 2011 | 4:00PM to 9:00PM | Consignor Pick up & clean up | | |

Page 1 of 2                    Page 1 of 2

Informers' Privilege

**From:** Informers' Privilege
**Sent:** Wednesday, July 27, 2011 12:27 PM
**To:** Informers' Privilege
**Subject:** Fw: Join Us For Rhea Lana's of Conway, August 28 - Sept 3!!

----- Forwarded Message -----
**From:** "rhealana@rhealana.com" <rhealana@rhealana.com>
**To:** Informers' Privilege
**Sent:** Wednesday, July 27, 2011 7:31 AM
**Subject:** Join Us For Rhea Lana's of Conway, August 28 - Sept 3!!

# Rhea Lana's
### THE NATION'S PREMIER CHILD CONSIGNMENT EVENT VENU
Clothing and Connecting Families Since 1997. ™

## Conway!

Informers'

We are very excited about our upcoming Rhea Lana's of Conway Children's Consignment Event, Sunday August 28 - Saturday, Sept 3 at the Conway Expo Center!

This is just a quick note to let you know that we have some marketing materials left if you'd like to help us get the word out about our great event. Just stop by the RL Corporate Office at your convenience, Monday-Friday, 8am-3pm to pick them up. Some options include:

Car Magnet + 3 hours on Sort Saturday or Sunday = Worker Pass
Car Magnet + 5 hours on Sort Saturday or Sunday = Early Worker Pass

100 Door Hangers = Worker Pass
100 Door Hangers = Early Worker Pass

We also have full color postcards and posters that can be distributed in family friendly places that you visit such as doctor's offices, dentists, dance studios, summer camps, vacation bible school and more.

Thanks so much for being part of the RL Family - we appreciate you! Also, remember that our Greater Little Rock event with 95,000 items opens this weekend at McCain Plaza in North Little Rock next to Bed, Bath and Beyond. If you'd like to shop early at this event, we still have some volunteer opportunities available here. We are receiving items through Saturday for our fabulous Searcy Event that opens next week. We also have events coming up throughout the state in Hot Springs, Russellville, and Northwest Arkansas.

RL Consignment Season is Here!

Have a blessed week~

nsignment Event!
3

ge for an early shopping
:00am - 11:00am at Rhea

lay = Worker Pass

7/28/2011

DOL 0275
App. 283

Page 2 of 2

Car Magnet - Option 2
Car Magnet plus 5 Hours on Clean Up Saturday or Sunday = Early Worker Pass

Door Hangers
100 Door Hangers = Worker Pass

Posters, Brochures and Sale Flyers to targeted locations as well as Yard Signs in approved locations. Do you have a church VBS program, summer camp , or workplace filled with moms and grandmoms where you can distribute for us?

Besides marketing help, other volunteer opportunities include bringing meals for our workers, volunteering Dad to help us set up racks or with Security, donating the use of tables and chairs and more. Volunteers are the lifeblood of our events and we can't do it without you!

**SUPER MOMS**
A Super Mom volunteers for 3 shifts during our event, plus helps us with one marketing effort. Super Moms may shop even earlier than our Early Workers. You must be a Consignor to apply for this position.

NEW - Join the exclusive RL Mobile Club by texting rhealana to 90210 and you'll be among the first to be notified of special promotions and contests!

I love it when RL Consignment Season is in the air!! Please contact us if we can answer any questions. We are also accepting consignors in other upcoming Central Arkansas events:
**RL of Greater Little Rock, July 31- August 6**
**RL of Searcy, Aug 2-6**

See you soon!
Rhea Lana Riner
PII

Email us at: rhealana@rhealana.com
Visit us at: conway.rhealana.com

<u>Click Here to Unsubscribe the email address:</u> Informers' Privilege
Confidentiality Notice: This e-mail message, including any attachments,
is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message..

7/15/2011

DOL 0276
App. 284

USCA Case #17-5259    Document #1784241    Filed: 02/16/2018    Page 289 of 330

App. 285

Eye D





**Rhea Lana's**
**Fall 2011 Sale**
**Russellville**

**Early Worker Pass**
Monday, September 12

**3:00 PM**

**North Hwy. 7**
**Russellville**
**(Across from Shiloh Ball Park)**

One person per Pass.
(Husband or Mother may help).
Please do not bring young children
to the Pre-Sale Event.

**DATES AND TIMES OF THE SALE!**
**SALE DAYS**
Tuesday, September 13, 10 AM - 7 PM
Wednesday, September 14, 10 AM - 7 PM
Thursday, September 15, 10 AM - 5 PM

**HALF PRICE SALE**
Friday, September 16, 10 AM - 7 PM
Saturday, September 17, 9 AM - 1 PM

**www.rhealana.com**

DOL 0277
App. 285

Rhea Lana's South Tulsa - Our Bartering Agreement                    http://southtulsa.rhealana.com/cssbarteragree.asp?init=ulnhg47grf



**South Tulsa**

## our agreement

### Click Thru this Page to see the Volunteer Schedule.

In the window below is the official Bartering Agreement which all our volunteers are required to sign before participating.

By "volunteering" time with Rhea Lana's you are actually "bartering" your labor. This means you are trading your work hours for the valuable opportunity to shop early. Bartering has been done for centuries and in many ways is how this country of ours was built!

This agreement is now required to satisfy new government interest in what is going on in the children's consignment event industry. You will sign a followup copy when you check in at the sale. Please read it carefully. By clicking "I Understand and Agree" below you are agreeing to the following terms:

● shop
● consign
● volunteer
● about us
● connect

Copyright © 2011 Rhea Lana's, Inc.
All rights reserved.

I acknowledge that I am voluntarily trading the time I work for Rhea Lana's for the opportunity to shop for children's items and accessories earlier than the general public. This work time is determined from my signing up on the volunteer schedule on the next page and by my signing in and out at the event location.

I acknowledge that my labor is worth the federally mandated minimum wage ($7.25/hr) multiplied times the number of hours I work.

I acknowledge that the opportunity to shop early is worth more to me than the value of my labor as calculated above. So, I am bartering my labor for this valuable opportunity.

[ I Understand and Agree! ]   [ I Disagree ]

1 of 1                                                              8/24/2011 3:27 PM

DOL 0278
App. 286

Additional Help Needed & Consignor Pick Up Tomorrow!          Page 1 of 1

## Additional Help Needed & Consignor Pick Up Tomorrow!

| | |
|---|---|
| From: | rhealana@rhealana.com |
| To: | Informers' Privilege |
| Subject: | Additional Help Needed & Consignor Pick Up Tomorrow! |
| Date: | Sep 3, 2011 11:20 PM |



**Rhea Lana's** THE NATION'S PREMIER CHILD
CONSIGNMENT EVENT VENU
Clothing and Connecting Families Since 1997. ™

## Conway!

Informer

Just a reminder that Consignor Pick Up is tomorrow, 2-5pm. We are working hard at the Conway
Expo Center to finish sorting and preparing your unsold items. We do need some additional help in
the morning at 9am. If you can come help us with sorting, I will pay you $8/hour. Interested? Just call
our hotline, 501-499-0009 or email me, rhealana@rhealana.com.

Thanks so much and we'll see you tomorrow!

Rhea Lana

Email us at: rhealana@rhealana.com
Visit us at: conway.rhealana.com

Click Here to Unsubscribe the email address: Informers' Privilege

http://webmail.earthlink.net/wam/printable.jsp?msgid=9318&x=-1271927369          09/06/2011

DOL 0279
App. 287

**Case Diary Entries**

**U.S. Department of Labor**
Wage and Hour Division

Case Id: 1677670
Name: Rhea Lana's

| Action Date/ Entry Date | Action Desc | Act | Place | Est Time | Non-Est | WHI |
|---|---|---|---|---|---|---|
| 12/03/2012 / 12/03/2012 | Informers' Privilege FLSA | FLSA | | 0.00 | 0.00 | R Darling |
| 12/03/2012 / 12/03/2012 | I placed it in Sonya's box. | | | 0.00 | 0.00 | R Darling |
| 12/04/2012 / 12/04/2012 | Returned to me. I put it in the cabinet. | | | 0.00 | 0.00 | R Darling |
| 12/18/2012 / 12/18/2012 | Rodriguez self-assigned to case as Lead Manager. | | | 0.00 | 0.00 | L Rodriguez |
| 12/18/2012 / 12/18/2012 | Haynes Tamara, Assigned to Case and Given Privileges: | | | 0.00 | 0.00 | L Rodriguez |
| 12/28/2012 / 01/07/2013 | Contacted Arkansas Department of labor, Nathan Butler, discussed investigation of firm. | FLSA | | 0.00 | 0.50 | T Haynes |
| 01/07/2013 / 01/07/2013 | Request MODO Control Record for Rhea Lana's E-Mail sent to Little Rock AR District Office 225 | | | 0.00 | 0.00 | T Haynes |
| 01/07/2013 / 01/07/2013 | MODO Association with WH MODO Office Little Rock AR District Office | | | 0.00 | 0.00 | T Haynes |
| 01/07/2013 / 01/07/2013 | MODO Association E-Mail Sent | | | 0.00 | 0.00 | T Haynes |
| 01/09/2013 / 06/18/2013 | Informers' Privilege | FLSA | | 0.00 | 0.00 | T Haynes |
| 01/28/2013 / 02/11/2013 | | FLSA | | 6.50 | 2.00 | T Haynes |
| 02/20/2013 / 02/20/2013 | Request for employers volunteers info was made. Employer given deadline of March 1, 2013 to submit requested records. | FLSA | | 0.00 | 0.25 | T Haynes |
| 02/21/2013 / 02/21/2013 | I left a message for Dave Riner on Tuesday morning and just now. | | | 0.00 | 0.00 | R Darling |
| 02/28/2013 / 02/28/2013 | DD Darling & ADD Rodriguez met w/ER | | | 0.00 | 0.00 | L Rodriguez |

DOL 0283

| Action Date/ Entry Date | Action Desc | Act | Place | Est Time | Non-Est | WHI |
|---|---|---|---|---|---|---|
| | and ER's reps/ and Rep from Sen Boozman, Rep from Cong. Griffin @ DO. ER ATC and AT provide a list of workers to interview. | | | | | |
| 02/28/2013 / 02/28/2013 | ER deadline to submitt list of workers March 4, 2013. | | | 0.00 | 0.00 L Rodriguez | |
| 02/28/2013 / 02/28/2013 | Meeting with ADD Rodriguez and DD Darling to discuss case procedures. | FLSA | | 0.00 | 1.00 T Haynes | |
| 03/01/2013 / 03/01/2013 | 2-28-13, me & Les, hosted a face to face meeting with Jason D. McGehee, representative for U.S. Congressman Tim Griffin, (R-AF), Stacey Mattingly, representative for Senator John Boozman (R-AR) about ER. Attorneys Aaron Brooks &.Tad Bohannon, w/Rhea Lana | | | 0.00 | 0.00 R Darling | |
| 03/01/2013 / 03/01/2013 | contin: President and Dave Riner and Denise Oxley, Arkansas Department of Labor.  The firm is not a public or non-profit/charitable employer used volunteers as workers to operate the business. The case has been listed in the pipeline report. | | | 0.00 | 0.00 R Darling | |
| 03/01/2013 / 03/01/2013 | cont: Subject firm entered a Consent Agreement with the State of Arkansas where consignors were not considered employees under Arkansas Law and where the employer agreed to cease the use of volunteers to perform work.  The employer requested the | | | 0.00 | 0.00 R Darling | |
| 03/01/2013 / 03/01/2013 | Department make a determination of employment for the consignors and volunteers without contacting such workers.  The employer agreed to provide information to the Wage-Hour investigator to continue with the investigation as requested | | | 0.00 | 0.00 R Darling | |
| 03/04/2013 / 03/04/2013 | Completed draft narrative and sent to DD Darling. Research, complete employer records review per DD Request. | FLSA | | 0.00 | 4.00 T Haynes | |
| 03/04/2013 / 03/12/2013 | Complete Draft Narrative | FLSA | | 0.00 | 3.00 T Haynes | |
| 03/08/2013 / 03/12/2013 | Employee interviews, ████████ Informers' Privilege | FLSA | | 0.00 | 8.00 T Haynes | |

Date: 06/21/2013 2:48:31 PM              Case ID: 1677670                           Page 2

DOL 0284

| Action Date/ Entry Date | Action Desc | Act | Place | Est Time | Non-Est | WHI |
|---|---|---|---|---|---|---|
| 03/14/2013 / 03/25/2013 | WHI Haynes, traveled to employees to obtain signatures for interviews. | FLSA | | 0.00 | 4.50 | T Haynes |
| 03/19/2013 / 03/19/2013 | JRC re-scheduled for 3.26.2013 as requested by RSOL. Originally scheduled for 3.19.2013. | | | 0.00 | 0.00 | L Rodriguez |
| 03/19/2013 / 03/19/2013 | Records request sent to employer via mail, fax, and email. Also attempted to contact employer via phone; phone message left. | FLSA | | 0.00 | 1.00 | T Haynes |
| 03/19/2013 / 03/19/2013 | WHI Haynes spoke with Dave Riner who stated he did not want to provide requested records, due to it disrupting business. Informed ADD Rodriguez who stated she would prepare a 72 hour records request letter. | FLSA | | 0.00 | 0.00 | T Haynes |
| 03/19/2013 / 03/19/2013 | 72hr letter draft sent to RSOL and RO for review. | | | 0.00 | 0.00 | L Rodriguez |
| 03/19/2013 / 03/19/2013 | RSOL Cranford called and stated ▮ Attorney-Client Privilege | | | 0.00 | 0.00 | L Rodriguez |
| 04/12/2013 / 04/16/2013 | Employee Interviews, Informers' Privilege Informers' Privilege Case file analysis, records review. Meet with ADD Rodriguez to discuss case status and procedures | FLSA | | 3.50 | 3.00 | T Haynes |
| 04/20/2013 / 06/06/2013 | Reviewed additional info submitted by employer. Met with ADD to discuss case. | FLSA | | 0.00 | 3.00 | T Haynes |
| 05/06/2013 / 05/13/2013 | Meet with ADD to discuss case. Employee Interviews. Informers' Privilege Informers' Privilege Review of records. Backwage comps | FLSA | | 0.00 | 6.00 | T Haynes |
| 05/20/2013 / 05/30/2013 | Case prep for FC, FC held with firm at LRDO | FLSA | | 0.00 | 6.50 | T Haynes |
| 05/20/2013 / 06/18/2013 | CL addressed at FC | CL | | 0.00 | 0.25 | T Haynes |
| 05/22/2013 / 05/30/2013 | | FLSA | | 0.00 | 4.50 | T Haynes |

Date: 06/21/2013 2:48:31 PM                Case ID: 1677670                                    Page 3

DOL 0285

| Action Date/ Entry Date | Action Desc | Act | Place | Est Time | Non-Est | WHI |
|---|---|---|---|---|---|---|
| 05/28/2013 / 06/04/2013 | Prep for FC, Research, BWs | FLSA | | 0.00 | 6.00 | T Haynes |
| 05/29/2013 / 06/04/2013 | Case file review, adjust backwages computations, meet with ADD to review BWs comps. | FLSA | | 0.00 | 6.00 | T Haynes |
| 05/30/2013 / 05/30/2013 | Darling Robert, Assigned to Case and Given Privileges: | | | 0.00 | 0.00 | R Darling |
| 06/05/2013 / 06/13/2013 | Firm submitted response to submitted backwage compuations and summary, review ER records.  Meet with ADD to discuss firm's response. | FLSA | | 0.00 | 4.00 | T Haynes |
| 06/11/2013 / 06/11/2013 | Phone conference with firm's attorney Mr. Bohannon to confirm compliance in regards to firm's managers.  Mr. Bohannon verbally stated, firm will pay managers hourly and pay in accordance with Section 7 of the FLSA. | FLSA | | 0.00 | 1.50 | T Haynes |
| 06/17/2013 / 06/18/2013 | Case prep for submittal | FLSA | | 0.00 | 3.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | Bulk edit performed, Change Employees' Tax Status | | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | Complete Case Narrative | FLSA | | 0.00 | 2.00 | T Haynes |
| 06/18/2013 / 06/18/2013 | Informers' Privilege | FLSA | | 0.00 | 0.00 | T Haynes |
| 06/20/2013 / 06/20/2013 | Case put in Active Followup | | | 0.00 | 0.00 | L Rodriguez |
| 06/21/2013 / 06/21/2013 | Requested New JRC as directed. | | | 0.00 | 0.00 | L Rodriguez |

Date: 06/21/2013 2:48:31 PM                Case ID: 1677670                                    Page 4

DOL 0286

| Action Date/ Entry Date | Action Desc | Act | Place | Est Time | Non-Est | WHI |
|---|---|---|---|---|---|---|
| | Scheduled for 6.25.2013. Prior JRC was held 3.26.2013. | | | | | |
| 06/21/2013 / 06/21/2013 | Case placed in S.Webb's box. | | | 0.00 | 0.00 | L Rodriguez |
| | | | | 10.00 | 70.00 | |
| | | | Total Time: | | 80.00 | |

**U.S. DEPARTMENT OF LABOR**          Wage and Hour Division
                                      10810 Executive Center Dr. Ste. 220
                                      Little Rock, AR 72211

May 24, 2013

The Honorable Tim Griffin
2nd District, Arkansas
1501 North University Avenue, Suite 150
Little Rock, AR 72207

RE: Your Constituent, Rhea Riner

Dear Congressman Griffin,

This is in response to your correspondence dated February 15, 2013 on behalf of your
constituent, Rhea Lana Riner and her firm called Rhea Lana's Franchise Systems, Inc.
(Rhea Lana's). Ms. Riner contacted your office expressing her concerns in regards to an
investigation being conducted by our agency.

The Wage and Hour Division of the U.S. Department of Labor enforces numerous federal
labor laws including the Fair Labor Standards Act (FLSA). The FLSA contains provisions
and standards concerning minimum wage, overtime pay, record keeping and child labor.
For the FLSA to apply, a person must be engaged in work which is covered by the Act and
an employer- employee relationship must exist. As such, our agency is responsible for
ensuring the proper application of the federal labor laws we enforce with regards to
employers and employees.

The Little Rock District Office of the Wage and Hour Division is conducting an
investigation of the firm which indicates that Rhea Lana's had a number of workers, some
of which were viewed as employees and some as non-employee volunteers/consignors. We
have determined that most of these consignors are also employees of the firm as defined by
the FLSA.

In your correspondence you refer to the consent agreement signed by Rhea Lana's and the
Arkansas Department of Labor (ADL). In that consent agreement, Rhea Lana's agreed to
not have employees called "volunteers" perform work in the future without compensation.
The employer's agreement with the Arkansas State Department of Labor will benefit them
in their efforts to comply with federal law.

On May 20, 2013 our Investigator and Assistant District Director met with the employer and
their attorney to discuss the results of the investigation and inform them of the areas of non-
compliance. We reached agreement on some issues, but agreed another meeting is
advisable. That meeting will be scheduled in the near future.

DOL 0290

I trust this is responsive to your inquiry. If you should need further assistance, I may be reached at (501) 221-4607.

Sincerely,

Robert A. Darling
District Director

Enclosed: Fact Sheet #13

DOL 0291

**U.S. Department of Labor**  Wage & Hour Division
A. Maceo Smith Federal Building
525 Griffin Street, Room 800
Dallas, Texas 75202-5007



July 22, 2013

MEMORANDUM FOR:           ROBERT DARLING
                         District Director


FROM:   *Venecia Taylor for*      CYNTHIA C. WATSON
                         Regional Administrator


SUBJECT:                 RHEA LANA, INC.
                         Our File Number: 2013-225-09721
                         Whisard Id: 1677670
                         Little Rock District Office

The subject file (s) or correspondence is/are submitted for:

1. _____          Administrative Closing.
2. _____          Opinion Enclosed.
3. _____          Your information and/or inclusion in case file.
4. _____          Preparation of additional development.
5. __X____           Your use; file(s) has/have served their purpose.
6. _____          Consideration of attached complaint/correspondence
7. _____          Other.


REMARKS:

Subject file was referred to RSOL Attorney-Client Privilege ███████████████
Attorney-Client Privilege ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

Subject files are returned to your office Attorney-Client Privilege █████████.

Attachments: One (1) file (RHEA LANA, WHISARD ID 1677670).

DOL 0296

**– App. 295 –**

**U.S. Department of Labor**

| To: Nadia De La Rosa | Date: 6/27/13 |
|---|---|
| From: Robert Darling, District Director | Office: Arkansas District Office |

Subject:   Rhea Lana

**Informers' Privilege**

Whisard ID Number   1677670

This file was sent to the RO for a FOIA on 6-24-13.  On 6-25-13 we held a second JRC with

Margaret and Nadia in order to be able to send them the file to get a legal opinion.  Because

the file had already been sent, this 136 was sent electronically to be inserted in the file.

The ER is a consignment business dealing in children's items including clothing and toys.

ER uses the labor provided by the individuals who wish to sell their goods as well as their

family members (including children) to run their consignment business without compensation

to the workers.

ER had been previously investigated by the State of AR DOL. As a result, they were told that workers

were not ees as long as they did some consignment work.  This included managers.  ER felt that

WH was bound by the State's position.

While this is a nationwide industry and this ER is a leader in the industry, there is no history

of investigations that we could find.

ER has filed multiple congressionals, written an article in the USA today and appeared on

numerous television news pieces.  The attorney has stated that their goal is to get WH to

litigate with them.  Additionally, ER states that when the case is concluded, they intend to

request an opinion letter from the Administrator.

To Do:

1.  Forward the file to SOL to get a legal opinion of our enforcement position on this establishment.

Form WH-136

(Continue on Reverse Side If Necessary)

DOL 0297

## WHISARD Compliance Action Report

### U.S. Department of Labor
Wage and Hour Division

| | | | |
|---|---|---|---|
| Case ID: | **1677670** | Originating District: | **Little Rock AR District Office** |
| Informers' Privilege | | Investigating. District: | **Little Rock AR District Office** |
| WHMIS Case Number: | | Lead Investigator: | **Haynes, Tamara** |
| Registration Date: | **12/03/2012** | | |
| Assignment Date: | **12/18/2012** | | |

### Employer Information

| | | | |
|---|---|---|---|
| Trade Name: | **Rhea Lana's** | Legal Name: | **Rhea Lana, Inc.** |
| Address: | **1055 Sunflower Drive, Suite 104** | EIN: | PII |
| | | County: | **Faulkner** |
| | | NAICS Code: | **448130** |
| | **Conway, AR72034** | No. Of Employees: | **15** |

### Investigation Information

| | | | | |
|---|---|---|---|---|
| Period Investigated From: | **01/28/2011** | | BNPI: | |
| To: | **01/27/2013** | | Reinvestigation: | ☐ |
| Informers' Privilege | | | Recurring Violation: | ☐ |
| Investigation Tool: | **Full Investigation** | | Future Compliance Agreed: | ☑ |
| Compliance Status: | **Agree to Comply** | | Involved in AG: | ☐ |

### Recommended Action:

| | | | | |
|---|---|---|---|---|
| BWFS: | ☑ | | RO/NO Review: | ☐ |
| CMP: | ☐ | | Follow Up Investigation: | ☐ |
| Litigation: | ☐ | | Other Action: | ☐ |
| Civil Action: | ☐ | | Denial of Future Certificate: | ☐ |
| Criminal Action: | ☐ | | BW Payment Deadline: | **06/19/2013** |
| Submit For Opinion: | ☐ | | Trailer forms attached: | ☐ |

**CL**

| Violation / Compliance Status | Violations | | | | | CMPs* |
|---|---|---|---|---|---|---|
| **No Violation found for this act / Agree to Comply** | | | | $0.00 | $0.00 | |

Date: 06/20/2013 12:17:05 PM    Case ID:  1677670    Page 1

DOL 0299

## WHISARD Compliance Action Report

### FLSA

| Violation / Compliance Status | Violations | EEs ATP | BWs Computed | BWs Agreed | LDs Computed | LDs Agreed | CMPs* |
|---|---|---|---|---|---|---|---|
| *Failure to pay Minimum Wage / Agree to Comply* | 35 | 35 | $4,533.55 | $4,533.55 | $0.00 | $0.00 | $0.00 |
| *Failure to pay proper overtime / Agree to Comply* | 5 | 5 | $1,836.19 | $1,836.19 | $0.00 | $0.00 | $0.00 |
| *Failure to keep accurate records / Agree to Comply* | 1 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| *FLSA   Totals:* | 39 | 39 | $6,369.74 | $6,369.74 | $0.00 | $0.00 | |
| *Total Violations Under FLSA :* | | 41 | ███████████████████ | | | | $0.00 |

*\* CMPs computed do not necessarily indicate CMPs assessed.*

| | | | |
|---|---|---|---|
| Unduplicated Employees Found: | *39* | Unduplicated Employees Agreed: | *39* |
| Total Amount BWs Computed: | *$6,369.74* | Total Amount BWs Agreed: | *$6,369.74* |
| Total Amount LDs Computed: | *$0.00* | Total Amount LDs Agreed: | *$0.00* |

### Conclusions & Recommendations:

*80hrs.Enter coverage applicable for entire invest period.FC held with Mr./Mrs. Rhiner and Aaron Brook, Attorney.Sec 6 and 7viols found due to employer ded hrs worked.39 ees due $6,369.74.ER ATP/ATC.Ees aslo misclass as independent contr.Firm did not agree to comply.BWs were not computed per MODO instructions.Rec. No CMPs due to no hist and no CL viols.Rec 16b be mailed to potentially affected individuals. Rec. Admin close upon POP in DO.  Pubs;HRG,FLSA,516,541,778,785,CL-101.*

WHI Signature: _____  Date: ___*06/18/2013*___

Reviewed By: _____  Date: 6 -20 2013

Date: 06/20/2013 12:17:06 PM                Case ID:  1677670                Page 2

DOL 0300

**– App. 298 –**

Rhea Lana's Case ID: 1677670

Case ID: 1677670
Rhea Lana, Inc.
dba: Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, AR  72034
(501) 409-0009

EIN: PII ▓▓▓▓▓▓

## Informers' Privilege

This investigation is part of the Little Rock We Can Help (Little Rock We Can Help) initiative.

This investigation is part of the referrals from the state of AR DOL initiative.

### FLSA Narrative

### COVERAGE:

Subject firm operates semi-annual short term consignment sales of children's clothing and related items. The firm provides space for the sale, arranges advertising, and enables families to sell children's clothes, toys, and accessories at the event, and handles all other logistical and administrative details.  (See Exhibits D-15)

The firm is owned by Rhea Lana Riner  (50%) and Dave Riner (50%).  The firm was incorporated in the State of Arkansas on October 19, 2004.  There are approximately 15 employees.  All employees are covered on an enterprise basis under Section 3(s)(1)(a) for the entire investigative period.  The firms ADV in 2011; $1,862,431.000, 2010: $1,667,074.00.  In addition the firm regularly orders supplies such as children's toys from Connecticut.  The firm also has a current and functioning Internet Website (http://rhealana.com) .  (See Exhibits C-2)

Mr. and Mrs. Riner also own Rhea Lana's Franchise Systems ( PII ▓▓▓▓▓ ).   There are over 100 workers who are classified as independent contractors.  Rhea Lana's Franchise Systems operates in 21 different states in 62 locations.  (See Exhibits C-2, D-15, D-12, D-17, D-20)

Rhea Lana offers software services to independent consignment sales across the country. The software is now limited to Rhea Lana's Franchises exclusively.  Rhea Lana is the first web based computerized

Page 1

DOL 0301

– App. 299 –

Rhea Lana's Case ID: 1677670

children's consignment event in the country.  In 2008, the firm expanded in the form of Rhea Lana's Franchises.  By the end of 2008, the firm had 5 Rhea Lana events. Then in 2009,  the firm tripled in size with a total of 19 events in 9 states. In 2010, the firm had a total of 38 events in 15 states. By 2011 the ended with 47 events in 16 states. The year 2012 has expanded to 62 locations in 20 states.

Section 3(d) Employer: Mrs. Riner is the owner and person who meets the definition of § 3 (d) of the FLSA, as she is involved in the operation of the business and acts in direct interest of the corporation in relation to its employees.  (See B Exhibits)

## Rhea Lana's Franchise Systems Business Model

The firm holds 6 consignment events per year, in Conway, Arkansas and Little Rock Arkansas.  These events last 7 days.

The firm has 7 different classifications of workers: (See Exhibits D-17, D-18, D-15)

| Title | Work | Remuneration |
|---|---|---|
| Consignor | Enter items for sale in computer program, decide if items will go to "half-price" on last day is still unsold, package or otherwise prepare items for sale, tag sale items, bring sale items to sale location, check-in and price items, put items on display racks at sale location, pick-up or donate items at end of sale | 70% of the their selected sale price |
| | | |

Page 2

DOL 0302

– App. 300 –

Rhea Lana's Case ID: 1677670

| Worker | Same as Consignors plus work 1 five hour shift | Same benefits as Consignor plus the right to shop before the sale opens to the general public |
|---|---|---|
| Early Worker | Same as Consignors plus work 2 five hour shifts | Same benefits as Consignor plus the right to shop before the Workers |
| Super Mom | Same as Consignors plus work 3 five hour shifts | Same benefits as Consignor plus the right to shop before the Early Workers |
| Primo Mom | Same as Consignors plus work 4 five hour shifts | Same benefits as Consignor plus the right to shop before the Super Moms |
| Manager* | (30 to 40 of these) Same as Consignors, operate cash registers and helping consignors identify recall items plus they are asked to work at two of the three events held each season, a minimum of 25 hours each sale. Most accomplish this request. | Same benefits as Consignors plus the right to shop before the Primo Moms and paid $8 to $9 per hour for those hours in addition to hours required to obtain the desired shopping time. If they want to shop before Primo Moms they have to work a minimum of 12.5 hours and they are paid for every hour over 12.5. |
| Ops Manager* | (5 of these) Same as Managers and they are asked to work all three events per season and they work lots of hours. | Same benefits as Consignors plus the right to shop before the Managers and paid $14 to $15 per hour. |

On January 19, 2012, the firm entered into a consent agreement with the Arkansas Department of Labor, to change business practices and no longer use the worker classification; volunteers. A copy of that consent agreement can be found in exhibit E-4(c).

Despite the consent agreement, workers advertisement to recruit non-consignors can be found on Rhea Lana's website. The practice of the firm is to included numerous family members under one consignor number. Workers who had been classified as consignors in the past are still classified as consignors even if they work at a sales event but don't sell any of their goods. (See Exhibits D-22)

Page 3

DOL 0303

Rhea Lana's Case ID: 1677670

The period of investigation is January 28, 2011 until January 27, 2013.

The FLSA Handy Reference Guide was provided to Christy Hudson, Account Executive at the initial conference held January 28, 2013.

No 16(b) actions were reported by the firm.

**MODO**
The corporation is headquartered in Conway – AR, therefore the Little Rock District Office is the MODO. A MODO control record was requested and the case was associated on January 7, 2013.  (See exhibit D-2).

**EXEMPTIONS:**

541.101 was applicable for owners Dave Riner and Rhea Lana Riner as they own at least a bona fide 20 percent equity interest in the enterprise.  (See Exhibits C-2)

541.302 Creative Professionals asserted for Allison Crom- Graphic Communications Director.  Ms Crom's primary duties are creative design, graphic arts.  Paid a salary of at least $455 per week. (See Exhibits A-0, B-6)

541.302 Creative Professional asserted for Kailey Wood.  Ms. Woods primary duties are creative design, graphic arts.  She is paid a salary of at least $455 per week.  (See Exhibits A-0, B-16)

**STATUS OF COMPLIANCE:**



The firm alleged that most of the workers (all referred to as consignors) were not employees.  The

Page 4

DOL 0304

Rhea Lana's Case ID: 1677670

following is a breakdown of the employment relationship status: (See Exhibits D-7, D-8, D-10, D-12, D-15)

**1) The extent to which the services rendered are an integral part of the principal's business.**

The services performed are the primary type of work the principal performs for her customers/clients.

The services are clearly a distinct job that is part of the principal's overall process of production.

The alleged subcontractor (volunteer/consignor) does not supervise any of the principal's employees. In some instances individuals bring in family members to assist them in their responsibilities but those seem to be largely related to the responsibilities of the consignor/volunteer. (See Exhibits B-8, B-10, B-11, B-14, B-15)

**2) The permanency of the relationship.**

The individuals involved do not have a fixed employment period. The sales that occur happen twice a year so any labor performed occurs in blocks of time related to the timing of the sales.

The persons in question work for relatively short periods of time at irregular intervals in between personal activities. Thus far there is no indication of them working for others.

As projects are completed employees are given other project assignments

The persons in question do not work exclusively or almost exclusively for one company over a longer period of time. They work 2 times per year at the most. They can choose to sit out on a sale if they so choose without any negative repercussions.

A question in my mind is whether these are just seasonal employees working at a seasonal business. The percentage of turnover by workers from one sale to the next was not measurable because Rhea Lana did not keep track of that information. This seems to be a significant factor. (See Exhibits B-1, B-1, B-4, B-5, B-7, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15)

**3) The amount of the alleged contractor's investment in facilities and equipment.**

The amount of Investment by the consignors is very small. There is a fee paid to the Rhea Lana. The consigner's provide their own price tags but this is a minimal cost. The only equipment used is the individual's personal car used to transport the clothes from their house to the sale. Once at the sale, virtually all equipment/facilities used are provided by Rhea Lana. This includes the building in

Page 5

DOL 0305

Rhea Lana's Case ID: 1677670

which the sale occurs and the racks on which the clothing items are displayed. Regardless there are not a large amount of capital expenditures, such as risk capital and capital investments, not negligible items, or labor. As stated above, in some instances, the consignors/volunteers bring family members to help them. The job responsibilities of those family members are the same as the consignors

None of the consignors/volunteers has a company name or holds themselves out as an independent business person. However, none of them think of themselves as employees either.

Consignors provides materials and supplies

The consignors/volunteers are not charged rent for premises comparable to market value for generally equivalent premises as in the example of a dealer. However, they do pay a nominal fee of $9.50 and 30% of the sales. (See Exhibits B-1, B-1, B-4, B-5, B-7, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15)

**4) The nature and degree of control by the principal.**

Because the individuals in question think of themselves as neither employee nor independent contractor, they do not think of themselves as having their own employees to hire and fire. However, they do feel free to bring helpers with them. These individuals largely work as many hours as they please but there is an expectation that the workers communicate with Rhea Lana ahead of time.

As stated above, it is accurate to say that the individuals in question have the ability to terminate a relationship without incurring any liability.

Rhea Lana provides instructions on how work is to be done, determine sequence of work to be performed and trains workers. They do not set hours of work.

None of the consignors/volunteers are required to provide oral or written reports on the progress of work.

The consignors/volunteers are not restricted from working for anyone else. (See Exhibits B-1, B-1, B-4, B-5, B-7, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15)

**5) The alleged contractor's opportunities for profit and loss.**

The individuals in question do not bid on the job (labor and material). The reason the consignors/volunteers purchase the items sold is not so they can resell them, the items are for

Page 6

DOL 0306

**– App. 304 –**

Rhea Lana's Case ID: 1677670

their consumption and that of their families.  They later sell them but only as an afterthought.

None of the individuals are considered employees or independent contractors by Rhea Lana.  The individual consignors/volunteers can be a part of the sale or not, but there is no competition with other consignors/volunteers.  There is no bid process.

Consignors/volunteers do not "turn down a job" per se.  They are informed of a sale and if they want to sign up for it they do.  If they don't want to be a part of it they don't sign up. If they don't want to be a part of one sale, they can be a part of the next sale without sanctions against them.

Consignors/volunteers do not make any investments for insurance or bonding for business purposes.

Consignors can earn more money based on how they choose to market their items.  They choose which items are sold and are not sold. They choose the price of their items.  They choose how they will be displayed in the sale.  They choose if the items in question will be sold by themselves or as part of a group, sold as a group. The amount of profit made by the individual consignor will be clearly correlated with the mastery of these areas.

The vast majority (well over 99%), of income for consignors/volunteers, comes from other sources of income and not from selling goods at Rhea Lana or shops like Rhea Lana.

None of the consignors/volunteers is paid a fixed hourly rate. (See Exhibits B-1, B-1, B-4, B-5, B-7, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15)

**6) The amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor.**

As stated above, the earnings of the consignors depend completely upon their judgment or initiative.

Consignors have direct control over the essential determinants of profits in a business and direct share in the success of the business.

There are aspects of the work done by consignors/volunteers that is routine in nature.  Examples included picking up clutter/garbage in work areas, running the cash register, watching for shot lifters and general straightening.  Non-routine work which requires industry and efficiency related to the marketing of their products is listed above.

**7) The degree of independent business organization and operation.**

Neither the consignors or volunteers develop a business relationships with any other  contractors.

Page 7

DOL 0307

– App. 305 –

Rhea Lana's Case ID: 1677670

None of the consignors/volunteers considers themselves employees or independent contractors. The don't advertise independently. They do not use the yellow pages and don't have business cards. None has a separate business site.

Our investigation revealed that Rhea Lana's had a number of workers, some of whom they defined as employees and some not defined as employees by the employer.

There were numerous workers defined as employees by the employer prior to the above mentioned consent agreement reached with the State of Arkansas Department of Labor. These workers were paid in violation of the overtime provisions of the FLSA. We determined that these were non-exempt employees. When they worked more than 40 hours in a week, the firm paid them straight time for all hours worked. Additionally, those same workers were not paid for all hours worked when they worked at the sales. This also frequently resulted in overtime violations. These employees were identified as the firm's Managers.

The class of worker known as consignors/volunteers was not defined as employees by the employer but in our determination, most were employees.

In some cases consignors bring in items to be sold, drop them off and leave. In this instance, the incentive for consignors is the proceeds from the sale of their goods. We have not determined an employment relationship to exist for these workers. *It should be noted that this group represents a small part of the classifications examined.*

The majority of the workers refer to themselves as volunteers. Most workers have very similar duties. What distinguishes one worker from another is how many hours they work.
These workers price their items, bring them in, and set them up for display. Then they break them down after the sale. Most of the time, these workers spend additional time doing various other duties during the time of the sale including running the cash register, security, and assisting in the sales of everyone's goods including the sorting of those goods.

The incentive for consignors to work additional hours at an event is early purchasing access to the items being sold in the sale. In addition to providing goods for sale, most of the workers who refer to themselves as volunteers work a minimum of at least 5 hours for a sale. The more hours that are worked, the earlier purchasing access workers get to the sale. For example, b working one 5 hour shift, you receive a "Worker's Pass" allowing you to purchase the sale items before the sale begins. If you work two 5 hour shifts you receive an "Early Worker's Pass" to shop even earlier in the day. For working

Page 8

DOL 0308

Rhea Lana's Case ID: 1677670

3 shifts of 5 hours each, you are classified as a "Super Mom" and can purchase items before everyone else.

Workers can also accrue early access by advertising upcoming sales. They have the opportunity to go from house to house hanging door hangers advertising the sale. Workers can also place brochures and posters in preschool's, daycares, dance studios, and doctors' offices to advertise the sale. (See Exhibits B-1, B-1, B-4, B-5, B-7, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15, D-7, D-8, D-10, D-12, D-15)

**Section 6 - Minimum Wage**

35 employees (managers) were not paid the statutory minimum wage for all hours worked. These violations occurred as the result of the employer's practice of deducting hours worked by employees. The firm had the practice of deducting 12.5 hours for the opportunity of managers to shop early. (See Exhibits B-9, B-12, B-13, D-21)

**Method of back wage computation:**

Regular Rate = Total compensation ÷ Total Hours worked
MW differential= Regular Rate – MW
MW owed = MW differential x Hours worked

A total of $4,533.55 in back wages has been computed for the firms managers.

Minimum wage violations were also found for workers identified above as consignor/volunteers. Per MODO instructions back wages were not computed for this group of workers.

**Section 7 - Overtime**

5 employees (managers) were not paid time and one-half their regular rate of pay for working over 40 hours per week. These violations occurred as the result of the employer's practice of deducting hours worked by employees. The firm had the practice of deducting 12.5 hours for the opportunity of managers to shop early. (See Exhibits B-9, B-12, B-13, D-21)

**Method of back wage computation:**

Regular Rate = Total Compensation ÷ Total Hours worked

Page 9

DOL 0309

Rhea Lana's Case ID: 1677670

OT Rate= Regular Rate x 1.5
OT due = OT Rate * OT hours

A total of $1,836.19 in back wages has been computed.

Overtime violations also found for workers identified above as consignor/volunteers.  Per MODO instructions back wages were not computed for this group of workers.

**Section 11- Record Keeping**

The firm failed to maintain accurate records of the following for employees;

- Hours worked each day.
- Total hours worked each workweek.
- Regular hourly pay rate.
- Total daily or weekly straight-time earnings.
- Total overtime earnings for the workweek.

This was a result of the firm discarding employee (volunteer/consignor) time sheets after each event. (See Exhibits D-12(b))

**Section 12 - Child Labor**

No minors were employed contrary to the CL provisions of the FLSA.   (See Exhibits B-1 - B-16, D-19)

**DISPOSITION:**

On May 20, 2013 WHI Haynes and ADD Rodriguez met with the Dave Riner, Rhea Lana Riner, and Aaron Brooks Attorney at the Little Rock  District Office.  The firm was put on notice that they were not in compliance in all of the above areas.

This WHI discussed coverage (individual and enterprise), enterprise vs. establishment, exemptions, and the applicability of the FLSA (§ 6, 7, 11, 12).

The violations found were discussed in detailed, in particular minimum wage and overtime violations pertaining to the firm's managers.  The firm stated, that they indeed considered the managers to be employees of the firm and at one time previously paid these employees in accordance with Section 7 of the FLSA. Ms. Riner stated, the firm will not deduct hours worked from managers.  It was done as a

Page 10

DOL 0310

Rhea Lana's Case ID: 1677670

opportunity for these workers to shop early at an event.  WHI Haynes informed the firm, the deduction of these hours caused the firm to be in violation of Section 6 and 7 of the FLSA.  The firm also paid managers straight time for overtime.  This was discussed with the firm.

Regarding Firm's Remedy to the Section 6, 7, and 11 Violations in relationship to Managers:
During the final conference held with Mr. and Ms. Riner, the employer has agreed to fully comply in the future with all applicable provisions of the FLSA in regards to the firms managers; in particular, the employer will do the following:
1. Pay all non-exempt managers at least the applicable MW in effect for all the hours worked.
2. Employer will pay all non-exempt managers (paid on an hourly basis) overtime at one and one-half their rate of pay for the hours worked over 40 in a work week.
3. Employer will keep accurate record of the daily and weekly hours worked by all non-exempt managers.  (See Exhibits D-7)

   Employer also stated,  will continue compliance with the Child Labor Regulations.

Regarding Sections 6, 7, and 11 Violations (misclassified workers):

The firm has not agreed to compliance in regards misclassified volunteers.  WHI Haynes informed the firm, the workers known as consignor/volunteers are indeed employees of the firm. WHI Haynes discussed employment relationship status with Mr. and Mrs. Riner.  The firm was put on notice, they were not in compliance in regards to these workers.  WHI Haynes informed the firm, these employees need to be paid in accordance with Section 6, 7 and 11 of the FLSA. (See Exhibits D-8, D-10)

Regarding Firm's Remedy to the Section 6, 7, and 11 Violations:
In a letter sent to WHI Haynes on June 5, 2013 via the firm's attorney, Tad Bohannon.  The firm states "we do not believe that individuals who assist with Rhea Lana's consignment sales events are "employees" under the FLSA."  (See Exhibits D-8)

On June 5, 2013, the firm agreed to pay the back wages owed to the managers. The Summary of Unpaid Wages, form WH-56, was signed and dated by Ms. Rhea Lana Riner.  The employer will provide proof of payment by using forms WH-58.

On June 12, 2013 the firm provided compliance in regards to the firm's manager via mail through Attorney Tad Bohannon.  (See Exhibits D-7)

Page 11

DOL 0311

Rhea Lana's Case ID: 1677670

# Informers' Privilege

Civil Money Penalties:
During the final conference, this WHI discussed with Mr. and Mrs. Riner the MW/OT provisions of the FLSA, and that future violations could result in the assessment of CMPs.

Publications Provided:
During the final conference, the following publications were provided to Mr. and Mrs. Riner; FLSA, 516, 541, 778, 785, CL-101.

Recommendations:
This WHI recommends the following:

# Deliberative Process Privilege

Rhea Lana Riner, Owner
PII
P.O. Box 1022
Conway, Ar. 72034

Tad Bohannon, Attorney
(501) 371-0808
200 West Capital Avenue, Suite 2300
Little Rock, Arkansas 72201

WHI Tamara Haynes

Page 12

DOL 0312

**U.S. Department of Labor**

Wage and Hour Division
10180 Executive Center Drive Suite 220
Little Rock, AR  72211
Phone: 501-223-9114
Fax: 501-223-8734

August 26, 2013

Rhea Lana Rhiner
c/o Rhea Lana's
1055 Sunflower Drive, Suite 104
Conway, AR  72034

Subject:  FLSA - Minimum Wage/Overtime Violations of Rhea Lana, Inc. dba Rhea Lana's and Rhea Lana an individual

File Number:  1677670

Dear Ms. Rhiner:

The recent investigation of your firm conducted by Investigator Haynes under the Fair Labor Standards Act (FLSA) covered the period 01/28/2011 to 01/27/2013.  The investigation disclosed that your employees are subject to the requirements of the FLSA.

The investigation disclosed violations of FLSA section 6 resulting from the failure to pay employees at least the applicable minimum wage for all hours worked and/or FLSA section 7 resulting from the failure to pay statutory overtime pay for hours worked in excess of 40 hours per week. You agreed to pay $6,369.74 due to 39 employees. Investigator Haynes has advised me that you have agreed to comply with the employees identified as managers and that you have agreed to pay the above-described back wages in full by 06/19/2013.

It is further my understanding that you refuse to comply with the employee group known as consignors/volunteers. Letters have been sent to the consignors/volunteers informing them of their private right under the FLSA to bring an independent suit to recover any back wages due.

We would like to direct your attention to section 16(e) of the FLSA and Regulations, Part 578.  As you will note, section 16(e) provides for the assessment of a civil money penalty for any repeated or willful violations of section 6 or 7, in an amount not to exceed $1,100 for each such violation.  No penalty is being assessed as a result of this investigation.  If at any time in the future your firm is found to have violated the monetary provisions of the FLSA, it will be subject to such penalties.

Copies of the FLSA, Regulation 578, and a Handy Reference Guide are enclosed for your reference. If you have any questions about the investigation or about any aspect of the FLSA, please do not hesitate to contact me or Investigator Haynes.

Sincerely,

Robert A. Darling
District Director

DOL 0379

**– App. 311 –**

**TIM GRIFFIN**
2ND DISTRICT, ARKANSAS
ASSISTANT MAJORITY WHIP

1501 NORTH UNIVERSITY AVENUE
SUITE 150
LITTLE ROCK, AR 72207
PHONE: (501) 324-5941
FAX: (501) 324-6029

1232 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
PHONE: (202) 225-2506
FAX: (202) 225-5903

## Congress of the United States
## House of Representatives
### Washington, DC 20515-0402

**COMMITTEE ON ARMED SERVICES**
SUBCOMMITTEE ON READINESS
SUBCOMMITTEE ON
SEAPOWER AND PROJECTION FORCES

**COMMITTEE ON THE JUDICIARY**
SUBCOMMITTEE ON CRIME,
TERRORISM, AND HOMELAND SECURITY
SUBCOMMITTEE ON INTELLECTUAL PROPERTY,
COMPETITION, AND THE INTERNET

**COMMITTEE ON FOREIGN AFFAIRS**
SUBCOMMITTEE ON EUROPE AND EURASIA
(VICE CHAIRMAN)
SUBCOMMITTEE ON TERRORISM,
NONPROLIFERATION, AND TRADE
SUBCOMMITTEE ON AFRICA,
GLOBAL HEALTH, AND HUMAN RIGHTS

February 15, 2013

The Honorable Hilda Solis
Secretary
U.S. Department of Labor
200 Constitution Ave NW
Washington, DC 20210-0001

Dear Secretary Solis:

I write to express my concerns regarding the U.S. Department of Labor's (DOL) audit of Rhea Lana's Franchise Systems, Inc. (Rhea Lana's), located in Conway, Arkansas. Rhea Lana's is a children's consignment event that franchises in over sixty locations. I am concerned that the audit is unnecessarily requesting to interview consignors who assist with the sale of items (including their own) at Rhea Lana's events, and inaccurately identifying these individuals as employees.

Rhea Lana's depends on these unpaid consignors to work the events, which provide essential low cost products for individuals and families. In January 2012, Rhea Riner, the owner of Rhea Lana's, signed a consent agreement with the Arkansas Department of Labor (ADL) regarding the ADL's investigation into the use of unpaid labor. In the consent agreement, both parties agreed that the consignors are not employees within the meaning of the Arkansas Minimum Wage Act. According to Dave and Rhea Riner, the U.S. Department of Labor (DOL) has undertaken a federal audit of Rhea Lana's and the federal auditor has requested Rhea Lana's supply the names and contact information of consignors, presumably to conduct interviews. These consignors are customers of Rhea Lana's, and there is concern that interviewing these individuals exceeds the requirements of the audit and would cause undue harm to Rhea Lana's and the consignment industry. I have enclosed a copy of Rhea Lana's consent agreement with the ADL for your review.

According to the DOL Wage and Hour Division, a federal auditor may question employees to determine if there has been a violation of the Fair Labor Standards Act (FLSA). I would appreciate your review of Rhea Lana's complaint that the federal auditor's request to speak with consignors exceeds the scope of the federal audit. Further, I request that the DOL provide me with information on how the agency has determined that consignors for Rhea Lana's be considered employees under the FLSA for the purpose of this audit.

I appreciate your consideration of my request and any assistance you can provide in resolving this issue. My office contact for this issue is Peter Comstock at Peter.Comstock@mail.house.gov or (202) 226-8497. Thank you.

Sincerely,

Tim Griffin
Member of Congress

Enclosure

711470

**U.S. Department of Labor**      Wage and Hour Division
Washington, D.C. 20210



JUN - 5 2013

The Honorable Tim Griffin
U.S. House of Representatives
Washington, D.C. 20515

Dear Congressman Griffin:

Thank you for your letter to former Secretary of Labor Hilda L. Solis regarding your concerns with the Wage and Hour Division's (WHD) Little Rock Arkansas District Office investigation of Rhea Lana's Franchise Systems, Inc., located in Conway, Arkansas.

This investigation is not yet complete and it is the long-standing policy of the WHD not to discuss the details of an open investigation. I am forwarding your correspondence to Randall O'Neal, Director of Enforcement at the WHD's Southwest Regional Office (RO). The RO has administrative jurisdiction over this matter and will respond to you directly. Or, you may contact Mr. O'Neal at:

525 S. Griffin Street, Suite 800
Dallas, Texas 75202
Ph: (972) 850-2642

Thank you again for your letter. Please be assured we are looking into this matter. If we may be of further assistance to you or your staff, please contact Nikki McKinney in the Office of Congressional and Intergovernmental Affairs at (202) 693-4600.

Sincerely,

Derrick J. Witherspoon
Branch of Fair Labor Standards Branch and Child Labor
Division of Enforcement Policy and Procedures

RECEIVED 2013 JUN 10 PM 5: 02 EXEC. SECRETARIAT OSEC-DOL

**Congress of the United States**
Washington, DC 20515

July 18, 2013

Mary Beth Maxwell
Acting Deputy Administrator
U.S. Department of Labor
Wage and Hour Division
200 Constitution Ave
Washington, DC 20210-0001

Dear Ms. Maxwell:

We write to seek information about the U.S. Department of Labor's (DOL) audit of Rhea Lana's Franchise Systems, Inc. (Rhea Lana's), located in Conway, Arkansas. Rhea Lana's is a children's consignment event whose franchises hold periodic events in more than sixty locations around the nation. At the center of the audit is the issue of whether or not the consignors at Rhea Lana's events should be considered employees under the Fair Labor Standards Act (FLSA). We urge the DOL Wage and Hour Division to further review the audit and provide our offices with additional information on DOL's decision to pursue this case under FLSA.

In January 2012, Rhea Riner, the owner of Rhea Lana's signed a consent agreement with the Arkansas Department of Labor (ADL) that stated that individuals who sell their items at Rhea Lana's consignment events are considered "consigners" and are not employees within the meaning of the Arkansas Minimum Wage Act. As we understand, the participation by the consigners is completely voluntary, and, if they do choose to participate, they retain 70 percent of the revenue from their sales, and Rhea Lana's retains the remaining 30 percent. At the conclusion of these events, Rhea Lana's donates unsold items to local organizations and schools.

It is our understanding that DOL has allowed for exemptions from FLSA for volunteers who receive minimal compensation for their services. We request that you provide our offices with incidents or examples of when DOL considers compensated volunteers as exempt from FLSA minimum wage requirements. We also request any directives, documentation, or communications to local DOL offices or field investigators, or any changes to or restatements of policy, relating to the enforcement or treatment of voluntary consignments or volunteer arrangements under the FLSA. Further, we request that DOL provide additional guidance to Rhea Lana's in order to facilitate their continuation of services in providing children and families with affordable and donated goods through the use of their volunteer consignors. We request that you provide this information to our offices no later than July 26, 2013. Thank you for your consideration of our request.

Sincerely,

Mark Pryor
United States Senator

John Boozman
United States Senator

PRINTED ON RECYCLED PAPER

**– App. 314 –**

Mary Beth Maxwell
July 18, 2013
Page 2 of 2

Rick Crawford
Member of Congress

Tim Griffin
Member of Congress

Steve Womack
Member of Congress

Tom Cotton
Member of Congress



## U.S. Wage and Hour Division

Little Rock District Office,   10810 Executive Center Drive, Suite 220,   Little Rock, AR 72211

August 6, 2013

Subject:  Rhea Lana, Inc. d/b/a Rhea Lana's – 1677670

To Whom It May Concern:

A recent investigation of the above named firm under the Fair Labor Standards Act (FLSA) indicates that you might not have been paid as required by the law for the period 01/28/2011 to 01/27/20136.  The FLSA requires employers to pay each employee covered by the Act no less than the federal minimum wage and overtime premium pay (at time and one-half the regular rate of pay) for all hours worked in excess of 40 hours in a single workweek.  The law contains numerous exemptions from these basic standards.

The Wage and Hour Division contacted the firm and explained the FLSA wage requirements, but the firm did not agree to make payments to you.  Under the law, the Wage and Hour Division has the authority to supervise voluntary payment of back wages but cannot itself order such payment.  The Department of Labor (Department) is authorized to file lawsuits against employers and request that a court order the payment of back wages; however, after reviewing all of the circumstances in this case, it has been decided and it is not suitable for litigation by the Department. Consequently, no further action will be taken to secure payment of additional money possibly owed to you.

The fact that we will take no further action on your behalf does not affect your private right under the FLSA to bring an independent suit to recover any back wages due.  The Congress, recognizing that all complaints may not be resolved or developed for litigation by the Department, has included provisions in FLSA to bring an independent suit to recover any back wages and an equal amount as liquidated damages plus attorney's fees and court costs.  The Department does not encourage or discourage such suits.  The decision is entirely up to you.   However, keep in mind that recovery of back wages under this law is subject to a statute of limitations.  Generally, this means that any part of a back wage claim which was earned more than two years before suit is filed may not be collectible.

A copy of the Handy Reference Guide to the Fair Labor Standards Act is enclosed for your information.

Sincerely,

Robert A. Darling
District Director

Link in e-mail:   Handy Reference Guide

**– App. 316 –**

U.S. Department of Labor

Wage and Hour Division
Washington, D.C. 20210



AUG 3 0 2013

The Honorable Tim Griffin
U.S. House of Representatives
Washington, D.C. 20515

Dear Congressman Griffin:

Thank you for your letter to Acting Deputy Administrator Mary Beth Maxwell regarding the U.S. Department of Labor (DOL), Wage and Hour Division's (WHD) investigation of Rhea Lana's Franchise Systems, Inc. (Rhea Lana's), located in Conway Arkansas. You ask whether or not the consignors at Rhea Lana's events should be considered employees under the Fair Labor Standards Act (FLSA) and request additional information on the WHD decision to pursue this case.

The FLSA provides that certain volunteers may receive nominal compensation for their services. Section 3(e)(4)(A) of the FLSA provides that the term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State or an interstate governmental agency if the individual receives no compensation or is paid expenses, reasonable benefits or a nominal fee to perform the services for which the individual volunteered and such services are not the same type of services which the individual is employed to perform for such public agency. Examples of volunteers for public agencies include volunteer firefighters, reserve police officers, emergency medical technicians, ambulance drivers, high school coaches, and advisors for extracurricular school activities.

Section 203(e)(5) of the FLSA provides that the term "employee" does not include individuals who volunteer their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries.

WHD communicates to its offices and investigators impart, through the WHD Field Operations Handbook (FOH). The FOH provides WHD investigators and staff with interpretations of statutory and regulatory provisions, procedures for conducting investigations, and general administrative guidance. The FOH reflects policies established through changes in legislation, regulations, significant court decisions, and the decisions and opinions of the WHD Administrator. FOH section 10b03(c) addresses volunteers (copy enclosed). It states "the nature of religious, charitable, and similar nonprofit organizations, and schools is such that individuals may volunteer their services in one capacity or another, usually on a part-time basis, not as employees or in contemplation of pay for the services rendered."

The FLSA recognizes the generosity and public benefits of volunteering and allows individuals to freely volunteer in many circumstances for charitable and public purposes. The WHD has recognized that a person may volunteer time to religious, charitable, civic, humanitarian, or similar non-profit organizations. Such a person will not be considered an employee for FLSA purposes if the individual volunteers freely for public services, religious or humanitarian objectives, and without contemplation or receipt of compensation.

The FLSA defines employment very broadly for work performed for a for-profit employer covered by the FLSA. In prior opinion letters, for example, the WHD considered whether the FLSA permitted covered retailers to use members of a charitable organization to wrap Christmas presents or to count inventory in exchange for payments to the charities in lieu of paying wages directly to the workers. The WHD concluded that the protections of the FLSA applied to the members of the charitable organization. In both cases the individuals engaged in activities that were an integral part of the FLSA-covered, for-profit retailer's business. Accordingly, the company's costs of doing business and profitability were favorably enhanced by the proposed "volunteer" activity.

This distinction between "ordinary volunteerism" and the performance of FLSA-covered "work" by employees for commercial profit-making companies has been acknowledged by the U.S. Supreme Court. The Court has recognized that a fundamental purpose of the FLSA was to prevent covered employers from gaining an unfair competitive advantage over other employers through payment of substandard wages. The Court has also recognized that individuals may not waive their statutory entitlements under the FLSA by characterizing the activities they perform for a covered employer as "volunteer." _See Tony and Susan Alamo Foundation v. Secretary of Labor_, 471 U.S. 290, 299 (1984); _Brooklyn Savings Bank v. O'Neil_, 324 U.S. 697 (1945). In its only decision directly addressing the status of volunteers under the FLSA, the Supreme Court stated that the purposes of the FLSA "require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act. * * * Such exceptions to coverage would affect many more people than those workers directly at issue in this case and would be likely to exert a general downward pressure on wages in competing businesses." _Alamo Foundation_, 471 U.S. at 302. _See_ Wage and Hour Opinion Letter FLSA2002-9, Oct. 7, 2002 (copy enclosed).

Section 203(g) of the FLSA defines employment very broadly to include "to suffer or permit to work." In the application of the FLSA, as distinguished from a person who is engaged in a business of his or her own, is one who as a matter of economic reality follows the usual path of an employee and is dependent on the business which he or she serves. The employer-employee relationship under the FLSA is tested by "economic reality" rather than "technical concepts." It is not determined by the common law standards relating to master and servant. _See_ Fact Sheet #13: Employment Relationship Under the FLSA (copy enclosed).

The WHD has a long standing policy of limiting volunteer status to those individuals performing charitable activities by for-profit organizations. The WHD determined that consignor's at Rhea Lana's events who brought in items to be sold, dropped them off, and then left the premises, were not employees. However, other workers who considered themselves to be "volunteers" and any consignors who also worked at the event (operating the cash register, providing security, and assisting in the sorting and sales of goods) were found to be employees. The WHD determined that the "volunteers" and "consignor volunteers" engaged in activities that are an integral part of the Rhea Lana's FLSA-covered, for-profit business.

Thank you again for your concerns in this important area. If we may be of further assistance to you or your staff, please contact Nikki McKinney in the Office of Congressional and Intergovernmental Affairs at (202) 693-4600.


Sincerely,

Laura A. Fortman
Principal Deputy Administrator

Rev. 596                    FIELD OPERATIONS HANDBOOK - 10/20/93                    10b - 10b03

10b      THE EMPLOYMENT RELATIONSHIP

10b00    Employment relationship required for FLSA to apply.

In order for the FLSA to apply there must be an employee-employer relationship.  This requires an
"employer" and "employee" and the act or condition of employment:  FLSA Secs 3(d), (e) and (g)
define the terms "employer", "employee", and "employ".

10b01    FLSA employment relationship distinguished from the common law concept.

The courts have made it clear that the employment relationship under the FLSA is broader than the
traditional common law concept of the master and servant relationship.  The difference between the
FLSA employment relationship and the common law employment relationship arises from the FLSA
statement that "Employ includes to suffer or permit to work".  The courts have indicated that, while
"to permit" requires a more positive action than "to suffer", both terms imply much less positive
action than required by the common law. Mere knowledge by an employer of work done for him or
her by another is sufficient to create the employment relationship under the FLSA.

10b02    Method of compensation not material.

The fact that no compensation is paid and the worker is dependent entirely on tips does not negate
his/her status as an employee, if other indications of employment are present.  If the worker is paid,
the fact that he or she is paid by the piece or by the job or on a percentage or commission basis rather
than on the basis of work time does not preclude a determination that the worker is, on the facts, an
employee with respect to the work for which such compensation is received.

10b03    Religious, charitable, and nonprofit organizations, schools institutions, volunteer workers,
         member of religious orders.

   (a)   There is no special provision in the FLSA which precludes an employee-employer relationship
         between a religious, charitable or nonprofit organization and persons who perform work for such an
         organization.  For example, a church or religious order may operate an establishment to print books,
         magazines, or other publications and employ a regular staff who do this work as a means of
         livelihood.  In such cases there is an employee-employer relationship for purposes of the Act.

   (b)   Persons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious
         orders who serve pursuant to their religious obligations in the schools, hospitals, and other institutions
         operated by their church or religious order shall not be considered to be "employees". However, the
         fact that such a person is a member of a religious order does not preclude an employee-employer
         relationship with a State or secular institution.

   (c)   In many cases the nature of religious, charitable and similar nonprofit organizations, and
         schools is such that individuals may volunteer their services in one capacity or another,
         usually on a part-time basis, not as employees or in contemplation of pay for the services
         rendered.  For example, members of civic organizations may help out in a sheltered
         workshop; women's organizations may send members or students into hospitals or nursing
         homes to provide certain personal services for the sick or the elderly; mothers may assist in a
         school library or cafeteria as a public duty to maintain effective services for their children;

USCA Case #17-5259   Document #1718347       Filed: 02/16/2018   Page 325 of 330

Rev. 596                 FIELD OPERATIONS HANDBOOK - 10/20/93                 10b03 -2

or fathers may drive a school bus to carry a football team or band on a trip. Similarly, individuals may volunteer to perform such tasks as driving vehicles or folding bandages for the Red Cross, working with children with disabilities or disadvantaged youth, helping in youth programs as camp counselors, scoutmasters, den mothers, providing child care assistance for needy working mothers, soliciting contributions or participating in benefit programs for such organizations and volunteering other services needed to carry out their charitable, educational, or religious programs. The fact that services are performed under such circumstances is not sufficient to create an employee-employer relationship.

(d) Although the volunteer services (as described in (c) above) are not considered to create an employment relationship, the organizations for which they are performed will generally also have employees performing compensated service whose employment is subject to the standards of the Act. Where such an employment relationship exists, the Act requires payment of not less than the statutory wages for all hours "worked" in the w/w. However, there are certain circumstances where such an employee may donate services as a volunteer, and the time so spent is not considered to be compensable "work". For example, an office employee of a hospital may volunteer to sit with a sick child or elderly person during off-duty hours as an act of charity. WH will not consider that an employee-employer relationship exists with respect to such volunteer time between the establishment and the volunteer or between the volunteer and the person for whose benefit the service is performed. Another example is where an office employee of a church may volunteer to perform non-clerical services in the church preschool during off duty time from his or her office work as an act of charity. Conversely, a preschool employee may volunteer to perform work in some other facet of the church's operations without an employment relationship being formed with respect to such volunteer time. However, this does not mean that a regular office employee of a charitable organization can volunteer services on an uncompensated basis to handle correspondence in connection with a special fund drive or to handle other work arising from exigencies of the operations conducted by the employer.

(e) As part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramural and interscholastic athletics and other similar endeavors. Activities of students in such programs, conducted primarily for the benefit of the participants as a part of the educational opportunities provided to the students by the school or institution, are not "work" of the kind contemplated by Sec 3(g) of the Act and do not result in an employee-employer relationship between the student and the school or institution. Also, the fact that a student may receive a minimal payment for participation is such activities would not necessarily create an employment relationship.

(f) The sole fact that a student helps in a school lunchroom or cafeteria for periods of 30 minutes to an hour per day in exchange for their lunch is not considered to be sufficient to make him or her an employee of the school, regardless of whether he or she performs such work regularly or only on occasion. Also, the fact that students on occasion do some cleaning up of a classroom, serve the school as junior patrol officers or perform minor clerical work in the school office or library for periods of an hour per day or less without contemplation of compensation or in exchange or a meal or for a cash amount reasonably equivalent to the price of a meal or, when a cash amount is given in addition to a meal, it is only a nominal sum, is not considered sufficient in itself to characterize the students as employees of the school. A similar policy will be followed where the students perform such tasks less frequently but for a full day, with an arrangement to perform their academic work for such days at other times. For example, the students may perform full-day cafeteria service four times per year. In such cases, the time devoted to cafeteria work in the aggregate would be less than if the student worked an hour per day. However, if there are other indicia of employment or the students

**– App. 321 –**

**U.S. Department of Labor**
Wage and Hour Division



U.S. Wage and Hour Division
(Revised July 2009)

## Fact Sheet #13: Employment Relationship Under the Fair Labor Standards Act (FLSA)

This fact sheet provides general information concerning the meaning of "employment relationship" and the significance of that determination in applying provisions of the FLSA.

### Characteristics

An employment relationship under the FLSA must be distinguished from a strictly contractual one. Such a relationship must exist for any provision of the FLSA to apply to any person engaged in work which may otherwise be subject to the Act. In the application of the FLSA an employee, as distinguished from a person who is engaged in a business of his or her own, is one who, as a matter of economic reality, follows the usual path of an employee and is dependent on the business which he or she serves. The employer-employee relationship under the FLSA is tested by "economic reality" rather than "technical concepts." It is not determined by the common law standards relating to master and servant.

The U.S. Supreme Court has on a number of occasions indicated that there is no single rule or test for determining whether an individual is an independent contractor or an employee for purposes of the FLSA. The Court has held that it is the total activity or situation which controls. Among the factors which the Court has considered significant are:

1) The extent to which the services rendered are an integral part of the principal's business.

2) The permanency of the relationship.

3) The amount of the alleged contractor's investment in facilities and equipment.

4) The nature and degree of control by the principal.

5) The alleged contractor's opportunities for profit and loss.

6) The amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor.

7) The degree of independent business organization and operation.

There are certain factors which are immaterial in determining whether there is an employment relationship. Such facts as the place where work is performed, the absence of a formal employment agreement, or whether an alleged independent contractor is licensed by State/local government are not considered to have a bearing on determinations as to whether there is an employment relationship. Additionally, the Supreme Court has held that the time or mode of pay does not control the determination of employee status.

### Requirements

When it has been determined that an employer-employee relationship does exist, and the employee is engaged in work that is subject to the Act, it is required that the employee be paid at least the Federal minimum wage of $7.25 per hour effective July 24, 2009, and in most cases overtime at time and one-half his/her regular rate of pay for all hours worked in excess of 40 per week. The Act also has youth employment provisions

FS 13

which regulate the employment of minors under the age of eighteen, as well as <u>recordkeeping</u> requirements.

**Typical Problems**

(1) One of the most common problems is in the construction industry where contractors hire so-called independent contractors, who in reality should be considered employees because they do not meet the tests for independence, as stated above. (2) Franchise arrangements can pose problems in this area as well. Depending on the level of control the franchisor has over the franchisee, employees of the latter may be considered to be employed by the franchisor. (3) A situation involving a person volunteering his or her services for another may also result in an employment relationship. For example, a person who is employee cannot "volunteer" his/her services to the employer to perform the same type service performed as an employee. Of course, individuals may volunteer or donate their services to religious, public service, and non-profit organizations, without contemplation of pay, and not be considered employees of such organization. (4) Trainees or students may also be employees, depending on the circumstances of their activities for the employer. (5) People who perform work at their own home are often improperly considered as independent contractors. The Act covers such homeworkers as employees and they are entitled to all benefits of the law.

**Where to Obtain Additional Information**

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**U.S. Department of Labor**
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

1-866-4-USWAGE
TTY: 1-866-487-9243
<u>Contact Us</u>

**– App. 323 –**

Rhea Lana's Case ID: 1677670

The period of investigation is January 28, 2011 until January 27, 2013.

The FLSA Handy Reference Guide was provided to Christy Hudson, Account Executive at the initial conference held January 28, 2013.

No 16(b) actions were reported by the firm.

**MODO**
The corporation is headquartered in Conway – AR, therefore the Little Rock District Office is the MODO. A MODO control record was requested and the case was associated on January 7, 2013.  (See exhibit D-2).

**EXEMPTIONS:**

541.101 was applicable for owners Dave Riner and Rhea Lana Riner as they own at least a bona fide 20 percent equity interest in the enterprise.  (See Exhibits C-2)

541.302 Creative Professionals asserted for Allison Crom- Graphic Communications Director.  Ms Crom's primary duties are creative design, graphic arts.  Paid a salary of at least $455 per week. (See Exhibits A-0, B-6)

541.302 Creative Professional asserted for Kailey Wood.  Ms. Woods primary duties are creative design, graphic arts.  She is paid a salary of at least $455 per week.  (See Exhibits A-0, B-16)

**STATUS OF COMPLIANCE:**

This firm has no history with the Wage and Hour Division.



The firm alleged that most of the workers (all referred to as consignors) were not employees.  The

Page 4

Rhea Lana's Case ID: 1677670

# Informers' Privilege

Civil Money Penalties:
During the final conference, this WHI discussed with Mr. and Mrs. Riner the MW/OT provisions of the FLSA, and that future violations could result in the assessment of CMPs.

Publications Provided:
During the final conference, the following publications were provided to Mr. and Mrs. Riner; FLSA, 516, 541, 778, 785, CL-101.

Recommendations:
This WHI recommends the following:
1. No CMPs are recommended at this time, as this is the employer's first investigation. In addition, there were violations of child labor found. The employer has agreed to future compliance in regards to th firm's managers and to pay all the back wages owed to these employees.
2. Case to be reviewed and administratively closed once proof of payment has been received in the district office.
3. 16b letters mailed to individuals potentially affected by the con-compliance employer's position.

Deliberative Process Privilege

Rhea Lana Riner, Owner
PII
P.O. Box 1022
Conway, Ar. 72034

Tad Bohannon, Attorney
(501) 371-0808
200 West Capital Avenue, Suite 2300
Little Rock, Arkansas 72201

WHI Tamara Haynes

Page 12

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2018 I electronically filed the foregoing

Joint Appendix with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system,

thereby serving all persons required to be served.


Date: February 16, 2018                  */s/Joshua N. Schopf*
                                         Joshua N. Schopf